## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 06-613-SLR |
| | ) | |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPENING MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

ASHBY & GEDDES
Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Dated: December 13, 2006

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

    I.      J&J's Statements to Financial Analysts .................................................... 4

    II.     The Petitions to Make Special Filed in Related Applications ............................ 11

    III.    J&J's Action Against Boston Scientific, Guidant and Abbott for Breach
          of Contract and Tortious Interference ................................................................. 12

LEGAL STANDARDS ..................................................................................................... 13

ARGUMENT ..................................................................................................................... 14

    I.      J&J's STATEMENTS DO NOT CREATE DECLARATORY
         JUDGMENT JURISDICTION .............................................................................. 14

         A.     J&J's Statements Were Made to Raise Legitimate Antitrust and
               Regulatory Concerns About Boston Scientific's Takeover Bid, Not
               to Threaten Litigation. ........................................................................... 14

         B.     The Statements Made by the Analysts and Reporter Do Not Give
               Rise to a *Reasonable* Apprehension of Suit .................................................. 16

         C.     Even in the Licensing Context, J&J's Statements Would Be
               Insufficient to Create Jurisdiction. ......................................................... 19

         D.     J&J Has Never Made Threats of Litigation, Either to Abbott or Its
               Customers. .............................................................................................. 21

    II.     THE PETITIONS TO MAKE SPECIAL FILED IN PENDING PATENT
         APPLICATIONS NOT AT ISSUE IN THIS CASE DO NOT GIVE RISE
         TO A *REASONABLE* APPREHENSION OF SUIT. ............................................. 22

    III.    UNRELATED LITIGATION BETWEEN J&J AND ABBOTT DOES
         NOT GIVE RISE TO A CASE OR CONTROVERSY BASED ON THE
         PATENTS-IN-SUIT. ............................................................................................ 24

    IV.    EVEN IF THE COURT WERE TO FIND AN ACTUAL
         CONTROVERSY, IT SHOULD EXERCISE ITS DISCRETION NOT TO
         HEAR THIS CASE ............................................................................................... 25

CONCLUSION .................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*AngioDynamics, Inc. v. Diomed Holdings, Inc.*, No. 06-02 GMS, 2006 WL 2583107 (D. Del. September 7, 2006) .........................................................21

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731 (Fed. Cir. 1988) ..............................................................................................14, 21, 25

*BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993) .....................................................................................13, 14, 15, 16, 21

*Bausch & Lomb, Inc. v. CIBA Corp.*, 39 F. Supp. 2d 271 (W.D.N.Y. 1999) ....................17

*Cygnus Therapeutics System v. Alza Corp.*, 92 F.3d 1153 (Fed. Cir. 1996) ..............15, 22

*DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Delaware, Inc.*, 148 F. Supp. 2d 412 (D. Del. 2001) ...........................................................19, 20, 24

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)........................................19, 25

*Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985) ...................................24

*MedImmune, Inc. v. Centocor, Inc.*, 409 F.3d 1376 (Fed. Cir. 2005)..................................3

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051 (Fed. Cir. 1995) .....................................................................................14, 19, 20

*Serco Services Co. v. Kelley Co.*, 51 F.3d 1037 (Fed. Cir. 1995).................................4, 25

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992)............13, 14, 18, 19, 20, 23

*Vermeer Manufacturing Co. v. Deere & Co.*, 379 F. Supp. 2d 645 (D. Del. 2005) ....19, 20

*West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295 (Fed. Cir. 1992) ..............................................................................................16, 17, 22

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ..............................................................25

### FEDERAL STATUTES

28 U.S.C. § 2201.................................................................................................................13

## INTRODUCTION

This declaratory judgment action should be dismissed because there is no case or controversy.  Johnson & Johnson ("J&J") has never threatened the plaintiffs with patent infringement suits, and the facts relied upon by plaintiffs cannot possibly have created a reasonable apprehension by the plaintiffs that they would be sued. The case or controversy requirement is a strict one because it arises from the Constitution, which requires that Federal courts only adjudicate actual cases or controversies.  No lawsuit or counterclaim has ever been filed by J&J on the patents-in-suit here, and J&J has never threatened such a suit.  Indeed, J&J has never communicated to plaintiffs (in writing or otherwise) that it intends to assert the claims of these patents against them.

To support the argument that a case or controversy exists, plaintiffs point to three separate and unrelated acts by J&J, none of which by itself or in combination comes close to constituting the sort of action that the courts have recognized as giving rise to declaratory judgment jurisdiction.  Two of the acts have nothing to do with the patents-in-suit.  To start with, plaintiffs point to a breach of contract/tortious interference lawsuit filed by J&J against Boston Scientific Corporation ("Boston Scientific"), Guidant and Abbott on September 25, 2006, in the Southern District of New York.  But that lawsuit neither involves patents nor even mentions the possibility of patent infringement litigation.  It seeks damages based upon Guidant's breach of its merger agreement with J&J and the role played by Boston Scientific and Abbott in connection with that breach.  Moreover, because the lawsuit was filed after the infringement of the patents-in-suit allegedly began, the omission of patent infringement claims from the lawsuit suggests, if anything, a *lack* of intent to assert those patents.  At the very least, it does not create a reasonable apprehension of patent litigation.

Second, plaintiffs point to statements made by J&J attorneys during ongoing prosecution of patent applications in the U.S. Patent and Trademark Office ("PTO"). J&J attorneys did urge the PTO to expedite its consideration of these applications because J&J believes that the newly presented claims will be infringed by plaintiffs, should the patents eventually issue. The applications in question may or may not result in issued patents, and to date all claims in these applications which have been examined by the PTO have been rejected. Needless to say, it is undisputable that this Court has no jurisdiction – under the Declaratory Judgment Act or on any other basis – to adjudicate unissued patent claims pending in the Patent Office. Moreover, in the prosecution of these applications, J&J has never told the PTO that it intends to assert any claims of the patents-in-suit against plaintiffs. Plaintiffs offer no precedent for treating statements of this kind – directed as they are to *different* patent claims (and moreover claims not even allowed) – as the type of statements that give rise to a reasonable apprehension of a lawsuit on other patents.

The only other basis for plaintiffs' argument appears to be isolated statements made by financial analysts almost a year ago in several articles covering the highly publicized takeover battle between J&J and Boston Scientific for Guidant. Notably, most of the statements plaintiffs rely upon were not made by J&J representatives, but rather were statements of third-party analysts or reporters. No statements are attributed to J&J representatives, in these reports or otherwise, that in any way demonstrate a clear and imminent intent to assert the patents-in-suit.

J&J's takeover bid was made approximately a year before Boston Scientific's. At the time of the Boston Scientific proposal, J&J's bid had already been approved by antitrust regulators. To obtain approval, J&J agreed to grant Abbott, who was developing a competing

drug-eluting stent, a license to certain J&J patents, including patents covering drug-eluting stents. Boston Scientific's proposal contemplated that Guidant's stent business would be spun off to Abbott, but it still had to undergo antitrust review. One potential antitrust issue was that Boston Scientific did not have the ability to provide Abbott with a license to J&J's intellectual property. If the antitrust regulators concluded that the Abbott business would not be viable without the J&J license, they might not approve the Boston Scientific transaction, or the approval process might take months or years. In either event, Guidant shareholders would be better off if Guidant were sold to J&J.

All of this was the subject of extensive press coverage at the time, and questions about the transaction were put to all of the parties by analysts and others. The articles cited and relied upon by plaintiffs are nothing more than press coverage of this takeover battle in which the intellectual property portfolios of the parties were a relevant issue. The benefits of the J&J license to Abbott in the larger scheme of the transaction were of legitimate interest – wholly apart from the issue of which patents, if any, might ever be asserted.

J&J was in constant dialogue with both Abbott and Guidant throughout this period – J&J having negotiated agreements with both companies in connection with its own proposal. Yet plaintiffs have not suggested or alleged that J&J made any direct threat to sue either company for infringement of the patents-in-suit in the event Boston Scientific prevailed in the takeover battle.

The Declaratory Judgment Act was intended to resolve a "substantial controversy" between parties having "adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Centocor, Inc.*, 409 F.3d 1376, 1379 (Fed. Cir. 2005). Equally importantly, the courts have recognized that judicial

resources and the resources of the parties should not be wasted in resolving purely hypothetical disputes. *See Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995). The declaratory judgment standard is clearly not met. None of J&J's actions, alone or in combination, gives rise to a reasonable apprehension of an infringement suit on the particular patents at issue here. Consequently, plaintiffs' lawsuit should be dismissed for lack of subject matter jurisdiction. In the alternative, the Court should exercise its discretion not to hear this case because doing so would be contrary to the purpose of the Declaratory Judgment Act.

## STATEMENT OF FACTS

### I.      J&J's Statements to Financial Analysts

Plaintiffs' primary basis for declaratory judgment jurisdiction rests on a handful of statements extracted from analysts' reports in January 2006 concerning the takeover battle between J&J and Boston Scientific for Guidant. This takeover battle was one of the most significant business stories at the time, and it generated a frenzy of interest from the financial community, the media, and the public.

The events that led to this battle began in December 2004. At that time, J&J entered into an agreement to acquire Guidant for $25.4 billion.[1] J&J spent the following year working out the issues relating to the transaction and preparing for the closing.[2] One of the major tasks was to obtain antitrust approval by the United States, the European Union, and other foreign regulators.[3] At the time, J&J and Boston Scientific were the only two companies approved to sell drug-eluting stents in the United States. But Guidant was planning to introduce its own drug-eluting stent (the Xience V) in late 2007. Thus, the antitrust regulators were

---

[1] Barnaby J. Feder, *Quiet End To Battle Of the Bids*, N.Y. Times, Jan. 26, 2006, at C1, attached as Exhibit A ("January 26 Article").
[2] *Id* at 3.
[3] Barnaby J. Feder, *Johnson & Johnson Pulls Ahead in Takeover Battle for Guidant*, N.Y. Times, Jan. 14, 2006, at C1, attached as Exhibit B ("January 14 Article").

concerned that a combination of J&J with Guidant would reduce competition by eliminating

Guidant's future as an independent third player in a market that then had only two players.  To

address this concern, J&J agreed with the FTC to grant Abbott, who was also developing a drug-

eluting stent, a non-exclusive license for certain of its stent and catheter patents in order to

enhance Abbott's ability to enter the drug-eluting stent market with its own product, thereby

offsetting the loss of Guidant as an independent competitor in the market.  The patents-in-suit

would have been part of the license.[4]

On December 5, 2005, just as the transaction between J&J and Guidant was about

to close, Boston Scientific launched a surprise bid to acquire Guidant for $25 billion.[5]  Boston

Scientific, however, faced an antitrust issue similar to the one the FTC required J&J to resolve

because its deal with Guidant would also eliminate Guidant's future entry into the drug-eluting

stent market as a third independent competitor.  To deal with this antitrust issue, Guidant agreed

on January 8, 2006 to divest Guidant's vascular intervention business to Abbott.[6]  In this

situation, of course, Abbott would not receive the licenses to J&J's stent patents that the FTC

required J&J to grant to Abbott as a condition of a J&J/Guidant deal.  Over the next two weeks,

J&J and Boston Scientific each made competing new proposals.[7]  Finally, on January 25, 2006,

Guidant announced that it was terminating its agreement with J&J and entering into an

agreement to be acquired by Boston Scientific.[8]

---

[4] Panasewicz Decl. ¶ 3, attached as Exhibit C; Mehrotra Decl. ¶ 3, attached as Exhibit D.
[5] Jan. 26 Article at 1 & 3.
[6] Andrew Ross Sorkin, *New Bid For Guidant Sets Up A Showdown*, N.Y. Times, Jan. 9, 2006, at C1, attached as Exhibit E ("January 9 Article").
[7] Jan. 26 Article at 3-4.
[8] *Id*. at 1.

During this period, there was enormous interest in the takeover battle by the media and financial analysts.[9]  From the standpoint of Guidant shareholders, one potential drawback of Boston Scientific's offer was that it could take longer to close than J&J's offer.[10]  It had taken many months for J&J to obtain approval from the FTC and foreign regulatory authorities, and it was unclear how long a similar process would take for Boston Scientific.[11]  To secure antitrust approval, J&J agreed to license Abbott under J&J's patents; the regulators viewed this license as necessary to enable Abbott to make a competitive product.  Under the Boston Scientific offer, Abbott would not receive a license to any J&J patents.  The absence of a J&J license had the potential to cause delays while regulatory authorities evaluated the competitive importance of the patented J&J technology.  In this respect, the J&J offer was arguably more attractive because it would potentially close more quickly.

To respond to media attention in mid-January, J&J developed a script for dealing with questions raised by the media and financial analysts.[12]  J&J considered its bid to be superior to Boston Scientific's because, among other reasons, the license to Abbott would obviate a potentially lengthy antitrust review by the regulatory agencies.[13]  J&J only discussed the intellectual property landscape with analysts in the context of explaining why its bid for Guidant was superior to Boston Scientific's.  No decision had yet been reached on asserting the patents if Boston Scientific were to acquire Guidant and Abbott then infringed those patents.  As a result,

---

[9] *Id*. at 1-2.
[10] Jan. 14 Article at 1-2.
[11] Jan. 26 Article at 3; Jan. 14 Article at 2.
[12] Panasewicz Decl. ¶ 3; Mehrotra Decl. ¶ 3.
[13] Panasewicz Decl. ¶ 3; Mehrotra Decl. ¶ 3.

the script contained no threats of litigation.[14]  Instead, the script focused on the competitive

landscape as it would be viewed by antitrust regulators:

> Under our Consent Order with the FTC we are obligated to license
> to Abbott certain of our drug eluting stent patents.  Our IP portfolio
> in this area includes patents directed to Rapamycin and its
> analogues including ABT-578 and Everolimus when used on a
> stent.  Abbott does not receive access to this under the Boston
> agreement.  Without access to this IP there is a risk that a DES
> [drug eluting stent] using any of these compounds may infringe our
> IP.[15]

This script was developed on or about January 12 and incorporated into a

finalized document on January 16, 2006.[16]  Following the development of the script, two

individuals in J&J's investor relations department, Louise Mehrotra and Stan Panasewicz, spoke

with financial analysts about the reasons why J&J's bid was better than Boston Scientific's.  The

analysts they spoke to included representatives of Citigroup, Lehman, JMP Securities, Deutsch

Bank, Prudential, and A.G. Edwards.[17]  J&J also communicated the information in the script to

the investor relations department at Guidant. [18]  Three analysts – Larry Biegelsen of Prudential,

Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the patent

issues in reports they issued.

Panasewicz spoke with Biegelsen of Prudential, closely following the approved

J&J script.[19]  He explained that Boston Scientific's offer was inferior to J&J's because Abbott

would not receive rights to J&J's drug-eluting stent patents, including the Wright '764 and

---

[14] Panasewicz Decl. ¶ 5; Mehrotra Decl. ¶ 5.
[15] *See* Guidant Questions & Answers Revised, Jan. 16, 2006, at 20, attached as Exhibit F ("Guidant Q&A").
[16] Panasewicz Decl. ¶ 4; Mehrotra Decl. ¶ 4.
[17] Panasewicz Decl. ¶ 6; Mehrotra Decl. ¶ 6.
[18] Panasewicz Decl. ¶ 6; Mehrotra Decl. ¶ 6.
[19] Panasewicz Decl. ¶ 7.

Falotico '796 patents.  He did not discuss or make any threats of litigation.[20]  Mehrotra communicated essentially the same information to Wald of A.G. Edwards – explaining that Abbott would not receive rights to J&J's patents if Guidant accepted Boston Scientific's offer. Like Panasewicz, she closely followed the prepared J&J script and did not discuss or make any threats about potential patent litigation.[21]  Panasewicz communicated essentially the same information to Matthew Dodds of Citigroup. [22]

Dodds was the first of these analysts to publish a report discussing J&J's patents – which he did on January 13, 2006.[23]  Dodds made no suggestion that J&J had made any threats of litigation; to the contrary, the report discussed the antitrust implications of J&J's intellectual property for the Boston Scientific bid for Guidant.  The report surmised that Guidant was "as concerned with anti-trust as price"[24] which "could be related to JNJ's IP around using limus compounds on a stent."[25]  Dodds noted that "Boston's offer implies that Guidant's Board is more concerned with anti-trust issues than the investment community has realized" and that "JNJ's IP position" was "one major issue that has been overlooked to date."[26]  Dodds further explained that:

> In the Boston deal for Guidant, neither Boston nor Abbott would garner access to the limus patents *so another competitive stent entrant may not technically be "created" with this deal*…. Hence, while the Boston/Abbott deal looks quite a bit more comprehensive than the JNJ/Abbott deal, the importance of the limus patent rights appear to have been underestimated.[27]

---

[20] *Id.*
[21] Mehrotra Decl. ¶ 7.
[22] Panasewicz Decl. ¶ 8.
[23] Matthew J. Dodds, *An INTERESTing New Offer*, Citigroup, January 13, 2006, attached as Exhibit G.
[24] *Id.* at 1.
[25] *Id.* at 2.
[26] *Id.*
[27] *Id.* (emphasis added).

