# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

December 14, 2006

Ms. Rosanna DiMeo
Case Manager
United States District Court
844 North Kind Street,
Wilmington, DE 19801

      RE:   *Abbott Laboratories v. Johnson & Johnson, et al.,*
             C.A. No. 06-613-SLR

Dear Ms. DiMeo:

      On December 13, 2006, we inadvertently submitted to the Court an incorrect version of the Declaration of Louise Mehrotra that was attached as Exhibit D to the Opening Memorandum in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.I. 15) in this matter. To correct that error, I enclose a disk containing the correct version of the Mehrota Declaration, and would appreciate it if you would please substitute it for the originally-filed version. Thank you for your assistance with this matter, and my apologies for the inconvenience.

                              Very truly yours,

                              */s/ John G. Day*

                              John G. Day (I.D. #2403)

JGD: nml
Enclosure
164790.1

c:     Frederick L. Cottrell, III, Esquire (by hand, w/hard copy of enclosure)
       Edward A. Mas, II, Esquire (via electronic mail, w/hard copy of enclosure)
       David T. Pritikin, Esquire (via electronic mail, w/hard copy of enclosure)

# Exhibit D

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, <br><br> Defendants. | ) <br> ) <br> ) Civil Action No. 06-613 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DECLARATION OF LOUISE MEHROTRA

I, Louise Mehrotra, hereby declare as follows:

1. I am employed by Johnson & Johnson ("J&J") in its Investor Relations department. My current position is Vice President of Investor Relations. I have held this position since November 2005. One of my responsibilities in this position at J&J is to communicate with financial analysts.

2. In December of 2005 and January 2006, a major takeover battle took place between J&J and Boston Scientific Corporation ("Boston Scientific") for control of Guidant Corporation ("Guidant"). This takeover battle was the subject of intense interest by financial analysts. I, along with Stanley Panasewicz, J&J's Director of Investor Relations, spoke with financial analysts about the competing bids by J&J and Boston Scientific. I did not speak to any reporters on this subject.

3. In early-to-mid January 2006, J&J developed a script for dealing with questions raised by financial analysts about the takeover battle. Those of us who communicated with financial analysts were instructed to follow closely the words and substance of the script. According to the script, we were to communicate that J&J considered its bid to be superior to Boston Scientific's because, among other reasons, the J&J transaction had secured regulatory approval and the Boston Scientific transaction had not. A key concern of the antitrust regulators had to do with whether Abbott would have the patent rights needed to sell a competitively viable drug-eluting stent. J&J had agreed that if Guidant accepted its offer, J&J would grant Abbott a license to certain drug eluting stent patents, including U.S. Patent No. 6,585,764 to Wright (the "Wright '764 patent"), U.S. Patent No. 6,808,536 to Wright (the "Wright '536 patent"), and U.S. Patent No. 6,776,796 to Falotico (the Falotico '796 patent"). Abbott, however, would not receive a license to those patents if Guidant accepted Boston Scientific's offer, which could delay or prevent regulatory approval of the Boston Scientific transaction.

4. The script was developed on or about January 12 and incorporated into a finalized document on January 16, 2006. Relevant portions are attached as Exhibit F to J&J's Memorandum in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction. The script stated, in pertinent part:

> Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents. Our IP portfolio in this area includes patents directed to Rapamycin and its analogues including ABT-578 and Everolimus when used on a stent. Abbott does not receive access to this under the Boston agreement. Without access to this IP there is a risk that a DES [drug eluting stent] using any of these compounds may infringe our IP.

(Exhibit F, p. 20.)

5.  In this script, J&J was careful not to suggest or imply that any decision had been reached on suing Abbott for patent infringement, even if Guidant was acquired by Boston Scientific and then Abbott commenced to infringe the J&J patents. These events had not occurred, and there was no need to speculate about what could happen if they did occur. So far as I know, as of January 2006, no one at J&J had yet decided what would happen.

6.  During the following week, I, along with Stan Panasewicz in J&J's Investor Relations department, spoke with financial analysts about why J&J's bid was better than Boston Scientific's. The analysts we spoke to included analysts from Citigroup, Lehman, JMP Securities, Deutsch Bank, Prudential, and A.G. Edwards. We also communicated the information in the script to the investor relations department at Guidant. Three analysts – Larry Biegelsen of Prudential, Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the patent issues in reports they issued.

7.  I called and spoke with Jan David Wald of A.G. Edwards on or about January 17, 2006. In this conversation, I adhered closely to the approved J&J script attached as Exhibit F to J&J's Memorandum. The primary purpose of my call to Wald was to tell him that his projection for Boston Scientific's stock price (which did not take into account the merger with Guidant) was being used by Boston Scientific in its valuation analysis for the merger. During this call, I also told him that under the scenario that the Boston bid prevailed, Abbott would not receive rights to J&J's patents on drug-eluting stents including the Wright '764 patent and the Falotico '796 patent, and that this could result in delays while regulatory authorities evaluated whether Abbott's business was viable without these patent rights. I was careful not to discuss the possibility of litigation or make any threats of litigation during the call.

8. I did not speak with Lawrence Biegelsen of Prudential about J&J's patents. It is my understanding that Stan Panasewicz spoke with Mr. Biegelsen on this topic.

9. I have seen a January 23, 2006 article in the *International Herald Tribune*, which is attached to Abbott's Complaint as Exhibit F. I had no communications with the reporter who wrote this article about the subjects discussed in the article.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2006.

_____
Louise Mehrotra