Dodd further pointed out that Boston Scientific's "last trip to the FTC was ugly" and that

"Boston has said little about EU anti-trust clearance, which may not be on fast-track status." [28]

> Biegelsen published a nine page report on January 20, 2006. It stated that:

> > JNJ claims that 2 of its patents **may be infringed** if a company tries
> > to launch a drug-eluting stent coated with a rapamycin derivative
> > such as ABT's zotarolimus and GDT's everolimus. The **potential**
> > for JNJ to prevent ABT and BSX from marketing the Xience-V
> > DES, could give the GDT board pause for approving a BSX-GDT
> > merger.[29]

After discussing details of the parties' offers and making predictions, Biegelsen continued as

follows:

> > If BSX acquires GDT, BSX would sell GDT's vascular
> > intervention (VI) business, including shared rights to GDT's
> > promising everolimus-coated stent, Xience-V, to ABT. Although
> > JNJ's patents have never been litigated, **JNJ believes it has a
> > strong intellectual property (IP) position** with regard to the use of
> > rapamycin derivatives on a stent. JNJ **could** pursue a preliminary
> > injunction if ABT and BSX try to launch an everolimus-coated or
> > zotarolimus-coated stent. The **potential** for JNJ to prevent ABT
> > and BSX from marketing the Xience-V DES, **could give the GDT
> > board and the FTC pause for approving a BSX-GDT merger**.
> > According to JNJ, the key patents are the Falotico (6,776,796) and
> > Wright (6,585,764) patents. [30]

Biegelsen's report did not include any quotes from J&J, or assert that J&J had threatened patent

litigation. Biegelsen also made clear at the end of the report that it contained his "personal

views," not those of J&J.[31]

> Wald published an 11 page report on a few days later on January 23, 2006. Wald

had this to say about the patent issues relating to the competing J&J and Boston Scientific bids:

---

[28] *Id.*
[29] Larry Biegelsen, *JNJ: Takes Off the Gloves*, Prudential Equity Group, LLC, Jan. 20, 2006, Compl. Ex. D at 1 (emphasis added) ("Biegelsen Report").
[30] *Id.* at 3 (emphasis added).
[31] *Id*. at 6.

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific (BSX) and others recently that lead us to believe that the Guidant (GDT) game is far from over. Both companies seem intent on winning the battle for GDT, even to the extent of being 'nice' to sell side analysts. ***Our takeaway message from these conversations has been that both sides believe there is information to share that can bolster the argument for its being a better suitor for GDT***.

JNJ, for example, reminded us that the analysis that BSX presented as to its valuation included price objectives that did not assume the deal had taken place. That is certainly true of our $42 price objective, which is built on our beliefs about the dynamics of the drug eluting stent market and BSX's potential pipeline of products (moving to the right in time and leaving some unsuccessful projects behind to be sure, assuming its deal with GDT goes through). Suffice it to say, we were glad that BSX did not just use our Price Objective, but averaged it with others.

***We were also reminded by JNJ that it had three patents related to '-limus' compounds that it thought precluded any other company from using such a compound on a stent***. We were only given two patent numbers (6776796 and 6585764), and, sure enough, both have to do with using any '-limus' on a stent. We have not vetted these patents, but they did seem quite broad in their language. ***When we spoke to BSX management about them, we were told neither GDT nor Abbott (ABT) seemed to be concerned about them***, and that their broad language may make them non-defensible. As we said, we have not vetted them yet.[32]

Wald's report, like Biegelsen's, did not quote anyone from J&J or even assert that J&J had threatened patent litigation. Like Biegelsen's report, the Wald report explained that it contained Wald's "personal views," not those of J&J.[33] On the other hand, Wald's report said that neither Abbott nor Guidant was concerned about these patents – the very antithesis of having a reasonable apprehension of suit.[34]

---

[32] Jan David Wald, *The Game May Be Far From Over*, AG Edwards, Jan. 23, 2006, Compl. Ex. E at 1 (emphasis added) ("Wald Report").
[33] *Id*. at 4.
[34] *Id.* at 1.

The opinions expressed in the Wald and Biegelsen reports were picked up by a Bloomberg reporter, who wrote an article that was published in the *International Herald Tribune* on January 23, 2006.[35]  The *International Herald Tribune* article similarly did not quote anyone from J&J; to the contrary, it stated that "[a] spokesman for J&J, Jeffrey Leebaw … declined to comment."[36]  Mr. Leebaw was the only J&J employee contacted by the Bloomberg reporter, and Leebaw did not discuss J&J's patents with him.[37]  Leebaw was not even asked to comment on the statements concerning J&J's patents, but only on J&J's general efforts to raise doubts about Boston Scientific's offer.[38]  The reporter's statements were based on the opinions of analysts Biegelsen and Wald, not discussions with anyone from J&J.

Shortly thereafter, on January 25, 2006, Guidant announced that it was terminating its agreement with J&J and entering into an acquisition agreement with Boston Scientific.  J&J had no further communications with analysts or reporters regarding its drug eluting stent patents and their connection to Guidant or Abbott.  Nor did J&J make any contact with Abbott, Guidant, Boston Scientific, or any of their customers regarding the patents-in-suit after Guidant terminated its agreement with J&J.  Before the present case was filed, neither Abbott, Guidant, nor Boston Scientific ever contacted J&J to determine whether J&J intended to assert the patents-in-suit against the Xience V stent

## II.    The Petitions to Make Special Filed in Related Applications

Abbott's Complaint refers to Petitions to Make Special that J&J filed in the Patent Office in early August 2006.[39]  These Petitions to Make Special were not filed in the applications

---

[35] Compl. ¶ 31; Avram Goldstein, *J&J works to discredit rival offer for Guidant*, Int'l Herald Tribune, Jan. 23, 2006, Compl. Ex. F, ("IHT Article").
[36] Leebaw Decl. ¶ 2, attached as Exhibit H; IHT Article at 1.
[37] Leebaw Decl. ¶ 2 & 3.
[38] *Id.* at ¶ 3.
[39] Compl. ¶ 40.

for the patents-in-suit, but were filed in related applications recently filed by J&J with different claims.  The Petitions were filed in order to expedite the examination of these applications in the Patent Office.  To date, no claims have been allowed or issued in the related applications.

One of the grounds for filing a Petition to Make Special to obtain expedited examination is to show that at least one claim of the application covers a product that is being made, used, or sold in the United States.  J&J's petitions in the related applications were filed on that basis.  Accordingly, J&J's attorney stated in the petitions that "[i]n my opinion, the XIENCE V product is unquestionably within the scope of" several claims of the applications.[40] "It is therefore my opinion," J&J's attorney went on, "that a patent containing these claims *could* immediately be asserted upon issue."[41]  These statements were expressly limited to the still unissued claims in the applications pending in the Patent Office; J&J said absolutely nothing about the patents-in-suit in these Petitions.  Moreover, even as to the pending claims, J&J did not state that it intended to file suit on such claims if and when they issued, but merely that it "could" assert some claims if they ultimately issued.

## III.    J&J's Action Against Boston Scientific, Guidant and Abbott for Breach of Contract and Tortious Interference

Abbott's pleading also refers to a recent Complaint filed by J&J in the Southern District of New York for breach of contract, and tortious interference with contract, against Boston Scientific, Guidant, and Abbott.[42]  In that Complaint, J&J accused the defendants of allowing Abbott access to confidential information in violation of a provision of the contract between J&J and Guidant that was specifically designed to prevent Guidant from using J&J's

---

[40] Decl. by Att'y in Support of Pet. to Make Special ¶ 6, Aug. 7, 2006, Compl. Exs. G & H ("Valla Declaration").

[41] *Id*. ¶ 9, (emphasis added).

[42] Compl. ¶ 48.

agreement to buy Guidant to solicit higher offers.[43]  The J&J Complaint for breach of

contract/tortious interference made no mention of patents, and asserted no claims of patent

infringement.

### LEGAL STANDARDS

A declaratory judgment action may be brought in order to resolve an "actual

controversy" between "interested" parties.  28 U.S.C. § 2201.  In order to satisfy this

requirement, "the controversy must be actual, not hypothetical or of uncertain prospective

occurrence."  *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993).

There must be a "definite and concrete dispute between adverse parties, appropriate to immediate

and definitive determination of their legal rights."  *Id*.  The Act guards against the use of the

courts to provide an "advisory opinion on a situation not ripe for litigation."  *Id.*

The Federal Circuit has developed a two-part test for determining whether there is

an "actual controversy" sufficient to support jurisdiction.  First, there must be "an *explicit threat*

or *other action* by the patentee, which creates a *reasonable apprehension* on the part of the

declaratory plaintiff that it will face an infringement suit."  *Id.* at 978 (emphasis added).  This leg

of the two-part test is missing here.  In addition, there must be "present activity which could

constitute infringement or concrete steps taken with the intent to conduct such activity."  *Id.*  The

purpose of the two-part test is "to determine whether the need for judicial attention is real and

immediate" or instead, as in this case, is "prospective and uncertain of occurrence."  *Id.*  The

plaintiff has the burden of establishing that jurisdiction is proper.  *See Shell Oil Co. v. Amoco

Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992).

---

[43] *J&J v. Guidant Corp.*, No. 06 CV 7685, (S.D.N.Y Sept. 25, 2006), Compl. Ex. I ¶¶ 53-59
("J&J Complaint").

The Federal Circuit has provided guidance on what kinds of conduct by the patentee can give rise to a reasonable apprehension of suit on the part of a declaratory judgment plaintiff. Clearly "more is required than the existence of an adversely held patent." *BP Chemicals*, 4 F.3d at 978. Statements that fall short of a threat of litigation, such as that an alleged infringer's activities "fall within" a patent or even that one "intends to enforce" a patent, are also generally insufficient. *Shell Oil Co. v. Amoco Corp.*, 970 F.2d at 889; *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1054 (Fed. Cir. 1995). And while a patentee may not employ "scare-the-customer-and-run" tactics, *see Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988), there is no allegation here that J&J has tried to frighten Abbott's customers with threats of infringement suits.

## **ARGUMENT**

### I.    **J&J's STATEMENTS DO NOT CREATE DECLARATORY JUDGMENT JURISDICTION**

#### A.    **J&J's Statements Were Made to Raise Legitimate Antitrust and Regulatory Concerns About Boston Scientific's Takeover Bid, Not to Threaten Litigation.**

The statements made by J&J relied on by plaintiffs were plainly not threats of litigation. They were made to further J&J's bid for Guidant by showing that its offer was better than Boston Scientific's offer. J&J explained that Boston Scientific's inability to give Abbott a license to J&J's patents created an antitrust issue that could delay or prevent regulatory approval of a Boston Scientific/Guidant merger. These regulatory concerns had nothing to do with J&J asserting its patents against Abbott in the future. No one reasonably could have perceived these statements as a litigation threat. Wald confirmed this when he explained that his "takeaway message" from his conversation with J&J was that the information shared "can bolster the argument for [J&J's] being a better suitor for" Guidant, not that J&J was planning to sue

Abbott.[44]  And, Dodds of Citigroup referred to the "anti-trust issues" that could result from "JNJ's IP around using limus compounds on a stent."[45]  There is no evidence that Guidant or Abbott perceived J&J's statements any differently.  To the contrary, according to Wald, "neither [Guidant] nor Abbott (ABT) seemed to be concerned about" the J&J patents.[46]

       J&J made its statements to analysts in order to communicate a drawback in Boston Scientific's bid which had the prospect of delaying or preventing regulatory approval. By contrast, J&J had already secured regulatory approval for its offer.  Communicating this difference to the financial community did not amount to "an explicit threat or other action" that "creates a reasonable apprehension" on the part of Abbott "that it will face an infringement suit." *See BP Chemicals*, 4 F.3d at 978.  To the contrary, as the Federal Circuit has explained, the "actual controversy" requirement is not met "when a patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity."  *Cygnus Therapeutics Sys. v. Alza Corp.*, 92 F.3d 1153, 1160 (Fed. Cir. 1996).

       The case for jurisdiction here is even weaker than in *BP Chemicals*.  In that case, BP Chemicals and Union Carbide competed to license their processes to Chevron Oil.  *BP Chemicals*, 4 F.3d at 979.  Union Carbide and BP Chemicals had no direct communications with each other concerning the patent at issue, but Union Carbide provided written sales materials to Chevron stating that "[w]e have strong patent positions on key elements of gas phase technology that we feel give our licensees an advantageous position."  *Id.*  Union Carbide's patent counsel

---

[44] Wald Report at 1.
[45] Dodds Report at 2.
[46] Wald Report at 1.

further stated that its patent was a strong patent, which Chevron's witness testified he interpreted as a threat of infringement. *Id.* Nonetheless, the Federal Circuit affirmed the district court's finding that this did not give rise to a reasonable apprehension of suit by BP Chemicals. *Id.*

A finding that J&J's statements to analysts created an actual controversy would have an undesirable chilling effect on communications between a company and financial analysts about intellectual property issues in mergers and other financial transactions. If Abbott's position were adopted, a company would be reluctant to discuss patent issues in financial transactions for fear of inviting a declaratory judgment suit. Such a result would serve neither patent owners, the financial community, nor the public, which has an interest in allowing companies to speak frankly with analysts so as not to impede the free flow of information. No such result is necessary to protect potential infringers. Companies such as Abbott can contact the patent owner directly to determine its intentions if they are concerned about the possibility of litigation.

> **B.      The Statements Made by the Analysts and Reporter Do Not Give Rise to a *Reasonable* Apprehension of Suit**

Abbott's Complaint improperly attempts to conflate the opinions and speculations of analysts and reporters with statements made by J&J. The law is clear, however, that the opinions and speculations of third parties do not give rise to a reasonable apprehension of suit.

For example in *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295 (Fed. Cir. 1992), the inventor of the patents-in-suit, who was employed by a joint venture of defendant First Data, stated that plaintiff West "had infringed the patents" at issue. *Id.* 1296. The Federal Circuit found that this was not "enough evidence of conduct of First Data or conduct attributable to First Data to arouse in West a reasonable apprehension of a lawsuit." *Id.* at 1297. The court noted that the inventor "was not an owner, officer, agent, or even an employee" of

First Data, and that "this court cannot attribute" the inventor's "conduct to First Data." *Id.* at 1297-98.

Similarly, in *Bausch & Lomb, Inc. v. CIBA Corp.*, 39 F. Supp.2d 271 (W.D.N.Y. 1999), plaintiff B & L was told that a scientist of defendant CIBA said that CIBA "was going to sue B & L for patent infringement because B & L's lenses infringed on CIBA's patents." *Id.* at 273. B & L scientists also heard rumors that CIBA was going to sue B & L. The court found that these circumstances were insufficient to create a reasonable apprehension of suit. It characterized the statements to B & L as "nothing more than recitation of a hearsay comment" and explained that "[t]o create a controversy between plaintiff and the patentee, an agent must have actual or apparent authority to level a charge of infringement on behalf of the patentee." *Id.* at 274 (citations omitted).

Here, most of the statements Abbott relies on in its Complaint were opinions expressed by analysts or reporters, not statements attributed to J&J. Biegelsen said that J&J had the "potential" to prevent Abbott from marketing the Xience stent, and that J&J "could" pursue a preliminary injunction.[47] Biegelsen never attributed these statements to J&J; to the contrary, he made clear that the report contained his "personal views."[48] Abbott also relies on statements of questionable origin and reliability in the *International Herald Tribune* article that J&J's "campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation" and that J&J "was considering filing patent infringement lawsuits."[49] This information clearly did not come from J&J, as the reporter expressly stated that

---

[47] Biegelsen Report at 3.
[48] *Id.* at 6.
[49] IHT Article at 1.

J&J's spokesman, Mr. Leebaw, "declined to comment."[50]  Indeed, the reporter did not even

quote Biegelsen or Wald for these statements, and these statements appeared nowhere in either

of their reports.  Thus, they at most reflected the reporter's speculation about what J&J might do,

based on opinions expressed by two stock analysts (Biegelsen and Wald).  A reporter's

speculation, based on the opinion of analysts, would not create a reasonable apprehension of suit

in a reasonable person, because such speculation frequently turns out to be incorrect.

Here, neither Biegelsen, Wald, nor the reporter who wrote the *International

Herald Tribune* article was an agent of J&J.  They had no authority to threaten an infringement

suit on behalf of J&J.  Thus, their "personal views" and opinions were not authorized by J&J and

could not create a *reasonable* apprehension of suit on the part of Abbott.  The statements that

were attributed to J&J did not create a reasonable apprehension of litigation.  As reported by

analyst Biegelsen, J&J "believes it has a strong intellectual property (IP) position" and that its

patents "may be infringed" if a company were to launch a stent coated with everolimus.[51]

Similarly, analyst Wald stated only that he was "reminded" by J&J that it "had three patents

related to '-limus' compounds" that "precluded any other company from using such a compound

on a stent."[52]  This language is certainly no stronger than saying that plaintiff's products "fall

within" the claims, that the patentee intends to "enforce its patent," or that the patentee's product

"appears to infringe" or "may be infringing."   But the Federal Circuit has found that these kinds

of statements are not sufficient to create declaratory judgment jurisdiction.  *See Shell Oil*, 970

F.2d 885, 886-89 (statement that activities "fall within" and are "covered by" its patent and that

patentee intends to "enforce its patent" did not give rise to reasonable apprehension of suit);

---

[50] *Id*. ; Leebaw Decl. ¶ 2 & 3; Mehrotra Decl. ¶ 9; Panasewicz Decl. ¶ 10.
[51] Biegelsen Report at 1 & 3.
[52] Wald Report at 1.

*DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*, 148 F. Supp.2d 412, 413, 415 (D.

Del. 2001) (patentee's statement that plaintiff's activities "may be infringing" insufficient to

create reasonable apprehension of suit); *Phillips Plastics Corp.*, 57 F.3d at 1052 ("patentee's

statement that it intended to enforce the patent" found "not to create a reasonable apprehension

of suit"); *Vermeer Mfg. Co. v. Deere & Co.*, 379 F. Supp.2d 645, 647, 649 (D. Del. 2005)

(patentee's statement that plaintiff's product "appears to infringe" and that patentee "will enforce

its patent rights" insufficient to create reasonable apprehension of suit).

        If Abbott wanted to determine whether J&J planned to assert the patents-in-suit, it

easily could have approached J&J directly, instead of relying on the unauthorized, speculative

opinions of third parties. Abbott did not do so, either back in January when the statements were

made or at any time during the succeeding eight months before Abbott filed this action.

## C.      Even in the Licensing Context, J&J's Statements Would Be Insufficient to Create Jurisdiction.

        Even an offer to license patents in and of itself does not give rise to declaratory

judgment jurisdiction. *Phillips Plastics*, 57 F.3d at 1053. The possibility of litigation is even

more remote here. In the license context, as the courts have recognized, there is always at least

an implicit threat of litigation by the patent owner; otherwise there would be little motivation for

the party approached to pay for a license. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811

(Fed. Cir. 1996) (noting that "any time parties are in negotiation over patent rights, the

possibility of a lawsuit looms in the background" because the "threat of enforcement" is "the

entire source of the patentee's bargaining power").

        Yet even in the context of vigorous and adversarial license negotiations between a

licensor and a prospective licensee/infringer, statements of the kind at issue here still would not

rise to the level necessary to create Declaratory Judgment jurisdiction. Courts have given

examples of the type of language that may be used by a patentee in the licensing context without giving rise to a reasonable apprehension of suit. For example, in *Shell Oil*, the patentee told the accused infringer that its activities "fall within," are "covered by," and are "operations under" its patent. *Shell Oil*, 970 F.2d at 886-879. The patentee also answered "Yes" when asked by the plaintiff if it intended to "enforce its patent." *Id.* at 887. The Federal Circuit, however, found that this conduct "did not rise to the level of a threat of an infringement suit," *id.* at 889, and affirmed the district court's dismissal for lack of jurisdiction. Similarly, in *DuPont Dow*, 148 F. Supp. 2d at 413 & 415, the court found that a patentee's letter to the plaintiff stating that its activities "may be infringing" the patent in suit was insufficient to create a reasonable apprehension of suit. *See also Phillips Plastics Corp.*, 57 F.3d at 1052 ("patentee's statement that it intended to enforce the patent" found "not to create a reasonable apprehension of suit"); *Vermeer Mfg.*, 379 F. Supp.2d at 647, 649 (D. Del. 2005) (patentee's letter stating that plaintiff's product "appears to infringe" the patent-in-suit, and that the patentee "will enforce its patent rights" insufficient to create reasonable apprehension of suit).

        The statements made by J&J here fall well below the threshold of what is required to give rise to a case or controversy. J&J merely said that if Guidant accepted Boston Scientific's offer, there was a "risk" that a drug eluting stent using a rapamycin analog "may infringe our IP."[53] This is certainly no more of a threat than the statement that the plaintiff's products "fall within" the claims and that the patentee intended to "enforce its patent" in *Shell Oil*, or the statement that the patentee's product "may be infringing" or "appears to infringe" in *DuPont Dow* and *Vermeer Mfg.*

---

[53] Guidant Q&A, at 20, Ex. F.

**D.      J&J Has Never Made Threats of Litigation, Either to Abbott or Its Customers.**

Another factor strongly showing the lack of a reasonable apprehension of suit is the complete absence of any litigation threats by J&J either to Abbott or its customers.  On one hand, courts have found the existence of an actual controversy where a patentee has made threats or engaged in threatening conduct to the plaintiff or its customers.  *See Arrowhead Indus.*, 846 F.2d at 736 (patentee told plaintiff's customer that plaintiff was infringing the patent).  On the other hand, where there has been no threat to sue or other threatening communication between the patentee and the plaintiff or its customers, courts generally find the actual controversy requirement not met.

For example, in *BP Chemicals*, the Court found no jurisdiction in a situation where BP Chemicals and Union Carbide competed to license their processes to Chevron Oil, but had no direct communications with each other concerning the patent at issue.  4 F.3d at 979.  Even though Union Carbide provided written sales materials to Chevron stating that it had "strong patent positions on key elements" of the technology that "give our licensees an advantageous position," and its patent counsel stated that its patent was a "strong patent," the Court found that Union Carbide's conduct did not give rise to a reasonable apprehension of suit.  *Id.*

Similarly, in *AngioDynamics, Inc. v. Diomed Holdings, Inc.*, No. 06-02-GMS, 2006 WL 2583107 (D. Del. September 7, 2006), the defendant had a history of defending its patents, was litigating an unrelated trade secret claim, and made a statement to investors that its newly issued patent embraced the plaintiff's product.  *Id.* at *3.  Specifically, the patentee's CEO stated in a quarterly earnings conference call that the plaintiff was "offering marked introducer sheaths particularly for use in a technique *embraced by the now allowed Diomed patent*."  *Id.* at

-21-

*4 (emphasis added). The court found no actual controversy. *Id.* at *3. In particular, the CEO's statements during the quarterly earnings conference call did not give rise to a reasonable apprehension of suit because they were "not made to [Plaintiff] directly," and were consistent with the type of language ("embraced by") found by the Federal Circuit as not giving rise to jurisdiction. *Id.* at *4. *See also Cygnus Therapeutics Sys. v. Alza Corp.*, 92 F.3d 1153, 1156, 1160 (Fed. Cir. 1996) (statement of patentee's CEO at trade conference that products are "covered by our patents," that the company had a "very strong proprietary position," and that other companies "won't market the products because we're not going to give them licenses and the patents are valid" not sufficient to create a reasonable apprehension of suit); *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297-98 (Fed. Cir. 1992) (no reasonable apprehension of suit given the lack of contact between the parties).

Here, the Complaint offers no allegation that J&J ever made any threat of litigation to Abbott or its customers about the patents-in-suit. If Abbott wanted to determine J&J's intentions, it could easily have contacted J&J. Abbott, however, did not do so. Indeed, according to Wald of A.G. Edwards, neither Abbott nor Guidant "seemed to be concerned" about J&J's patents.[54] Indeed, J&J did thereafter sue Abbott and Guidant related to the events surrounding Abbott's acquisition of Guidant's drug-eluting stent business – but that lawsuit contained no allegations of infringement of these or any other patents.

## II.    THE PETITIONS TO MAKE SPECIAL FILED IN PENDING PATENT APPLICATIONS NOT AT ISSUE IN THIS CASE DO NOT GIVE RISE TO A *REASONABLE* APPREHENSION OF SUIT.

Ordinarily, new patent applications "are taken up for examination in the order of their effective United States filing dates."[55] A patent applicant can request that applications be

---

[54] Wald Report at 1.

[55] Manual of Patent Examining Procedure § 708.02, Rev. 3, Aug. 2005, at 700-131, attached as

expedited for a number of reasons, one of which that there is a product on the market that falls within the claims of the application.[56]  To obtain such expedited examination, an applicant must file a request in the form of a Petition to Make Special in the Patent Office.[57]

Abbott's Complaint points to Petitions to Make Special filed by J&J in the Patent Office as part of its basis for jurisdiction.  These Petitions, however, were not filed in the applications for the patents-in-suit.  They were filed in different applications with different claims.  Those applications are still pending in the Patent Office.  It is not clear when or if they will issue, and if so, in what form.  No such petitions were filed in the patents-in-suit.

The Petitions to Make Special in the separate pending applications cited by Abbott do not support the inference that J&J intended to file suit based on the patents-in-suit. Indeed, they support the opposite conclusion.  The Petitions were filed by J&J on August 7, 2006, and stated at that time that Abbott was manufacturing the Xience V stent in the United States.[58]  If J&J intended to sue Abbott for infringement of the patents-in-suit, it would have done so in August.  J&J did not.  Indeed, more than a month and a half passed before Abbott filed this action on September 29.  During that time, J&J did not file suit or take any action indicating that it planned to do so.

Moreover, the language of the petitions cited by Abbott does not rise to the level needed to create an actual controversy.  J&J merely stated that the Xience V stent is "within the scope of" certain claims of the pending applications, and that a patent containing these claims "could" be asserted if and when it issues.[59]  This is no more threatening than the statements in

---

Exhibit I.
[56] *Id.* at 700-132.
[57] *Id.* at 700-131.
[58] Valla Decl. ¶ 4, Compl. Ex. G & H.
[59] *Id*. ¶ 9.

*Shell Oil* that the plaintiff's products "fall within" the claims and that the patentee intends to "enforce its patent" – statements which were found not to give rise to a case or controversy in that case. *See Shell Oil*, 970 F.2d at 889.

### III.    UNRELATED LITIGATION BETWEEN J&J AND ABBOTT DOES NOT GIVE RISE TO A CASE OR CONTROVERSY BASED ON THE PATENTS-IN-SUIT.

The Federal Circuit has made clear that unrelated litigation between parties is not sufficient to give rise to a case or controversy. For example, in *Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985), the defendant had previously sued the plaintiff in state court for its hiring of the defendant's chief engineer. *Id.* at 883. The defendant had also sued two other parties on its patents some years before, and sent a letter offering to discuss a license. *Id.* The Court found that these facts did not establish an actual controversy. *Id.* Similarly, in *DuPont Dow*, the Court held that a prior litigation filed by the defendant against the plaintiff for infringing a different patent, even coupled with a letter stated that the accused infringer's product "may be infringing" the patent-in-suit, was insufficient to demonstrate a reasonable apprehension of suit. 148 F. Supp. 2d at 413-15.

The facts here are even more compelling. Abbott points to no litigation between J&J and Abbott based on the patents-in-suit or any other patents. The litigation relied on by Abbott is a breach of contract and tortious interference claim brought by J&J against Boston Scientific, Guidant and Abbott claiming that confidential information was provided to Abbott in violation of the merger agreement between Guidant and J&J.[60] This action is completely unrelated either to the present action or the patents-in-suit, and provides no indication or suggestion that J&J intended to sue Abbott for infringement of the patents-in-suit.

---

[60] *See* J&J Complaint, Compl. Ex. I.

IV.    **EVEN IF THE COURT WERE TO FIND AN ACTUAL CONTROVERSY, IT SHOULD EXERCISE ITS DISCRETION NOT TO HEAR THIS CASE.**

Even if there were an actual controversy between the parties giving rise to subject matter jurisdiction, this "does not mean that the district court is required to exercise that jurisdiction." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812, 814 (Fed. Cir. 1996). The Declaratory Judgment Act gives district courts a "unique breadth of discretion to decline to enter a declaratory judgment." *Id.* (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)). This discretion is broad – "as long as the district court acts in accordance with purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad discretion to refuse to entertain a declaratory judgment action." *Id.* at 813-14. For example, a court may dismiss a declaratory judgment action based on "a reasoned judgment whether the investment of time and resources will be worthwhile." *Serco Services Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995). A court may also decline jurisdiction where "allowing the declaratory judgment action to proceed would create an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings." *EMC Corp.*, 89 F.3d at 814 (affirming district court's discretionary decision not to hear action despite threats of litigation).

The Federal Circuit has described "the type of situation the Declaratory Judgment Act was intended to address" as follows:

> [A] patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword…. Guerilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity.

*EMC Corp.*, 89 F.3d at 814-15 (quoting *Arrowhead*, 846 F.2d at 734-35).

The situation here is very different. J&J did not engage in any "scare-the-customer-and-run" tactics or extra-judicial patent enforcement. It merely said that J&J's offer was superior to Boston Scientific's because Abbott would not receive a license to J&J's patents if it accepted Boston Scientific's bid, and this could delay or prevent regulatory approval. These discussions were for the purpose of telling analysts, the financial community, Guidant shareholders, and the public the reasons why J&J's bid was superior to Boston Scientific's, not threatening Abbott with a patent infringement suit. Allowing such discussions to be used as the pretext for hauling J&J into court would discourage communication between a company and financial analysts, which would be contrary to the purposes of the Declaratory Judgment Act. Consequently, even if the Court were to find an actual controversy here, it should exercise its discretion to decline jurisdiction over this case.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint in this action for lack of subject matter jurisdiction.

ASHBY & GEDDES

*/s/ John G. Day*
_____
Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendants*

-26-

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
Sidley Austin LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000

Dated:  December 13, 2006
176096.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of December, 2006, the attached **OPENING MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** was served upon the below-named counsel of record at the addresses and in the manner indicated:

Frederick L. Cottrell, III, Esquire                                     <u>HAND DELIVERY</u>
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19899

Edward A. Mas, II, Esquire                                     <u>VIA ELECTRONIC MAIL</u>
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, IL  60661


*/s/ John G. Day*
_____
John G. Day

# Exhibit A



The New York Times

1/26/06 NYT C1                                                          Page 1

1/26/06 N.Y. Times C1
2006 WLNR 1401814

New York Times (NY)
Copyright (c) 2006 The New York Times. All rights reserved.

**January 26, 2006**


Section: C


MARKET PLACE; Quiet End To Battle Of the Bids

BARNABY J. FEDER; Stephanie Saul contributed reporting for this article.

Market Place column on quiet end to battle for Guidant Corp, with Boston Scientific
acquiring company and Johnson & Johnson deciding not to make final counteroffer;
Johnson & Johnson releases terse statement saying company 'determined not to
increase its last offer for Guidant Corp, because to do so would not have been in
best interest of its shareholders'; about only comment was its reminder that Guidant
was obliged to pay it $705 million breakup fee by Jan 26; chart (M)

For Johnson & Johnson, Tuesday started with a morning conference call with analysts
to discuss earnings and ended with William C. Weldon, the company's chief executive,
and Robert J. Darretta Jr., the chief financial officer, attending a dinner for
several dozen institutional investors at the "21" Club in New York. Throughout the
day and evening, the company maintained a rigid silence about the one subject on
everyone's mind -- whether it would respond to a midnight deadline to counter Boston
Scientific's bold $27 billion offer for Guidant.

"They wanted to talk about anything but Guidant," said one investor who attended the
dinner. "It was the elephant in the room."
Only yesterday morning did Johnson & Johnson address the elephant, in a terse news
release saying the company had "determined not to increase its last offer for
Guidant Corporation, because to do so would not have been in the best interest of
its shareholders." About the only comment was its reminder that Guidant was obliged
to pay it a $705 million breakup fee by today.

It was a remarkably quiet conclusion to the biggest and most contentious takeover
battle yet in the medical device industry. The outcome leaves Boston Scientific as
the apparent winner of Guidant, the No. 2 company in the $10 billion market for
defibrillators and other implantable devices that regulate human heartbeats.

Those two companies announced their deal yesterday, pending the approval of
shareholders and regulators. People close to the takeover negotiations say it had
become evident at least 24 hours before the midnight deadline that a counteroffer
was unlikely because Johnson & Johnson's advisers had stopped communicating with the
Guidant team.

But in many ways, Johnson & Johnson had been forced into silence much earlier -- by
choices it made last fall, when it assumed it had the upper hand in its merger
dealings with Guidant and reduced its offer by nearly $4 billion.

It was a short time later that Boston Scientific mounted its surprise takeover
effort and emerged as the company willing to risk the most to acquire Guidant. By
last week, having decided not to raise its own bid of $71 a share, Johnson & Johnson
was reduced to behind-the-scenes attacks on the rationality of Boston Scientific's
$80-a-share offer. It apparently hoped that Boston Scientific's stock would decline

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

so far that Guidant shareholders would begin to doubt the deal's value.

Johnson & Johnson was not talking yesterday, but some analysts say the company's tough bargaining last fall resulted not only in the company's losing Guidant, but a certain amount of corporate luster as well.

"Their reputation had been as a savvy acquirer and a fair acquirer, and I think those two elements have been diminished in this," said Jan David Wald, a health care analyst at A. G. Edwards & Sons. Johnson & Johnson's declining drug sales in the United States make further expansion into medical devices a necessity, Mr. Wald said, but the Guidant stumble could hinder its ability to pursue future deals.

There are risks for Boston Scientific in coming out on top of this fight, not the least of which is the possibility that it is paying too much for Guidant to ever recoup its investment. And Johnson & Johnson could try to slow down Boston Scientific's efforts to close the Guidant deal by pressing antitrust objections at the Federal Trade Commission.

Such delays might send Boston Scientific's stock below $22.62, the price at which the value of the stock portion of the deal would begin shrinking, and induce Guidant investors to vote against the merger. Boston Scientific's shares are down nearly 14 percent since it announced its first bid in December, including a decline of 2 percent yesterday, to $23.54.

But Johnson & Johnson has lost its biggest advantage -- the fact that its merger deal had been fully reviewed by regulators and could have been completed immediately after a Guidant shareholders' vote that had been scheduled for Jan. 31. "The odds of them stopping this are not high," said Matthew Dodds, who follows the industry for Citigroup. "They are fully committed to walking."

Analysts say that may be best for all concerned. Johnson & Johnson could easily afford Guidant. And it desperately needs Guidant or some other large, fast-growing acquisition to mollify shareholders restive about the stagnation in its drug business. But Johnson & Johnson's shareholders have apparently shared management's concern about overpaying for Guidant. Johnson & Johnson's shares fell every time it raised its bid for Guidant.

Analysts have published a blizzard of speculation about whether Johnson & Johnson will now turn its attention to smaller device companies -- like St. Jude Medical, the third-ranked producer of heart-regulating implants, or Conor Medsystems, the developer of a promising new stent design for propping open heart arteries.

But some also note that the company could just as easily look for growth outside devices by purchasing drug or biotech companies.

"J.& J. has the financial strength to move on and the cash to acquire elsewhere to further its growth prospects," said Kenneth R. Weakley, who follows the industry for UBS, the brokerage house that sponsored Tuesday evening's dinner at the "21" Club. Mr. Weakley called the failure to close the deal with Guidant a "heartache, not a heart attack" for the company.

Johnson & Johnson's stock has fallen 4.4 percent since Boston Scientific first entered the bidding war, including a decline yesterday of 86 cents, to $58.50.

Boston Scientific clearly faces stiffer challenges. While Guidant will immediately transform it into a company with more than $9 billion in annual revenues and a shot at double-digit revenue growth for years to come, the cost of the transaction will eat into earnings for at least five years, according to most analysts' estimates.

In the near term, analysts will be closely watching whether Boston Scientific can keep to its ambitious timetable for completing regulatory reviews and close the deal by the end of this quarter. Under the terms of the agreement, it must pay interest to Guidant shareholders at a 6 percent annual rate for every day after March 31 that the closing is delayed.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The terms of the deal put extreme pressure on Boston Scientific to maintain the market share and profit margins of its blockbuster drug-coated stent, Taxus, which doctors use to keep patients' coronary arteries propped open after blockages are cleared. Boston Scientific will also need to meet targets for introducing important new products, like a disposable line of endoscopes, used to diagnose gastrointestinal problems, that is scheduled to be released later this year.

Taxus is the market leader in the $6 billion market in countries where it competes with Cypher, Johnson & Johnson's drug-coated stent, but that lead has eroded. In addition, Medtronic recently entered the drug-coated stent market in Europe, and Guidant received word Tuesday that Europe is about to approve its Xience stent.

The one clear winner in the deal, analysts said, is Abbott Laboratories, which injected up to $6.2 billion into Boston Scientific's offer through a variety of side deals, stock sales and below-market-rate loans to that company. The payoff is that Abbott would receive virtually all of Guidant's business except for its heart-regulating implants. On news of the deal and a forecast of strong drug sales during Abbott's fourth-quarter earnings announcement, the company's stock was up more than 5 percent yesterday.

The Guidant portfolio of products to treat damage to the circulatory system from diseases like diabetes generates more than $1 billion annually in sales. It would transform Abbott into a major player in outpatient clinics and hospital laboratories that deliver therapy through catheters as an alternative to more invasive surgical treatments. Analysts say its share of the Guidant deal could begin contributing to Abbott's earnings next year.

That outcome represents a huge improvement from the gains Abbott could have expected if Johnson & Johnson had acquired Guidant. Under that deal, Abbott was to receive access to a valuable stent implant system and rights to certain stent-coating drugs. Johnson & Johnson had worked out that arrangement to satisfy antitrust objections. But those were mere hors d'oeuvres for Abbott, while Boston Scientific offered a seven-course meal.

Chart: "Contentious Courtship"
Johnson & Johnson's 13-month effort to acquire the heart device maker Guidant has been thwarted by Boston Scientific, which started a takeover battle last month.

Johnson & Johnson (2005)

DEC. 15, 2004 -- J.& J. agrees to buy Guidant for $25.4 billion.
OCT. 18 -- J.& J. says it wants to renegotiate the terms of the deal.
NOV. 2 -- The F.T.C. conditionally approves the merger, but J.& J. says it may pull out.
NOV. 15 -- J.& J. proposes a revised deal for $21.5 billion.

Guidant (2005)

APRIL 27 -- Guidant shareholders approve the deal.
JUNE 17 -- Guidant announces a product recall.
NOV. 7 -- Guidant sues J.& J. to force completion of the acquisition.

Boston Scientific (2005)

DEC. 5 -- Boston Scientific offers $24.7 billion for Guidant.

Johnson & Johnson (2006)

JAN. 24 -- J.& J. allows deadline to raise its bid to lapse.

Guidant (2006)

JAN. 11 -- Guidant accepts J.& J.'s sweetened offer of $23.2 billion.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1/26/06 NYT C1                                                    Page 4


JAN. 13 -- Guidant accepts revised $24.2 billion bid from J.& J.

Boston Scientific (2006)

JAN. 12 -- Boston Scientific raises bid to $25 billion.
JAN. 17 -- Boston Scientific bids $27 billion.

(pg. C2)


---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; MEDTRONIC INC; BOSTON SCIENTIFIC CORP; GUIDANT CORP;
JOHNSON AND JOHNSON

NEWS SUBJECT:  (Business Management (1BU42); Antitrust Regulatory (1AN52); Sales &
Marketing (1MA51); Monopolies (1MO68); Major Corporations (1MA93); Market Data
(1MA11); Mergers & Acquisitions (1ME39); Economics & Trade (1EC26); Corporate Groups
& Ownership (1XO09))

INDUSTRY:  (Pharmaceuticals & Biotechnology (1PH13); Surgical Instrumentation
(1SU78); Manufacturing (1MA74); Internal Medicine (1IN54); Cardiology (1CA75);
Medical Devices (1ME31); Medical Equipment & Supplies (1HE68); Pharmaceuticals
Regulatory (1PH03); Medical Device Market (1ME44); Cardiovascular Devices (1CA41);
Healthcare (1HE06); Medical Device Regulatory (1ME42); Healthcare Practice
Specialties (1HE49))

REGION:  (North America (1NO39); Americas (1AM92); New England (1NE37);
Massachusetts (1MA15); USA (1US73))

Language:  EN

OTHER INDEXING:  (Feder, Barnaby J)  (ABBOTT LABORATORIES; CONOR MEDSYSTEMS;
CONTENTIOUS COURTSHIP; EUROPE; FEDERAL TRADE COMMISSION; GUIDANT; GUIDANT CORP; JJ;
JOHNSON; JOHNSON JOHNSON; JUDE MEDICAL; MARKET; MEDTRONIC)  (15; 18; 24; 24.;
Abbott; Edwards Sons; J. J. to; Jan David Wald; Kenneth R. Weakley; Matthew Dodds;
Quiet End; Robert J. Darretta Jr.; Taxus; Wald; Weakley; William C. Weldon)  (Heart;
Market Place (Times Column); Mergers, Acquisitions and Divestitures; Heart)

COMPANY TERMS: GUIDANT CORP; JOHNSON AND JOHNSON INC; BOSTON SCIENTIFIC CORP

EDITION: Late Edition - Final

Word Count: 2001
1/26/06 NYT C1


END OF DOCUMENT


©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

Westlaw.                                                    The New York Times

1/14/06 NYT C1                                                    Page 1

1/14/06 N.Y. Times C1
2006 WLNR 770636

New York Times (NY)
Copyright (c) 2006 The New York Times. All rights reserved.

January 14, 2006

Section: C

Johnson & Johnson Pulls Ahead in Takeover Battle for Guidant

BARNABY J. FEDER

Johnson & Johnson raises its bid for Guidant Corp to $24.2 billion; dissuades
Guidant from backing out of merger and going with higher bid from Boston Scientific;
deal with Johnson & Johnson has already cleared regulatory hurdles unlike Boston
Scientific offer which would not close until at least March; Guidant is desirable
due to its position in market for defibrillators and other heart-regulating implant
devices (M)

Reacting decisively, Johnson & Johnson struck back last night in the biggest
takeover battle ever in the medical device industry, raising its bid for the Guidant
Corporation to $71 a share in cash and stock, or about $24.2 billion.

In doing so, Johnson & Johnson was able to dissuade Guidant from backing out of a
previously announced merger and going with a higher bid from Boston Scientific.

Johnson & Johnson's latest offer would give Guidant shareholders $40.52 in cash and
0.493 share of Johnson & Johnson stock for each Guidant share. Although that offer
fell short of the $73-a-share bid by Boston Scientific, it was an increase of $1
billion from its stock-and-cash offer of just over $68 a share on Wednesday.

And it was close enough to Boston Scientific's bid to persuade Guidant's directors
to once again unanimously advise shareholders to vote for merging with Johnson &
Johnson at a meeting scheduled for Jan. 31. Boards of both Guidant and Johnson &
Johnson have approved the deal.

Boston Scientific did not return calls last night requesting a comment, but analysts
said they would not be surprised if the company took the weekend to decide on its
response.

"I don't think this is over yet," said Bruce Nudell, who follows the industry for
Sanford C. Bernstein. He said he expected Boston Scientific to come back with
another bid.

At stake in the takeover battle is Guidant's share of the $10 billion market for
implantable heart devices like defibrillators. The acquirer will also pick up
valuable technology in another major device business: the $5 billion market for
coronary stents that prop open arteries that feed blood to the heart.

Guidant has consistently favored Johnson & Johnson's offers over higher bids from
Boston Scientific because their merger, first arranged in December 2004, has cleared
potential regulatory hurdles. It could close immediately after the shareholder vote
at the end of the month.

"This agreement with Johnson & Johnson provides significant financial value and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certainty for shareholders," said James M. Cornelius, the chairman and chief executive of Guidant, in a statement issued jointly with Johnson & Johnson last night.

By contrast, Boston Scientific first entered the bidding a month ago, and its deal could not close before the end of March at the earliest. In addition, Guidant and some analysts say the Boston Scientific bid could run into antitrust or other legal hurdles that could make it hard to project the value of the stock portion of its bid.

Whoever ends up owning Guidant will also face questions about whether the prize is worth the price. While Guidant would immediately begin adding to revenue, it could be some time before the buyer would see an increase in profit from the large investment.

Guidant's jewel is its lucrative position in defibrillators and other heart-regulating implants, the largest sector of the medical device market and one of the fastest growing.

But the company lost market share last year after disclosures of product defects associated with at least seven deaths, related product recalls and negative publicity about its failure to promptly disclose its problems. Those problems led Johnson & Johnson to force Guidant in November to renegotiate their original merger terms down to $63.08 from $76 a share.

The year ended with Guidant having roughly 25 percent of the market and still ranked second to Medtronic, but questions abound about how quickly -- if ever -- Guidant can regain the 35 percent to 40 percent share it previously held.

Analysts following the back-and-forth struggle generally say they believe that Boston Scientific is a better strategic fit with Guidant, but that does not mean it can afford an all-out fight with Johnson & Johnson.

Boston Scientific, based in Natick, Mass., had revenue last year of about $6.28 billion. Johnson & Johnson, based in New Brunswick, N.J., sells drug and consumer health care items in addition to devices and had revenue last year of more than $50 billion.

Boston Scientific shareholders have become restless as growth in its blockbuster drug-coated Taxus stent leveled off last year because it will be several years before other products in its pipeline can hope to pick up the slack. Merging with Guidant would provide immediate growth opportunities and reduce its dependence on Taxus.

As a result, many analysts and investors forecast that Boston Scientific's stock will rise after the merger, further rewarding Guidant shareholders who receive it.

Boston Scientific's $73-a-share offer Thursday night would give Guidant shareholders $36.50 in cash and $36.50 worth of stock for each share.

"Boston Scientific's shares go higher every time the market thinks it's going to win," said Matthew Halbower, portfolio manager of Deephaven Capital Management in Minnetonka, Minn., who said his fund was one of Guidant's 10 largest shareholders.

Mr. Halbower said that in his view Guidant could have a much more positive impact on Boston Scientific than on Johnson and Johnson, so Deephaven will vote against Johnson & Johnson's latest offer.

Johnson & Johnson, which is suffering from lackluster growth prospects in pharmaceuticals, its biggest business, could also benefit from Guidant's near-term growth potential. And it is just as eager as Boston Scientific to get into the heart implant business.

But Johnson & Johnson's investors are generally more risk averse than Boston

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Scientific's, and analysts say the company has been under more pressure to show that it is a disciplined acquirer unwilling to overpay for growth.

Johnson & Johnson's revised bid was the fourth improvement this week in the choices dangled before Guidant's shareholders. The bidding began in earnest Sunday evening when Boston Scientific, having completed its investigation of Guidant's books and operations, announced that it would go through with its preliminary offer of $72 a share in cash and stock, with a total value of roughly $25 billion.

At the same time, Boston Scientific said it had an agreement for Abbott Laboratories to pay $3.2 billion for two Guidant divisions that overlap with Boston Scientific operations. That move, Boston Scientific said, should take care of any antitrust issues.

Guidant's board said it would consider the offer but on Wednesday re-endorsed previously announced plans to merge with Johnson & Johnson after that company agreed to sweeten the terms of their agreement from $64 a share to just over $68 with a stock and cash combination valued that day at $23.2 billion.

On Thursday, Boston Scientific responded by raising its offer to $73 a share, or about $25 billion, and introducing revisions aimed at reducing Guidant's concerns that its deal could take many months to close.

Boston Scientific also promised to pay 1.2 cents a Guidant share -- the equivalent of 6 percent interest -- for each day's delay beyond March 31 in completing a merger. And Boston Scientific imposed a deadline of 4 p.m. yesterday for Guidant to respond.

The deadline came and went without any public response.

Shareholders anticipating a higher offer sent Guidant shares up 44 cents, to $70.84. Johnson & Johnson shares fell 39 cents, to $61.82. Boston Scientific rose 15 cents, to $25.20

Boston Scientific's plans to sell virtually all of Guidant's operations outside of the electrical implants to Abbott introduced a wild card into the guessing game about what happens next.

Abbott, which has been slowly making its way into devices, would become a major force in the industry under Boston Scientific's plan and may have a strong incentive to help Boston Scientific finance a higher counterbid.

"I think Boston and Abbott have one more shot in them," said Mr. Nudell of Sanford C. Bernstein, "probably raising the cash part of their bid."

But Mr. Nudell said Johnson & Johnson might decide to go higher not just to gain Guidant's assets but to keep them out of Boston Scientific and Abbott's hands.

"I think that's driving them now," Mr. Nudell said. "And they have the money to spend until the cows come home."

---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; MEDTRONIC INC; BOSTON SCIENTIFIC CORP; GUIDANT CORP; JOHNSON AND JOHNSON

NEWS SUBJECT:  (Business Management (1BU42); Antitrust Regulatory (1AN52); Sales & Marketing (1MA51); Monopolies (1MO68); Major Corporations (1MA93); Market Data (1MA11); Mergers & Acquisitions (1ME39); Economics & Trade (1EC26); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Pharmaceuticals & Biotechnology (1PH13); Surgical Instrumentation (1SU78); Manufacturing (1MA74); Healthcare Regulatory (1HE04); Medical Electronics (1ME73); Medical Devices (1ME31); Pacemakers & Defibrillators (1PA44); Medical

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Equipment & Supplies (1HE68); Pharmaceuticals Regulatory (1PH03); Medical Device
Market (1ME44); Pharmaceuticals Marketing & Sales (1PH83); Electronics (1EL16);
Cardiovascular Devices (1CA41); Healthcare (1HE06); Medical Device Regulatory
(1ME42))

REGION:  (North America (1NO39); Americas (1AM92); New England (1NE37);
Massachusetts (1MA15); USA (1US73))

Language:  EN

OTHER INDEXING:  (Feder, Barnaby J)  (ABBOTT; ABBOTT LABORATORIES; DEEPHAVEN;
DEEPHAVEN CAPITAL MANAGEMENT; GUIDANT; GUIDANT CORP; JOHNSON JOHNSON; JOHNSON
JOHNSON PULLS AHEAD; MEDTRONIC)  (Bruce Nudell; Halbower; James M. Cornelius;
Johnson; Matthew Halbower; Nudell; Sanford C. Bernstein)  (Heart; Mergers,
Acquisitions and Divestitures; Defibrillators; Implants; Heart)

COMPANY TERMS: JOHNSON AND JOHNSON INC; GUIDANT CORP; BOSTON SCIENTIFIC CORP

EDITION: Late Edition - Final

Word Count: 1688
1/14/06 NYT C1

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) ) | Civil Action No. 06-613 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF STANLEY PANASEWICZ

I, Stanley Panasewicz, hereby declare as follows:

1.    I am employed by Johnson & Johnson ("J&J") in its Investor Relations department.  My current position is Director of Investor Relations.   I have held this position since November 2002.  One of my responsibilities in this position at J&J is to communicate with financial analysts.

2.    In December of 2005 and January 2006, a major takeover battle took place between J&J and Boston Scientific Corporation ("Boston Scientific") for control of Guidant Corporation ("Guidant").  This takeover battle was the subject of intense interest by financial analysts.  I, along with Louise Mehrotra, J&J's Vice President of Investor Relations, spoke with financial analysts about the competing bids by J&J and Boston Scientific.   I did not speak to any reporters on this subject.

3.    In early-to-mid January 2006, J&J developed a script for dealing with questions raised by financial analysts about the takeover battle. Those of us who communicated with financial analysts were instructed not to depart from the words or substance of the script. According to the script, we were to communicate that J&J considered its bid to be superior to Boston Scientific's because, among other reasons, the J&J transaction had secured regulatory approval and the Boston Scientific transaction had not. A key concern of the antitrust regulators had to do with whether Abbott would have the patent rights needed to sell a competitively viable drug-eluting stent. J&J had agreed that if Guidant accepted its offer, J&J would grant Abbott a license to certain drug eluting stent patents, including U.S. Patent No. 6,585,764 to Wright (the "Wright '764 patent"), U.S. Patent No. 6,808,536 to Wright (the "Wright '536 patent"), and U.S. Patent No. 6,776,796 to Falotico (the Falotico '796 patent"). Abbott, however, would not receive a license to those patents if Guidant accepted Boston Scientific's offer, which could delay or prevent regulatory approval of the Boston Scientific transaction.

4.    The script was developed on or about January 12 and incorporated into a finalized document on January 16, 2006. Relevant portions are attached as Exhibit F to J&J's Memorandum in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction. The script stated, in pertinent part:

> Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents. Our IP portfolio in this area includes patents directed to Rapamycin and its analogues including ABT-578 and Everolimus when used on a stent. Abbott does not receive access to this under the Boston agreement. Without access to this IP there is a risk that a DES [drug eluting stent] using any of these compounds may infringe our IP.

(Exhibit F, p. 20.)

2

5.    In this script, J&J was careful not to suggest or imply that any decision had been reached on suing Abbott for patent infringement, even if Guidant was acquired by Boston Scientific and then Abbott commenced to infringe the J&J patents. These events had not occurred, and there was no need to speculate about what could happen if they did occur. So far as I know, as of January 2006, no one at J&J had yet decided what would happen.

6.    During the following week, I, along with Louise Mehrotra in J&J's Investor Relations department, spoke with financial analysts about why J&J's bid was better than Boston Scientific's. The analysts we spoke to included analysts from Citigroup, Lehman, JMP Securities, Deutsch Bank, Prudential, and A.G. Edwards. We also communicated the information in the script to the investor relations department at Guidant. Three analysts – Larry Biegelsen of Prudential, Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the patent issues in reports they issued.

7.    I called and spoke with Larry Biegelsen of Prudential on or about January 20, 2006. In this conversation, I adhered closely to the approved J&J script attached as Exhibit F to J&J's Memorandum. During this call, I explained that Boston Scientific's offer was inferior to J&J's because Abbott would not receive rights to J&J's drug-eluting stent patents, including the U.S. Patent No. 6,585,764 to Wright and U.S. Patent No. 6,776,796 to Falotico, and that this could result in delays while regulatory authorities evaluated whether Abbott's business was viable without these patent rights. During the call with Biegelsen, I was careful not to discuss the possibility of litigation or make any threats of litigation. I did not say anything about J&J potentially pursuing a preliminary injunction if Abbott or Boston Scientific try to launch an everolimus-coated stent. Nor did I say that J&J was considering filing patent infringement suits

3

against Boston Scientific or Abbott over stent drug coatings or that Abbott or Boston Scientific would be tempting patent litigation by going through with its plan to acquire Guidant.

8.     I also spoke with Matthew Dodds of Citigroup on or about January 12, 2006. In this conversation, I adhered closely to the approved J&J script, and communicated essentially the same information as I did to Biegelsen.

9.     I did not speak with Jan David Wald of A.G. Edwards about J&J's patents. It is my understanding that Louise Mehrotra spoke with Mr. Wald on this topic.

10.     I have seen a January 23, 2006 article in the *International Herald Tribune*, which is attached to Abbott's Complaint as Exhibit F. I had no communications with the reporter who wrote this article about the subjects discussed in the article.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2006.

_Stanley Panasewicz_
Stanley Panasewicz

4

# Exhibit E

Westlaw.                                                    The New York Times

1/9/06 NYT C1                                                    Page 1


1/9/06 N.Y. Times C1
2006 WLNR 448663

                         New York Times (NY)
         Copyright (c) 2006 The New York Times. All rights reserved.

                           January 9, 2006



                             Section: C


                  New Bid For Guidant Sets Up A Showdown

                ANDREW ROSS SORKIN and BARNABY J. FEDER

Boston Scientific says it will make formal, binding bid for Guidant that is worth
$25 billion in cash and stock; offer is expected to set off takeover battle between
Boston Scientific and Johnson & Johnson, which had already agreed to buy Guidant for
$21.4 billion; Guidant board is expected to meet shortly to evaluate proposal and,
if it is deemed superior, Johnson & Johnson will have five days to respond with new,
higher offer; latest bid comes after monthlong examination of confidential financial
records; as part of its offer, Boston Scientific says it has reached agreement to
sell two Guidant units to Abbott Laboratories for $3.8 billion to satisfy regulators
(M)

After poring over Guidant's confidential financial records for more than a month,
Boston Scientific said yesterday that it would make a formal, binding bid for the
company that is worth $25 billion in cash and stock.

The offer is expected to set off a takeover battle between Boston Scientific and
Johnson & Johnson, which had already agreed to buy Guidant for $21.4 billion.
Johnson & Johnson lowered its earlier $25.4 billion offer because it said a raft of
safety problems had diminished Guidant's value.

The board of Guidant, the nation's second-largest maker of implantable
defibrillators and pacemakers after Medtronic, is expected to meet early this week
to evaluate the proposal. If Guidant's board deems Boston Scientific's bid to be
superior, Johnson & Johnson will have five days to respond with a new, higher offer.

Investors and analysts have been waiting anxiously to see if Boston Scientific would
be comfortable enough to continue to pursue its bid after reviewing Guidant's
internal financial and safety records, especially after it was disclosed last month
that the Food and Drug Administration had new reports about patient deaths
associated with short circuits in Guidant's heart devices.

In an interview yesterday, James R. Tobin, Boston Scientific's chief executive, said
he was satisfied with what he saw at Guidant.

"We did very thorough due diligence," Mr. Tobin said. "We put a full-court press on
this thing. The Guidant folks were very open to us. Clearly they have some short-
term challenges. We're realistic about what we're dealing with here."

Mr. Tobin added that beyond studying Guidant's own records, Boston Scientific also
talked to doctors and others involved in health care to gauge the vitality of the
business.

"There are clearly trust issues that have developed," Tobin said. "On the other
hand, Guidant's technology is acknowledged to be right up there. And we think

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there's an opportunity to regain that trust."

As part of Boston Scientific's formal offer, the company said that it had reached an agreement to sell two Guidant units, its vascular intervention and endovascular businesses, to Abbott Laboratories for $3.8 billion to satisfy regulators if it reaches a merger agreement with Guidant. Boston Scientific also said that its offer -- $36 a share in cash and the equivalent of $36 a share in stock -- would include what is known in the business as a collar, to protect investors should Boston Scientific shares fall and to protect Boston Scientific from paying too much if its own shares jump.

Under the terms of its offer, Boston Scientific said that if the average closing price of its stock in a 20-day period before the Guidant board's approval of the deal is less than $23.62, Guidant shareholders will receive 1.5241 Boston Scientific shares for each share of Guidant stock. If the average price is greater than $28.86, Guidant shareholders will receive 1.2474 Boston Scientific shares for each share of Guidant stock.

Boston Scientific's offer represents about a 12 percent premium over Johnson & Johnson's offer, based on the closing price of Johnson & Johnson's shares on Friday.

Boston Scientific said it estimated that if a deal was consummated, the combined company would have $10 billion in sales in 2007. It expects the combined company's sales to grow at a double-digit rate, achieving $16 billion in 2011.

Boston Scientific's side deal with Abbott is aimed at helping complete the deal quickly, but it also has big implications for Abbott and the industry.

The side deal is likely to be criticized by Medtronic. The company had unsuccessfully opposed Johnson & Johnson's plans in its proposed merger with Guidant to license Abbott to use Guidant's delivery gear for stents, which are used to open blocked blood vessels. Medtronic had argued that it was better positioned than Abbott to use the technology to provide added competition. Medtronic is likely to make similar arguments to regulators that Boston Scientific should be forced to give it access to Guidant's technology.

Abbott has been developing its own stent products. Last year, it became the second company after Guidant to gain regulatory clearance to market stents to prop open the carotid arteries, which are the main pathway for blood to the brain. But Abbott's effort to compete in the multibillion-dollar market for drug-coated coronary stents has lagged far behind those of Johnson & Johnson and Boston Scientific, the market leaders.

The acquisition of Guidant's vascular business would represent the company's first major commitment to what had been a relatively cautious strategy of diversifying into device implants, which is dominated by companies like Medtronic, Johnson & Johnson and Boston Scientific. Abbott acquired two start-up vascular companies, Jomed and Integrated Vascular Systems, in 2003.

---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; MEDTRONIC INC; BOSTON SCIENTIFIC CORP; GUIDANT CORP; JOHNSON AND JOHNSON

NEWS SUBJECT: (Mergers & Acquisitions (1ME39); Major Corporations (1MA93); Corporate Groups & Ownership (1XO09))

INDUSTRY: (Healthcare (1HE06); Medical Devices (1ME31); Medical Equipment & Supplies (1HE68); Pharmaceuticals & Biotechnology (1PH13); Surgical Instrumentation (1SU78); Manufacturing (1MA74))

REGION: (Massachusetts (1MA15); USA (1US73); Americas (1AM92); New England (1NE37); North America (1NO39))

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Language:  EN

OTHER INDEXING:  (Sorkin, Andrew Ross; Feder, Barnaby J)  (ABBOTT; ABBOTT
LABORATORIES; FOOD AND DRUG ADMINISTRATION; GUIDANT; INTEGRATED VASCULAR SYSTEMS;
JOHNSON JOHNSON; MEDTRONIC)  (James R. Tobin; Tobin)  (Heart; Mergers, Acquisitions
and Divestitures; Heart)

COMPANY TERMS: BOSTON SCIENTIFIC CORP; GUIDANT CORP; JOHNSON AND JOHNSON INC; ABBOTT
LABORATORIES INC

EDITION: Late Edition - Final

Word Count: 1100
1/9/06 NYT C1

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit F

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**REDACTED**

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**REDACTED**

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**REDACTED**

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

**GUIDANT**
**Questions & Answers**
**Revised (1/16/06)**

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**REDACTED**

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

**GUIDANT**
**Questions & Answers**
**Revised (1/16/06)**

## LEGAL/ARBITRAGE (Steve Rosenberg/Jim Hilton/Eric Harris)

| 1. | Q | **What are the mechanics for shareholders to exchange their shares?** |
|---|---|---|
| | A | • After the merger is completed, the exchange agent will send a letter of transmittal to each former Guidant stockholder. The transmittal letter will contain instructions for exchanging shares of Guidant common stock for cash and shares of J&J common stock as provided in the Merger Agreement. |
| 2. | Q | **Does either the GUIDANT Board of Directors or J&J Board of Directors have a fiduciary out?** |
| | A | • The revised amendment to the merger agreement contains customary deal protection provisions customary for transactions of this nature. The revised amendment to the merger agreement has been filed and is publicly available. |
| 3. | Q | **What are the closing conditions in this revised transaction?** |
| | A | • The revised amendment to the agreement has been filed with the SEC. |
| 4. | Q | **Please list the steps and the associated timeline necessary to close this transaction.** |
| | A | • Revised proxy is targeted to be mailed to the SEC on 1/17/06<br>• A supplement to the Proxy Statement/Prospectus (mailed to Shareholders) – will be mailed as soon as the SEC reviews and clears the revised proxy which could occur on 1/17/06<br>• Guidant Shareholder Vote – scheduled for 1/31/06<br>Anticipated Closing – immediately following a favorable shareholder vote (~2 days) |
| 5. | Q | **Since this is a revised amendment to the agreement, will it require review and approval by the FTC and the European Commission again?** |
| | A | • We do not anticipate further review by the FTC or the European Commission |
| 6. | Q | **When does the merger agreement expire?** |
| | A | • The revised amendment to the agreement was filed with the SEC so you can now review it |
| 7. | Q | **Are there any MAC clauses contained in the agreement?** |
| | A | • The revised amendment to the agreement was filed with the SEC so you can now review it |

**GUIDANT**
**Questions & Answers**
**Revised (1/16/06)**

| 8. | Q | Under what circumstances can either Company walk away from this agreement? |
|---|---|---|
|  | A | • The revised amendment to the agreement was filed with the SEC so you can now review it |
| 9. | Q | What type of legal exposure relating to the recalls/lawsuits filed, if any, are you expecting? |
|  | A | • It's not appropriate for us to comment on this. |
| 10. | Q | What is the status of the criminal investigation of Guidant as well as the subpoena recently issued to Guidant? |
|  | A | • It's not appropriate for us to comment on this. |
| 11. | Q | Was J&J previously aware of the various product malfunctions prior to the recalls and product notifications? |
|  |  | • It's not appropriate for us to comment on this. |
| 12. | Q | Are you required to find buyers to fulfill your EU divestiture requirements in order to close the acquisition? |
|  | A | • No |
| 13. | Q | Why do you believe there may be IP issues associated with Boston Scientific's offer for Guidant which are not an issue in J&J's offer for Guidant? |
|  | A | • Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents. Our IP portfolio in this area includes patents directed to Rapamyocin and its analogues including ABT-578 and Everolimus when used on a stent. Abbott does not receive access to this under the Boston agreement. Without access to this IP there is a risk that a DES using any of these compounds may infringe our IP. |

**GUIDANT**
**Questions & Answers**
**Revised (1/16/06)**

| 14. | Q | What are some of the factors that you believe may cause the FTC/EC regulatory review process to take longer than Boston Scientific is publicly indicating? |
|---|---|---|
|  | A | <ul><li>J&J's regulatory process took approximatey 1 year to complete so it may not be realistic to think Boston Scientific's process can be completed in only a few months.</li><li>Boston Scientific has conditioned its proposal on retaining rights to the Guidant DES program and there is a risk that the Regulatory authorities may not permit such retention.</li><li>The Boston and Abbott agreement is likely to be a very complex agreement which historically necessitates a longer review time due to the complexity of the agreement. There is also the possibility this will raise competitive concerns and questions that will take time to address.</li><li>The assets associated with Guidant's VI and CRM businesses are in some case intermingled. Disaggragating (both physical and Intangibles) these assets could be a complex process which could result in a substantial delay in the regulatory approval</li></ul> |

# Exhibit G



**Multi-Company Note**

# Medical Supplies & Technology

## An INTERESTing New Offer

**January 13, 2006**

▬▬▬▬

**Matthew J Dodds**
+1-212-816-6928
matthew.dodds@citigroup.com

**Efrem Kamen**
+1-212-816-3820

**United States**

SUMMARY

➤ BSX's new bid appears more focused on anti-trust issues than a higher price, which is likely to be based on intellectual property as much as timing. We don't think BSX's new offer is enough to get GDT to switch sides.

➤ A BSX/GDT deal may not have the freedom of passage through the FTC that is widely anticipated, as JNJ holds some key intellectual property needed to make ABT a "competitive" DES player.

➤ JNJ owns the IP around the use of the drug sirolimus (rapamycin) and its analogues on a stent - this includes both ABT-578 and everolimus.

➤ When the FTC initially approved JNJ/GDT in October, JNJ agreed to license rapid exchange and other stent rights to ABT. We suspect that the other stent rights included the IP surrounding the use of rapamycin analogues on a stent.

➤ Without this IP, the FTC could have concern over ABT's ability to make ZoMaxx or Xience V a viable competitor.

### SUMMARY VALUATION AND RECOMMENDATION DATA

| Company (Ticker) | Price | Expected Returns | | | | Rating | Div.(E) | Target | LTGR | Earnings Per Share | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Price | Div. | Total | | | | | | Current Yr | Next Yr |
| Abbott Laboratories- | $41.34 | (8.1%) | 2.6% | (5.5%) | Curr | 3M | $1.07 | $38.00 | 7% | $2.48E | $2.50E |
| (ABT) | | | | | Prev | 3M | $1.07 | $38.00 | 7% | $2.48E | $2.50E |
| Boston Scientific- | $25.05 | 7.8% | 0.0% | 7.8% | Curr | 2H | $0.00 | $27.00 | 7% | $1.83E | $1.80E |
| (BSX) | | | | | Prev | 2H | $0.00 | $27.00 | 7% | $1.83E | $1.80E |
| Guidant Corporation- | $70.40 | (31.8%) | 0.6% | (31.3%) | Curr | 3H | $0.40 | $48.00 | 15% | $1.82E | $1.49E |
| (GDT) | | | | | Prev | 3H | $0.40 | $48.00 | 15% | $1.82E | $1.49E |
| Johnson & Johnson- | $62.21 | 28.6% | 2.1% | 30.7% | Curr | 1L | $1.29 | $80.00 | 11% | $3.50E | $3.86E |
| (JNJ) | | | | | Prev | 1L | $1.29 | $80.00 | 11% | $3.50E | $3.86E |

### OPINION

**BSX's new offer shows GDT's Board is as concerned with anti-trust as price...**

After the close yesterday, Boston came back with another offer for Guidant. While this was widely anticipated, it is a bit quicker than we thought and the structure puts more of a focus on anti-trust concerns than a pricing premium. Specifically, the Boston offer of $73 is only $1 higher than the last offer and is still equally split between stock and cash. We felt Boston would go to $76 with its follow up bid on the chance that JNJ was "maxed" at $68. In addition to the $1 increase in price, Boston has altered its agreement on two fronts to address two apparent concerns of Guidant's Board: 1) the ability to get through the FTC, and 2) the ability to close the deal in a timely manner. To address these concerns, Boston has now

Citigroup Research is a division of Citigroup Global Markets Inc. (the "Firm"), which does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Non-US research analysts who have prepared this report, and who may be associated persons of the member or member organization, are not registered/qualified as research analysts with the NYSE and/or NASD, but instead have satisfied the registration/qualification requirements or other research-related standards of a non-US jurisdiction.
Customers of the Firm in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at http://www.smithbarney.com (for retail clients) or http://www.citigroupgeo.com (for institutional clients) or can call (866) 836-9542 to request a copy of this research.

**Citigroup Global Markets**



offered to divest all overlapping assets if necessary and will pay $0.012 in cash per day (or $4MM per day) for every day the closing slips after April 1.The second component is quite novel, and we aren't sure if this has ever been done before in a major acquisition/merger. While it may sound lucrative since the cash register rings daily, it's really quite small ($120MM a month) in relation to the $25B deal size.

**...And could be related to JNJ's IP around using limus compounds on a stent...**

The interesting new features of Boston's offer implies that Guidant's Board is more concerned with anti-trust issues than the investment community has realized.  Our recent work in the area suggests there may be one major issue that has been overlooked to date – JNJ's IP position on using sirolimus (rapamycin) and its analogues on a stent.  JNJ licensed rapamycin from Wyeth but also has its own patents that cover the use of rapamycin and rapamycin analogues on a stent.   These patents include the '796 patent filed in May 2001 and the '536 patent filed in April 2003. The patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.  While we have not done specific research on the strength of the patents, the claims appear to somewhat broadly cover the use of rapamycin on a stent to treat restenosis.

What makes this issue interesting is that JNJ is likely to have offered a license to these patents along with rapid-exchange to Abbott since ABT-578 (the drug Abbott uses for ZoMaxx) is a rapamycin analogue.  If this is correct, it means that the FTC required this access to ensure that Abbott would not face litigation from JNJ when it eventually enters the US market.

**...Which would remain an issue with Boston's new offer...**

In the Boston deal for Guidant, neither Boston nor Abbott would garner access to the limus patents so another competitive stent entrant may not technically be "created" with this deal. (It could be argued that Guidant didn't have access to these patents before the JNJ offer, but if the FTC determined it was an issue in its JNJ/GDT review, its on the map.)  Hence, while the Boston/Abbott deal looks quite a bit more comprehensive than the JNJ/Abbott deal, the importance of the limus patent rights appear to have been underestimated.

**...Along with some other potential snags....**

While Boston is now saying it will divest all required assets – which would presumably include dropping the "shared" rights to everolimus – this would require another "agreement" with Abbott since the current one does not include this scenario.  It was also noted by the *Wall Street Journal* that Boston's last trip to the FTC was ugly as its acquisition of Cardiovascular Imaging Systems included an agreement with Hewlett Packard that the FTC felt was not honored.  Finally, Boston has said little about EU anti-trust clearance, which may not be on fast-track status given that Boston and Guidant have more overlap and the EU authorities raised several product issues between JNJ and Guidant that the FTC did not raise.

**...So the bottom line on the new offer is: we just don't think it's enough.**

Last night, Guidant's Board noted that it will look at and respond to the new offer by Boston Scientific.  Even with the new components of the Boston offer, we don't think Guidant's Board will get comfortable enough with the aforementioned anti-trust issues and the extra $1.  Boston is demanding that Guidant's Board respond by 4 p.m. EST today (which is ironically Friday the 13th).  If Guidant doesn't take the offer (80%), Boston could still go higher on price since Guidant's Board appeared comfortable to go with Boston earlier this week when the spread was $8. If Guidant does take Boston's new offer (20%), its hard to

**citigroup**

say what JNJ will do, especially given the fact that we have been incorrect on JNJ's last three moves relating to Guidant.

**QUARTERLY ESTIMATES PER SHARE DATA**

| Ticker | Period | Current Year | | Next Year | | Next Year + 1 | |
|---|---|---|---|---|---|---|---|
| | | Current | Previous | Current | Previous | Current | Previous |
| **ABT** | 1Q | **$0.58A** | $0.58A | **$0.58E** | $0.58E | **NA** | NA |
| (FYE Dec) | 2Q | **$0.58A** | $0.58A | **$0.62E** | $0.62E | **NA** | NA |
| | 3Q | **$0.58A** | $0.58A | **$0.60E** | $0.60E | **NA** | NA |
| | 4Q | **$0.74E** | $0.74E | **$0.70E** | $0.70E | **NA** | NA |
| | Year | **$2.48E** | $2.48E | **$2.50E** | $2.50E | **$2.62E** | $2.62E |
| **BSX** | 1Q | **$0.51A** | $0.51A | **$0.47E** | $0.47E | **NA** | NA |
| (FYE Dec) | 2Q | **$0.48A** | $0.48A | **$0.45E** | $0.45E | **NA** | NA |
| | 3Q | **$0.42A** | $0.42A | **$0.42E** | $0.42E | **NA** | NA |
| | 4Q | **$0.42E** | $0.42E | **$0.46E** | $0.46E | **NA** | NA |
| | Year | **$1.83E** | $1.83E | **$1.80E** | $1.80E | **$1.99E** | $1.99E |
| **GDT** | 1Q | **$0.65A** | $0.65A | **NA** | NA | **NA** | NA |
| (FYE Dec) | 2Q | **$0.63A** | $0.63A | **NA** | NA | **NA** | NA |
| | 3Q | **$0.28A** | $0.28A | **NA** | NA | **NA** | NA |
| | 4Q | **$0.26E** | $0.26E | **NA** | NA | **NA** | NA |
| | Year | **$1.82E** | $1.82E | **$1.49E** | $1.49E | **$2.42E** | $2.42E |
| **JNJ** | 1Q | **$0.97A** | $0.97A | **$1.04E** | $1.04E | **NA** | NA |
| (FYE Dec) | 2Q | **$0.93A** | $0.93A | **$1.01E** | $1.01E | **NA** | NA |
| | 3Q | **$0.87A** | $0.87A | **$0.97E** | $0.97E | **NA** | NA |
| | 4Q | **$0.74E** | $0.74E | **$0.83E** | $0.83E | **NA** | NA |
| | Year | **$3.50E** | $3.50E | **$3.86E** | $3.86E | **$4.22E** | $4.22E |

**VALUATION AND RISKS – COMPANIES DISCUSSED**
**Johnson & Johnson (JNJ –$62.21; 1L)**

*Valuation*

We arrive at our $80 target price for Johnson & Johnson based on an average of three different valuations: 1) a 21x multiple off our forward 12 months (F12M) EPS forecast; 2) a TEV/2005E EBITDA target multiple of 14x; and 3) a 10-year DCF analysis.

A 21x P/E multiple represents a weighted multiple using a sum-of-the-parts analysis on JNJ's three major divisions: Pharmaceuticals (58% of operating profit), MD&D (31%), and Consumer (11%). For Pharmaceuticals, our target multiple of 20x represents a modest premium to the large-cap pharmaceutical group average of 17x, but is in line to slightly above the better-positioned franchises of Eli Lilly (21x), and Novartis (18x). Our comp group also includes companies such as Bristol Myers. The range of this comp group is from 15x–19x.

For MD&D, our target multiple of 25x represents a 10% premium to our F12M forecast for the CMTI as JNJ's business should grow 16% in 2005E, well north of the group average. The group in comprised of 17 large-cap med tech companies and includes companies such as



Medtronic, Abbott Laboratories, and Alcon. The trading range for the comp group is 15x–33x forward 12-month EPS.

For Consumer, we are forecasting a 21x multiple, which is in line with the average F12M P/E multiple the Citigroup Home & Personal Care Products Team is forecasting for the four closest comparable companies. The range of the comps group is 18x-21x and includes companies such as Avon Products, Procter & Gamble, and Colgate-Palmolive.

For our TEV/2005E EBITDA calculation, we use the 2004 share count and net debt, and the 2005E EBITDA to calculate the current multiple of 14x.  Our TEV/EBITDA premium is based on the same factors as our Price/F12M EPS target, and we arrive at a TEV/EBITDA target price of $78.  The range of our TEV/EBITDA for the comp groups ranges from 10x to 32x 2005 EBITDA.

**Johnson & Johnson Valuation Ratios**

|  | Current | CMTI | Hos. Sup. Peers | Pharma Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|---|
| LT EPS Growth | 10% | 15% | 13% | 9% | 7% | | | |
| Price/F12M EPS | 17x | 23x | 18x | 17x | 18x | 21x | $78.96 | 26% |
| TEV/2004 EBITDA | 11x | 17x | 12x | | | 14x | $78.08 | 25% |
| Implied DCF Value | -- | | | | | | $84.15 | 35% |
| **Derived Price Target** | | | | | | | **$80.40** | **29%** |
| Dividend Yield | | | | | | | | 2% |
| **Expected Total Return** | | | | | | | | **31%** |

*Source: Citigroup Investment Research estimates*

Our DCF valuation of $84 per share is based on ten years of projected free cash flow with a 1% terminal growth rate. For an equity risk premium we used 3.8%; our adjusted beta is 0.58; and our weighted average cost of capital is 6.4%.

### Risks

We rate Johnson & Johnson Low Risk based on three factors: 1) Johnson & Johnson's broad business mix in three large, defensive markets – pharmaceuticals, medical products, and consumer products – makes Johnson & Johnson the most diversified large-cap company in the health care space; 2) Johnson & Johnson is a major player in all three of its targeted markets, including the No. 1 position in the $224 billion medical products market; and 3) Johnson & Johnson has a sizable cash hoard – over $7 billion in net cash – and free cash flow generation currently running at roughly $1.5 billion/quarter.

Risks to our thesis include: 1) unexpected generic competition for Levaquin, Risperdal, Aciphex, Topamax, or Procrit before 2008; 2) the inability to gain further share in the US drug eluting stent market in 2005 and 2006; 3) overly aggressive growth expectations for Natrecor, Remicade, or Topamax; 4) issues related to the Guidant merger.

Given the recent heightened scrutiny over drug-safety, there also exists the risk that any of Johnson & Johnson major pharmaceuticals could face slowing sales because of new or increased safety concerns.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from foreign exchange based on favorable yoy comparisons of the U.S. dollar versus the Euro and Yen declining in 2005; and 3) a strengthening US economy could lead to a negative sector rotation, as the med tech industry is non-cyclical in nature.

citigroup

If the impact on the company from any of these factors proves to be greater/less than we anticipate, it may prevent the stock from achieving our target price or could cause our target price to be materially outperformed.

### Guidant (GDT –$70.40; 3H)

#### Valuation

Our $48 target on GDT is still based on fundamental valuation and not on the newly proposed deal terms by either JNJ or BSX. Our target is based on an average of a 22x P/E multiple off of our forward 12-month EPS estimate of $1.46 (Q4:05 – Q3:06), a 16x TEV/2005 EBITDA multiple, and a DCF valuation.

Our P/E multiple is based on GDT trading at 22x forward 12-month earnings, which is based on a multiple that is in line to slightly below our Citigroup Med Tech Index (CMTI) of 17 large-cap companies, which also averages 22x.. Our index includes companies such as Medtronic, Baxter, and Alcon. Our in-line target is based on Guidant performance over the next 12-months falling right in the average range of the group. The P/E multiples in the group range from as low as 15x forward earnings to as high as 33x forward earnings.

Our TEV/EBITDA multiple of 16x 2005 EBITDA is also roughly in line with the CMTI average of 17x. This is based on the same reasons as the in-line P/E multiple. The group TEV/EBITDA multiples in the CMTI range from 10x to 32x.

**Guidant Estimated Valuation Ratios If JNJ or BSX Deal Breaks**

|  | Current | CMTI | Cardio Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|
| Price/F12M EPS | 34x | 22x | 26x | 18x | 22x | $45.04 | -36% |
| TEV/EBITDA | 17x | 17x | 20x |  | 16x | $50.84 | -28% |
| Implied DCF Value | -- |  |  |  |  | $47.81 | -32% |
| **Derived Price Target** |  |  |  |  |  | **$47.89** | **-32%** |
| Dividend Yeild |  |  |  |  |  |  | 1% |
| **Expected Total Return** |  |  |  |  |  |  | **-32%** |

*Source: Citigroup Investment Research*

Our DCF valuation of $48 per share is based on ten years of projected free cash flow with a 2% terminal growth rate. For an equity risk premium we used 3.8%; our adjusted beta is 0.79; and our weighted average cost of capital is 7.2%.

#### Risks

We rate Guidant High Risk primarily based on four factors: 1) Risk of failure of the company's DES programs; 2) Liability surrounding EVT; 3) Additional fallout from the ICD recall; and 4) A formal SEC investigation.

Upside investment risks to our Sell rating and target price include: 1) the completion of the proposed acquisition by either Johnson & Johnson or Boston Scientific, or 2) a stronger-than-anticipated return in the ICD market.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from foreign exchange if favorable yoy comparisons of the US dollar versus



the Euro and Yen subside; and 3) a strengthening US economy could lead to a negative sector rotation, as the med tech industry is non-cyclical in nature.

On the contrary, shares of Guidant could fall below our target price should the company's ICD market share losses continue or should legal problems relating to the recent DOJ subpoena or the SEC investigation arise. These situations would likely cause the deal to break for a second time, which could also cause Guidant to fall below our target.

### Boston Scientific (BSX– $25.05; 2H)

#### Valuation

Our price target on Boston Scientific remains $27.  Our $27 target price is based off an average of three different valuations: 1) a 15x multiple off our forward 12 months (F12M ending 3Q:06) EPS forecast of $1.75; 2) a TEV/EBITDA target multiple of 10x; and 3) a 10-year DCF analysis.

A 15x P/E multiple represents a 30%-35% discount our CMTI F12M group multiple of 22x and is based on a forecast of minimal EPS growth from 2005-08 and the heightened risk that TAXUS share could fall below our Street low expectations.  The CMTI is comprised of 17 large-cap medical devices companies, including companies such as Johnson & Johnson, Medtronic, and Alcon.  The range of the CMTI F12M P/E multiples is from 15x to 33x.

Our TEV/EBITDA target multiple of 10x is also based on Boston trading at a 30%-35% discount to the current CMTI multiple of 17x.  The comp group has changed ever so slightly since our last published note, pushing our multiple target for BSX to round down from 11x to 10x.  This said, the difference in value is minimal.  The TEV/EBITDA range for the CMTI is from 10x to 32x current enterprise value to projected 2005 EBITDA.

#### Boston Scientific Valuation Ratios

|  | Current | CMTI | Cardio Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|
| Price/F12M EPS | 14x | 23x | 31x | 19x | 15x | $26.12 | 4% |
| TEV/EBITDA | 10x | 17x | 23x |  | 10x | $28.62 | 14% |
| Implied DCF Value | -- |  |  |  |  | $26.31 | 5% |
| **Derived Price Target** |  |  |  |  |  | **$27.01** | **8%** |
| Dividend Yeild |  |  |  |  |  |  | 0% |
| **Expected Total Return** |  |  |  |  |  |  | **8%** |

*Source: Citigroup Investment Research*

Our DCF valuation of $27 per share is based on 10 years of projected free cash flow with a 1% terminal growth rate.   For an equity risk premium we used 3.9%, our adjusted beta is 1.51 and our WACC is 8.9%.

#### Risks

We rate BSX shares High Risk. Investment risks particular to Boston Scientific include:

➤ **Reliance on a single product line.**  The expected performance of the TAXUS stent in 2005 means that 40% of sales and 50% of EPS will come from a single product line.  No other large-cap med tech company has this level of sales and EPS concentrated in one product line and recent data has led to questions about the safety profile of this stent.



➤ **Patent risk surrounding the TAXUS stent.** Boston remains in litigation with JNJ over key stent patents in the US. Boston recently lost initial jury decisions on two JNJ patents (Palmaz and Gray), but won decisions on two of its own patents (Ding and Yang). These cases are unlikely to be resolved anytime soon, but could ultimately result in a large damage award or injunctive relief.

➤ **Competitive ASP pressure in the DES market in excess of our forecast.** We expect US DES ASPs to decline by 5% annually through 2008. Primary DES competitor JNJ is larger and better capitalized and has already been using price to win back DES market share in the US.

We would also highlight that BSX has recently announced its intentions to bid for Guidant. A culmination of this deal could adversely provide new risk to our BSX rating in either direction, as it could cause BSX share to fall due to possible dilution or could cause share to increase in value based on improved long-term prospects for BSX.

Our High Risk rating is primarily based on the company's significant reliance on a single product line combined with the outstanding legal issues noted above.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from FX as favorable Y/Y comparisons of the US dollar vs. the Euro and Yen subside in Q4; and 3) negative sector rotation if the US economy remains strong, as the med tech industry is non-cyclical in nature.

The above factors highlight some of the risks associated with investing in Boston Scientific's shares (for a more detailed list, please see the company's most recent 10-K filing). If any of the above-mentioned risk factors has a more negative impact on the company than we anticipate, the stock will likely have difficulty achieving our target price. Conversely, if any of these risk factors has less of an impact on the company's fundamentals, the stock could materially outperform our price target.



# ANALYST CERTIFICATION                                APPENDIX A-1

I, Matthew J. Dodds, research analyst and the author of this report, hereby certify that all of the views expressed in this research report accurately reflect my personal views about any and all of the subject issuer(s) or securities. I also certify that no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation(s) or view(s) in this report.

## IMPORTANT DISCLOSURES

### Boston Scientific (BSX)
**Ratings and Target Price History - Fundamental Research**
Analyst: Matthew Dodds (covered since May 19 2004)                    USD



| # | Date | Rating | Target Price | Closing Price |
|---|------|--------|--------------|---------------|
| 1: | 18 May 04 | *2H | *40.00 | 38.98 |
| 2: | 2 Jun 04 | 2H | *46.00 | 44.70 |
| 3: | 19 Jul 04 | 2H | *38.00 | 36.15 |
| 4: | 30 Sep 04 | 2H | *40.00 | 39.73 |
| 5: | 19 Oct 04 | 2H | *39.00 | 35.15 |
| 6: | 20 Apr 05 | 2H | *34.00 | 28.75 |
| 7: | 26 May 05 | 2H | *33.00 | 28.16 |
| 8: | 23 Jun 05 | 2H | *31.00 | 27.81 |
| 9: | 8 Sep 05 | 2H | *28.00 | 25.18 |
| 10: | 16 Oct 05 | 2H | *27.00 | 23.57 |

*Indicates change.

Covered
Not covered

### Guidant Corporation (GDT)
**Ratings and Target Price History - Fundamental Research**
Analyst: Matthew Dodds (covered since May 19 2004)                    USD



| # | Date | Rating | Target Price | Closing Price |
|---|------|--------|--------------|---------------|
| 1: | 18 May 04 | *3H | *57.00 | 59.07 |
| 2: | 28 May 04 | 3H | *53.00 | 54.34 |
| 3: | 1 Jul 04 | 3H | *51.00 | 55.50 |
| 4: | 22 Jul 04 | *2H | 51.00 | 50.55 |
| 5: | 15 Sep 04 | *3H | *54.00 | 63.54 |
| 6: | 17 Oct 04 | 3H | *55.00 | 64.50 |
| 7: | 21 Oct 04 | 3H | *56.00 | 63.67 |
| 8: | 7 Dec 04 | 3H | *59.00 | 72.35 |
| 9: | 27 Jan 05 | *2H | *76.00 | 72.00 |
| 10: | 24 Jun 05 | 2H | *70.00 | 63.90 |
| 11: | 21 Jul 05 | 2H | *76.00 | 69.63 |
| 12: | 2 Nov 05 | *3H | *54.00 | 60.40 |
| 13: | 7 Nov 05 | 3H | *50.00 | 57.52 |
| 14: | 27 Dec 05 | 3H | *48.00 | 64.69 |

*Indicates change.

Covered
Not covered



## Johnson & Johnson (JNJ)
### Ratings and Target Price History - Fundamental Research
Analyst: Matthew Dodds (covered since November 12 2004)



| # | Date | Rating | Target Price | Closing Price |
|---|------|--------|-------------|---------------|
| 1: | 11 Nov 04 | *1L | *71.00 | 60.60 |
| 2: | 7 Dec 04 | 1L | *72.00 | 60.41 |
| 3: | 18 Apr 05 | 1L | *76.00 | 69.04 |
| 4: | 20 Apr 05 | 1L | *80.00 | 68.10 |

*Indicates change.

—— Covered
------ Not covered

Customers of the Firm in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at http://www.smithbarney.com (for retail clients) or http://www.citigroupgeo.com (for institutional clients) or can call (866) 836-9542 to request a copy of this research.

A director of Citigroup Inc. serves as a director of Johnson & Johnson.

Citigroup Global Markets Inc. and/or its affiliates has a significant financial interest in relation to Johnson & Johnson. (For an explanation of the determination of significant financial interest, please refer to the policy for managing conflicts of interest which can be found at www.citigroupgeo.com .)

Citigroup Global Markets Inc. and/or its affiliates has a significant financial interest in relation to Guidant Corporation. (For an explanation of the determination of significant financial interest, please refer to the policy for managing conflicts of interest which can be found at www.citigroupgeo.com .)

Citigroup Global Markets Inc. or its affiliates beneficially owns 1% or more of any class of common equity securities of Guidant Corporation. This position reflects information available as of the prior business day.

Citigroup Global Markets Inc. or an affiliate received compensation for products and services other than investment banking services from Boston Scientific, Guidant Corporation and Johnson & Johnson in the past 12 months.

Citigroup Global Markets Inc. currently has, or had within the past 12 months, the following company(ies) as clients, and the services provided were non-investment-banking, securities-related: Boston Scientific, Guidant Corporation and Johnson & Johnson.

Citigroup Global Markets Inc. currently has, or had within the past 12 months, the following company(ies) as clients, and the services provided were non-investment-banking, non-securities-related: Boston Scientific, Guidant Corporation and Johnson & Johnson.

Analysts' compensation is determined based upon activities and services intended to benefit the investor clients of Citigroup Global Markets Inc. and its affiliates ("the Firm"). Like all Firm employees, analysts receive compensation that is impacted by overall firm profitability, which includes revenues from, among other business units, the Private Client Division, Institutional Equities, and Investment Banking.

The Firm is a market maker in the publicly traded equity securities of Boston Scientific, Guidant Corporation and Johnson & Johnson.

### Citigroup Investment Research Ratings Distribution
Data current as of 31 December 2005

| | Buy | Hold | Sell |
|---|-----|------|------|
| Citigroup Investment Research Global Fundamental Coverage (2784) | 42% | 41% | 17% |
| % of companies in each rating category that are investment banking clients | 47% | 48% | 37% |
| Medical Supplies & Technology -- North America (9) | 44% | 33% | 22% |
| % of companies in each rating category that are investment banking clients | 50% | 33% | 50% |

**Guide to Fundamental Research Investment Ratings:**
Citigroup Investment Research's stock recommendations include a risk rating and an investment rating.
**Risk ratings**, which take into account both price volatility and fundamental criteria, are: Low (L), Medium (M), High (H), and Speculative (S).
**Investment ratings** are a function of Citigroup Investment Research's expectation of total return (forecast price appreciation and dividend yield within the next 12 months) and risk rating.
For securities in developed markets (US, UK, Europe, Japan, and Australia/New Zealand), investment ratings are: Buy (1) (expected total return of 10% or more for Low-Risk stocks, 15% or more for Medium-Risk stocks, and 20% or more for High-Risk stocks, and 35% or more for Speculative stocks); Hold (2) (0%-10% for Low-Risk stocks, 0%-15% for Medium-Risk stocks, 0%-20% for High-Risk stocks, and 0%-35% for Speculative stocks); and Sell (3) (negative total return).
Investment ratings are determined by the ranges described above at the time of initiation of coverage, a change in investment and/or risk rating, or a change in target price (subject to limited management discretion). At other times, the expected total returns may fall outside of these ranges because of market price movements and/or other short-term volatility or trading patterns. Such interim deviations from

9



specified ranges will be permitted but will become subject to review by Research Management. Your decision to buy or sell a security should be based upon your personal investment objectives and should be made only after evaluating the stock's expected performance and risk.

Between September 9, 2002, and September 12, 2003, Citigroup Investment Research's stock ratings were based upon expected performance over the following 12 to 18 months relative to the analyst's industry coverage universe at such time. An Outperform (1) rating indicated that we expected the stock to outperform the analyst's industry coverage universe over the coming 12-18 months. An In-line (2) rating indicated that we expected the stock to perform approximately in line with the analyst's coverage universe. An Underperform (3) rating indicated that we expected the stock to underperform the analyst's coverage universe. In emerging markets, the same ratings classifications were used, but the stocks were rated based upon expected performance relative to the primary market index in the region or country. Our complementary Risk rating system -- Low (L), Medium (M), High (H), and Speculative (S) -- took into account predictability of financial results and stock price volatility. Risk ratings for Asia Pacific were determined by a quantitative screen which classified stocks into the same four risk categories. In the major markets, our Industry rating system -- Overweight, Marketweight, and Underweight -- took into account each analyst's evaluation of their industry coverage as compared to the primary market index in their region over the following 12 to 18 months.

## OTHER DISCLOSURES

Within the past 5 years, Citigroup Global Markets Inc. or its affiliates has acted as manager or co manager of a public offering of fixed income securities of Boston Scientific and Johnson & Johnson.

Citigroup Global Markets Inc. or its affiliates beneficially owns 2% or more of any class of common equity securities of Guidant Corporation.

Citigroup Global Markets Inc. or its affiliates holds a long position in any class of common equity securities of Guidant Corporation.

For securities recommended in the Product in which the Firm is not a market maker, the Firm is a liquidity provider in the issuers' financial instruments and may act as principal in connection with such transactions. The Firm is a regular issuer of traded financial instruments linked to securities that may have been recommended in the Product. The Firm regularly trades in the securities of the subject company(ies) discussed in the Product. The Firm may engage in securities transactions in a manner inconsistent with the Product and, with respect to securities covered by the Product, will buy or sell from customers on a principal basis.

Securities recommended, offered, or sold by the Firm: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources that the Firm believes to be reliable, we do not guarantee its accuracy and it may be incomplete and condensed. Note, however, that the Firm has taken all reasonable steps to determine the accuracy and completeness of the disclosures made in the Important Disclosures section of the Product. In producing Products, members of the Firm's research department may have received assistance from the subject company(ies) referred to in the Product. Any such assistance may have included access to sites owned, leased or otherwise operated or controlled by the issuers and meetings with management, employees or other parties associated with the subject company(ies). Firm policy prohibits research analysts from sending draft research to subject companies. However, it should be presumed that the author of the Product has had discussions with the subject company to ensure factual accuracy prior to publication. All opinions, projections and estimates constitute the judgment of the author as of the date of the Product and are subject to change without notice. Prices and availability of financial instruments also are subject to change without notice. Although Citigroup Investment Research does not set a predetermined frequency for publication, if the Product is a fundamental research report, it is the intention of Citigroup Investment Research to provide research coverage of the/those issuer(s) mentioned therein, including in response to news affecting this issuer, subject to applicable quiet periods and capacity constraints. The Product is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security. Any decision to purchase securities mentioned in the Product must take into account existing public information on such security or any registered prospectus.

Investing in non-U.S. securities, including ADRs, may entail certain risks. The securities of non-U.S. issuers may not be registered with, nor be subject to the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on foreign securities. Foreign companies are generally not subject to uniform audit and reporting standards, practices and requirements comparable to those in the U.S. Securities of some foreign companies may be less liquid and their prices more volatile than securities of comparable U.S. companies. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign stock and its corresponding dividend payment for U.S. investors. Net dividends to ADR investors are estimated, using withholding tax rates conventions, deemed accurate, but investors are urged to consult their tax advisor for exact dividend computations. Investors who have received the Product from the Firm may be prohibited in certain states or other jurisdictions from purchasing securities mentioned in the Product from the Firm. Please ask your Financial Consultant for additional details. Citigroup Global Markets Inc. takes responsibility for the Product in the United States. Any orders by non-US investors resulting from the information contained in the Product may be placed only through Citigroup Global Markets Inc.

The Citigroup legal entity that takes responsibility for the production of the Product is the legal entity which the first named author is employed by. The Product is made available in Australia to wholesale clients through Citigroup Global Markets Australia Pty Ltd. (ABN 64 003 114 832 and AFSL No. 240992) and to retail clients through Citigroup Wealth Advisors Pty Ltd. (ABN 19 009 145 555 and AFSL No. 240813), Participants of the ASX Group and regulated by the Australian Securities & Investments Commission. Citigroup Centre, 2 Park Street, Sydney, NSW 2000. If the Product is being made available in certain provinces of Canada by Citigroup Global Markets (Canada) Inc. ("CGM Canada"), CGM Canada has approved the Product. Citigroup Place, 123 Front Street West, Suite 1100, Toronto, Ontario M5J 2M3. The Product may not be distributed to private clients in Germany. The Product is distributed in Germany by Citigroup Global Markets Deutschland AG & Co. KGaA, which is regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin). Frankfurt am Main, Reuterweg 16, 60323 Frankfurt am Main. If the Product is made available in Hong Kong by, or on behalf of, Citigroup Global Markets Asia Ltd., it is attributable to Citigroup Global Markets Asia Ltd., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. Citigroup Global Markets Asia Ltd. is regulated by Hong Kong Securities and Futures Commission. If the Product is made available in Hong Kong by The Citigroup Private Bank to its clients, it is attributable to Citibank N.A., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. The Citigroup Private Bank and Citibank N.A. is regulated by the Hong Kong Monetary Authority. The Product is made



available in India by Citigroup Global Markets India Private Limited, which is regulated by Securities and Exchange Board of India. Bakhtawar, Nariman Point, Mumbai 400-021. If the Product was prepared by Citigroup Investment Research and distributed in Japan by Nikko Citigroup Ltd., it is being so distributed under license. Nikko Citigroup Limited is regulated by Financial Services Agency, Securities and Exchange Surveillance Commission, Japan Securities Dealers Association, Tokyo Stock Exchange and Osaka Securities Exchange. Akasaka Park Building, 2-20, Akasaka 5-chome, Minato-ku, Tokyo 107-6122. The Product is made available in Korea by Citigroup Global Markets Korea Securities Ltd., which is regulated by Financial Supervisory Commission and the Financial Supervisory Service. Hungkuk Life Insurance Building, 226 Shinmunno 1-GA, Jongno-Gu, Seoul, 110-061. The Product is made available in Malaysia by Citigroup Global Markets Malaysia Sdn Bhd, which is regulated by Malaysia Securities Commission. Menara Citibank, 165 Jalan Ampang, Kuala Lumpur, 50450. The Product is made available in Mexico by Acciones y Valores Banamex, S.A. De C. V., Casa de Bolsa, which is regulated by Comision Nacional Bancaria y de Valores. Reforma 398, Col. Juarez, 06600 Mexico, D.F. In New Zealand the Product is made available through Citigroup Global Markets New Zealand Ltd., a Participant of the New Zealand Exchange Limited and regulated by the New Zealand Securities Commission. Level 19, Mobile on the Park, 157 lambton Quay, Wellington. The Product is made available in Poland by Dom Maklerski Banku Handlowego SA an indirect subsidiary of Citigroup Inc., which is regulated by Komisja Papierów Wartosciowych i Gield. Bank Handlowy w Warszawie S.A. ul. Senatorska 16, 00-923 Warszawa. The Product is made available in the Russian Federation through ZAO Citibank, which is licensed to carry out banking activities in the Russian Federation in accordance with the general banking license issued by the Central Bank of the Russian Federation and brokerage activities in accordance with the license issued by the Federal Service for Financial Markets. Neither the Product nor any information contained in the Product shall be considered as advertising the securities mentioned in this report within the territory of the Russian Federation or outside the Russian Federation. The Product does not constitute an appraisal within the meaning of the Federal Law of the Russian Federation of 29 July 1998 No. 135-FZ (as amended) On Appraisal Activities in the Russian Federation. 8-10 Gasheka Street, 125047 Moscow. The Product is made available in Singapore through Citigroup Global Markets Singapore Pte. Ltd., a Capital Markets Services Licence holder, and regulated by Monetary Authority of Singapore. 1 Temasek Avenue, #39-02 Millenia Tower, Singapore 039192. Citigroup Global Markets (Pty) Ltd. is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at 145 West Street, Sandton, 2196, Saxonwold. Citigroup Global Markets (Pty) Ltd. is regulated by JSE Securities Exchange South Africa, South African Reserve Bank and the Financial Services Board. The investments and services contained herein are not available to private customers in South Africa. The Product is made available in Taiwan through Citigroup Global Markets Inc. (Taipei Branch), which is regulated by Securities & Futures Bureau. No portion of the report may be reproduced or quoted in Taiwan by the press or any other person. No. 8 Manhattan Building, Hsin Yi Road, Section 5, Taipei 100, Taiwan. The Product is made available in United Kingdom by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. This material may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the FSA and further details as to where this may be the case are available upon request in respect of this material. Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB. The Product is made available in United States by Citigroup Global Markets Inc, which is regulated by NASD, NYSE and the US Securities and Exchange Commission. 388 Greenwich Street, New York, NY 10013. Unless specified to the contrary, within EU Member States, the Product is made available by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. Many European regulators require that a firm must establish, implement and make available a policy for managing conflicts of interest arising as a result of publication or distribution of investment research. The policy applicable to Citigroup Investment Research's Products can be found at www.citigroupgeo.com. Compensation of equity research analysts is determined by equity research management and Citigroup's senior management and is not linked to specific transactions or recommendations. The Product may have been distributed simultaneously, in multiple formats, to the Firm's worldwide institutional and retail customers. The Product is not to be construed as providing investment services in any jurisdiction where the provision of such services would be illegal. Subject to the nature and contents of the Product, the investments described therein are subject to fluctuations in price and/or value and investors may get back less than originally invested. Certain high-volatility investments can be subject to sudden and large falls in value that could equal or exceed the amount invested. Certain investments contained in the Product may have tax implications for private customers whereby levels and basis of taxation may be subject to change. If in doubt, investors should seek advice from a tax adviser. Advice in the Product has been prepared without taking account of the objectives, financial situation or needs of any particular investor. Accordingly, investors should, before acting on the advice, consider the appropriateness of the advice, having regard to their objectives, financial situation and needs.

© 2006 Citigroup Global Markets Inc. Citigroup Investment Research is a division and service mark of Citigroup Global Markets Inc. and its affiliates and is used and registered throughout the world. Citigroup and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world. Nikko is a registered trademark of Nikko Cordial Corporation. All rights reserved. Any unauthorized use, duplication, redistribution or disclosure is prohibited by law and will result in prosecution. The Firm accepts no liability whatsoever for the actions of third parties. The Product may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the Product refers to website material of the Firm, the Firm has not reviewed the linked site. Equally, except to the extent to which the Product refers to website material of the Firm, the Firm takes no responsibility for, and makes no representations or warranties whatsoever as to, the data and information contained therein. Such address or hyperlink (including addresses or hyperlinks to website material of the Firm) is provided solely for your convenience and information and the content of the linked site does not in anyway form part of this document. Accessing such website or following such link through the Product or the website of the Firm shall be at your own risk and the Firm shall have no liability arising out of, or in connection with, any such referenced website.

ADDITIONAL INFORMATION IS AVAILABLE UPON REQUEST

# Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) Civil Action No. 06-613 |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF JEFFREY LEEBAW

I, Jeffrey Leebaw, hereby declare as follows:

1.      I am employed by Johnson & Johnson Corporation ("J&J ") in its Corporate Communications department. My current position is Vice President, Corporate Media Relations. I have held this position since March 2006. Prior to that, I was Executive Director, Corporate Communications, which position I held for approximately ten years. One of my responsibilities in these positions at J&J was to communicate with the news media.

2.      On or about January 20, 2006, I was contacted via e-mail by Avram Goldstein, a reporter from Bloomberg News service. Mr. Goldstein said "I'm working on a story about your lobbying effort on Wall Street and how JNJ is reaching out to analysts and shareholders to sow doubts about Boston Scientific. Can we discuss?" I wrote back to Mr.

Goldstein declining to comment. I did not discuss J&J's patents with Mr. Goldstein, or provide any information to Mr. Goldstein about J&J's patents.

      3.    Mr. Goldstein wrote an article that was published in the *International Herald Tribune* on January 23, 2006, entitled "J&J works to discredit rival offer for Guidant." This article is attached to Abbott's Complaint as Exhibit F. The article correctly states that I "declined to comment." Mr. Goldstein, however, never asked me to comment on the statements made later in the article after the reference to my name, including the statements that Boston Scientific was "tempting patent litigation" or that J&J "was considering filing patent infringement lawsuits." So far as I am aware, I was the only J&J employee contacted by Mr. Goldstein with respect to this article.

      4.    I had no communications with either Lawrence Biegelsen of Prudential or Jan David Wald of A.G. Edwards about J&J's patents or any other issues surrounding the takeover battle between J&J and Boston Scientific for Guidant. Communications with financial analysts are typically handled by J&J's Investor Relations group, not the Corporate Communications group. To my knowledge, no one in J&J's Corporate Communications group spoke with Biegelsen or Wald about these issues.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on December 13, 2006.

                    Jeffrey Leebaw

2

# Exhibit I

(C) Applications for reissues, particularly those involved in stayed litigation (37 CFR 1.176).

(D) Applications remanded by an appellate tribunal for further action.

(E) An application, once taken up for action by an examiner according to its effective filing date, should be treated as special by an examiner, art unit or Technology Center to which it may subsequently be transferred; exemplary situations include new cases transferred as the result of a telephone election and cases transferred as the result of a timely reply to any official action.

(F) Applications which appear to interfere with other applications previously considered and found to be allowable, or which will be placed in interference with an unexpired patent or patents.

(G) Applications ready for allowance, or ready for allowance except as to formal matters.

(H) Applications which are in condition for final rejection.

(I) Applications pending more than 5 years, including those which, by relation to a prior United States application, have an effective pendency of more than 5 years. See MPEP § 707.02.

(J) Reexamination proceedings, MPEP § 2261 >and § 2661<.

See also MPEP § 714.13, § 1207 and § 1309.

## 708.02    Petition To Make Special  [R-3]

*37 CFR 1.102.  Advancement of examination.*

(a)  Applications will not be advanced out of turn for examination or for further action except as provided by this part, or upon order of the Director to expedite the business of the Office, or upon filing of a request under paragraph (b) of this section or upon filing a petition under paragraphs (c) or (d) of this section with a showing which, in the opinion of the Director, will justify so advancing it.<

(b)  Applications wherein the inventions are deemed of peculiar importance to some branch of the public service and the head of some department of the Government requests immediate action for that reason, may be advanced for examination.

**>

(c)  A petition to make an application special may be filed without a fee if the basis for the petition is:

(1)  The applicant's age or health; or
(2)  That the invention will materially:
(i)  Enhance the quality of the environment;
(ii)  Contribute to the development or conservation of energy resources; or
(iii) Contribute to countering terrorism.<

(d)  A petition to make an application special on grounds other than those referred to in paragraph (c) of this section must be accompanied by the fee set forth in § 1.17(h).

New applications ordinarily are taken up for examination in the order of their effective United States filing dates. Certain exceptions are made by way of petitions to make special, which may be granted under the conditions set forth below.>Any statement in support of a petition to make special must be based on a good faith belief that the invention in fact qualifies for special status. See 37 CFR 1.56 and 10.18.<

## I.    MANUFACTURE

An application may be made special on the ground of prospective manufacture upon the filing of a petition accompanied by the fee under 37 CFR 1.17(h) and a statement by the applicant, assignee or an attorney/agent registered to practice before the Office alleging:

(A) The possession by the prospective manufacturer of sufficient presently available capital (stating approximately the amount) and facilities (stating briefly the nature thereof) to manufacture the invention in quantity or that sufficient capital and facilities will be made available if a patent is granted;

If the prospective manufacturer is an individual, there must be a corroborating statement from some responsible party, as for example, an officer of a bank, showing that said individual has the required available capital to manufacture;

(B) That the prospective manufacturer will not manufacture, or will not increase present manufacture, unless certain that the patent will be granted;

(C) That the prospective manufacturer obligates himself, herself or itself, to manufacture the invention, in the United States or its possessions, in quantity immediately upon the allowance of claims or issuance of a patent which will protect the investment of capital and facilities; and

(D) That the applicant or assignee has made or caused to be made a careful and thorough search of the prior art, or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

## II.   INFRINGEMENT

Subject to a requirement for a further showing as may be necessitated by the facts of a particular case, an application may be made special because of actual infringement (but not for prospective infringement) upon payment of the fee under 37 CFR 1.17(h) and the filing of a petition accompanied by a statement by the applicant, assignee, or an attorney/agent registered to practice before the Office alleging:

(A) That there is an infringing device or product actually on the market or method in use;

(B) That a rigid comparison of the alleged infringing device, product, or method with the claims of the application has been made, and that, in his or her opinion, some of the claims are unquestionably infringed; and

(C) That he or she has made or caused to be made a careful and thorough search of the prior art or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

Models or specimens of the infringing product or that of the application should not be submitted unless requested.

## III.   APPLICANT'S HEALTH

An application may be made special upon a petition by applicant accompanied by any evidence showing that the state of health of the applicant is such that he or she might not be available to assist in the prosecution of the application if it were to run its normal course, such as a doctor's certificate or other medical certificate. No fee is required for such a petition.  See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## IV.   APPLICANT'S AGE

An application may be made special upon filing a petition including any evidence showing that the applicant is 65 years of age, or more, such as a birth certificate or applicant's statement. No fee is required with such a petition.  See  37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## V.   ENVIRONMENTAL QUALITY

The U.S. Patent and Trademark Office will accord "special" status to all patent applications for inventions which materially enhance the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements, i.e.,  air, water, and soil.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially enhances the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements.< No fee is required for such a petition. See 37 CFR 1.102(c). >If the application disclosure is not clear on its face that the claimed invention materially enhances the quality of the environment by contributing to the restoration or maintenance of one of the basic life-sustaining natural elements, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially enhance the quality of the environment. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may enhance the quality of the environment.<

## VI.  ENERGY

The U.S. Patent and Trademark Office will, on petition, accord "special" status to all patent applications for inventions which materially contribute to (A) the discovery or development of energy resources, or (B) the more efficient utilization and conservation of energy resources. Examples of inventions in category (A) would be developments in fossil fuels (natural gas, coal, and petroleum), hydrogen fuel technologies, nuclear energy, solar energy, etc. Category (B) would include inventions relating to the reduction of energy consumption in combustion systems, industrial equipment, household appliances, etc.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to category (A) or (B) set forth above.< No fee is required for such a petition,  37 CFR 1.102(c).>If the application disclosure is not clear on its face that the claimed invention materially contributes to category (A) or (B), the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially contribute to category (A) or (B). Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to category (A) or (B).<

## VII.  INVENTIONS RELATING TO RECOMBINANT DNA

In recent years revolutionary genetic research has been conducted involving recombinant deoxyribonucleic acid ("recombinant DNA"). Recombinant DNA research appears to have extraordinary potential benefit for mankind. It has been suggested, for example, that research in this field might lead to ways of controlling or treating cancer and hereditary defects. The technology also has possible applications in agriculture and industry. It has been likened in importance to the discovery of nuclear fission and fusion. At the same time, concern has been expressed over the safety of this type of research. The National Institutes of Health (NIH) has released guidelines for the conduct of research concerning recombinant DNA. These "Guidelines for Research Involving Recombination DNA Molecules," were published in the *Federal Register* of July 7, 1976, 41 FR 27902-27943. NIH is sponsoring experimental work to identify possible hazards and safety practices and procedures.

In view of the exceptional importance of recombinant DNA and the desirability of prompt disclosure of developments in the field, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to safety of research in the field of recombinant DNA. Upon appropriate petition and payment of the fee under 37 CFR 1.17(h), the Office will make special patent applications for inventions relating to safety of research in the field of recombinant DNA. Petitions for special status should be accompanied by statements under 37 CFR 1.102 by the applicant, assignee, or statements by an attorney/agent registered to practice before the Office explaining the relationship of the invention to safety of research in the field of recombinant DNA research. The fee set forth under 37 CFR 1.17(h) must also be paid.

## VIII.  SPECIAL EXAMINING PROCEDURE FOR CERTAIN NEW APPLICATIONS — ACCELERATED EXAMINATION

A new application (one which has not received any examination by the examiner) may be granted special status provided that applicant (and this term includes applicant's attorney or agent) complies with each of the following items:

(A) Submits a petition to make special accompanied by the fee set forth in 37 CFR 1.17(h);

(B) Presents all claims directed to a single invention, or if the Office determines that all the claims presented are not obviously directed to a single invention, will make an election without traverse as a prerequisite to the grant of special status.

The election may be made by applicant at the time of filing the petition for special status. Should applicant fail to include an election with the original papers or petition and the Office determines that a requirement should be made, the established telephone restriction practice will be followed.

If otherwise proper, examination on the merits will proceed on claims drawn to the elected invention.

If applicant refuses to make an election without traverse, the application will not be further examined at that time. The petition will be denied on the ground that the claims are not directed to a single invention, and the application will await action in its regular turn.

Divisional applications directed to the nonelected inventions will not automatically be given special status based on papers filed with the petition in the parent application. Each such application must meet on its own all requirements for the new special status;

(C) Submits a statement(s) that a pre-examination search was made, listing the field of search by class and subclass, publication, Chemical Abstracts, foreign patents, etc. The pre-examination search must be directed to the invention as claimed in the application for which special status is requested. A search made by a foreign patent office satisfies this requirement if the claims in the corresponding foreign application are of the same or similar scope to the claims in the U.S. application for which special status is requested;

(D) Submits one copy each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record; and

(E) Submits a detailed discussion of the references, which discussion points out, with the particularity required by 37 CFR 1.111 (b) and (c), how the claimed subject matter is patentable over the references.

In those instances where the request for this special status does not meet all the prerequisites set forth above, applicant will be notified and the defects in the request will be stated. The application will remain in the status of a new application awaiting action in its regular turn. In those instances where a request is defective in one or more respects, applicant will be given *one* opportunity to perfect the request in a renewed petition to make special. If perfected, the request will then be granted. If not perfected in the first renewed petition, any additional renewed petitions to make special may or may not be considered at the discretion of the Technology Center (TC) Special Program Examiner.

Once a request has been granted, prosecution will proceed according to the procedure set forth below;

there is no provision for "withdrawal" from this special status.

The special examining procedure of VIII (accelerated examination) involves the following procedures:

(A) The new application, having been granted special status as a result of compliance with the requirements set out above will be taken up by the examiner before all other categories of applications except those clearly in condition for allowance and those with set time limits, such as examiner's answers, etc., and will be given a complete first action which will include *all* essential matters of merit as to all claims. The examiner's search will be restricted to the *subject matter encompassed by the claims*. A first action rejection will set a 3-month shortened period for reply.

(B) During the 3-month period for reply, applicant is encouraged to arrange for an interview with the examiner in order to resolve, with finality, as many issues as possible. In order to afford the examiner time for reflective consideration before the interview, applicant or his or her representative should cause to be placed in the hands of the examiner at least one working day prior to the interview, a copy (clearly denoted as such) of the amendment that he or she proposes to file in response to the examiner's action. Such a paper will not become a part of the file, but will form a basis for discussion at the interview.

(C) Subsequent to the interview, or responsive to the examiner's first action if no interview was had, applicant will file the "record" reply. The reply at this stage, to be proper, must be restricted to the rejections, objections, and requirements made. Any amendment which would require broadening the search field will be treated as an improper reply.

(D) The examiner will, within 1 month from the date of receipt of applicant's formal reply, take up the application for final disposition. This disposition will constitute either a final action which terminates with the setting of a 3-month period for reply, or a notice of allowance. The examiner's reply to any amendment submitted after final rejection should be prompt and by way of form PTOL-303, by passing the application to issue, or by an examiner's answer should applicant choose to file an appeal brief at this time. The use of these forms is not intended to open the door to further prosecution. Of course, where relatively minor issues

or deficiencies might be easily resolved, the examiner may use the telephone to inform the applicant of such.

(E) A personal interview after a final Office action will not be permitted unless requested by the examiner. However, telephonic interviews will be permitted where appropriate for the purpose of correcting any minor outstanding matters.

After allowance, these applications are given top priority for printing. See MPEP § 1309.

## IX. SPECIAL STATUS FOR PATENT APPLICATIONS RELATING TO SUPERCONDUCTIVITY

In accordance with the President's mandate directing the U.S. Patent and Trademark Office to accelerate the processing of patent applications and adjudication of disputes involving superconductivity technologies when requested by the applicant to do so, the U.S. Patent and Trademark Office will, on request, accord "special" status to all patent applications for inventions involving superconductivity materials. Examples of such inventions would include those directed to superconductive materials themselves as well as to their manufacture and application. In order that the U.S. Patent and Trademark Office may implement this procedure, we invite all applicants desiring to participate in this program to request that their applications be accorded "special" status. Such requests should be accompanied by a statement under 37 CFR 1.102 that the invention involves superconductive materials. No fee is required.

## X. INVENTIONS RELATING TO HIV/AIDS AND CANCER

In view of the importance of developing treatments and cures for HIV/AIDS and cancer and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to HIV/AIDS and cancer.

Applicants who desire that an application relating to HIV/AIDS or cancer be made special should file a petition and the fee under 37 CFR 1.17(h) requesting the U.S. Patent and Trademark Office to make the application special. The petition for special status should be accompanied by a statement explaining how the invention contributes to the diagnosis, treatment or prevention of HIV/AIDS or cancer.

## XI. INVENTIONS FOR COUNTERING TERRORISM

In view of the importance of developing technologies for countering terrorism and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications **>for inventions which materially contribute to countering terrorism<.

International terrorism as defined in 18 U.S.C. 2331 includes "activities that - (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; [and] (B) appear to be intended - (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping..." The types of technology for countering terrorism could include, but are not limited to, systems for detecting/identifying explosives, aircraft sensors/security systems, and vehicular barricades/disabling systems.

**>All applicants desiring to participate in this program should petition that their applications be accorded special status. The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to countering terrorism. No fee is required for such a petition. See 37 CFR 1.102(c). If the application disclosure is not clear on its face that the claimed invention is materially directed to countering terrorism, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the invention materiality contributes to countering terrorism. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could counter terrorism. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to countering terrorism.<

## XII. SPECIAL STATUS FOR APPLICATIONS RELATING TO BIOTECHNOLOGY FILED BY APPLICANTS WHO ARE SMALL ENTITIES

Applicants who are small entities may request that their biotechnology applications be granted "special" status. Applicant must file a petition with the petition fee under 37 CFR 1.17(h) requesting the special status and must:

(A) state that small entity status has been established or include a statement establishing small entity status;

(B) state that the subject of the patent application is a major asset of the small entity; and

(C) state that the development of the technology will be significantly impaired if examination of the patent application is delayed, including an explanation of the basis for making the statement.

### FORMAL REQUIREMENTS OF PETITION TO MAKE SPECIAL

Any petition to make special should:

(A) be in writing; and

(B) identify the application by application number and filing date.

### HANDLING OF PETITIONS TO MAKE SPECIAL

Applications which have been made special will be advanced out of turn for examination and will continue to be treated as special throughout the entire prosecution in the Office.

Each petition to make special, regardless of the ground upon which the petition is based and the nature of the decision, is made of record in the application file, together with the decision thereon. The part of the Office that rules on a petition is responsible for properly entering that petition and the resulting decision in the file record. The petition, with any attached papers and supporting affidavits, will be given a single paper number and so entered in the "Contents" of the file. The decision will be accorded a separate paper number and similarly entered. To ensure entries in the "Contents" in proper order, the technical support staff in the TC will make certain that all papers prior to a petition have been entered and/or listed in the application file before forwarding it for consideration of the petition. Note MPEP § 1002.02 (s). For Image File Wrapper (IFW) processing, see IFW Manual.

Petitions to make special are decided by the Special Program Examiner of the TC to which the application is assigned.

## 708.03 Examiner Tenders Resignation [R-2]

Whenever an examiner tenders his or her resignation, the supervisory patent examiner should see that the remaining time as far as possible is used in winding up the old complicated cases or those with involved records and getting as many of his or her amended cases as possible ready for final disposition.

If the examiner has considerable experience in his or her particular art, it is also advantageous to the Office if he or she indicates (in pencil) in the file wrappers of application in his or her docket, the field of search or other pertinent data that he or she considers appropriate. >For Image File Wrapper (IFW) processing, see IFW Manual.<

## 709 Suspension of Action [R-3]

*37 CFR 1.103. Suspension of action by the Office.*

(a) *Suspension for cause.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph for good and sufficient cause. The Office will not suspend action if a reply by applicant to an Office action is outstanding. Any petition for suspension of action under this paragraph must specify a period of suspension not exceeding six months. Any petition for suspension of action under this paragraph must also include:

(1) A showing of good and sufficient cause for suspension of action; and

**>

(2) The fee set forth in § 1.17(g), unless such cause is the fault of the Office.<

(b) *Limited suspension of action in a continued prosecution application (CPA) filed under § 1.53(d).* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph in a continued prosecution application filed under § 1.53(d) for a period not exceeding three months. Any request for suspension of action under this paragraph must be filed with the request for an application filed under § 1.53(d), specify the period of suspension, and include the processing fee set forth in § 1.17(i).

(c) *Limited suspension of action after a request for continued application (RCE) under § 1.114.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph after the filing of a request for continued examina-

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) |
| | ) Civil Action No. 06-613 |
| Plaintiffs, | ) ) |
| | ) |
| vs. | ) ) |
| | ) |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF LOUISE MEHROTRA

I, Louise Mehrotra, hereby declare as follows:

1.      I am employed by Johnson & Johnson ("J&J ") in its Investor Relations department.  My current position is Vice President of Investor Relations.  I have held this position since November 2005.  One of my responsibilities in this position at J&J is to communicate with financial analysts.

2.      In December of 2005 and January 2006, a major takeover battle took place between J&J and Boston Scientific Corporation ("Boston Scientific") for control of Guidant Corporation ("Guidant").  This takeover battle was the subject of intense interest by financial analysts.  I, along with Stanley Panasewicz, J&J's Director of Investor Relations, spoke with financial analysts about the competing bids by J&J and Boston Scientific.   I did not speak to any reporters on this subject.

3.      In early-to-mid January 2006, J&J developed a script for dealing with questions raised by financial analysts about the takeover battle.  Those of us who communicated with financial analysts were instructed to follow closely the words and substance of the script.  According to the script, we were to communicate that J&J considered its bid to be superior to Boston Scientific's because, among other reasons, the J&J transaction had secured regulatory approval and the Boston Scientific transaction had not.  A key concern of the antitrust regulators had to do with whether Abbott would have the patent rights needed to sell a competitively viable drug-eluting stent.  J&J had agreed that if Guidant accepted its offer, J&J would grant Abbott a license to certain drug eluting stent patents, including U.S. Patent No. 6,585,764 to Wright (the "Wright '764 patent"), U.S. Patent No. 6,808,536 to Wright (the "Wright '536 patent"), and U.S. Patent No. 6,776,796 to Falotico (the Falotico '796 patent").  Abbott, however, would not receive a license to those patents if Guidant accepted Boston Scientific's offer, which could delay or prevent regulatory approval of the Boston Scientific transaction.

4.      The script was developed on or about January 12 and incorporated into a finalized document on January 16, 2006.  Relevant portions are attached as Exhibit F to J&J's Memorandum in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction.  The script stated, in pertinent part:

> Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents.  Our IP portfolio in this area includes patents directed to Rapamycin and its analogues including ABT-578 and Everolimus when used on a stent.  Abbott does not receive access to this under the Boston agreement.  Without access to this IP there is a risk that a DES [drug eluting stent] using any of these compounds may infringe our IP.

(Exhibit F, p. 20.)

5.     In this script, J&J was careful not to suggest or imply that any decision had been reached on suing Abbott for patent infringement, even if Guidant was acquired by Boston Scientific and then Abbott commenced to infringe the J&J patents. These events had not occurred, and there was no need to speculate about what could happen if they did occur. So far as I know, as of January 2006, no one at J&J had yet decided what would happen.

6.     During the following week, I, along with Stan Panasewicz in J&J's Investor Relations department, spoke with financial analysts about why J&J's bid was better than Boston Scientific's. The analysts we spoke to included analysts from Citigroup, Lehman, JMP Securities, Deutsch Bank, Prudential, and A.G. Edwards. We also communicated the information in the script to the investor relations department at Guidant. Three analysts – Larry Biegelsen of Prudential, Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the patent issues in reports they issued.

7.     I called and spoke with Jan David Wald of A.G. Edwards on or about January 17, 2006. In this conversation, I adhered closely to the approved J&J script attached as Exhibit F to J&J's Memorandum. The primary purpose of my call to Wald was to tell him that his projection for Boston Scientific's stock price (which did not take into account the merger with Guidant) was being used by Boston Scientific in its valuation analysis for the merger. During this call, I also told him that under the scenario that the Boston bid prevailed, Abbott would not receive rights to J&J's patents on drug-eluting stents including the Wright '764 patent and the Falotico '796 patent, and that this could result in delays while regulatory authorities evaluated whether Abbott's business was viable without these patent rights. I was careful not to discuss the possibility of litigation or make any threats of litigation during the call.

3

8.    I did not speak with Lawrence Biegelsen of Prudential about J&J's patents.  It is my understanding that Stan Panasewicz spoke with Mr. Biegelsen on this topic.

9. I have seen a January 23, 2006 article in the *International Herald Tribune*, which is attached to Abbott's Complaint as Exhibit F.  I had no communications with the reporter who wrote this article about the subjects discussed in the article.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2006.

Louise Mehrotra

4