## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 06-613-SLR |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) ) | |
| Defendants. | ) ) | |

## AMENDED OPENING MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-2202

Dated: April 26, 2007

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

I.    ABBOTT'S PURPORTED BASES FOR THE EXISTENCE OF AN "ACTUAL
      CONTROVERSY" .......................................................................................................3

II.   BACKGROUND ON THE BIDDING CONTEST FOR GUIDANT ........................4

III.  ANALYST AND MEDIA COVERAGE OF POSSIBLE ANTITRUST HURDLES
      FACING BOSTON SCIENTIFIC'S BID FOR GUIDANT ......................................6

      1.    Matthew Dodds' January 13, 2006 Citigroup Note...................................8

      2.    Lawrence Biegelsen's January 20, 2006 Prudential Note .........................9

      3.    Jan Wald's January 23, 2006 AG Edwards Note ....................................11

      4.    Avram Goldstein's January 23, 2006 *International Herald Tribune* Article .............12

IV.   OTHER LITIGATION BETWEEN THE PARTIES ................................................12

V.    THE PETITIONS TO MAKE SPECIAL ...............................................................13

LEGAL STANDARD ...........................................................................................................14

ARGUMENT .......................................................................................................................16

I.    CIRCUMSTANCES FOUND TO CREATE A JUSTICIABLE ARTICLE III
      CONTROVERSY IN *MEDIMMUNE, SANDISK,* AND *TEVA* ARE NOT
      PRESENT IN THIS CASE.........................................................................................16

      A.    J&J Has Not Accused Abbott Of Actual Infringement Of The Patents-In-Suit ........16

      B.    J&J Has Not Threatened to File Suit Against Abbott For Infringement of
            The Patents-In-Suit ...................................................................................17

      C.    J&J Has Not Engaged in Scare-The-Customer-And-Run Tactics.............18

      D.    The Statutory Context Determinative in *Teva* Does Not Exist In This Case............18

II.   THE "CIRCUMSTANCES" CITED BY ABBOTT DO NOT WARRANT THE
      CONCLUSION THAT JURISDICTION SHOULD BE EXERCISED HERE ..................19

A.  J&J's Statements To Guidant Concerning The Patents-In-Suit Were Not Threats of Litigation ..................................................................19

B.  Statements Referencing The Potential For Litigation Were The Opinions and Conclusions Of Analysts and Reporters And Not Statements *Made By J&J*............20

C.  J&J's Act Of Filing Petitions To Make Special On Pending Patent Applications Does Not Compel The Conclusion That A Justiciable Controversy Exists As To The Patents In Suit..........................................21

D.  None Of The Other Lawsuits Between The Parties Involves Claims of Infringement of The Patents-In-Suit ..................................................22

E.  Plaintiffs' Actions and Allegations Do Not Suggest Any Real, Imminent Controversy Regarding The Patents-In-Suit..................................23

III.  EVEN IF THE COURT FINDS IT CAN EXERCISE JURISDICTION, IT SHOULD EXERCISE ITS DISCRETION TO DECLINE TO DO SO ..................................24

CONCLUSION.....................................................................................26

## **TABLE OF AUTHORITIES**

### **Cases**

*Arrowhead Indus. Water, Inc., v. Ecolochem*, 846 F.2d 731 (Fed. Cir. 1988) ....................................18

*BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993) ................................1, 14, 15

*Bausch & Lomb, Inc. v. CIBA Corp.*, 39 F. Supp. 2d 271 (W.D.N.Y. 1999) ......................................21

*DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*, 148 F. Supp. 2d 412
    (D. Del. 2001) ............................................................................................................................20, 22

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)......................................................15, 24, 25

*Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985) .........................................................22

*MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764 (2007)............................................1, 15, 16, 17, 24

*SanDisk Corp. v. STMicroelectronics, Inc.*, No. 05-1300, 2007 WL 881008
    (Fed. Cir. March 26, 2007) .......................................................................................1, 15, 16, 18

*Serco Services Co. v. Kelley Co.*, 51 F.3d 1037 (Fed. Cir. 1995).........................................................24

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992).......................................................14, 20

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, No. 06-1181, 2007 WL 942201
    (Fed. Cir. March 30, 2007) ................................................................1, 14, 15, 18, 19, 23

*Vermeer Manufacturing Co. v. Deere & Co.*, 379 F. Supp. 2d 645 (D. Del. 2005) ...........................20

*West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295 (Fed. Cir. 1992) ................20, 21

### **Statutes**

28 U.S.C. § 2201..............................................................................................................................14

## INTRODUCTION

In December 2006, the Defendants moved to dismiss Plaintiffs' declaratory judgment action because it failed to allege facts that establish the existence of a justiciable case or controversy. At the time they filed the Motion, Defendants analyzed the facts alleged in the complaint in light of the then-prevailing two-part legal test, as articulated by the Federal Circuit.[1] Plaintiffs then conducted substantial discovery focused on the issues relevant to the motion. Earlier this year – while the motion was pending – the Supreme Court modified the Federal Circuit's two-part test. *See MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764 (2007). Subsequently, two Federal Circuit opinions acknowledged *MedImmune*'s effect on the viability of the two-part test, reversing district court dismissals of patent declaratory judgment actions in light of *MedImmune. See Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, No. 06-1181, 2007 WL 942201, at *5 (Fed. Cir. March 30, 2007); *SanDisk Corp. v. STMicroelectronics, Inc.*, No. 05-1300, 2007 WL 881008, at *7 (Fed. Cir. March 26, 2007). Now, per the Supreme Court, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 127 S. Ct. at 771 (*citing Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Although *MedImmune* provides a slightly different prism through which the facts of a patent declaratory judgment action must be viewed, it does not alter the picture those facts

---

[1] The Federal Circuit's two-part test for determining declaratory justiciability in patent cases required: "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993).

present in this case.  Here, "all the circumstances" do not compel the conclusion that a justiciable controversy exists under Article III of the United States Constitution.

These are the "circumstances" surrounding Plaintiffs' case:  (1) defendants Johnson & Johnson and Cordis Corporation (collectively, "J&J") did not file a claim against Abbott Laboratories and Advanced Cardiovascular Systems, Inc. (collectively, "Abbott") on any of the patents-in-suit and have never threatened to do so; (2) J&J has not accused any Abbott product of actually infringing the patents-in-suit, let alone provided detailed claim-by-claim contentions such as those presented by the defendant's expert in the *SanDisk* case; (3) more than eight months *before* Abbott filed suit, J&J investor relations representatives made statements to representatives at Guidant Corporation ("Guidant") and a handful of financial analysts concerning J&J's drug-eluting stent patents in the context of advocating the superiority of J&J's bid in a then-ongoing corporate takeover contest for Guidant between J&J and Boston Scientific Corporation ("Boston Scientific"); (4) J&J filed papers in the United States Patent and Trademark Office ("PTO") seeking to accelerate the review of several pending patent applications (none of which was for the patents-in-suit), and in connection with those papers asserted that Abbott's drug-eluting stent XIENCE V was infringing claims of *those* patent applications – all at a time it elected not to assert the patents-in-suit; and (5) J&J has initiated litigation against competitors in the past and recently sued Boston Scientific, Guidant, and Abbott in September 2006, alleging breach of contract and tortious interference in connection with the takeover contest for Guidant, but no claims of patent infringement.

While the Federal Circuit's two-part test is no longer controlling, some of the Federal Circuit's "actual controversy" jurisprudence is still instructive because the court has opined as to the impact of a variety of "circumstances" that may be relevant to determining

whether an actual controversy exists in a given case. *MedImmune*, *SanDisk*, and *Teva* do not

state or even suggest that in all or most cases decided under the previous two-part test, the result

would have been different under the "all the circumstances" analysis. Indeed, the Supreme Court

in *MedImmune* did not remove all barriers to bringing a claim for declaratory relief in a patent

case. Where, as here, the general standards for establishing the existence of a justiciable

controversy are not met, courts must continue to dismiss cases. An exercise of jurisdiction is to

be limited to cases in which it is clear under "all the circumstances" that the injury to plaintiff is

immediate and real. The best Abbott can do, in this case, is to point to "circumstances" that

suggest J&J might, some day, assert claims from *other* patents against drug-eluting stents sold by

Abbott. That does not make a controversy founded on the patents-in-suit sufficiently immediate

or real to constitute a justiciable controversy. Having not established that an "actual

controversy" exists for the specific patents-in-suit, Abbott should not be permitted to seek

advisory and hypothetical rulings on J&J's patents.

## STATEMENT OF FACTS

I.    **ABBOTT'S PURPORTED BASES FOR THE EXISTENCE OF AN "ACTUAL CONTROVERSY"**

In its Complaint, Abbott identifies principal bases for its suit. First, Abbott cites

public statements made by J&J and third parties regarding J&J's drug-eluting stent patents

(including the patents-in-suit) all of which were made in the context of J&J's and Boston

Scientific's takeover battle for Guidant.[2] Second, Abbott points to J&J's so-called "history of

suing competitors" and singles out a lawsuit filed in September 2006 by J&J against Abbott,

Boston Scientific, and Guidant alleging breach of contract and tortious interference in connection

---

[2] Compl. ¶¶ 20-35.

with the takeover contest for Guidant.[3]  Third, Abbott points to statements made by J&J

attorneys during prosecution in the PTO of two pending patent applications.[4]

## II.   BACKGROUND ON THE BIDDING CONTEST FOR GUIDANT

    J&J and Boston Scientific competed to acquire Guidant in late 2005 and early

2006.  This takeover battle was one of the most covered business stories at the time, and it

generated a great interest from the financial community, the media, and the public.  J&J first

entered into an agreement to acquire Guidant in December 2004.[5]  J&J spent the following year

working out the issues relating to the transaction and preparing for the closing.[6]  One of the

major tasks was to obtain antitrust approval by the United States, the European Union, and other

foreign regulators.[7]  At the time, J&J and Boston Scientific were the only two companies

approved to sell drug-eluting stents in the United States.  But Guidant was planning to introduce

its own drug-eluting stent (the XIENCE V) in late 2007.  Thus, the antitrust regulators were

concerned that a combination of J&J with Guidant would reduce competition by eliminating

Guidant's future as an independent third player in a market that then had only two players.  To

address this concern, J&J (with the FTC's blessing) agreed to grant Abbott a license for certain

intellectual property in order to enhance Abbott's ability to enter the drug-eluting stent market

with its own product, thereby offsetting the loss of Guidant as an independent competitor in the

market.  The patents-in-suit would have been part of the license.[8]  On November 15, 2005,

Abbott publicly announced this licensing agreement as, among other things, including

---

[3] *Id.* ¶¶ 14-5; 48-9.
[4] *Id.* ¶¶ 40, 44.
[5] Barnaby J. Feder, *Quiet End To Battle Of the Bids*, N.Y. Times, Jan. 26, 2006, at C1, attached as Exhibit A ("January 26 Article").
[6] *Id.* at 3.
[7] Barnaby J. Feder, *Johnson & Johnson Pulls Ahead in Takeover Battle for Guidant*, N.Y. Times, Jan. 14, 2006, at C1, attached as Exhibit B ("January 14 Article").
[8] Panasewicz Decl. ¶ 3, attached as Exhibit C; Mehrotra Decl. ¶ 3, attached as Exhibit D.

intellectual property related to drug-eluting stents and announced that it was contingent on J&J closing its acquisition of Guidant.[9]

On December 5, 2005, just as the transaction between J&J and Guidant was about to close, Boston Scientific launched a surprise bid to acquire Guidant.[10] Boston Scientific, however, faced an issue similar to the one that J&J faced with regulators, because Boston's deal with Guidant would also eliminate Guidant's future entry into the drug-eluting stent market as a third independent competitor. To deal with this antitrust issue, Boston Scientific announced on January 8, 2006 that it had reached an agreement to divest Guidant's vascular intervention business to Abbott to satisfy regulators.[11] Of course, if Boston Scientific's bid prevailed, Abbott would not receive a license to J&J's IP, because the license was conditioned on J&J acquiring Guidant. Over the next two weeks, J&J and Boston Scientific each made competing new proposals.[12] Notably, on January 12, 2006, Boston Scientific made an offer for Guidant that contained, among other things, an offer to divest all overlapping assets, if required — including shared rights to Guidant's everolimus-coated stent, XIENCE V — in an effort to address Guidant's antitrust concerns related to Boston Scientific's bid.[13] In the days that followed, analysts began to focus on the antitrust hurdles that J&J already had cleared but Boston Scientific still faced, which had the potential to delay the closing of an acquisition of Guidant by

---

[9] Abbott Press Release, *Abbott to Acquire License to Johnson & Johnson's Rapid Exchange Catheter Delivery Technology*, November 15, 2005, attached as Exhibit E ("Abbott Press Release November 15, 2005").

[10] January 26 Article at 1, 3.

[11] Andrew Ross Sorkin, *New Bid For Guidant Sets Up A Showdown*, N.Y. Times, Jan. 9, 2006, at C1, attached as Exhibit G ("January 9 Article").

[12] January 26 Article at 3-4.

[13] Boston Scientific Press Release, *Boston Scientific Improves Offer to Acquire Guidant*, January 12, 2006, attached as Exhibit H ("Boston Scientific Press Release January 12, 2006"); Matthew J. Dodds, *An INTERESTing New Offer*, Citigroup, January 13, 2006, at 1-2, attached as Exhibit I ("Dodds Note").

Boston Scientific.  Eventually, on January 25, 2006, Guidant announced that it was entering into an agreement to be acquired by Boston Scientific.[14]

## III.    ANALYST AND MEDIA COVERAGE OF POSSIBLE ANTITRUST HURDLES FACING BOSTON SCIENTIFIC'S BID FOR GUIDANT

During January 2006, there was much interest in the takeover battle by the media and financial analysts.[15]  As it had done at other milestones during J&J's potential acquisition of Guidant, in mid-January J&J's investor relations department developed a script (or "Q&A" document) to guide their communications with analysts.[16]  The last version of the script was dated January 16, 2006.[17]  Among other things, the script made reference to the competitive landscape as it would be viewed by antitrust regulators, including the license of the patents-in-suit among others that J&J was obligated to grant Abbott to secure antitrust approval.  In pertinent part, the script read:

> Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents.  Our IP portfolio in this area includes patents directed to Rapamycin and its analogues including ABT-578 and Everolimus when used on a stent.  Abbott does not receive access to this under the Boston agreement.  Without access to this IP there is a risk that a DES [drug eluting stent] using any of these compounds may infringe our IP.[18]

On or about January 12, 2006, Louise Mehrotra of J&J's investor relations group spoke with Doug Hughes from Guidant to discuss information that J&J and Guidant might want

---

[14] January 26 Article at 1.

[15] *Id.* at 1-2.

[16] Panasewicz Decl. ¶ 3; Mehrotra Decl. ¶ 3.  For example, scripts were prepared in December 2004 when J&J entered into an agreement to acquire Guidant and in November 2005 when J&J revised its offer for Guidant.  Panasewicz Dep. at 21:25-22:20, attached as Exhibit J.

[17] Panasewicz Decl. ¶ 4; Mehrotra Decl. ¶ 4.

[18] Guidant Questions & Answers Revised, Jan. 16, 2006, at 20, attached as Exhibit F ("Guidant Q&A").

to highlight when discussing the competing bids with the investment community.[19]  Mehrotra and Hughes had spoken throughout the bidding war in an effort to ensure that the investor relations messages from both companies were based on the same factual foundation.[20]  During that conversation, Mehrotra discussed the issue of the license of drug-eluting stent patents, describing it in essentially the same way as it was described in the script quoted above.[21]  J&J believed Guidant might also want to mention these facts when communicating to the investment community its view regarding the relative advantages of the competing bids.[22]

On January 13, 2006, a J&J corporate communications representative emailed a peer at Guidant a "talking points" document entitled "Why do you think J&J's offer of $XX is superior to BSXs offer of $73?" and explained in her email that J&J was intending to use the substance of this document when responding to such media inquiries.[23]  The talking points document included a subheading "Timing" followed by six bullet points, each expressly referencing the relative strength or weakness of one of the bids from the standpoint of the time it would take or did take for FTC review.  One of the six bullet points conveyed essentially the same information as the script quoted above.[24]

Mehrotra and Stanley Panasewicz, also of J&J's investor relations department, spoke with financial analysts about the reasons why J&J's bid was better than Boston Scientific's as part of an effort by J&J to reach out to the investment community.[25]  The analysts they spoke

---

[19] Mehrotra Dep. at 111:5-13; 113:8-114:4, attached as Exhibit K.
[20] *Id.* at 102:10-18.
[21] *Id.* at 112:16-113:3.
[22] *Id.* at 113:23-114:4.
[23] Email and Talking Points Document ("Guidant Talking Points"), January 13, 2006, attached as Exhibit L.
[24] Guidant Talking Points at 1.
[25] Mehrotra Dep. at 23:5-19; Panasewicz Dep. at 14:12-19.

to included representatives of several firms.[26]  Three analysts – Larry Biegelsen of Prudential,

Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the FTC review

and associated patent rights in notes they issued.[27]

### 1.  Matthew Dodds' January 13, 2006 Citigroup Note

Dodds was the first analyst Panasewicz spoke with regarding the antitrust issues

and J&J's drug-eluting stent ("DES") patents.  Dodds had questions regarding J&J's and Boston

Scientific's competing bids, and the subject of J&J's DES patents was discussed.  In response to

Dodds' request, Panasewicz provided Dodds the patent numbers of one or more of the patents-in-

suit.[28]

On January 13, 2006, Dodds published a note evaluating Boston Scientific's

revised January 12, 2006 offer.  Dodds pointed out that the structure of Boston Scientific's

revised offer put more of a focus on antitrust concerns than pricing premiums to address two

apparent concerns of Guidant's board: "(1) the ability to get through the FTC, and (2) the ability

to close the deal in a timely manner."[29]  Dodds noted that ". . . Boston's offer implies that

Guidant's Board is more concerned with anti-trust issues than the investment community has

realized" and that ". . . there may be one major issue that has been overlooked to date — JNJ's IP

---

[26] Panasewicz Decl. ¶ 6; Mehrotra Decl. ¶ 6.

[27] In addition to the analysts reports discussed below, Abbott cites excerpts from three other
analyst notes for its contention that there is a justiciable controversy over the patents-in-suit:
Katherine Martinelli from Merrril Lynch March 14, 2006; Bob Hopkins from Lehman Brothers
January 30, 2006; and Matthew Dodds from Citigroup March 23, 2006.  *See* Plaintiffs' Response
to Defendants' First Set of Interrogatories Relating to Subject Matter Jurisdiction, April 20, 2007,
at 9-10 attached as Exhibit M ("Abbott Interrogatory Responses").  None of these three were
cited in Abbott's complaint or attached as exhibits thereto.  On their face, none of the excerpts
purports to contain a quote from J&J.  Two of them do not even purport to attribute any
statement to J&J.  They do not purport to report any threats of litigation made by J&J.  Indeed,
the analysts refer to litigation as "hypothetical" and as a possibility. *See id.*  The information
contained in these notes is essentially duplicative of the information contained in the analysts
notes referenced in the complaint.

[28] Panasewicz Dep. at 43:1-8; 46:17-47:8.

[29] Dodds Note at 1.

position on using sirolimus (rapamycin) and its analogues on a stent."[30]  Dodds wrote that

because Abbott would not receive J&J's patents if Boston Scientific acquired Guidant, the FTC

may not consider a Boston Scientific-Guidant-Abbott deal as creating another competitive stent

entrant.[31]  Speculating about the patents, Dodds wrote that they "have never been challenged or

enforced because no other company has launched a limus-based drug-eluting stent in the US, but

are *likely* to *eventually* lead to litigation."[32]  Dodds does not attribute this statement to J&J.

Dodds further pointed out that Boston Scientific's "last trip to the FTC was ugly" and that

"Boston has said little about EU anti-trust clearance, which may not be on fast-track status." [33]

Dodds concluded that he did not think that Boston Scientific's revised offer was enough to

overcome the antitrust concerns of Guidant's board.[34]  Dodds' note was published on

January 13, 2006, more than eight months *before* Abbott filed this suit.

### 2.    Lawrence Biegelsen's January 20, 2006 Prudential Note

In mid-January 2006, J&J reached out to analysts to convey its belief that its bid

was superior to Boston Scientific's bid.

REDACTED

[35] Possibly at Bieglesen's

initiative, he and Panasewicz discussed the intellectual property issues in the context of the

potential for a prolonged FTC review that could delay the completion of Boston Scientific's

acquisition of Guidant.[36]  They discussed the possibility that J&J patents "may be infringed" but

---

[30] *Id.* at 2.
[31] *Id.*
[32] *Id.* (emphasis added).
[33] *Id.*
[34] *Id.*
[35] Biegelsen Dep. at 15:6-15; 30:9-24, attached as Exhibit N.
[36] Panasewicz Dep. at 55:10-22; Biegelsen Dep. at 15:6-15; 69:3-9.

did not discuss any specific stent coatings.[37] Panasewicz may have said something to the effect that J&J believed its IP was strong, but never said with certainty that XIENCE V or any other product *would* infringe the patents-in-suit and made no mention of J&J pursuing a preliminary injunction.[38]

In his note, Biegelsen explained the facts surrounding the purpose of the license the FTC required J&J to grant Abbott to clear antitrust review.[39] Biegelsen did not directly quote J&J or Panasewicz and purports to attribute just two statements to J&J. One refers to the potential that J&J's patents "*may be infringed*" if a company comes out with a drug-eluting stent using stent coatings such as Abbott's zotarolimus or Guidant's everolimus.[40] According to Biegelsen, the source of this information also may have been Dodds' note.[41] Biegelsen also wrote that J&J "believes it has a strong intellectual property (IP) position with regard to the use of rapamycin derivatives on a stent."[42] Biegelsen's note does not attribute any other statements to J&J. Therefore, statements in Biegelsen's note that J&J "*could* pursue a preliminary injunction," and its "*potential*" to prevent Abbott and Boston Scientific from marketing XIENCE V were Biegelsen's statements, and not statements made by or attributable to J&J.[43] Biegelsen did not report that J&J has accused any product of actually infringing J&J's patents, and did not report that J&J was considering filing a patent infringement lawsuit.[44] He made clear at the end

---

[37] Panasewicz Dep. at 57:11-59:19.
[38] *Id.* at 61:13-62:7; Biegelsen Dep. at 19:14-18; 21:23-22:8; 73:17-75:8.
[39] Larry Biegelsen, *JNJ: Takes Off the Gloves*, Prudential Equity Group, LLC, Jan. 20, 2006, at 2, Compl. Ex. D ("Biegelsen Note").
[40] Biegelsen Note at 1 (emphasis added) (Compl. Ex. D).
[41] Biegelsen Dep. at 16:6-16; 17:19-22.
[42] Biegelsen Note at 3 (Compl. Ex. D).
[43] *Id.* (emphasis added); Biegelsen Dep. at 73:17-75:8.
[44] Biegelsen Dep. at 47:11-24.

of the note that it contained his "personal views," not those of J&J.[45]  Biegelsen's note was

published January 20, 2006, more than eight months *before* Abbott filed this suit.

### 3.     Jan Wald's January 23, 2006 AG Edwards Note

Mehrotra called AG Edwards analyst Jan Wald on or about January 17, 2006.[46]

**REDACTED**

Wald introduced his note by stating that his conversations with J&J, Boston

Scientific, and others led him to believe that the takeover battle was far from over and the

takeaway message was that "both sides believe there is information to share that can bolster the

argument for its being a better suitor for GDT."[51]  Within this context, Wald wrote:

> We were also reminded by JNJ that it had three patents related to '-
> limus' compounds that it thought precluded any other company

---

[45] Biegelsen Note at 6 (Compl. Ex. D).
[46] Mehrotra Decl. ¶ 7.
[47] *Id.* ¶ 7; Wald Dep. at 59:8-13; 73:21-74:6, attached as Exhibit O.
[48] Mehrotra Decl. ¶ 7; Wald Dep. at 27:3-8.
[49] Wald Dep. at 39:18-42:14.
[50] *Id.* at 43:3-14.
[51] Jan David Wald, *The Game May Be Far From Over*, AG Edwards, Jan. 23, 2006, at 1 Compl.
Ex. E ("Wald Note").

> from using such a compound on a stent. . . . When we spoke to
> BSX management about them, we were told neither GDT nor
> Abbott (ABT) seemed to be concerned about them, and that their
> broad language may make them non-defensible.  As we said, we
> have not vetted them yet.[52]

Wald's note, like Biegelsen's, did not quote anyone from J&J.  Wald explained that his note

contained his "personal views," not those of J&J.[53]  Wald's note was published January 23, 2006,

more than eight months *before* Abbott filed this suit.

### 4.    Avram Goldstein's January 23, 2006 *International Herald Tribune* Article

In its Complaint, Abbott also cites excerpts from an article written by a

Bloomberg reporter, Avram Goldstein, that was published in the *International Herald Tribune*.[54]

The Goldstein article quotes from Biegelsen's note and contains a quote from a conversation with

Wald, but does not quote anyone from J&J; to the contrary, it stated that "[a] spokesman for J&J,

Jeffrey Leebaw ... declined to comment."[55]  Goldstein's article was published January 23, 2006,

more than eight months *before* Abbott filed this suit.

## IV.    OTHER LITIGATION BETWEEN THE PARTIES

In its Complaint, Abbott singles out a lawsuit J&J filed against Abbott, Guidant

and Boston Scientific in the Southern District of New York in September 2006 for breach of

---

[52] *Id.*

[53] *Id.* at 4.

[54] Compl. ¶ 31; Avram Goldstein, *J&J works to discredit rival offer for Guidant*, Int'l Herald Tribune, Jan. 23, 2006, Compl. Ex. F, ("IHT Article").  In its interrogatory responses, Abbott cites excerpts from five additional news articles to support its claim of a justiciable controversy.  Abbott Interrogatory Responses at 11-12.  Abbott did not cite these articles in its complaint nor attach any of them as exhibits thereto.  On their face, none of the excerpted portions of the five articles purports to contain a direct quote from J&J (or anyone else for that matter) or to directly attribute a statement to J&J.  Three of these purport to include statements attributable to analysts themselves or their notes.  With respect to the other two, one cites to an unnamed analyst and the other to no source whatsoever.  *See id.*  The information contained in these articles is essentially duplicative of the information contained in the Goldstein article.

[55] Leebaw Decl. ¶ 2, attached as Exhibit P; IHT Article at 1 (Compl. Ex. F).

contract, and tortious interference with contract.[56] J&J alleged the defendants allowed Abbott access to confidential information in violation of a provision of the merger agreement between J&J and Guidant that was specifically designed to prevent Guidant from using J&J's agreement to solicit higher offers.[57] J&J's suit does not contain allegations of patent infringement. The other lawsuits between the parties cited by Abbott were filed by Cordis nearly 10 years ago and could not have involved infringement claims of any of the patents-in-suit, the earliest of which issued on July 1, 2003.[58]

## V.    THE PETITIONS TO MAKE SPECIAL

Abbott's Complaint refers to Petitions to Make Special that J&J filed in the PTO in early August 2006 in relation to two patent applications.[59] The Petitions were filed to seek expedited examination of these applications. (J&J filed similar Petitions to Make Special in four other patent applications.) The PTO has allowed claims in three applications that are now awaiting issuance; the other three applications are still pending. The applications for which the petitions were filed are in the same patent family, but they seek claims that are different from the claims of the patents-in-suit.

Ordinarily, new patent applications "are taken up for examination in the order of their effective United States filing dates," but a patent applicant can request that applications be expedited for a number of reasons, one of which is that there is a product on the market that falls within the claims of the application.[60] J&J's petitions to obtain expedited examination were filed on that basis. Accordingly, J&J's attorney stated in the petitions that "[i]n my opinion, the

---

[56] Compl. ¶ 48.
[57] *J&J v. Guidant Corp.*, No. 06 CV 7685, (S.D.N.Y Sept. 25, 2006), ¶¶ 53-59, Compl. Ex. I ("J&J Complaint").
[58] Compl. ¶ 15; U.S. Patent No. 6,585,764, Compl. Ex. A.
[59] Compl. ¶ 40.
[60] Manual of Patent Examining Procedure § 708.02, Rev. 3, Aug. 2005, at 700-131, 132, attached as Exhibit Q.

XIENCE V product is unquestionably within the scope of "several claims of the applications.[61] J&J said nothing about its intentions with respect to the patents-in-suit, insofar as those patents -- already issued -- are not relevant to determining whether a pending application deserves expedited status. The patents-in-suit issued between July 1, 2003 and October 26, 2004, whereas J&J did not file the first of its petitions on the pending applications until August 2006. At no time before or since filing the petitions has J&J filed suit on the patents-in-suit, despite its knowledge of the facts concerning XIENCE V.

## LEGAL STANDARD

For federal jurisdiction to exist, a declaratory judgment claim must involve an "actual controversy." 28 U.S.C. § 2201. "[T]he controversy must be actual, not hypothetical or of uncertain prospective occurrence." *BP Chemicals*, 4 F.3d at 977. There must be a "definite and concrete dispute between adverse parties, appropriate to immediate and definitive determination of their legal rights." *Id*. The Declaratory Judgment Act guards against the use of the courts to provide an "advisory opinion on a situation not ripe for litigation." *Id*. The plaintiff has the burden of establishing that jurisdiction is proper. *See Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992).

The Act's "actual controversy" requirement refers to the types of "Cases and Controversies" justiciable under Article III of the U.S. Constitution. *Teva*, 2007 WL 942201, at*2 (citing *MedImmune*, 127 S.Ct. at 771). A justiciable Article III controversy requires that the party instituting the action have standing and that the issue presented to the court be ripe. *Teva*, 2007 WL 942201, at *3. To establish standing, a plaintiff must allege actual or imminent injury-in-fact, while ripeness focuses on the conduct of the defendant to determine whether the

---

[61] Decl. by Att'y in Support of Pet. to Make Special ¶ 6, Aug. 7, 2006, Compl. Exs. G & H ("Valla Decl.").

defendant's actions have harmed, are harming, or are about to harm the plaintiff. *Id.* As a corollary to the ripeness requirement, Article III prohibits against the issuance of advisory opinions. *Id.* at *4.

In *MedImmune*, the Supreme Court reiterated the standard for determining whether a justiciable Article III controversy exists: "the question in each case is whether the facts alleged, under *all the circumstances*, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[62] *MedImmune*, 127 S. Ct. at 771 (*citing Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). For a court to have jurisdiction over a declaratory judgment claim, " '*all* the circumstances must demonstrate that a justiciable Article III 'controversy' exists." *Teva*, 2007 WL 942201, at*3 (emphasis added). It seems clear that the mere fact that a plaintiff knows of the existence of an adversely held patent and fears that there is a risk of infringement is not sufficient to create an "actual controversy." In other words, a defendant/patentee must take some affirmative step vis-à-vis the plaintiff with respect to a particular patent in order to permit a finding that an actual controversy exists allowing litigation of that patent. *See SanDisk*, 2007 WL 881008, at *7.

---

[62] The "all the circumstances" test has long been cited by the Federal Circuit as a fundamental inquiry in the "actual controversy" analysis. *See e.g., EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996); *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993). Until the Supreme Court's recent *MedImmune* decision, the Federal Circuit had employed its "pragmatic" two-part test for determining declaratory justiciability in patent cases. *BP Chemicals*, 4 F.3d at 978. Similar to the "all circumstances" analysis, the purpose of the two-part test also was "to determine whether the need for judicial attention is real and immediate" or is "prospective and uncertain of occurrence." *Id.* As a result, pre-*MedImmune* Federal Circuit cases remain instructive to the subject matter jurisdiction inquiry.

## ARGUMENT

**I.     CIRCUMSTANCES FOUND TO CREATE A JUSTICIABLE ARTICLE III CONTROVERSY IN *MEDIMMUNE*, *SANDISK*, AND *TEVA* ARE NOT PRESENT IN THIS CASE.**

The Supreme Court in *MedImmune* and Federal Circuit in *SanDisk* and *Teva* used the fact-specific "all the circumstances" standard to find an "actual controversy" existed in three patent cases. But none of the key circumstances considered in those cases are present here, and therefore these cases provide only the test to be applied, and do not mandate any particular result.

### A.     J&J Has Not Accused Abbott Of Actual Infringement Of The Patents-In-Suit.

Unlike the defendants in *MedImmune* and *SanDisk*, J&J has never directly (or indirectly) accused XIENCE V or any other Abbott product of actually infringing any of the patents-in-suit. In both *MedImmune* and *SanDisk*, a significant circumstance establishing an "actual controversy" was that prior to the plaintiff filing suit, the defendant had directly contacted the plaintiff and accused it of actual infringement. *MedImmune* 127 S. Ct. at 768; *SanDisk*, 2007 WL 881008, at *9. In *MedImmune*, soon after the patent-in-suit issued, the defendant sent a letter to the plaintiff asserting that the plaintiff's product was covered by the defendant's patent and demanding royalty payments from the plaintiff under a pre-existing license agreement. *MedImmune*, 127 S. Ct. at 768.

In *SanDisk*, the defendant directly accused the plaintiff of infringement of the patents-in-suit, as well as provided the plaintiff with a detailed infringement analysis. The defendant's technical experts gave a four- to five-hour presentation on the specific claims of its 14 patents that it believed plaintiffs infringed, including mapping the elements of each of the claims to the plaintiff's products and during which the experts liberally referred to the plaintiff's infringement of the defendant's patents. At the conclusion of the meeting, defendant gave

16

plaintiff written materials containing a detailed infringement analysis for certain of plaintiff's products. *SanDisk*, 2007 WL 881008, at *2, *9.

In stark contrast, J&J has done nothing of the sort accusing XIENCE V or any other Abbott product of actually infringing the patents-in-suit. The statements J&J made to Guidant, as well as those statements reported by financial analysts that were, in fact, made by J&J did not contain accusations that XIENCE V or any other Abbott product actually infringed any of the patents-in-suit. At most, they stated that J&J patents *"may"* be infringed by a drug-eluting stent coated with a rapamycin derivative. Similarly, statements made by J&J's patent attorney in support of the Petitions to Make Special were statements expressly directed to claims of pending patent applications, and not claims of any of the patents-in-suit.

**B.    J&J Has Not Threatened to File Suit Against Abbott For Infringement Of The Patents-In-Suit.**

In *MedImmune*, the defendant expressly threatened to sue plaintiff and enjoin its sales if the plaintiff failed to pay royalties to the defendant on the patent-in-suit. *MedImmune*, 127 S. Ct. at 772. Here, J&J has not threatened to sue Abbott for infringement of any of the patents-in-suit.

It is undisputed that J&J never sent a letter to or otherwise contacted Abbott directly threatening litigation on the patents-in-suit. With respect to excerpts from published analyst notes and news articles reporting on the patents-in-suit as part of larger coverage of the then on-going bidding war for Guidant between J&J and Boston Scientific, three things are clear. First, none of the excerpts contains a statement or suggestion by J&J that amounts to a threat that J&J would sue Abbott for infringement relating to the XIENCE V stent or any other product. Second, the analyst notes and articles reflect, in large part, the opinions and speculation of the authors, not statements made by J&J. Finally, and perhaps most tellingly, the analyst notes and

17

articles Abbott has cited in its complaint as evidence of the existence of a justiciable controversy were published more than eight months before Abbott filed this lawsuit. In summary, these publications by third parties provide an insufficient basis for finding jurisdiction exists.

**C.    J&J Has Not Engaged in Scare-The-Customer-And-Run Tactics.**

Unlike the defendant in *SanDisk*, J&J has not engaged in any "scare-the customer-and-run" tactics. In *SanDisk*, the Federal Court concluded that the defendant's statement that it would not sue the plaintiff was a hollow promise in light of the detailed infringement analysis defendant prepared and communicated to the plaintiff over the course of a four-to-five-hour presentation. The Federal Court concluded that the defendant's actions constituted a sort of " 'extra-judicial patent enforcement with scare-the-customer-and-run tactics' that the Declaratory Judgment Act was intended to obviate." *SanDisk*, 2007 WL 881008, at \*9 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988)). In *Arrowhead*, one of the circumstances found by the Federal Circuit to establish an "actual controversy" was that the defendant had sent a letter to the plaintiff's customer accusing the plaintiff of infringement and suggesting that the customer could also be liable for infringement if it purchased the plaintiff's services. 846 F.2d at 733. As a result of the defendant's letter, the plaintiff's customer feared litigation and required an indemnification from the plaintiff before it would purchase the plaintiff's services. *Id.* at 737. Although *Arrowhead* was decided under the old two-part test, *SanDisk* makes clear that a defendant's use of "scare-the-customer-and-run-tactics" is a circumstance that weighs in favor of finding that an "actual controversy" exists under the "all the circumstances" standard. Here, J&J has not engaged in such tactics.

**D.    The Statutory Context Determinative In *Teva* Does Not Exist In This Case.**

In *Teva*, the defendant had identified five patents in connection with a New Drug Application ("NDA") it filed with the FDA. The plaintiff filed an Abbreviated New Drug

Application ("ANDA") with the FDA for a generic version of the drug named in defendant's NDA, along with certifications that its generic did not infringe the five patents listed by defendant or that the patents were invalid. By operation of law, plaintiff's ANDA constituted a single act of infringement for all five of defendant's patents and triggered the defendant's right to sue for infringement on all five patents. Defendant sued for patent infringement on only one of the five patents. Plaintiff then filed an action for declaratory judgment relating to the other four patents. *See Teva*, 2007 WL 942201, at *1. In finding that an "actual controversy" existed permitting litigation of the four unasserted patents, the Federal Circuit emphasized five circumstances, all of which were specific to the Hatch-Waxman Act context in which the parties' actions took place. *Id.* at *7-10. There is no similar statutory context establishing a jurisdictional right in this case. Thus, *Teva* does not provide a basis for finding a justiciable controversy in the present case.

## II. THE "CIRCUMSTANCES" CITED BY ABBOTT DO NOT WARRANT THE CONCLUSION THAT JURISDICTION SHOULD BE EXERCISED HERE.

### A. J&J's Statements To Guidant Concerning The Patents-In-Suit Were Not Threats Of Litigation.

The statements J&J made to Guidant regarding the patents-in-suit did not contain accusations of infringement or threats of suit, but simply reiterated facts of which Guidant and Abbott were already aware. It was not news to Guidant or Abbott (or the public for that matter) that J&J's agreement to license its drug-eluting stent patents to Abbott was contingent on J&J closing the deal with Guidant.[63] Similarly, the statements published in analyst notes that were actually *made by J&J* (as opposed to the opinions and conclusions of the authors) amount to little more than a declaration that J&J believes in the general strength of its IP position on these patents, and that the patents needed to be factored into the discussion of the regulatory hurdles to

---

[63] Abbott Press Release November 15, 2005.

Boston Scientific's bid.[64]  Moreover, all of the statements actually made by J&J were made within the context of highlighting for the investment community one reason why J&J's bid was superior to Boston Scientific's.  *See Shell Oil*, 970 F.2d at 889 (when conducting a totality of the circumstances inquiry to determine if an "actual controversy" exists, a court must consider the context in which events took place).

> **B.    Statements Referencing The Potential For Litigation Were The Opinions and Conclusions Of Analysts and Reporters And Not Statements *Made By J&J*.**

Notably, most of the statements Abbott relies upon were not made by J&J representatives, but rather were statements of opinion and conclusion by third-party analysts or reporters.  The analysts and news reporters were not agents of J&J.  They had no authority to threaten an infringement suit on behalf of J&J.  Thus, their "personal views" and opinions were not authorized by J&J and do not constitute a circumstance demonstrating a justiciable controversy on the patents-in-suit.[65]  And, as was the case with statements made by J&J

---

[64] Statements that J&J's patents "may be infringed" or that J&J believes its IP position is strong are certainly no more threatening than saying that plaintiff's products "fall within" the claims, that the patentee intends to "enforce its patent," or that the patentee's product "appears to infringe" or "may be infringing."  Under its pre-*MedImmune* decisions, the Federal Circuit found that such statements are not sufficient to create declaratory judgment jurisdiction.  *See Shell Oil*, 970 F.2d 885, 886-89 (statement that activities "fall within" and are "covered by" its patent and that patentee intends to "enforce its patent" did not constitute an allegation of infringement or threat of suit); *DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*, 148 F. Supp. 2d 412, 413, 415 (D. Del. 2001) (patentee's statement that plaintiff's activities "may be infringing" insufficient to demonstrate existence of an "actual controversy"); *Vermeer Mfg. Co. v. Deere & Co.*, 379 F. Supp. 2d 645, 647, 649 (D. Del. 2005) (patentee's statement that plaintiff's product "appears to infringe" and that patentee "will enforce its patent rights" insufficient to demonstrate existence of an "actual controversy").  While *MedImmune* modified the test to be employed by a court when evaluating the existence of an "actual controversy" in a patent case, it and the Federal Circuit cases that have followed did not call into question the rationality of the decisions cited above.

[65] The Federal Circuit pre-*MedImmune* has refused to attribute to a patent holder the opinions and speculations of third parties when conducting an "actual controversy" analysis.  For example in *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295 (Fed. Cir. 1992), the inventor of the patents-in-suit, who was employed by a joint venture of defendant First Data,

concerning the patents-in-suit, the statements by analysts and reporters cited by Abbott in the complaint were made more than eight months before Abbott sued, thereby belying any claim of "imminent" injury Abbott might associate with those statements.

      **C.**      **J&J's Act Of Filing Petitions To Make Special On Pending Patent Applications Does Not Compel The Conclusion That A Justiciable Controversy Exists As To The Patents In Suit.**

      Abbott is relying on statements made in petitions filed in the PTO pertaining to patent applications as a basis for seeking declaratory judgments of non-infringement and invalidity on issued patents that were never asserted against Abbott, but these petitions do not support an inference that J&J intended to file suit based on the patents-in-suit. Indeed, they support the opposite conclusion. The first petitions were filed by J&J on August 7, 2006, and asserted that Abbott was manufacturing the XIENCE V stent in the United States.[66] Had J&J intended to assert the patents-in-suit against XIENCE V, presumably it would have done so at that time. Abbott should not be allowed to pick and choose patents to be litigated where there is no basis for concluding it faces a real, imminent threat that it will be sued on those patents.

---

stated that plaintiff West "had infringed the patents" at issue. *Id.* 1296. The Federal Circuit found that this was not "enough evidence of conduct of First Data or conduct attributable to First Data to arouse in West a reasonable apprehension of a lawsuit." *Id.* at 1297. The court noted that the inventor "was not an owner, officer, agent, or even an employee" of First Data, and that "this court cannot attribute" the inventor's "conduct to First Data." *Id.* at 1297-98. Similarly, in *Bausch & Lomb, Inc. v. CIBA Corp.*, 39 F. Supp.2d 271 (W.D.N.Y. 1999), plaintiff B & L was told that a scientist of defendant CIBA said that CIBA "was going to sue B & L for patent infringement because B & L's lenses infringed on CIBA's patents." *Id.* at 273. B & L scientists also heard rumors that CIBA was going to sue B & L. The court found that these circumstances were insufficient to demonstrate the existence of an "actual controversy." It characterized the statements to B & L as "nothing more than recitation of a hearsay comment" and explained that "[t]o create a controversy between plaintiff and the patentee, an agent must have actual or apparent authority to level a charge of infringement on behalf of the patentee." *Id.* at 274 (citations omitted). Statements made by third parties was not at issue in *MedImmune*, *SanDisk*, or *Teva*, and there is no reason to believe that this is no longer the law in the Federal Circuit post-*MedImmune*.

[66] Valla Decl. ¶ 4 (Compl. Exs. G & H).

Abbott's request for declaratory judgment on the patents-in-suit is no more than a veiled request for an advisory opinion.

### D.    None Of The Other Lawsuits Between The Parties Involves Claims of Infringement of The Patents-In-Suit.

The other lawsuits between the parties cited by Abbott as a basis for its claim of declaratory judgment jurisdiction do not contain claims for patent infringement of any of the patents-in-suit.  Further, the fact that J&J filed a lawsuit against Guidant, Boston, Scientific, and Abbott relating to the Guidant transaction after the infringement of the patents-in-suit allegedly began and did not elect to include claims of patent infringement suggests, if anything, a *lack* of intent to assert those patents.

Unrelated litigation between the parties was not a circumstance present for consideration in *MedImmune*, *Teva*, or *SanDisk*.  However, under its previous two-part test, the Federal Circuit had made it clear that unrelated litigation between parties was not sufficient to give rise to a case or controversy.  For example, in *Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985), the defendant had previously sued the plaintiff in state court for its hiring of the defendant's chief engineer.  *Id.* at 883.  The defendant had also sued two other parties on its patents some years before, and sent a letter offering to discuss a license.  *Id.* The Court found that these facts did not establish an actual controversy.  *Id.*  Similarly, in *DuPont Dow*, the Court held that a prior litigation filed by the defendant against the plaintiff for infringing a different patent, even coupled with a letter stated that the accused infringer's product "may be infringing" the patent-in-suit, was insufficient to establish declaratory jurisdiction.  148 F. Supp. 2d at 413-15.  There is no reason to believe this is no longer the law.

**E.    Plaintiffs' Actions and Allegations Do Not Suggest Any Real, Imminent Controversy Regarding The Patents-In-Suit.**

In its Complaint, Abbott alleges that J&J broadcast accusations of infringement by XIENCE V and threats that J&J would sue Abbott for this infringement.[67]  However, as of the time of those alleged threats, neither Guidant nor Abbott appears to have been concerned about the patents-in-suit.[68]  The alleged threats regarding the patents-in-suit were made more than eight months before Abbott filed suit.  If the "threats" did not seem sufficiently immediate and real to cause Guidant or Abbott to file a declaratory judgment action in January 2006, they would have been of even less concern to Abbott with each month that passed without a word from J&J regarding the patents-in-suit.  To support its claim of jurisdiction, Abbott has not alleged a single statement or action by J&J relating to the patents-in-suit that occurred during Abbott's eight-month delay in filing suit.  All of the bases cited by Abbott either involve alleged statements made or actions taken by J&J (1) at least eight months prior to Abbott filing suit, and/or (2) that do not involve the patents-in-suit at all.

Furthermore, Abbott has made no allegation that demonstrates that the "dispute" between the parties on the patents-in-suit is ripe for judicial review.  Abbott has not alleged that any purported actions by J&J have harmed, are harming, or are about to harm Abbott.  *See Teva*, 2007 WL 942201, at *3.  Abbott has made no allegation that J&J has contacted its customers threatening suit, that Abbott has received complaints by its customers because of J&J, or that its launch plans for XIENCE V have been derailed.[69]  To the contrary, Abbott states that it has

---

[67] Compl. ¶ 20-1.

[68] Wald Note at 1 (Compl. Ex. E).

[69] In response to a discovery request from J&J for all documents and things relating to any statement made or action taken by J&J to Guidant or Abbott customers threatening or in any way suggesting that J&J would be filing suit, Abbott has not produced a single document.  Similarly, in response to an interrogatory request for all statements, threats, or other actions purportedly taken by J&J forming the bases for Abbott's request for declaratory relief, Abbott did not identify

manufactured thousands of XIENCE V products in the United States in preparation for its launch

and that it will continue to do so following its launch.[70]  Abbott also made clear that the delay to

the launch of XIENCE V, announced by Guidant in March 2006, was due to manufacturing

issues and not the purported actions by J&J.[71]  Abbott's actions belie any suggestion that there is

a controversy between the parties concerning the patents-in-suit that is sufficiently immediate

and real so as to constitute a justiciable controversy.

## III.    EVEN IF THE COURT FINDS IT CAN EXERCISE JURISDICTION, IT SHOULD EXERCISE ITS DISCRETION TO DECLINE TO DO SO.

Assuming, for argument's sake, that the court finds there is an actual controversy

permitting an exercise of jurisdiction, this "does not mean that the district court is required to

exercise that jurisdiction." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813 (Fed. Cir. 1996).  The

Declaratory Judgment Act gives district courts a "unique and substantial discretion in deciding

whether to declare the rights of litigants." *MedImmune*, 127 S.Ct. at 776 (quoting *Wilton v.*

*Seven Falls Co.*, 515 U.S. 277, 286 (1995)).  This discretion is broad – "as long as the district

court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of

sound judicial administration, the court has broad discretion to refuse to entertain a declaratory

judgment action." *EMC Corp.*, 89 F.2d at 813-14.  For example, a court may dismiss a

declaratory judgment action based on "a reasoned judgment whether the investment of time and

resources will be worthwhile." *Serco Services Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir.

1995).  A court may also decline jurisdiction where "allowing the declaratory judgment action to

proceed would create an incentive structure that is inconsistent with the public interest in

preserving declaratory proceedings for cases closer to the central objectives of declaratory

---

any purported actions by J&J directed at Guidant's or Abbott's customers.  *See* Abbott
Interrogatory Responses at 4-14.
[70] Compl. ¶¶ 50-1.
[71] *Id.* ¶ 38.

proceedings." *EMC Corp.*, 89 F.3d at 814 (affirming district court's discretionary decision not to hear action despite threats of litigation).

The Federal Circuit has described "the type of situation the Declaratory Judgment Act was intended to address" as follows:

> [A] patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword…. Guerilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity.

*EMC Corp.*, 89 F.3d at 814-15 (quoting *Arrowhead*, 846 F.2d at 734-35).

The situation here is very different.  J&J did not engage in any "scare-the-customer-and-run" tactics or extra-judicial patent enforcement.  It merely said that J&J's offer was superior to Boston Scientific's because Abbott would not receive a license to J&J's patents if it accepted Boston Scientific's bid, and this could delay or prevent regulatory approval.  J&J set out to convince analysts, the financial community, Guidant shareholders, and the public that J&J's bid was superior to Boston Scientific's.  Allowing such discussions to be used as the pretext for hauling J&J into court would not serve the purposes of the Declaratory Judgment Act.  Consequently, even if the Court were to find an actual controversy here, it should exercise its discretion to decline jurisdiction over this case.

Furthermore, to find an "actual controversy" over patents that a patent holder had decidedly not asserted based on statements made in the prosecution of different patent applications amounts to allowing a party to seek a hypothetical and advisory opinion on the patents of its choosing.  At any given time, there are more than hundreds of thousands of unexpired patents, many of which are members of patent families.  To find that statements made in the prosecution of a patent application creates a justiciable controversy over any number of the

patents in the same family would open the floodgates to parties seeking advisory opinions on

claims that a patentee may never intend to assert, unduly burdening the courts and subjecting a

patent holder to unprovoked expensive and resource-consuming litigation.  Abbott should not be

permitted to use statements made in the prosecution of patent applications to manufacture a

controversy on related patents in an effort to seek what amounts to an advisory opinion from a

federal court whose attention should be focused on *actual* controversies.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the complaint in this action

for lack of subject matter jurisdiction.


ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-2202

Dated: April 26, 2007
180037.1

# EXHIBIT A

Westlaw.                                                    The New York Times

1/26/06 NYT C1                                                        Page 1


1/26/06 N.Y. Times C1
2006 WLNR 1401814

                        New York Times (NY)
          Copyright (c) 2006 The New York Times. All rights reserved.

                            **January 26, 2006**



                                Section: C

              MARKET PLACE; Quiet End To Battle Of the Bids

      BARNABY J. FEDER; Stephanie Saul contributed reporting for this article.

Market Place column on quiet end to battle for Guidant Corp, with Boston Scientific
acquiring company and Johnson & Johnson deciding not to make final counteroffer;
Johnson & Johnson releases terse statement saying company 'determined not to
increase its last offer for Guidant Corp, because to do so would not have been in
best interest of its shareholders'; about only comment was its reminder that Guidant
was obliged to pay it $705 million breakup fee by Jan 26; chart (M)

For Johnson & Johnson, Tuesday started with a morning conference call with analysts
to discuss earnings and ended with William C. Weldon, the company's chief executive,
and Robert J. Darretta Jr., the chief financial officer, attending a dinner for
several dozen institutional investors at the "21" Club in New York. Throughout the
day and evening, the company maintained a rigid silence about the one subject on
everyone's mind -- whether it would respond to a midnight deadline to counter Boston
Scientific's bold $27 billion offer for Guidant.

"They wanted to talk about anything but Guidant," said one investor who attended the
dinner. "It was the elephant in the room."
Only yesterday morning did Johnson & Johnson address the elephant, in a terse news
release saying the company had "determined not to increase its last offer for
Guidant Corporation, because to do so would not have been in the best interest of
its shareholders." About the only comment was its reminder that Guidant was obliged
to pay it a $705 million breakup fee by today.

It was a remarkably quiet conclusion to the biggest and most contentious takeover
battle yet in the medical device industry. The outcome leaves Boston Scientific as
the apparent winner of Guidant, the No. 2 company in the $10 billion market for
defibrillators and other implantable devices that regulate human heartbeats.

Those two companies announced their deal yesterday, pending the approval of
shareholders and regulators. People close to the takeover negotiations say it had
become evident at least 24 hours before the midnight deadline that a counteroffer
was unlikely because Johnson & Johnson's advisers had stopped communicating with the
Guidant team.

But in many ways, Johnson & Johnson had been forced into silence much earlier -- by
choices it made last fall, when it assumed it had the upper hand in its merger
dealings with Guidant and reduced its offer by nearly $4 billion.

It was a short time later that Boston Scientific mounted its surprise takeover
effort and emerged as the company willing to risk the most to acquire Guidant. By
last week, having decided not to raise its own bid of $71 a share, Johnson & Johnson
was reduced to behind-the-scenes attacks on the rationality of Boston Scientific's
$80-a-share offer. It apparently hoped that Boston Scientific's stock would decline

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

so far that Guidant shareholders would begin to doubt the deal's value.

Johnson & Johnson was not talking yesterday, but some analysts say the company's tough bargaining last fall resulted not only in the company's losing Guidant, but a certain amount of corporate luster as well.

"Their reputation had been as a savvy acquirer and a fair acquirer, and I think those two elements have been diminished in this," said Jan David Wald, a health care analyst at A. G. Edwards & Sons. Johnson & Johnson's declining drug sales in the United States make further expansion into medical devices a necessity, Mr. Wald said, but the Guidant stumble could hinder its ability to pursue future deals.

There are risks for Boston Scientific in coming out on top of this fight, not the least of which is the possibility that it is paying too much for Guidant to ever recoup its investment. And Johnson & Johnson could try to slow down Boston Scientific's efforts to close the Guidant deal by pressing antitrust objections at the Federal Trade Commission.

Such delays might send Boston Scientific's stock below $22.62, the price at which the value of the stock portion of the deal would begin shrinking, and induce Guidant investors to vote against the merger. Boston Scientific's shares are down nearly 14 percent since it announced its first bid in December, including a decline of 2 percent yesterday, to $23.54.

But Johnson & Johnson has lost its biggest advantage -- the fact that its merger deal had been fully reviewed by regulators and could have been completed immediately after a Guidant shareholders' vote that had been scheduled for Jan. 31. "The odds of them stopping this are not high," said Matthew Dodds, who follows the industry for Citigroup. "They are fully committed to walking."

Analysts say that may be best for all concerned. Johnson & Johnson could easily afford Guidant. And it desperately needs Guidant or some other large, fast-growing acquisition to mollify shareholders restive about the stagnation in its drug business. But Johnson & Johnson's shareholders have apparently shared management's concern about overpaying for Guidant. Johnson & Johnson's shares fell every time it raised its bid for Guidant.

Analysts have published a blizzard of speculation about whether Johnson & Johnson will now turn its attention to smaller device companies -- like St. Jude Medical, the third-ranked producer of heart-regulating implants, or Conor Medsystems, the developer of a promising new stent design for propping open heart arteries.

But some also note that the company could just as easily look for growth outside devices by purchasing drug or biotech companies.

"J.& J. has the financial strength to move on and the cash to acquire elsewhere to further its growth prospects," said Kenneth R. Weakley, who follows the industry for UBS, the brokerage house that sponsored Tuesday evening's dinner at the "21" Club. Mr. Weakley called the failure to close the deal with Guidant a "heartache, not a heart attack" for the company.

Johnson & Johnson's stock has fallen 4.4 percent since Boston Scientific first entered the bidding war, including a decline yesterday of 86 cents, to $58.50.

Boston Scientific clearly faces stiffer challenges. While Guidant will immediately transform it into a company with more than $9 billion in annual revenues and a shot at double-digit revenue growth for years to come, the cost of the transaction will eat into earnings for at least five years, according to most analysts' estimates.

In the near term, analysts will be closely watching whether Boston Scientific can keep to its ambitious timetable for completing regulatory reviews and close the deal by the end of this quarter. Under the terms of the agreement, it must pay interest to Guidant shareholders at a 6 percent annual rate for every day after March 31 that the closing is delayed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The terms of the deal put extreme pressure on Boston Scientific to maintain the market share and profit margins of its blockbuster drug-coated stent, Taxus, which doctors use to keep patients' coronary arteries propped open after blockages are cleared. Boston Scientific will also need to meet targets for introducing important new products, like a disposable line of endoscopes, used to diagnose gastrointestinal problems, that is scheduled to be released later this year.

Taxus is the market leader in the $6 billion market in countries where it competes with Cypher, Johnson & Johnson's drug-coated stent, but that lead has eroded. In addition, Medtronic recently entered the drug-coated stent market in Europe, and Guidant received word Tuesday that Europe is about to approve its Xience stent.

The one clear winner in the deal, analysts said, is Abbott Laboratories, which injected up to $6.2 billion into Boston Scientific's offer through a variety of side deals, stock sales and below-market-rate loans to that company. The payoff is that Abbott would receive virtually all of Guidant's business except for its heart-regulating implants. On news of the deal and a forecast of strong drug sales during Abbott's fourth-quarter earnings announcement, the company's stock was up more than 5 percent yesterday.

The Guidant portfolio of products to treat damage to the circulatory system from diseases like diabetes generates more than $1 billion annually in sales. It would transform Abbott into a major player in outpatient clinics and hospital laboratories that deliver therapy through catheters as an alternative to more invasive surgical treatments. Analysts say its share of the Guidant deal could begin contributing to Abbott's earnings next year.

That outcome represents a huge improvement from the gains Abbott could have expected if Johnson & Johnson had acquired Guidant. Under that deal, Abbott was to receive access to a valuable stent implant system and rights to certain stent-coating drugs. Johnson & Johnson had worked out that arrangement to satisfy antitrust objections. But those were mere hors d'oeuvres for Abbott, while Boston Scientific offered a seven-course meal.

Chart: "Contentious Courtship"
Johnson & Johnson's 13-month effort to acquire the heart device maker Guidant has been thwarted by Boston Scientific, which started a takeover battle last month.

Johnson & Johnson (2005)

DEC. 15, 2004 -- J.& J. agrees to buy Guidant for $25.4 billion.
OCT. 18 -- J.& J. says it wants to renegotiate the terms of the deal.
NOV. 2 -- The F.T.C. conditionally approves the merger, but J.& J. says it may pull out.
NOV. 15 -- J.& J. proposes a revised deal for $21.5 billion.

Guidant (2005)

APRIL 27 -- Guidant shareholders approve the deal.
JUNE 17 -- Guidant announces a product recall.
NOV. 7 -- Guidant sues J.& J. to force completion of the acquisition.

Boston Scientific (2005)

DEC. 5 -- Boston Scientific offers $24.7 billion for Guidant.

Johnson & Johnson (2006)

JAN. 24 -- J.& J. allows deadline to raise its bid to lapse.

Guidant (2006)

JAN. 11 -- Guidant accepts J.& J.'s sweetened offer of $23.2 billion.

®  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JAN. 13 -- Guidant accepts revised $24.2 billion bid from J.& J.

Boston Scientific (2006)

JAN. 12 -- Boston Scientific raises bid to $25 billion.
JAN. 17 -- Boston Scientific bids $27 billion.

(pg. C2)


---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; MEDTRONIC INC; BOSTON SCIENTIFIC CORP; GUIDANT CORP;
JOHNSON AND JOHNSON

NEWS SUBJECT:  (Business Management (1BU42); Antitrust Regulatory (1AN52); Sales &
Marketing (1MA51); Monopolies (1MO68); Major Corporations (1MA93); Market Data
(1MA11); Mergers & Acquisitions (1ME39); Economics & Trade (1EC26); Corporate Groups
& Ownership (1XO09))

INDUSTRY:  (Pharmaceuticals & Biotechnology (1PH13); Surgical Instrumentation
(1SU78); Manufacturing (1MA74); Internal Medicine (1IN54); Cardiology (1CA75);
Medical Devices (1ME31); Medical Equipment & Supplies (1HE68); Pharmaceuticals
Regulatory (1PH03); Medical Device Market (1ME44); Cardiovascular Devices (1CA41);
Healthcare (1HE06); Medical Device Regulatory (1ME42); Healthcare Practice
Specialties (1HE49))

REGION:  (North America (1NO39); Americas (1AM92); New England (1NE37);
Massachusetts (1MA15); USA (1US73))

Language:  EN

OTHER INDEXING:  (Feder, Barnaby J)  (ABBOTT LABORATORIES; CONOR MEDSYSTEMS;
CONTENTIOUS COURTSHIP; EUROPE; FEDERAL TRADE COMMISSION; GUIDANT; GUIDANT CORP; JJ;
JOHNSON; JOHNSON JOHNSON; JUDE MEDICAL; MARKET; MEDTRONIC)  (15; 18; 24; 24.;
Abbott; Edwards Sons; J. J. to; Jan David Wald; Kenneth R. Weakley; Matthew Dodds;
Quiet End; Robert J. Darretta Jr.; Taxus; Wald; Weakley; William C. Weldon)  (Heart;
Market Place (Times Column); Mergers, Acquisitions and Divestitures; Heart)

COMPANY TERMS: GUIDANT CORP; JOHNSON AND JOHNSON INC; BOSTON SCIENTIFIC CORP

EDITION: Late Edition - Final

Word Count: 2001
1/26/06 NYT C1




END OF DOCUMENT




©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.                                                          The New York Times

1/14/06 NYT C1                                                    Page 1


1/14/06 N.Y. Times C1
2006 WLNR 770636

New York Times (NY)
Copyright (c) 2006 The New York Times. All rights reserved.

January 14, 2006


Section: C


Johnson & Johnson Pulls Ahead in Takeover Battle for Guidant

BARNABY J. FEDER

Johnson & Johnson raises its bid for Guidant Corp to $24.2 billion; dissuades
Guidant from backing out of merger and going with higher bid from Boston Scientific;
deal with Johnson & Johnson has already cleared regulatory hurdles unlike Boston
Scientific offer which would not close until at least March; Guidant is desirable
due to its position in market for defibrillators and other heart-regulating implant
devices (M)

Reacting decisively, Johnson & Johnson struck back last night in the biggest
takeover battle ever in the medical device industry, raising its bid for the Guidant
Corporation to $71 a share in cash and stock, or about $24.2 billion.

In doing so, Johnson & Johnson was able to dissuade Guidant from backing out of a
previously announced merger and going with a higher bid from Boston Scientific.

Johnson & Johnson's latest offer would give Guidant shareholders $40.52 in cash and
0.493 share of Johnson & Johnson stock for each Guidant share. Although that offer
fell short of the $73-a-share bid by Boston Scientific, it was an increase of $1
billion from its stock-and-cash offer of just over $68 a share on Wednesday.

And it was close enough to Boston Scientific's bid to persuade Guidant's directors
to once again unanimously advise shareholders to vote for merging with Johnson &
Johnson at a meeting scheduled for Jan. 31. Boards of both Guidant and Johnson &
Johnson have approved the deal.

Boston Scientific did not return calls last night requesting a comment, but analysts
said they would not be surprised if the company took the weekend to decide on its
response.

"I don't think this is over yet," said Bruce Nudell, who follows the industry for
Sanford C. Bernstein. He said he expected Boston Scientific to come back with
another bid.

At stake in the takeover battle is Guidant's share of the $10 billion market for
implantable heart devices like defibrillators. The acquirer will also pick up
valuable technology in another major device business: the $5 billion market for
coronary stents that prop open arteries that feed blood to the heart.

Guidant has consistently favored Johnson & Johnson's offers over higher bids from
Boston Scientific because their merger, first arranged in December 2004, has cleared
potential regulatory hurdles. It could close immediately after the shareholder vote
at the end of the month.

"This agreement with Johnson & Johnson provides significant financial value and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certainty for shareholders," said James M. Cornelius, the chairman and chief executive of Guidant, in a statement issued jointly with Johnson & Johnson last night.

By contrast, Boston Scientific first entered the bidding a month ago, and its deal could not close before the end of March at the earliest. In addition, Guidant and some analysts say the Boston Scientific bid could run into antitrust or other legal hurdles that could make it hard to project the value of the stock portion of its bid.

Whoever ends up owning Guidant will also face questions about whether the prize is worth the price. While Guidant would immediately begin adding to revenue, it could be some time before the buyer would see an increase in profit from the large investment.

Guidant's jewel is its lucrative position in defibrillators and other heart-regulating implants, the largest sector of the medical device market and one of the fastest growing.

But the company lost market share last year after disclosures of product defects associated with at least seven deaths, related product recalls and negative publicity about its failure to promptly disclose its problems. Those problems led Johnson & Johnson to force Guidant in November to renegotiate their original merger terms down to $63.08 from $76 a share.

The year ended with Guidant having roughly 25 percent of the market and still ranked second to Medtronic, but questions abound about how quickly -- if ever -- Guidant can regain the 35 percent to 40 percent share it previously held.

Analysts following the back-and-forth struggle generally say they believe that Boston Scientific is a better strategic fit with Guidant, but that does not mean it can afford an all-out fight with Johnson & Johnson.

Boston Scientific, based in Natick, Mass., had revenue last year of about $6.28 billion. Johnson & Johnson, based in New Brunswick, N.J., sells drug and consumer health care items in addition to devices and had revenue last year of more than $50 billion.

Boston Scientific shareholders have become restless as growth in its blockbuster drug-coated Taxus stent leveled off last year because it will be several years before other products in its pipeline can hope to pick up the slack. Merging with Guidant would provide immediate growth opportunities and reduce its dependence on Taxus.

As a result, many analysts and investors forecast that Boston Scientific's stock will rise after the merger, further rewarding Guidant shareholders who receive it.

Boston Scientific's $73-a-share offer Thursday night would give Guidant shareholders $36.50 in cash and $36.50 worth of stock for each share.

"Boston Scientific's shares go higher every time the market thinks it's going to win," said Matthew Halbower, portfolio manager of Deephaven Capital Management in Minnetonka, Minn., who said his fund was one of Guidant's 10 largest shareholders.

Mr. Halbower said that in his view Guidant could have a much more positive impact on Boston Scientific than on Johnson and Johnson, so Deephaven will vote against Johnson & Johnson's latest offer.

Johnson & Johnson, which is suffering from lackluster growth prospects in pharmaceuticals, its biggest business, could also benefit from Guidant's near-term growth potential. And it is just as eager as Boston Scientific to get into the heart implant business.

But Johnson & Johnson's investors are generally more risk averse than Boston

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Scientific's, and analysts say the company has been under more pressure to show that it is a disciplined acquirer unwilling to overpay for growth.

Johnson & Johnson's revised bid was the fourth improvement this week in the choices dangled before Guidant's shareholders. The bidding began in earnest Sunday evening when Boston Scientific, having completed its investigation of Guidant's books and operations, announced that it would go through with its preliminary offer of $72 a share in cash and stock, with a total value of roughly $25 billion.

At the same time, Boston Scientific said it had an agreement for Abbott Laboratories to pay $3.2 billion for two Guidant divisions that overlap with Boston Scientific operations. That move, Boston Scientific said, should take care of any antitrust issues.

Guidant's board said it would consider the offer but on Wednesday re-endorsed previously announced plans to merge with Johnson & Johnson after that company agreed to sweeten the terms of their agreement from $64 a share to just over $68 with a stock and cash combination valued that day at $23.2 billion.

On Thursday, Boston Scientific responded by raising its offer to $73 a share, or about $25 billion, and introducing revisions aimed at reducing Guidant's concerns that its deal could take many months to close.

Boston Scientific also promised to pay 1.2 cents a Guidant share -- the equivalent of 6 percent interest -- for each day's delay beyond March 31 in completing a merger. And Boston Scientific imposed a deadline of 4 p.m. yesterday for Guidant to respond.

The deadline came and went without any public response.

Shareholders anticipating a higher offer sent Guidant shares up 44 cents, to $70.84. Johnson & Johnson shares fell 39 cents, to $61.82. Boston Scientific rose 15 cents, to $25.20

Boston Scientific's plans to sell virtually all of Guidant's operations outside of the electrical implants to Abbott introduced a wild card into the guessing game about what happens next.

Abbott, which has been slowly making its way into devices, would become a major force in the industry under Boston Scientific's plan and may have a strong incentive to help Boston Scientific finance a higher counterbid.

"I think Boston and Abbott have one more shot in them," said Mr. Nudell of Sanford C. Bernstein, "probably raising the cash part of their bid."

But Mr. Nudell said Johnson & Johnson might decide to go higher not just to gain Guidant's assets but to keep them out of Boston Scientific and Abbott's hands.

"I think that's driving them now," Mr. Nudell said. "And they have the money to spend until the cows come home."

---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; MEDTRONIC INC; BOSTON SCIENTIFIC CORP; GUIDANT CORP; JOHNSON AND JOHNSON

NEWS SUBJECT: (Business Management (1BU42); Antitrust Regulatory (1AN52); Sales & Marketing (1MA51); Monopolies (1MO68); Major Corporations (1MA93); Market Data (1MA11); Mergers & Acquisitions (1ME39); Economics & Trade (1EC26); Corporate Groups & Ownership (1XO09))

INDUSTRY: (Pharmaceuticals & Biotechnology (1PH13); Surgical Instrumentation (1SU78); Manufacturing (1MA74); Healthcare Regulatory (1HE04); Medical Electronics (1ME73); Medical Devices (1ME31); Pacemakers & Defibrillators (1PA44); Medical

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Equipment & Supplies (1HE68); Pharmaceuticals Regulatory (1PH03); Medical Device
Market (1ME44); Pharmaceuticals Marketing & Sales (1PH83); Electronics (1EL16);
Cardiovascular Devices (1CA41); Healthcare (1HE06); Medical Device Regulatory
(1ME42))

REGION:  (North America (1NO39); Americas (1AM92); New England (1NE37);
Massachusetts (1MA15); USA (1US73))

Language:  EN

OTHER INDEXING:  (Feder, Barnaby J)  (ABBOTT; ABBOTT LABORATORIES; DEEPHAVEN;
DEEPHAVEN CAPITAL MANAGEMENT; GUIDANT; GUIDANT CORP; JOHNSON JOHNSON; JOHNSON
JOHNSON PULLS AHEAD; MEDTRONIC)  (Bruce Nudell; Halbower; James M. Cornelius;
Johnson; Matthew Halbower; Nudell; Sanford C. Bernstein)  (Heart; Mergers,
Acquisitions and Divestitures; Defibrillators; Implants; Heart)

COMPANY TERMS: JOHNSON AND JOHNSON INC; GUIDANT CORP; BOSTON SCIENTIFIC CORP

EDITION: Late Edition - Final

Word Count: 1688
1/14/06 NYT C1

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ABBOTT LABORATORIES and ADVANCED  )
CARDIOVASCULAR SYSTEMS, INC.,     )    Civil Action No. 06-613
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )
                                  )
JOHNSON and JOHNSON, INC. and CORDIS )
CORPORATION,                      )
                                  )
          Defendants.             )


## DECLARATION OF STANLEY PANASEWICZ


I, Stanley Panasewicz, hereby declare as follows:


1.      I am employed by Johnson & Johnson ("J&J") in its Investor Relations

department. My current position is Director of Investor Relations.  I have held this position

since November 2002. One of my responsibilities in this position at J&J is to communicate with

financial analysts.

2.      In December of 2005 and January 2006, a major takeover battle took place

between J&J and Boston Scientific Corporation ("Boston Scientific") for control of Guidant

Corporation ("Guidant"). This takeover battle was the subject of intense interest by financial

analysts. I, along with Louise Mehrotra, J&J's Vice President of Investor Relations, spoke with

financial analysts about the competing bids by J&J and Boston Scientific.  I did not speak to any

reporters on this subject.

3.    In early-to-mid January 2006, J&J developed a script for dealing with questions raised by financial analysts about the takeover battle. Those of us who communicated with financial analysts were instructed not to depart from the words or substance of the script. According to the script, we were to communicate that J&J considered its bid to be superior to Boston Scientific's because, among other reasons, the J&J transaction had secured regulatory approval and the Boston Scientific transaction had not. A key concern of the antitrust regulators had to do with whether Abbott would have the patent rights needed to sell a competitively viable drug-eluting stent. J&J had agreed that if Guidant accepted its offer, J&J would grant Abbott a license to certain drug eluting stent patents, including U.S. Patent No. 6,585,764 to Wright (the "Wright '764 patent"), U.S. Patent No. 6,808,536 to Wright (the "Wright '536 patent"), and U.S. Patent No. 6,776,796 to Falotico (the Falotico '796 patent"). Abbott, however, would not receive a license to those patents if Guidant accepted Boston Scientific's offer, which could delay or prevent regulatory approval of the Boston Scientific transaction.

4.    The script was developed on or about January 12 and incorporated into a finalized document on January 16, 2006. Relevant portions are attached as Exhibit F to J&J's Memorandum in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction. The script stated, in pertinent part:

> Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents. Our IP portfolio in this area includes patents directed to Rapamycin and its analogues including ABT-578 and Everolimus when used on a stent. Abbott does not receive access to this under the Boston agreement. Without access to this IP there is a risk that a DES [drug eluting stent] using any of these compounds may infringe our IP.

(Exhibit F, p. 20.)

5.      In this script, J&J was careful not to suggest or imply that any decision had been reached on suing Abbott for patent infringement, even if Guidant was acquired by Boston Scientific and then Abbott commenced to infringe the J&J patents. These events had not occurred, and there was no need to speculate about what could happen if they did occur. So far as I know, as of January 2006, no one at J&J had yet decided what would happen.

6.      During the following week, I, along with Louise Mehrotra in J&J's Investor Relations department, spoke with financial analysts about why J&J's bid was better than Boston Scientific's. The analysts we spoke to included analysts from Citigroup, Lehman, JMP Securities, Deutsch Bank, Prudential, and A.G. Edwards. We also communicated the information in the script to the investor relations department at Guidant. Three analysts – Larry Biegelsen of Prudential, Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the patent issues in reports they issued.

7.      I called and spoke with Larry Biegelsen of Prudential on or about January 20, 2006. In this conversation, I adhered closely to the approved J&J script attached as Exhibit F to J&J's Memorandum. During this call, I explained that Boston Scientific's offer was inferior to J&J's because Abbott would not receive rights to J&J's drug-eluting stent patents, including the U.S. Patent No. 6,585,764 to Wright and U.S. Patent No. 6,776,796 to Falotico, and that this could result in delays while regulatory authorities evaluated whether Abbott's business was viable without these patent rights. During the call with Biegelsen, I was careful not to discuss the possibility of litigation or make any threats of litigation. I did not say anything about J&J potentially pursuing a preliminary injunction if Abbott or Boston Scientific try to launch an everolimus-coated stent. Nor did I say that J&J was considering filing patent infringement suits

3

against Boston Scientific or Abbott over stent drug coatings or that Abbott or Boston Scientific would be tempting patent litigation by going through with its plan to acquire Guidant.

8.    I also spoke with Matthew Dodds of Citigroup on or about January 12, 2006. In this conversation, I adhered closely to the approved J&J script, and communicated essentially the same information as I did to Biegelsen.

9.    I did not speak with Jan David Wald of A.G. Edwards about J&J's patents. It is my understanding that Louise Mehrotra spoke with Mr. Wald on this topic.

10.    I have seen a January 23, 2006 article in the *International Herald Tribune*, which is attached to Abbott's Complaint as Exhibit F. I had no communications with the reporter who wrote this article about the subjects discussed in the article.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2006.

*Stanley Panasewicz*
Stanley Panasewicz

4

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | |
| vs. | |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | |
| Defendants. | |

Civil Action No. 06-613

## DECLARATION OF LOUISE MEHROTRA

I, Louise Mehrotra, hereby declare as follows:

1.       I am employed by Johnson & Johnson ("J&J ") in its Investor Relations department.  My current position is Vice President of Investor Relations.  I have held this position since November 2005.  One of my responsibilities in this position at J&J is to communicate with financial analysts.

2.       In December of 2005 and January 2006, a major takeover battle took place between J&J and Boston Scientific Corporation ("Boston Scientific") for control of Guidant Corporation ("Guidant").  This takeover battle was the subject of intense interest by financial analysts.  I, along with Stanley Panasewicz, J&J's Director of Investor Relations, spoke with financial analysts about the competing bids by J&J and Boston Scientific.   I did not speak to any reporters on this subject.

3.      In early-to-mid January 2006, J&J developed a script for dealing with questions raised by financial analysts about the takeover battle. Those of us who communicated with financial analysts were instructed to follow closely the words and substance of the script. According to the script, we were to communicate that J&J considered its bid to be superior to Boston Scientific's because, among other reasons, the J&J transaction had secured regulatory approval and the Boston Scientific transaction had not. A key concern of the antitrust regulators had to do with whether Abbott would have the patent rights needed to sell a competitively viable drug-eluting stent. J&J had agreed that if Guidant accepted its offer, J&J would grant Abbott a license to certain drug eluting stent patents, including U.S. Patent No. 6,585,764 to Wright (the "Wright '764 patent"), U.S. Patent No. 6,808,536 to Wright (the "Wright '536 patent"), and U.S. Patent No. 6,776,796 to Falotico (the Falotico '796 patent"). Abbott, however, would not receive a license to those patents if Guidant accepted Boston Scientific's offer, which could delay or prevent regulatory approval of the Boston Scientific transaction.

4.      The script was developed on or about January 12 and incorporated into a finalized document on January 16, 2006. Relevant portions are attached as Exhibit F to J&J's Memorandum in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction. The script stated, in pertinent part:

> Under our Consent Order with the FTC we are obligated to license
> to Abbott certain of our drug eluting stent patents. Our IP portfolio
> in this area includes patents directed to Rapamycin and its
> analogues including ABT-578 and Everolimus when used on a
> stent. Abbott does not receive access to this under the Boston
> agreement. Without access to this IP there is a risk that a DES
> [drug eluting stent] using any of these compounds may infringe our
> IP.

(Exhibit F, p. 20.)

5.    In this script, J&J was careful not to suggest or imply that any decision had been reached on suing Abbott for patent infringement, even if Guidant was acquired by Boston Scientific and then Abbott commenced to infringe the J&J patents.  These events had not occurred, and there was no need to speculate about what could happen if they did occur.  So far as I know, as of January 2006, no one at J&J had yet decided what would happen.

6.    During the following week, I, along with Stan Panasewicz in J&J's Investor Relations department, spoke with financial analysts about why J&J's bid was better than Boston Scientific's.  The analysts we spoke to included analysts from Citigroup, Lehman, JMP Securities, Deutsch Bank, Prudential, and A.G. Edwards.  We also communicated the information in the script to the investor relations department at Guidant.  Three analysts – Larry Biegelsen of Prudential, Jan David Wald of A.G. Edwards, and Matthew Dodds of Citigroup – mentioned the patent issues in reports they issued.

7.    I called and spoke with Jan David Wald of A.G. Edwards on or about January 17, 2006.  In this conversation, I adhered closely to the approved J&J script attached as Exhibit F to J&J's Memorandum.  The primary purpose of my call to Wald was to tell him that his projection for Boston Scientific's stock price (which did not take into account the merger with Guidant) was being used by Boston Scientific in its valuation analysis for the merger.  During this call, I also told him that under the scenario that the Boston bid prevailed, Abbott would not receive rights to J&J's patents on drug-eluting stents including the Wright '764 patent and the Falotico '796 patent, and that this could result in delays while regulatory authorities evaluated whether Abbott's business was viable without these patent rights.  I was careful not to discuss the possibility of litigation or make any threats of litigation during the call.

8.     I did not speak with Lawrence Biegelsen of Prudential about J&J's patents.  It is my understanding that Stan Panasewicz spoke with Mr. Biegelsen on this topic.

9. I have seen a January 23, 2006 article in the *International Herald Tribune*, which is attached to Abbott's Complaint as Exhibit F.  I had no communications with the reporter who wrote this article about the subjects discussed in the article.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2006.

_____
Louise Mehrotra

4

# EXHIBIT E



## Press Release

## Abbott to Acquire License to Johnson & Johnson's Rapid Exchange Catheter Delivery Technology

Abbott Park, Illinois, November 15, 2005 — Following today's announcement that Johnson & Johnson and Guidant have entered into a revised agreement by which Johnson & Johnson will acquire Guidant, Abbott announced its worldwide licensing agreement with Johnson & Johnson for a large portfolio of intellectual property for developing and commercializing rapid exchange (RX) delivery systems and related drug-eluting stents and interventional products. The agreement, which is contingent upon closing of the acquisition, will provide Abbott with access to patents that enhance the company's ability to bring to market an RX catheter delivery system. Incorporating RX into its growing product portfolio increases Abbott's already strong presence in catheterization labs, as the majority of interventional procedures in the United States are performed with rapid exchange delivery systems.

"Abbott's licensing agreement with Johnson & Johnson is an important addition to our vascular business, providing us with broad access to a large portfolio of intellectual property in the vascular devices field," said Richard A. Gonzalez, president and chief operating officer of Abbott's Medical Products Group. "This license gives us further assurance that we'll have a clear path to use rapid exchange delivery systems with many of our vascular products, including our ZoMaxx® drug-eluting coronary stent."

Financial terms of the agreement will be disclosed upon the closing of the acquisition.

### About Abbott Vascular
Abbott Vascular, a division of Abbott, is transforming the treatment of vascular disease, combining the latest medical device innovations with world-class pharmaceuticals to advance medicine and improve patient care. Abbott Vascular offers a comprehensive portfolio of vessel closure, endovascular and coronary products that are recognized internationally for their safety, ease of use and effectiveness in treating patients with vascular disease. Abbott Vascular is headquartered in Redwood City, Calif. For more information about Abbott Vascular, visit www.abbottvascular.com.

### About Abbott
Abbott is a global, broad-based health care company devoted to the discovery, development, manufacture and marketing of pharmaceuticals and medical products, including nutritionals, devices and diagnostics. The company employs 60,000 people and markets its products in more than 130 countries.

⊡ top of page

Home | Select a Country | Site Map | Contact Us | Privacy Policy | T

Copyright © 2006, 2007 Abbott Laboratories. Abbott Park, Illino

Unless otherwise specified, all product names appearing in this Internet site are or licensed to Abbott Laboratories, its subsidiaries or affiliates. No use of any Al name, or trade dress in this site may be made without the prior written au Laboratories, except to identify the product or services of the company.

# EXHIBIT F

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**REDACTED**

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**REDACTED**

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

REDACTED

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

**LEGAL/ARBITRAGE (Steve Rosenberg/Jim Hilton/Eric Harris)**

| 1. | Q | **What are the mechanics for shareholders to exchange their shares?** |
|---|---|---|
|  | A | • After the merger is completed, the exchange agent will send a letter of transmittal to each former Guidant stockholder. The transmittal letter will contain instructions for exchanging shares of Guidant common stock for cash and shares of J&J common stock as provided in the Merger Agreement. |
| 2. | Q | **Does either the GUIDANT Board of Directors or J&J Board of Directors have a fiduciary out?** |
|  | A | • The revised amendment to the merger agreement contains customary deal protection provisions customary for transactions of this nature. The revised amendment to the merger agreement has been filed and is publicly available. |
| 3. | Q | **What are the closing conditions in this revised transaction?** |
|  | A | • The revised amendment to the agreement has been filed with the SEC. |
| 4. | Q | **Please list the steps and the associated timeline necessary to close this transaction.** |
|  | A | • Revised proxy is targeted to be mailed to the SEC on 1/17/06<br>• A supplement to the Proxy Statement/Prospectus (mailed to Shareholders) – will be mailed as soon as the SEC reviews and clears the revised proxy which could occur on 1/17/06<br>• Guidant Shareholder Vote – scheduled for 1/31/06<br>Anticipated Closing – immediately following a favorable shareholder vote (~2 days) |
| 5. | Q | **Since this is a revised amendment to the agreement, will it require review and approval by the FTC and the European Commission again?** |
|  | A | • We do not anticipate further review by the FTC or the European Commission |
| 6. | Q | **When does the merger agreement expire?** |
|  | A | • The revised amendment to the merger agreement was filed with the SEC so you can now review it |
| 7. | Q | **Are there any MAC clauses contained in the agreement?** |
|  | A | • The revised amendment to the merger agreement was filed with the SEC so you can now review it |

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

| 8. | Q | Under what circumstances can either Company walk away from this agreement? |
|---|---|---|
| | A | • The revised amendment to the agreement was filed with the SEC so you can now review it |
| 9. | Q | What type of legal exposure relating to the recalls/lawsuits filed, if any, are you expecting? |
| | A | • It's not appropriate for us to comment on this. |
| 10. | Q | What is the status of the criminal investigation of Guidant as well as the subpoena recently issued to Guidant? |
| | A | • It's not appropriate for us to comment on this. |
| 11. | Q | Was J&J previously aware of the various product malfunctions prior to the recalls and product notifications? |
| | | • It's not appropriate for us to comment on this. |
| 12. | Q | Are you required to find buyers to fulfill your EU divestiture requirements in order to close the acquisition? |
| | A | • No |
| 13. | Q | Why do you believe there may be IP issues associated with Boston Scientific's offer for Guidant which are not an issue in J&J's offer for Guidant? |
| | A | • Under our Consent Order with the FTC we are obligated to license to Abbott certain of our drug eluting stent patents. Our IP portfolio in this area includes patents directed to Rapamyocin and its analogues including ABT-578 and Everolimus when used on a stent. Abbott does not receive access to this under the Boston agreement. Without access to this IP there is a risk that a DES using any of these compounds may infinge our IP. |

# GUIDANT
## Questions & Answers
### Revised (1/16/06)

| 14. | Q | What are some of the factors that you believe may cause the FTC/EC regulatory review process to take longer than Boston Scientific is publicly indicating? |
|---|---|---|
| | A | <ul><li>J&J's regulatory process took approximatey 1 year to complete so it may not be realistic to think Boston Scientific's process can be completed in only a few months.</li><li>Boston Scientific has conditioned its proposal on retaining rights to the Guidant DES program and there is a risk that the Regulatory authorities may not permit such retention.</li><li>The Boston and Abbott agreement is likely to be a very complex agreement which historically necessitates a longer review time due to the complexity of the agreement. There is also the possibility this will raise competitive concerns and questions that will take time to address.</li><li>The assets associated with Guidant's VI and CRM businesses are in some case intermingled. Disaggragating (both physical and Intangibles) these assets could be a complex process which could result in a substantial delay in the regulatory approval</li></ul> |

# EXHIBIT G

Westlaw.                                                    The New York Times

1/9/06 NYT C1                                                        Page 1


1/9/06 N.Y. Times C1
2006 WLNR 448663

New York Times (NY)
Copyright (c) 2006 The New York Times. All rights reserved.

January 9, 2006


Section: C


New Bid For Guidant Sets Up A Showdown

ANDREW ROSS SORKIN and BARNABY J. FEDER

Boston Scientific says it will make formal, binding bid for Guidant that is worth $25 billion in cash and stock; offer is expected to set off takeover battle between Boston Scientific and Johnson & Johnson, which had already agreed to buy Guidant for $21.4 billion; Guidant board is expected to meet shortly to evaluate proposal and, if it is deemed superior, Johnson & Johnson will have five days to respond with new, higher offer; latest bid comes after monthlong examination of confidential financial records; as part of its offer, Boston Scientific says it has reached agreement to sell two Guidant units to Abbott Laboratories for $3.8 billion to satisfy regulators (M)

After poring over Guidant's confidential financial records for more than a month, Boston Scientific said yesterday that it would make a formal, binding bid for the company that is worth $25 billion in cash and stock.

The offer is expected to set off a takeover battle between Boston Scientific and Johnson & Johnson, which had already agreed to buy Guidant for $21.4 billion. Johnson & Johnson lowered its earlier $25.4 billion offer because it said a raft of safety problems had diminished Guidant's value.

The board of Guidant, the nation's second-largest maker of implantable defibrillators and pacemakers after Medtronic, is expected to meet early this week to evaluate the proposal. If Guidant's board deems Boston Scientific's bid to be superior, Johnson & Johnson will have five days to respond with a new, higher offer.

Investors and analysts have been waiting anxiously to see if Boston Scientific would be comfortable enough to continue to pursue its bid after reviewing Guidant's internal financial and safety records, especially after it was disclosed last month that the Food and Drug Administration had new reports about patient deaths associated with short circuits in Guidant's heart devices.

In an interview yesterday, James R. Tobin, Boston Scientific's chief executive, said he was satisfied with what he saw at Guidant.

"We did very thorough due diligence," Mr. Tobin said. "We put a full-court press on this thing. The Guidant folks were very open to us. Clearly they have some short-term challenges. We're realistic about what we're dealing with here."

Mr. Tobin added that beyond studying Guidant's own records, Boston Scientific also talked to doctors and others involved in health care to gauge the vitality of the business.

"There are clearly trust issues that have developed," Tobin said. "On the other hand, Guidant's technology is acknowledged to be right up there. And we think

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there's an opportunity to regain that trust."

As part of Boston Scientific's formal offer, the company said that it had reached an
agreement to sell two Guidant units, its vascular intervention and endovascular
businesses, to Abbott Laboratories for $3.8 billion to satisfy regulators if it
reaches a merger agreement with Guidant. Boston Scientific also said that its offer
-- $36 a share in cash and the equivalent of $36 a share in stock -- would include
what is known in the business as a collar, to protect investors should Boston
Scientific shares fall and to protect Boston Scientific from paying too much if its
own shares jump.

Under the terms of its offer, Boston Scientific said that if the average closing
price of its stock in a 20-day period before the Guidant board's approval of the
deal is less than $23.62, Guidant shareholders will receive 1.5241 Boston Scientific
shares for each share of Guidant stock. If the average price is greater than $28.86,
Guidant shareholders will receive 1.2474 Boston Scientific shares for each share of
Guidant stock.

Boston Scientific's offer represents about a 12 percent premium over Johnson &
Johnson's offer, based on the closing price of Johnson & Johnson's shares on Friday.

Boston Scientific said it estimated that if a deal was consummated, the combined
company would have $10 billion in sales in 2007. It expects the combined company's
sales to grow at a double-digit rate, achieving $16 billion in 2011.

Boston Scientific's side deal with Abbott is aimed at helping complete the deal
quickly, but it also has big implications for Abbott and the industry.

The side deal is likely to be criticized by Medtronic. The company had
unsuccessfully opposed Johnson & Johnson's plans in its proposed merger with Guidant
to license Abbott to use Guidant's delivery gear for stents, which are used to open
blocked blood vessels. Medtronic had argued that it was better positioned than
Abbott to use the technology to provide added competition. Medtronic is likely to
make similar arguments to regulators that Boston Scientific should be forced to give
it access to Guidant's technology.

Abbott has been developing its own stent products. Last year, it became the second
company after Guidant to gain regulatory clearance to market stents to prop open the
carotid arteries, which are the main pathway for blood to the brain. But Abbott's
effort to compete in the multibillion-dollar market for drug-coated coronary stents
has lagged far behind those of Johnson & Johnson and Boston Scientific, the market
leaders.

The acquisition of Guidant's vascular business would represent the company's first
major commitment to what had been a relatively cautious strategy of diversifying
into device implants, which is dominated by companies like Medtronic, Johnson &
Johnson and Boston Scientific. Abbott acquired two start-up vascular companies,
Jomed and Integrated Vascular Systems, in 2003.

---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; MEDTRONIC INC; BOSTON SCIENTIFIC CORP; GUIDANT CORP;
JOHNSON AND JOHNSON

NEWS SUBJECT:  (Mergers & Acquisitions (1ME39); Major Corporations (1MA93);
Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Healthcare (1HE06); Medical Devices (1ME31); Medical Equipment &
Supplies (1HE68); Pharmaceuticals & Biotechnology (1PH13); Surgical Instrumentation
(1SU78); Manufacturing (1MA74))

REGION:  (Massachusetts (1MA15); USA (1US73); Americas (1AM92); New England (1NE37);
North America (1NO39))

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Language:  EN

OTHER INDEXING:  (Sorkin, Andrew Ross; Feder, Barnaby J)  (ABBOTT; ABBOTT
LABORATORIES; FOOD AND DRUG ADMINISTRATION; GUIDANT; INTEGRATED VASCULAR SYSTEMS;
JOHNSON JOHNSON; MEDTRONIC)  (James R. Tobin; Tobin)  (Heart; Mergers, Acquisitions
and Divestitures; Heart)

COMPANY TERMS: BOSTON SCIENTIFIC CORP; GUIDANT CORP; JOHNSON AND JOHNSON INC; ABBOTT
LABORATORIES INC

EDITION: Late Edition - Final

Word Count: 1100
1/9/06 NYT C1

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

## Press Release

Print Page | Close Window

**Boston Scientific Improves Offer to Acquire Guidant**

Increases Value to $73 Per Share

All Modifications Requested by Guidant's Board Have Been Addressed

If Transaction Does Not Close By March 31, 2006, Guidant Shareholders Will
Receive Interest

NATICK, Mass., Jan. 12 /PRNewswire-FirstCall/ -- Boston Scientific Corporation (NYSE: BSX) today announced that it has improved its definitive offer to acquire Guidant Corporation (NYSE: GDT). Boston Scientific has notified the Guidant Board of Directors that its amended offer will expire at 4:00 p.m. ET on January 13, 2006, unless the Guidant Board has declared Boston Scientific's improved offer superior to the current Johnson & Johnson $67.92 transaction (based on the closing price of Johnson & Johnson's common stock on Thursday, January 12).

Under the terms of the amended offer, Boston Scientific will provide Guidant shareholders with:

-- Improved Value: Acquire all of the outstanding shares of Guidant for
$73 per share, $36.50 in cash and $36.50 in Boston Scientific common
stock, subject to a collar. The amended offer is not subject to any
financing condition.

-- Certainty of Completion: Boston Scientific has now agreed that, if
required, it will divest all overlapping assets. This revision to its
offer addresses any perceived antitrust concerns articulated to Boston
Scientific by Guidant.

-- Certainty of Value: If the closing of the transaction does not occur by
March 31, 2006, the $73 per share price would be increased by $0.012
in cash for each day between April 1, 2006, and the date of closing
(representing an annual interest rate of 6 percent).

"Our amended offer addresses all of the outstanding issues raised by Guidant's Board," said Pete Nicholas, Chairman of Boston Scientific. "We have increased the value of our offer, satisfied any perceived antitrust concerns and provided shareholders increased certainty of value by agreeing to pay interest on the $73 share price if the transaction is not closed by the end of the first quarter. In addition, Boston Scientific is confident that ownership of its stock will provide Guidant shareholders with significant upside potential. We strongly encourage the Guidant Board to act in the best interests of Guidant shareholders by declaring our $73 per share offer superior to the revised $67.92 per share transaction with Johnson & Johnson."

Under the terms of the amended Boston Scientific offer, each share of Guidant common stock will be exchanged for $36.50 in cash and $36.50 in Boston Scientific common stock, based on the average closing price of Boston Scientific common stock during the 20 consecutive trading day period ending three days prior to Guidant's shareholder meeting to approve the transaction. If the average closing price of Boston Scientific common stock during such period is less than $23.62, Guidant shareholders will receive 1.5453 Boston Scientific shares for each share of Guidant common stock, and if the average closing price of Boston Scientific common stock during such period is greater than $28.86, Guidant shareholders will receive 1.2647 Boston Scientific shares for each share of Guidant common stock.

If the Guidant Board declares Boston Scientific's amended offer superior by 4:00 p.m. ET on January 13, 2006, Boston Scientific's offer will remain open until close of business on January 24, 2006.

Boston Scientific intends to file its offer letter and the revised Merger Agreement with the Securities and Exchange Commission on Friday, January 13, 2006.

Shearman & Sterling LLP is acting as legal counsel to Boston Scientific, and Merrill Lynch & Co., Bear, Stearns & Co. Inc., and Banc of America Securities LLC are acting as financial advisors.

Boston Scientific Corporation

Boston Scientific is a worldwide developer, manufacturer and marketer of medical devices whose products are used in a broad range of interventional medical specialties. For more information, please visit: http://www.bostonscientific.com.

Forward-Looking Statements

Case 1:06-cv-00613-SLR    Document 42-2    Filed 05/03/2007    Page 51 of 63

This press release contains "forward-looking statements," including, among other statements, statements regarding the proposed business combination between Boston Scientific Corporation and Guidant Corporation, and the anticipated consequences and benefits of such transaction. Statements made in the future tense, and words such as "anticipate", "expect", "project", "believe", "plan", "estimate", "intend", "will", "may" and similar expressions are intended to identify forward-looking statements. These statements are based on current expectations, but are subject to certain risks and uncertainties, many of which are difficult to predict and are beyond the control of Boston Scientific. Relevant risks and uncertainties include those referenced in Boston Scientific's filings with the Securities and Exchange Commission ("SEC") (which can be obtained as described in "Additional Information" below), and include: general industry conditions and competition; economic conditions, such as interest rate and currency exchange rate fluctuations; technological advances and patents attained by competitors; challenges inherent in new product development, including obtaining regulatory approvals; domestic and foreign health care reforms and governmental laws and regulations; and trends toward health care cost containment. Risks and uncertainties relating to the proposed transaction include: Boston Scientific and Guidant will not enter into any definitive agreement with respect to the proposed transaction; required regulatory approvals will not be obtained in a timely manner, if at all; the proposed transaction will not be consummated; the anticipated benefits of the proposed transaction will not be realized; and the integration of Guidant's operations with Boston Scientific will be materially delayed or will be more costly or difficult than expected. These risks and uncertainties could cause actual results to differ materially from those expressed in or implied by the forward-looking statements, and therefore should be carefully considered. Boston Scientific assumes no obligation to update any forward-looking statements as a result of new information or future events or developments.

Additional Information

This material is not a substitute for the prospectus/proxy statement and any other documents Boston Scientific and Guidant would file with the SEC if a definitive agreement with Guidant is executed. Investors and security holders are urged to read such prospectus/proxy statement and any other such documents, when available, which would contain important information about the proposed transaction. The prospectus/proxy statement would be, and other documents filed or to be filed by Boston Scientific and Guidant with the SEC are or will be, available free of charge at the SEC's website (www.sec.gov) or from Boston Scientific by directing a request to Boston Scientific Corporation, One Boston Scientific Place, Natick, Massachusetts 01760-1537, Attention: Milan Kofol, Investor Relations.

Boston Scientific is not currently engaged in a solicitation of proxies from the security holders of Boston Scientific or Guidant in connection with Boston Scientific's proposed acquisition of Guidant or in connection with Johnson & Johnson's proposed acquisition of Guidant. If a proxy solicitation commences, Boston Scientific, Guidant and their respective directors, executive officers and other employees may be deemed to be participants in such solicitation. Information about Boston Scientific's directors and executive officers is available in Boston Scientific's proxy statement, dated April 4, 2005, for its 2005 annual meeting of stockholders. Additional information about the interests of potential participants will be included in the prospectus/proxy statement Boston Scientific and Guidant would file if a definitive agreement with Guidant is executed.

```
Contacts
Milan Kofol (508-650-8569)(cell: 617-834-8595)
Investor Relations, Boston Scientific Corporation

Paul Donovan (508-650-8541) (cell: 508-667-5165)
Media Relations, Boston Scientific Corporation

Steve Frankel / Steve Silva (212-355-4449)
Joele Frank, Wilkinson Brimmer Katcher
```

# EXHIBIT I



**Multi-Company Note**

# Medical Supplies & Technology

## An INTERESTing New Offer

**January 13, 2006**

**Matthew J Dodds**
+1-212-816-6928
matthew.dodds@citigroup.com

**Efrem Kamen**
+1-212-816-3820

**United States**

**SUMMARY**

➤ BSX's new bid appears more focused on anti-trust issues than a higher price, which is likely to be based on intellectual property as much as timing. We don't think BSX's new offer is enough to get GDT to switch sides.

➤ A BSX/GDT deal may not have the freedom of passage through the FTC that is widely anticipated, as JNJ holds some key intellectual property needed to make ABT a "competitive" DES player.

➤ JNJ owns the IP around the use of the drug sirolimus (rapamycin) and its analogues on a stent - this includes both ABT-578 and everolimus.

➤ When the FTC initially approved JNJ/GDT in October, JNJ agreed to license rapid exchange and other stent rights to ABT. We suspect that the other stent rights included the IP surrounding the use of rapamycin analogues on a stent.

➤ Without this IP, the FTC could have concern over ABT's ability to make ZoMaxx or Xience V a viable competitor.

**SUMMARY VALUATION AND RECOMMENDATION DATA**

| Company (Ticker) | Price | Expected Returns Price | Div. | Total | Rating | | Div.(E) | Target | LTGR | Earnings Per Share Current Yr | Next Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Abbott Laboratories- | $41.34 | (8.1%) | 2.6% | (5.5%) | Curr | 3M | $1.07 | $38.00 | 7% | $2.48E | $2.50E |
| (ABT) | | | | | Prev | 3M | $1.07 | $38.00 | 7% | $2.48E | $2.50E |
| Boston Scientific- | $25.05 | 7.8% | 0.0% | 7.8% | Curr | 2H | $0.00 | $27.00 | 7% | $1.83E | $1.80E |
| (BSX) | | | | | Prev | 2H | $0.00 | $27.00 | 7% | $1.83E | $1.80E |
| Guidant Corporation- | $70.40 | (31.8%) | 0.6% | (31.3%) | Curr | 3H | $0.40 | $48.00 | 15% | $1.82E | $1.49E |
| (GDT) | | | | | Prev | 3H | $0.40 | $48.00 | 15% | $1.82E | $1.49E |
| Johnson & Johnson- | $62.21 | 28.6% | 2.1% | 30.7% | Curr | 1L | $1.29 | $80.00 | 11% | $3.50E | $3.86E |
| (JNJ) | | | | | Prev | 1L | $1.29 | $80.00 | 11% | $3.50E | $3.86E |

**OPINION**

**BSX's new offer shows GDT's Board is as concerned with anti-trust as price...**

After the close yesterday, Boston came back with another offer for Guidant. While this was widely anticipated, it is a bit quicker than we thought and the structure puts more of a focus on anti-trust concerns than a pricing premium. Specifically, the Boston offer of $73 is only $1 higher than the last offer and is still equally split between stock and cash. We felt Boston would go to $76 with its follow up bid on the chance that JNJ was "maxed" at $68. In addition to the $1 increase in price, Boston has altered its agreement on two fronts to address two apparent concerns of Guidant's Board: 1) the ability to get through the FTC, and 2) the ability to close the deal in a timely manner. To address these concerns, Boston has now

Citigroup Research is a division of Citigroup Global Markets Inc. (the "Firm"), which does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Non-US research analysts who have prepared this report, and who may be associated persons of the member or member organization, are not registered/qualified as research analysts with the NYSE and/or NASD, but instead have satisfied the registration/qualification requirements or other research-related standards of a non-US jurisdiction.
Customers of the Firm in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at http://www.smithbarney.com (for retail clients) or http://www.citigroupgeo.com (for institutional clients) or can call (866) 836-9542 to request a copy of this research.

**Citigroup Global Markets**



offered to divest all overlapping assets if necessary and will pay $0.012 in cash per day (or $4MM per day) for every day the closing slips after April 1.The second component is quite novel, and we aren't sure if this has ever been done before in a major acquisition/merger. While it may sound lucrative since the cash register rings daily, it's really quite small ($120MM a month) in relation to the $25B deal size.

**...And could be related to JNJ's IP around using limus compounds on a stent...**

The interesting new features of Boston's offer implies that Guidant's Board is more concerned with anti-trust issues than the investment community has realized.  Our recent work in the area suggests there may be one major issue that has been overlooked to date – JNJ's IP position on using sirolimus (rapamycin) and its analogues on a stent.  JNJ licensed rapamycin from Wyeth but also has its own patents that cover the use of rapamycin and rapamycin analogues on a stent.   These patents include the '796 patent filed in May 2001 and the '536 patent filed in April 2003. The patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.  While we have not done specific research on the strength of the patents, the claims appear to somewhat broadly cover the use of rapamycin on a stent to treat restenosis.

What makes this issue interesting is that JNJ is likely to have offered a license to these patents along with rapid-exchange to Abbott since ABT-578 (the drug Abbott uses for ZoMaxx) is a rapamycin analogue.  If this is correct, it means that the FTC required this access to ensure that Abbott would not face litigation from JNJ when it eventually enters the US market.

**...Which would remain an issue with Boston's new offer...**

In the Boston deal for Guidant, neither Boston nor Abbott would garner access to the limus patents so another competitive stent entrant may not technically be "created" with this deal.  (It could be argued that Guidant didn't have access to these patents before the JNJ offer, but if the FTC determined it was an issue in its JNJ/GDT review, its on the map.)  Hence, while the Boston/Abbott deal looks quite a bit more comprehensive than the JNJ/Abbott deal, the importance of the limus patent rights appear to have been underestimated.

**...Along with some other potential snags....**

While Boston is now saying it will divest all required assets – which would presumably include dropping the "shared" rights to everolimus – this would require another "agreement" with Abbott since the current one does not include this scenario.  It was also noted by the *Wall Street Journal* that Boston's last trip to the FTC was ugly as its acquisition of Cardiovascular Imaging Systems included an agreement with Hewlett Packard that the FTC felt was not honored.  Finally, Boston has said little about EU anti-trust clearance, which may not be on fast-track status given that Boston and Guidant have more overlap and the EU authorities raised several product issues between JNJ and Guidant that the FTC did not raise.

**...So the bottom line on the new offer is: we just don't think it's enough.**

Last night, Guidant's Board noted that it will look at and respond to the new offer by Boston Scientific.  Even with the new components of the Boston offer, we don't think Guidant's Board will get comfortable enough with the aforementioned anti-trust issues and the extra $1.  Boston is demanding that Guidant's Board respond by 4 p.m. EST today (which is ironically Friday the 13th).  If Guidant doesn't take the offer (80%), Boston could still go higher on price since Guidant's Board appeared comfortable to go with Boston earlier this week when the spread was $8.  If Guidant does take Boston's new offer (20%), its hard to



say what JNJ will do, especially given the fact that we have been incorrect on JNJ's last three moves relating to Guidant.

### QUARTERLY ESTIMATES PER SHARE DATA

| Ticker | Period | Current Year Current | Current Year Previous | Next Year Current | Next Year Previous | Next Year + 1 Current | Next Year + 1 Previous |
|---|---|---|---|---|---|---|---|
| **ABT** | 1Q | **$0.58A** | $0.58A | **$0.58E** | $0.58E | **NA** | NA |
| (FYE Dec) | 2Q | **$0.58A** | $0.58A | **$0.62E** | $0.62E | **NA** | NA |
| | 3Q | **$0.58A** | $0.58A | **$0.60E** | $0.60E | **NA** | NA |
| | 4Q | **$0.74E** | $0.74E | **$0.70E** | $0.70E | **NA** | NA |
| | Year | **$2.48E** | $2.48E | **$2.50E** | $2.50E | **$2.62E** | $2.62E |
| **BSX** | 1Q | **$0.51A** | $0.51A | **$0.47E** | $0.47E | **NA** | NA |
| (FYE Dec) | 2Q | **$0.48A** | $0.48A | **$0.45E** | $0.45E | **NA** | NA |
| | 3Q | **$0.42A** | $0.42A | **$0.42E** | $0.42E | **NA** | NA |
| | 4Q | **$0.42E** | $0.42E | **$0.46E** | $0.46E | **NA** | NA |
| | Year | **$1.83E** | $1.83E | **$1.80E** | $1.80E | **$1.99E** | $1.99E |
| **GDT** | 1Q | **$0.65A** | $0.65A | **NA** | NA | **NA** | NA |
| (FYE Dec) | 2Q | **$0.63A** | $0.63A | **NA** | NA | **NA** | NA |
| | 3Q | **$0.28A** | $0.28A | **NA** | NA | **NA** | NA |
| | 4Q | **$0.26E** | $0.26E | **NA** | NA | **NA** | NA |
| | Year | **$1.82E** | $1.82E | **$1.49E** | $1.49E | **$2.42E** | $2.42E |
| **JNJ** | 1Q | **$0.97A** | $0.97A | **$1.04E** | $1.04E | **NA** | NA |
| (FYE Dec) | 2Q | **$0.93A** | $0.93A | **$1.01E** | $1.01E | **NA** | NA |
| | 3Q | **$0.87A** | $0.87A | **$0.97E** | $0.97E | **NA** | NA |
| | 4Q | **$0.74E** | $0.74E | **$0.83E** | $0.83E | **NA** | NA |
| | Year | **$3.50E** | $3.50E | **$3.86E** | $3.86E | **$4.22E** | $4.22E |

### VALUATION AND RISKS – COMPANIES DISCUSSED
### Johnson & Johnson (JNJ –$62.21; 1L)

#### *Valuation*
We arrive at our $80 target price for Johnson & Johnson based on an average of three different valuations: 1) a 21x multiple off our forward 12 months (F12M) EPS forecast; 2) a TEV/2005E EBITDA target multiple of 14x; and 3) a 10-year DCF analysis.

A 21x P/E multiple represents a weighted multiple using a sum-of-the-parts analysis on JNJ's three major divisions: Pharmaceuticals (58% of operating profit), MD&D (31%), and Consumer (11%). For Pharmaceuticals, our target multiple of 20x represents a modest premium to the large-cap pharmaceutical group average of 17x, but is in line to slightly above the better-positioned franchises of Eli Lilly (21x), and Novartis (18x). Our comp group also includes companies such as Bristol Myers. The range of this comp group is from 15x–19x.

For MD&D, our target multiple of 25x represents a 10% premium to our F12M forecast for the CMTI as JNJ's business should grow 16% in 2005E, well north of the group average. The group in comprised of 17 large-cap med tech companies and includes companies such as



Medtronic, Abbott Laboratories, and Alcon. The trading range for the comp group is 15x–33x forward 12-month EPS.

For Consumer, we are forecasting a 21x multiple, which is in line with the average F12M P/E multiple the Citigroup Home & Personal Care Products Team is forecasting for the four closest comparable companies. The range of the comps group is 18x-21x and includes companies such as Avon Products, Procter & Gamble, and Colgate-Palmolive.

For our TEV/2005E EBITDA calculation, we use the 2004 share count and net debt, and the 2005E EBITDA to calculate the current multiple of 14x. Our TEV/EBITDA premium is based on the same factors as our Price/F12M EPS target, and we arrive at a TEV/EBITDA target price of $78. The range of our TEV/EBITDA for the comp groups ranges from 10x to 32x 2005 EBITDA.

**Johnson & Johnson Valuation Ratios**

| | Current | CMTI | Hos. Sup. Peers | Pharma Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|---|
| LT EPS Growth | 10% | 15% | 13% | 9% | 7% | | | |
| Price/F12M EPS | 17x | 23x | 18x | 17x | 18x | 21x | $78.96 | 26% |
| TEV/2004 EBITDA | 11x | 17x | 12x | | | 14x | $78.08 | 25% |
| Implied DCF Value | -- | | | | | | $84.15 | 35% |
| **Derived Price Target** | | | | | | | **$80.40** | **29%** |
| Dividend Yield | | | | | | | | 2% |
| **Expected Total Return** | | | | | | | | **31%** |

*Source: Citigroup Investment Research estimates*

Our DCF valuation of $84 per share is based on ten years of projected free cash flow with a 1% terminal growth rate. For an equity risk premium we used 3.8%; our adjusted beta is 0.58; and our weighted average cost of capital is 6.4%.

### Risks

We rate Johnson & Johnson Low Risk based on three factors: 1) Johnson & Johnson's broad business mix in three large, defensive markets – pharmaceuticals, medical products, and consumer products – makes Johnson & Johnson the most diversified large-cap company in the health care space; 2) Johnson & Johnson is a major player in all three of its targeted markets, including the No. 1 position in the $224 billion medical products market; and 3) Johnson & Johnson has a sizable cash hoard – over $7 billion in net cash – and free cash flow generation currently running at roughly $1.5 billion/quarter.

Risks to our thesis include: 1) unexpected generic competition for Levaquin, Risperdal, Aciphex, Topamax, or Procrit before 2008; 2) the inability to gain further share in the US drug eluting stent market in 2005 and 2006; 3) overly aggressive growth expectations for Natrecor, Remicade, or Topamax; 4) issues related to the Guidant merger.

Given the recent heightened scrutiny over drug-safety, there also exists the risk that any of Johnson & Johnson major pharmaceuticals could face slowing sales because of new or increased safety concerns.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from foreign exchange based on favorable yoy comparisons of the U.S. dollar versus the Euro and Yen declining in 2005; and 3) a strengthening US economy could lead to a negative sector rotation, as the med tech industry is non-cyclical in nature.



If the impact on the company from any of these factors proves to be greater/less than we anticipate, it may prevent the stock from achieving our target price or could cause our target price to be materially outperformed.

---

### Guidant (GDT –$70.40; 3H)

#### Valuation

Our $48 target on GDT is still based on fundamental valuation and not on the newly proposed deal terms by either JNJ or BSX. Our target is based on an average of a 22x P/E multiple off of our forward 12-month EPS estimate of $1.46 (Q4:05 – Q3:06), a 16x TEV/2005 EBITDA multiple, and a DCF valuation.

Our P/E multiple is based on GDT trading at 22x forward 12-month earnings, which is based on a multiple that is in line to slightly below our Citigroup Med Tech Index (CMTI) of 17 large-cap companies, which also averages 22x.. Our index includes companies such as Medtronic, Baxter, and Alcon. Our in-line target is based on Guidant performance over the next 12-months falling right in the average range of the group. The P/E multiples in the group range from as low as 15x forward earnings to as high as 33x forward earnings.

Our TEV/EBITDA multiple of 16x 2005 EBITDA is also roughly in line with the CMTI average of 17x. This is based on the same reasons as the in-line P/E multiple. The group TEV/EBITDA multiples in the CMTI range from 10x to 32x.

**Guidant Estimated Valuation Ratios If JNJ or BSX Deal Breaks**

| | Current | CMTI | Cardio Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|
| Price/F12M EPS | 34x | 22x | 26x | 18x | 22x | $45.04 | -36% |
| TEV/EBITDA | 17x | 17x | 20x | | 16x | $50.84 | -28% |
| Implied DCF Value | -- | | | | | $47.81 | -32% |
| **Derived Price Target** | | | | | | **$47.89** | **-32%** |
| Dividend Yeild | | | | | | | 1% |
| **Expected Total Return** | | | | | | | **-32%** |

*Source: Citigroup Investment Research*

---

Our DCF valuation of $48 per share is based on ten years of projected free cash flow with a 2% terminal growth rate. For an equity risk premium we used 3.8%; our adjusted beta is 0.79; and our weighted average cost of capital is 7.2%.

#### Risks

We rate Guidant High Risk primarily based on four factors: 1) Risk of failure of the company's DES programs; 2) Liability surrounding EVT; 3) Additional fallout from the ICD recall; and 4) A formal SEC investigation.

Upside investment risks to our Sell rating and target price include: 1) the completion of the proposed acquisition by either Johnson & Johnson or Boston Scientific, or 2) a stronger-than-anticipated return in the ICD market.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from foreign exchange if favorable yoy comparisons of the US dollar versus



the Euro and Yen subside; and 3) a strengthening US economy could lead to a negative sector rotation, as the med tech industry is non-cyclical in nature.

On the contrary, shares of Guidant could fall below our target price should the company's ICD market share losses continue or should legal problems relating to the recent DOJ subpoena or the SEC investigation arise. These situations would likely cause the deal to break for a second time, which could also cause Guidant to fall below our target.

### Boston Scientific (BSX– $25.05; 2H)

#### Valuation

Our price target on Boston Scientific remains $27.  Our $27 target price is based off an average of three different valuations: 1) a 15x multiple off our forward 12 months (F12M ending 3Q:06) EPS forecast of $1.75; 2) a TEV/EBITDA target multiple of 10x; and 3) a 10-year DCF analysis.

A 15x P/E multiple represents a 30%-35% discount our CMTI F12M group multiple of 22x and is based on a forecast of minimal EPS growth from 2005-08 and the heightened risk that TAXUS share could fall below our Street low expectations.  The CMTI is comprised of 17 large-cap medical devices companies, including companies such as Johnson & Johnson, Medtronic, and Alcon.  The range of the CMTI F12M P/E multiples is from 15x to 33x.

Our TEV/EBITDA target multiple of 10x is also based on Boston trading at a 30%-35% discount to the current CMTI multiple of 17x.  The comp group has changed ever so slightly since our last published note, pushing our multiple target for BSX to round down from 11x to 10x.  This said, the difference in value is minimal.  The TEV/EBITDA range for the CMTI is from 10x to 32x current enterprise value to projected 2005 EBITDA.

#### Boston Scientific Valuation Ratios

| | Current | CMTI | Cardio Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|
| Price/F12M EPS | 14x | 23x | 31x | 19x | 15x | $26.12 | 4% |
| TEV/EBITDA | 10x | 17x | 23x | | 10x | $28.62 | 14% |
| Implied DCF Value | -- | | | | | $26.31 | 5% |
| **Derived Price Target** | | | | | | **$27.01** | **8%** |
| Dividend Yeild | | | | | | | 0% |
| **Expected Total Return** | | | | | | | **8%** |

*Source: Citigroup Investment Research*

Our DCF valuation of $27 per share is based on 10 years of projected free cash flow with a 1% terminal growth rate.   For an equity risk premium we used 3.9%, our adjusted beta is 1.51 and our WACC is 8.9%.

#### Risks

We rate BSX shares High Risk. Investment risks particular to Boston Scientific include:

➤ **Reliance on a single product line.**  The expected performance of the TAXUS stent in 2005 means that 40% of sales and 50% of EPS will come from a single product line.  No other large-cap med tech company has this level of sales and EPS concentrated in one product line and recent data has led to questions about the safety profile of this stent.



➤ **Patent risk surrounding the TAXUS stent.** Boston remains in litigation with JNJ over key stent patents in the US. Boston recently lost initial jury decisions on two JNJ patents (Palmaz and Gray), but won decisions on two of its own patents (Ding and Yang). These cases are unlikely to be resolved anytime soon, but could ultimately result in a large damage award or injunctive relief.

➤ **Competitive ASP pressure in the DES market in excess of our forecast.** We expect US DES ASPs to decline by 5% annually through 2008. Primary DES competitor JNJ is larger and better capitalized and has already been using price to win back DES market share in the US.

We would also highlight that BSX has recently announced its intentions to bid for Guidant. A culmination of this deal could adversely provide new risk to our BSX rating in either direction, as it could cause BSX share to fall due to possible dilution or could cause share to increase in value based on improved long-term prospects for BSX.

Our High Risk rating is primarily based on the company's significant reliance on a single product line combined with the outstanding legal issues noted above.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from FX as favorable Y/Y comparisons of the US dollar vs. the Euro and Yen subside in Q4; and 3) negative sector rotation if the US economy remains strong, as the med tech industry is non-cyclical in nature.

The above factors highlight some of the risks associated with investing in Boston Scientific's shares (for a more detailed list, please see the company's most recent 10-K filing). If any of the above-mentioned risk factors has a more negative impact on the company than we anticipate, the stock will likely have difficulty achieving our target price. Conversely, if any of these risk factors has less of an impact on the company's fundamentals, the stock could materially outperform our price target.



## ANALYST CERTIFICATION                                    APPENDIX A-1

I, Matthew J. Dodds, research analyst and the author of this report, hereby certify that all of the views expressed in this research report accurately reflect my personal views about any and all of the subject issuer(s) or securities. I also certify that no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation(s) or view(s) in this report.

## IMPORTANT DISCLOSURES

### Boston Scientific (BSX)
**Ratings and Target Price History - Fundamental Research**

Analyst: Matthew Dodds (covered since May 19 2004)



| # | Date | Rating | Target Price | Closing Price |
|---|------|--------|--------------|---------------|
| 1: | 18 May 04 | *2H | *40.00 | 38.98 |
| 2: | 2 Jun 04 | 2H | *46.00 | 44.70 |
| 3: | 19 Jul 04 | 2H | *38.00 | 36.15 |
| 4: | 30 Sep 04 | 2H | *40.00 | 39.73 |
| 5: | 19 Oct 04 | 2H | *39.00 | 35.15 |
| 6: | 20 Apr 05 | 2H | *34.00 | 28.75 |
| 7: | 26 May 05 | 2H | *33.00 | 28.16 |
| 8: | 23 Jun 05 | 2H | *31.00 | 27.81 |
| 9: | 8 Sep 05 | 2H | *28.00 | 25.18 |
| 10: | 16 Oct 05 | 2H | *27.00 | 23.57 |

*Indicates change.

### Guidant Corporation (GDT)
**Ratings and Target Price History - Fundamental Research**

Analyst: Matthew Dodds (covered since May 19 2004)



| # | Date | Rating | Target Price | Closing Price |
|---|------|--------|--------------|---------------|
| 1: | 18 May 04 | *3H | *57.00 | 59.07 |
| 2: | 28 May 04 | 3H | *53.00 | 54.34 |
| 3: | 1 Jul 04 | 3H | *51.00 | 55.50 |
| 4: | 22 Jul 04 | *2H | 51.00 | 50.55 |
| 5: | 15 Sep 04 | *3H | *53.00 | 63.54 |
| 6: | 17 Oct 04 | 3H | *55.00 | 64.50 |
| 7: | 21 Oct 04 | 3H | *56.00 | 63.67 |
| 8: | 7 Dec 04 | 3H | *59.00 | 72.35 |
| 9: | 27 Jan 05 | *2H | *76.00 | 72.00 |
| 10: | 24 Jun 05 | 2H | *70.00 | 63.90 |
| 11: | 21 Jul 05 | 2H | *76.00 | 69.63 |
| 12: | 2 Nov 05 | *3H | *54.00 | 60.40 |
| 13: | 7 Nov 05 | 3H | *50.00 | 57.52 |
| 14: | 27 Dec 05 | 3H | *48.00 | 64.69 |

*Indicates change.

**citigroup**

### Johnson & Johnson (JNJ)
#### Ratings and Target Price History - Fundamental Research
Analyst: Matthew Dodds (covered since November 12 2004)



| # | Date | Rating | Target Price | Closing Price |
|---|------|--------|--------------|---------------|
| 1: | 11 Nov 04 | *1L | *71.00 | 60.60 |
| 2: | 7 Dec 04 | 1L | *72.00 | 60.41 |
| 3: | 18 Apr 05 | 1L | *76.00 | 69.04 |
| 4: | 20 Apr 05 | 1L | *80.00 | 68.10 |

*Indicates change.

— Covered
···· Not covered

Customers of the Firm in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at http://www.smithbarney.com (for retail clients) or http://www.citigroupgeo.com (for institutional clients) or can call (866) 836-9542 to request a copy of this research.

A director of Citigroup Inc. serves as a director ofJohnson & Johnson.

Citigroup Global Markets Inc. and/or its affiliates has a significant financial interest in relation to Johnson & Johnson. (For an explanation of the determination of significant financial interest, please refer to the policy for managing conflicts of interest which can be found at www.citigroupgeo.com .)

Citigroup Global Markets Inc. and/or its affiliates has a significant financial interest in relation to Guidant Corporation. (For an explanation of the determination of significant financial interest, please refer to the policy for managing conflicts of interest which can be found at www.citigroupgeo.com .)

Citigroup Global Markets Inc. or its affiliates beneficially owns 1% or more of any class of common equity securities of Guidant Corporation. This position reflects information available as of the prior business day.

Citigroup Global Markets Inc. or an affiliate received compensation for products and services other than investment banking services from Boston Scientific, Guidant Corporation and Johnson & Johnson in the past 12 months.

Citigroup Global Markets Inc. currently has, or had within the past 12 months, the following company(ies) as clients, and the services provided were non-investment-banking, securities-related: Boston Scientific, Guidant Corporation and Johnson & Johnson.

Citigroup Global Markets Inc. currently has, or had within the past 12 months, the following company(ies) as clients, and the services provided were non-investment-banking, non-securities-related: Boston Scientific, Guidant Corporation and Johnson & Johnson.

Analysts' compensation is determined based upon activities and services intended to benefit the investor clients of Citigroup Global Markets Inc. and its affiliates ("the Firm"). Like all Firm employees, analysts receive compensation that is impacted by overall firm profitability, which includes revenues from, among other business units, the Private Client Division, Institutional Equities, and Investment Banking.

The Firm is a market maker in the publicly traded equity securities of Boston Scientific, Guidant Corporation and Johnson & Johnson.

### Citigroup Investment Research Ratings Distribution
**Data current as of 31 December 2005**

| | Buy | Hold | Sell |
|---|-----|------|------|
| Citigroup Investment Research Global Fundamental Coverage (2784) | 42% | 41% | 17% |
| % of companies in each rating category that are investment banking clients | 47% | 48% | 37% |
| Medical Supplies & Technology -- North America (9) | 44% | 33% | 22% |
| % of companies in each rating category that are investment banking clients | 50% | 33% | 50% |

**Guide to Fundamental Research Investment Ratings:**
Citigroup Investment Research's stock recommendations include a risk rating and an investment rating.
**Risk ratings**, which take into account both price volatility and fundamental criteria, are: Low (L), Medium (M), High (H), and Speculative (S).
**Investment ratings** are a function of Citigroup Investment Research's expectation of total return (forecast price appreciation and dividend yield within the next 12 months) and risk rating.
For securities in developed markets (US, UK, Europe, Japan, and Australia/New Zealand), investment ratings are: Buy (1) (expected total return of 10% or more for Low-Risk stocks, 15% or more for Medium-Risk stocks, 20% or more for High-Risk stocks, and 35% or more for Speculative stocks); Hold (2) (0%-10% for Low-Risk stocks, 0%-15% for Medium-Risk stocks, 0%-20% for High-Risk stocks, and 0%-35% for Speculative stocks); and Sell (3) (negative total return).
Investment ratings are determined by the ranges described above at the time of initiation of coverage, a change in investment and/or risk rating, or a change in target price (subject to limited management discretion). At other times, the expected total returns may fall outside of these ranges because of market price movements and/or other short-term volatility or trading patterns. Such interim deviations from

9

**citigroup**

specified ranges will be permitted but will become subject to review by Research Management. Your decision to buy or sell a security should be based upon your personal investment objectives and should be made only after evaluating the stock's expected performance and risk.

Between September 9, 2002, and September 12, 2003, Citigroup Investment Research's stock ratings were based upon expected performance over the following 12 to 18 months relative to the analyst's industry coverage universe at such time. An Outperform (1) rating indicated that we expected the stock to outperform the analyst's industry coverage universe over the coming 12-18 months. An In-line (2) rating indicated that we expected the stock to perform approximately in line with the analyst's coverage universe. An Underperform (3) rating indicated that we expected the stock to underperform the analyst's coverage universe. In emerging markets, the same ratings classifications were used, but the stocks were rated based upon expected performance relative to the primary market index in the region or country. Our complementary Risk rating system -- Low (L), Medium (M), High (H), and Speculative (S) -- took into account predictability of financial results and stock price volatility. Risk ratings for Asia Pacific were determined by a quantitative screen which classified stocks into the same four risk categories. In the major markets, our Industry rating system -- Overweight, Marketweight, and Underweight -- took into account each analyst's evaluation of their industry coverage as compared to the primary market index in their region over the following 12 to 18 months.

## OTHER DISCLOSURES

Within the past 5 years, Citigroup Global Markets Inc. or its affiliates has acted as manager or co manager of a public offering of fixed income securities of Boston Scientific and Johnson & Johnson.

Citigroup Global Markets Inc. or its affiliates beneficially owns 2% or more of any class of common equity securities of Guidant Corporation.

Citigroup Global Markets Inc. or its affiliates holds a long position in any class of common equity securities of Guidant Corporation.

For securities recommended in the Product in which the Firm is not a market maker, the Firm is a liquidity provider in the issuers' financial instruments and may act as principal in connection with such transactions. The Firm is a regular issuer of traded financial instruments linked to securities that may have been recommended in the Product. The Firm regularly trades in the securities of the subject company(ies) discussed in the Product. The Firm may engage in securities transactions in a manner inconsistent with the Product and, with respect to securities covered by the Product, will buy or sell from customers on a principal basis.

Securities recommended, offered, or sold by the Firm: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources that the Firm believes to be reliable, we do not guarantee its accuracy and it may be incomplete and condensed. Note, however, that the Firm has taken all reasonable steps to determine the accuracy and completeness of the disclosures made in the Important Disclosures section of the Product. In producing Products, members of the Firm's research department may have received assistance from the subject company(ies) referred to in the Product. Any such assistance may have included access to sites owned, leased or otherwise operated or controlled by the issuers and meetings with management, employees or other parties associated with the subject company(ies). Firm policy prohibits research analysts from sending draft research to subject companies.  However, it should be presumed that the author of the Product has had discussions with the subject company to ensure factual accuracy prior to publication.  All opinions, projections and estimates constitute the judgment of the author as of the date of the Product and are subject to change without notice. Prices and availability of financial instruments also are subject to change without notice. Although Citigroup Investment Research does not set a predetermined frequency for publication, if the Product is a fundamental research report, it is the intention of Citigroup Investment Research to provide research coverage of the/those issuer(s) mentioned therein, including in response to news affecting this issuer, subject to applicable quiet periods and capacity constraints. The Product is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security. Any decision to purchase securities mentioned in the Product must take into account existing public information on such security or any registered prospectus.

Investing in non-U.S. securities, including ADRs, may entail certain risks. The securities of non-U.S. issuers may not be registered with, nor be subject to the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on foreign securities. Foreign companies are generally not subject to uniform audit and reporting standards, practices and requirements comparable to those in the U.S. Securities of some foreign companies may be less liquid and their prices more volatile than securities of comparable U.S. companies. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign stock and its corresponding dividend payment for U.S. investors. Net dividends to ADR investors are estimated, using withholding tax rates conventions, deemed accurate, but investors are urged to consult their tax advisor for exact dividend computations. Investors who have received the Product from the Firm may be prohibited in certain states or other jurisdictions from purchasing securities mentioned in the Product from the Firm. Please ask your Financial Consultant for additional details.  Citigroup Global Markets Inc. takes responsibility for the Product in the United States. Any orders by non-US investors resulting from the information contained in the Product may be placed only through Citigroup Global Markets Inc.

The Citigroup legal entity that takes responsibility for the production of the Product is the legal entity which the first named author is employed by.  The Product is made available in Australia to wholesale clients through Citigroup Global Markets Australia Pty Ltd. (ABN 64 003 114 832 and AFSL No. 240992) and to retail clients through Citigroup Wealth Advisors Pty Ltd. (ABN 19 009 145 555 and AFSL No. 240813), Participants of the ASX Group and regulated by the Australian Securities & Investments Commission.  Citigroup Centre, 2 Park Street, Sydney, NSW 2000.  If the Product is being made available in certain provinces of Canada by Citigroup Global Markets (Canada) Inc. ("CGM Canada"), CGM Canada has approved the Product.  Citigroup Place, 123 Front Street West, Suite 1100, Toronto, Ontario M5J 2M3.  The Product may not be distributed to private clients in Germany. The Product is distributed in Germany by Citigroup Global Markets Deutschland AG & Co. KGaA, which is regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin).  Frankfurt am Main, Reuterweg 16, 60323 Frankfurt am Main.  If the Product is made available in Hong Kong by, or on behalf of, Citigroup Global Markets Asia Ltd., it is attributable to Citigroup Global Markets Asia Ltd., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. Citigroup Global Markets Asia Ltd. is regulated by Hong Kong Securities and Futures Commission.  If the Product is made available in Hong Kong by The Citigroup Private Bank to its clients, it is attributable to Citibank N.A., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong.  The Citigroup Private Bank and Citibank N.A. is regulated by the Hong Kong Monetary Authority.  The Product is made

10



available in India by Citigroup Global Markets India Private Limited, which is regulated by Securities and Exchange Board of India. Bakhtawar, Nariman Point, Mumbai 400-021. If the Product was prepared by Citigroup Investment Research and distributed in Japan by Nikko Citigroup Ltd., it is being so distributed under license. Nikko Citigroup Limited is regulated by Financial Services Agency, Securities and Exchange Surveillance Commission, Japan Securities Dealers Association, Tokyo Stock Exchange and Osaka Securities Exchange. Akasaka Park Building, 2-20, Akasaka 5-chome, Minato-ku, Tokyo 107-6122. The Product is made available in Korea by Citigroup Global Markets Korea Securities Ltd., which is regulated by Financial Supervisory Commission and the Financial Supervisory Service. Hungkuk Life Insurance Building, 226 Shinmunno 1-GA, Jongno-Gu, Seoul, 110-061. The Product is made available in Malaysia by Citigroup Global Markets Malaysia Sdn Bhd, which is regulated by Malaysia Securities Commission. Menara Citibank, 165 Jalan Ampang, Kuala Lumpur, 50450. The Product is made available in Mexico by Acciones y Valores Banamex, S.A. De C. V., Casa de Bolsa, which is regulated by Comision Nacional Bancaria y de Valores. Reforma 398, Col. Juarez, 06600 Mexico, D.F. In New Zealand the Product is made available through Citigroup Global Markets New Zealand Ltd., a Participant of the New Zealand Exchange Limited and regulated by the New Zealand Securities Commission. Level 19, Mobile on the Park, 157 lambton Quay, Wellington. The Product is made available in Poland by Dom Maklerski Banku Handlowego SA an indirect subsidiary of Citigroup Inc., which is regulated by Komisja Papierów Wartosciowych i Gield. Bank Handlowy w Warszawie S.A. ul. Senatorska 16, 00-923 Warszawa. The Product is made available in the Russian Federation through ZAO Citibank, which is licensed to carry out banking activities in the Russian Federation in accordance with the general banking license issued by the Central Bank of the Russian Federation and brokerage activities in accordance with the license issued by the Federal Service for Financial Markets. Neither the Product nor any information contained in the Product shall be considered as advertising the securities mentioned in this report within the territory of the Russian Federation or outside the Russian Federation. The Product does not constitute an appraisal within the meaning of the Federal Law of the Russian Federation of 29 July 1998 No. 135-FZ (as amended) On Appraisal Activities in the Russian Federation. 8-10 Gasheka Street, 125047 Moscow. The Product is made available in Singapore through Citigroup Global Markets Singapore Pte. Ltd., a Capital Markets Services Licence holder, and regulated by Monetary Authority of Singapore. 1 Temasek Avenue, #39-02 Millenia Tower, Singapore 039192. Citigroup Global Markets (Pty) Ltd. is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at 145 West Street, Sandton, 2196, Saxonwold. Citigroup Global Markets (Pty) Ltd. is regulated by JSE Securities Exchange South Africa, South African Reserve Bank and the Financial Services Board. The investments and services contained herein are not available to private customers in South Africa. The Product is made available in Taiwan through Citigroup Global Markets Inc. (Taipei Branch), which is regulated by Securities & Futures Bureau. No portion of the report may be reproduced or quoted in Taiwan by the press or any other person. No. 8 Manhattan Building, Hsin Yi Road, Section 5, Taipei 100, Taiwan. The Product is made available in United Kingdom by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. This material may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the FSA and further details as to where this may be the case are available upon request in respect of this material. Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB. The Product is made available in United States by Citigroup Global Markets Inc, which is regulated by NASD, NYSE and the US Securities and Exchange Commission. 388 Greenwich Street, New York, NY 10013. Unless specified to the contrary, within EU Member States, the Product is made available by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. Many European regulators require that a firm must establish, implement and make available a policy for managing conflicts of interest arising as a result of publication or distribution of investment research. The policy applicable to Citigroup Investment Research's Products can be found at www.citigroupgeo.com. Compensation of equity research analysts is determined by equity research management and Citigroup's senior management and is not linked to specific transactions or recommendations. The Product may have been distributed simultaneously, in multiple formats, to the Firm's worldwide institutional and retail customers. The Product is not to be construed as providing investment services in any jurisdiction where the provision of such services would be illegal. Subject to the nature and contents of the Product, the investments described therein are subject to fluctuations in price and/or value and investors may get back less than originally invested. Certain high-volatility investments can be subject to sudden and large falls in value that could equal or exceed the amount invested. Certain investments contained in the Product may have tax implications for private customers whereby levels and basis of taxation may be subject to change. If in doubt, investors should seek advice from a tax adviser. Advice in the Product has been prepared without taking account of the objectives, financial situation or needs of any particular investor. Accordingly, investors should, before acting on the advice, consider the appropriateness of the advice, having regard to their objectives, financial situation and needs.

© 2006 Citigroup Global Markets Inc. Citigroup Investment Research is a division and service mark of Citigroup Global Markets Inc. and its affiliates and is used and registered throughout the world. Citigroup and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world. Nikko is a registered trademark of Nikko Cordial Corporation. All rights reserved. Any unauthorized use, duplication, redistribution or disclosure is prohibited by law and will result in prosecution. The Firm accepts no liability whatsoever for the actions of third parties. The Product may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the Product refers to website material of the Firm, the Firm has not reviewed the linked site. Equally, except to the extent to which the Product refers to website material of the Firm, the Firm takes no responsibility for, and makes no representations or warranties whatsoever as to, the data and information contained therein. Such address or hyperlink (including addresses or hyperlinks to website material of the Firm) is provided solely for your convenience and information and the content of the linked site does not in anyway form part of this document. Accessing such website or following such link through the Product or the website of the Firm shall be at your own risk and the Firm shall have no liability arising out of, or in connection with, any such referenced website.

ADDITIONAL INFORMATION IS AVAILABLE UPON REQUEST

# EXHIBIT J

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF DELAWARE

3                      -   -   -

4    ABBOTT LABORATORIES and      :

5    ADVANCED CARDIOVASCULAR      :

6    SYSTEM, INC.,                :

7                                 :

8         Plaintiffs,        : CIVIL ACTION NO.

9                            : C-06-613-SLR

10            v.             :

11                          :

12   JOHNSON AND JOHNSON,       :

13                          :

14        Defendant.           :

15                    -   -   -

16    DEPOSITION UNDER ORAL EXAMINATION OF

17              STANLEY PANASEWICZ

18         East Brunswick, New Jersey

19                March 14, 2007

20                    -   -   -

21   REPORTED BY:  DANA N. SREBRENICK, CSR RPR CLR

22                    -   -   -

23        ESQUIRE DEPOSITION SERVICES
          90 Woodbridge Center Drive
24        Woodbridge, New Jersey 07095
              (732) 283-1060
25   JOB NO. 60484        CONFIDENTIAL

Page 13

1    MR. VEITH: Okay. Mr.
2 Panasewicz has been designated as a corporate
3 representative on Topic 4 to the extent that
4 it relates to his knowledge, communications
5 on the subjects listed there. And also on
6 Topic 5 listed there.
7    Q.    Are you prepared, Mr.
8 Panasewicz, to testify as to that subject
9 matter as a representative of the
10 corporation?
11    A.    Yes, I am.
12    Q.    What did you do to prepare to
13 give that testimony?
14    A.    I met with our counsel, Paul.
15 We had conversations on the phone in terms of
16 background. I've looked at some documents to
17 get ready for the deposition.
18    Q.    What documents did you review?
19    A.    I reread my declaration. I
20 believe it's -- it's either Attachment A or
21 Appendix A that was provided to you. I
22 reread the analysts' report that was also
23 attached. There was a potential report that
24 I believe was attached. I reread that.
25    And there was a few other

Page 14

1 documents. I reread the Q&A document in
2 terms of some of the sections in that. And
3 I'm sure there was some other documents as
4 well.
5    Q.    Are there any other documents
6 that you specifically recall?
7    A.    Citigroup analyst report, I
8 remember rereading that report, report by
9 Matt Dodds. I remember rereading the list of
10 names that we may have contacted regarding an
11 outreach program.
12    Q.    What do you mean by "outreach
13 program"?
14    A.    Where there was a few analysts
15 that it was determined that we would call to
16 try and make sure that they understood the
17 difference between our deal and Boston's
18 deal, which was occurring during that time
19 period that you described as the bidding war.
20    Q.    Is the document -- if you would
21 look at Deposition Exhibit 104.
22    MR. VEITH: Keep them in order,
23 so like flip them face down, because it will
24 be useful later if he refers to others.
25    Q.    Are those the notes that you're

Page 15

1 referring to?
2    A.    This is a document that I did
3 go through and look at before I came here.
4    Q.    Is that the same document you
5 were referring to just a minute ago when you
6 were describing notes that you reviewed on
7 analysts' calls?
8    THE WITNESS: Could you read
9 back what I said? I don't remember saying
10 notes on analysts' calls.
11    MR. HANSEN: I may have
12 misunderstood.
13    (Whereupon, the requested
14 portion is read back by the reporter.)
15    Q.    Is the list of names that you
16 were referring to in your prior testimony, is
17 that Exhibit 104?
18    A.    No.
19    Q.    You did review Exhibit 104
20 before you came to the deposition today?
21    A.    Yes. It may not have been
22 today, but I've seen it recently, yes.
23    Q.    I'm handing you Exhibit 106.
24 Is that the list of names that you were
25 referring to when you said that you reviewed

Page 16

1 a list of names of analysts that were part of
2 this outreach program?
3    A.    Correct.
4    Q.    Exhibit 106 is that list?
5    A.    That's correct.
6    Q.    Have you reviewed any documents
7 since about 1:30 this afternoon?
8    A.    No. At 1:30 I was -- I was
9 making my way over to this facility.
10    Q.    Have you reviewed any documents
11 since about 12:30 this afternoon?
12    A.    I think I reread my declaration
13 right around that time when I was having a
14 sandwich, so it had to be somewhere around
15 12:15, 12:30, somewhere in that timeframe.
16    Q.    Since about 12:30 this
17 afternoon have you done anything else to
18 prepare for your testimony today?
19    A.    When I got here I met Paul in
20 the -- in the lobby, and we had a
21 conversation.
22    Q.    How long was that conversation?
23    A.    Approximately 15 minutes.
24    Q.    I'm not going to ask you to
25 disclose the content of the communication,

STANLEY PANASEWICZ, MARCH 14, 2007
CONFIDENTIAL

Page 21

1 be speculating without actually reading some
2 of the cubes that were in there.
3        Q.    With respect to the Q&A script
4 from January 16th, what was your role in the
5 preparation of that document?
6        A.    I believe my role, which is
7 fairly standard, is I'll develop a list of
8 potential questions that we may get from the
9 analyst or financial community in regards to
10 the transaction. I'll then work with other
11 team members to identify who would be the
12 experts per se, to help draft responses to
13 that document.
14        So, typically I'll start it off
15 with a list of questions. It will typically
16 be segregated by functional area and then
17 typically gets disseminated to these
18 functional experts for them to provide
19 commentary and draft responses.
20        And then it typically gets
21 circulated multiple times to the various
22 functional experts for others to look at and
23 review it and wordsmith it and fine tune the
24 responses.
25        Q.    And what is the purpose of such

Page 22

1 a document?
2        A.    The purpose is typically to
3 make sure that we convey our position
4 accurately in terms of any communications
5 that we may have with the financial
6 community.
7        Q.    Specifically what was the
8 purpose of the January 16th Q&A document?
9        A.    I can't recall the specific
10 purpose. Eventually that document would have
11 been used if we had -- had to make another
12 analyst call announcing potentially another
13 agreement.
14        So, we had similar Q&A
15 documents when we announced the agreement
16 back in December of '04 and when we announced
17 a new agreement with Guidant and their Board
18 back in, I believe it was November of 2005.
19 So, this was likely building on that, and
20 there could have been other reasons as well.
21        Q.    In this process of preparing
22 the document and having it circulated and
23 revised, is there a point at which it's
24 understood that it's in a condition where
25 individuals within the company can rely upon

Page 23

1 it for purposes of communication with the
2 outside world?
3        A.    That's typically, yes, there is
4 a point that that usually leads to.
5        Q.    And how is that point
6 identified?
7        A.    It's judgment. It's a judgment
8 call, you know, based on the iterations and
9 the input and feedback from the functional
10 experts that they're satisfied with the
11 responses in their sections, as well as maybe
12 other sections that they've reviewed.
13        Louise and I looking at it,
14 feeling comfortable that this properly
15 conveys our position. And depending on the
16 circumstances, it could get reviewed at
17 higher levels as well, to make sure that
18 those folks are comfortable as well.
19        Q.    Who uses the Q&A script once
20 it's been approved?
21        A.    It depends on which Q&A script
22 and which time period you're -- you're
23 referring to.
24        Q.    In this instance, the January
25 16th Q&A script.

Page 24

1        A.    This was used by investor
2 relations. It was likely used by some of our
3 Executive Committee members. A copy is
4 typically provided to our communications
5 folks. So, I couldn't speculate whether they
6 used that document or not.
7        Q.    I'll ask you to refer to
8 documents previously marked as Exhibits 109,
9 110 and 111.
10        Are these copies of the January
11 16, 2006 Q&A that you were referring to?
12        A.    Well, it's certainly one of
13 them. I don't know if they were identical or
14 not. The times that are printed out at the
15 bottom and the dates are slightly different,
16 so I can't tell if they're all identical or
17 not.
18        Q.    Would -- would you be able to
19 determine whether any of these were used by
20 anyone within Johnson & Johnson for purposes
21 of communicating with the outside world?
22        A.    Were any of these the ones that
23 were attached to the response back to your --
24 I had seen a redacted version that was dated
25 January 16th that was part of my initial

6 (Pages 21 to 24)

Page 41

1  the original e-mail sent by Louise Mehrotra
2  at 12:08 p.m., was that information still
3  subject to review before it would be relied
4  upon by someone within the company to
5  communicate with the outside world?
6      A.   It's possible that some of the
7  information still needed to get finalized,
8  and it's possible that some of the
9  information was already final.
10     Q.   How could you tell which is
11 final and which still needed to be finalized?
12     A.   You'd have to research it.
13 You'd have to review it, compare it to the
14 January 16th Q&A document.
15     Q.   If you compared the information
16 on a certain topic in this document and the
17 information on the same topic in the January
18 16th Q&A and the information is different,
19 does that reflect that the information was
20 revised before it was approved for
21 dissemination to the outside world?
22     A.   That could -- that could be a
23 logical explanation, yes.
24     Q.   Is there another explanation?
25     A.   That's the one that comes to my

Page 42

1  mind, but I don't know if it could be the
2  only one.
3      Q.   Right now you don't think of
4  any others?
5      A.   No.
6      Q.   As part of the outreach program
7  that we've been referring to, you spoke with
8  Matthew Dodds at Citigroup on or about
9  January 12, 2006?
10     A.   That may not have been part of
11 the outreach program.  I do believe I did
12 speak to Matt on or about that date.
13     Q.   Why do you believe that that
14 was not part of the outreach program?
15     A.   I don't recall if it was part
16 of the outreach program at that time.  I -- I
17 don't know when that list of names was
18 actually developed that we wanted to contact
19 proactively in one of the other exhibits that
20 you showed me earlier.
21     Q.   In the conversation that you
22 had with Matthew Dodds on January 12th, you
23 discussed the Wright and Falotico patents
24 with Mr. Dodds?
25     A.   I believe that's accurate.

Page 43

1      Q.   And you discussed with
2  Mr. Dodds intellectual property issues that
3  Boston Scientific and Abbott would face in
4  view of the Wright and Falotico patents?
5      A.   I wouldn't have put it in those
6  definitive terms, and I think it was more in
7  response to questions that he had regarding
8  intellectual property.
9      Q.   Who initiated the phone call on
10 January 12th?
11     A.   I don't recall for sure, but I
12 believe it was Matt.
13     Q.   During that phone call you gave
14 Mr. Dodds some patent numbers?
15     A.   That's correct.
16     Q.   At the time of this phone call
17 there was no Q&A script that provided for
18 discussions relating to the Wright and
19 Falotico patents, correct?
20     A.   There was dialogue in a script
21 developed regarding potential IP issues.
22     Q.   On January -- does it appear in
23 the January 12th document?
24     A.   The Q&A document that we just
25 looked at?

Page 44

1      Q.   Exhibit 112.
2      A.   No, it does not appear in
3  there.
4      Q.   There was a separate document?
5      A.   This was an e-mail exchange
6  between myself and some of our patent
7  attorneys.
8      Q.   And when did that e-mail
9  exchange take place?
10     A.   I don't recall for sure.
11          It would have been somewhere
12 around that, just probably prior to the
13 January 12th timeframe, somewhere around
14 that -- that neighborhood.
15     Q.   So, before Mr. Dodds -- before
16 this conversation with Mr. Dodds, you were
17 preparing to talk about the Wright and
18 Falotico patents?
19     A.   I can't recall for sure which
20 came first.
21     Q.   This e-mail exchange that
22 you're referring to, has that been produced,
23 Paul?
24          MR. VEITH:  In his log, I
25 believe.  I think they are privileged

11 (Pages 41 to 44)

STANLEY PANASEWICZ, MARCH 14, 2007
CONFIDENTIAL

Page 45

1  communications that he's been -- that he's
2  referring to.
3       Q.    Before your call with
4  Mr. Dodds, were you aware that it had not
5  been publicly disclosed that the Wright and
6  Falotico patents were part of the patents
7  that would be licensed from Johnson & Johnson
8  to Abbott in the event of a Johnson & Johnson
9  acquisition?
10      A.    I'm sorry, can you repeat that
11 question again?
12           MR. HANSEN:  Can you read it
13 back, please?
14           (Whereupon, the question is
15 read back by the reporter.)
16      A.    I don't know whether they were
17 public or not.
18      Q.    Do you have any idea how that
19 information became public?
20      A.    Which information?
21      Q.    The information that the Wright
22 and Falotico patents were part of the patents
23 that were to be licensed from Johnson &
24 Johnson to Abbott in the event of a Johnson &
25 Johnson acquisition?

Page 46

1            MR. VEITH:  Object to the form
2  of the question.  It assumes facts not
3  established.
4            You can answer, as long as you
5  understand his question.
6       A.    I don't know if it was
7  established or whether it was in the public
8  domain or not.  I -- I can't tell you whether
9  it was in the public domain via some other
10 vehicle.
11      Q.    Pursuant to the fair disclosure
12 regulations, wouldn't you need to know if
13 that information was public before discussing
14 it with Mr. Dodds?
15      A.    I don't view that as a material
16 item to Johnson & Johnson.
17      Q.    As part of the outreach program
18 that we've been discussing, Johnson & Johnson
19 specifically disseminated information about
20 the Wright and Falotico patents to analysts
21 and other media sources, correct?
22      A.    I would characterize it a
23 little bit different.  I believe we were
24 asked regarding Wright and Falotico and the
25 patent numbers.  Specifically the

Page 47

1  conversation I had with Matt Dodds, I can
2  recall he asked me for the patent numbers.
3       Q.    Who -- who in that conversation
4  brought the patents up in the first instance?
5       A.    I can't recall.  The patents
6  itself, I can recall Matt making a comment,
7  "Could you provide me the patent numbers?  I
8  would like to research the patents."
9       Q.    And this was after you had been
10 having a conversation with him about what?
11      A.    The -- the deal itself, I
12 believe.  I think it was he that called and I
13 think he had questions regarding the deal,
14 Boston's offer versus our offer.
15      Q.    Did you later see the analyst
16 report that was published by Mr. Dodds in
17 Citigroup shortly after your conversation
18 with Mr. Dodds?
19      A.    Yes.
20      Q.    What was the reaction
21 internally at Johnson & Johnson to that
22 report?
23      A.    Well, I can't speak for Johnson
24 & Johnson.  I can tell you that my own
25 reaction was that he'd probably understood

Page 48

1  the issue and the potential issues regarding
2  our offer versus Boston's offer.
3       Q.    Were you ever told that
4  information in his report was inaccurate?
5       A.    I believe I seem to recall
6  there was one inaccuracy where -- and I can't
7  recall whether it was that January 12th
8  report or not, but I believe he had a patent
9  number incorrect.  I have a recollection of
10 that.
11      Q.    And did you call him back to
12 give him a corrected number?
13      A.    I believe I did.
14      Q.    Did you also give him a third
15 number in addition to the two that he already
16 had at that point in time?
17      A.    I can't recall for sure.
18      Q.    Did anyone ever tell you that
19 the Wright and Falotico patents were not an
20 antitrust issue as pertaining to Boston
21 Scientific's proposed acquisition of Guidant?
22      A.    I'm not sure I understand the
23 question.
24           MR. HANSEN:  Could you read it
25 back, please?

12 (Pages 45 to 48)

STANLEY PANASEWICZ, MARCH 14, 2007
CONFIDENTIAL

Page 53

1  view of Boston Scientific's bid for Guidant?
2       MR. VEITH:  Object to the form
3  of the statement.  Is there a question there?
4       Q.    Is that correct?
5       MR. VEITH:  I'll object to the
6  form of the question.
7       A.    I don't know if you can call
8  them facts.  I don't know what you mean by
9  that, but certainly one of the things we try
10  and convey is our perspective, and that's
11  what a lot of the times the analysts are
12  looking for, is our perspective.  So we try
13  and convey what our belief and point of view
14  is.
15      Q.    And it's your hope that they
16  will then accurately report as a fact what
17  your view -- what Johnson & Johnson's view
18  is; is that correct?
19      A.    No.
20      Q.    You don't anticipate that they
21  will report what your view is?
22      A.    Not necessarily.
23      Q.    Do you believe that they often
24  will do that?
25      A.    They do sometimes.

Page 54

1       Q.    And if they mischaracterize
2  your view, what do you do about it?
3       A.    If it's something that is a
4  blatant mischaracterization or a factual
5  inaccuracy, typically I would give them a
6  call.
7       If it's a judgment that they've
8  made on their own, they're entitled to their
9  judgments and opinions, and I wouldn't
10  typically call them on that.
11      Q.    But if it was a
12  mischaracterization of Johnson & Johnson's
13  position on an issue, you would call them to
14  clarify it?
15      A.    That's possible.
16      Q.    If an analyst has
17  mischaracterized Johnson & Johnson's position
18  on a material matter, under what
19  circumstances would you decide not to call
20  and to make a correction?
21      A.    I guess that's kind of a
22  hypothetical question.  Unless I knew the
23  specific facts and circumstances and
24  background, it's difficult for me to weigh in
25  with an opinion on that.

Page 55

1       Q.    On or about January 20th, you
2  had a conversation with Larry Biegelsen of
3  Prudential Securities as part of Johnson &
4  Johnson's outreach program?
5       A.    I believe that's correct.
6       Q.    And as part of that -- and you
7  initiated that phone call, correct?
8       A.    I believe I had called Larry as
9  part of the outreach program, correct.
10      Q.    During that conversation you
11  raised the topic of the Wright and Falotico
12  patents?
13      A.    I can't recall how Wright and
14  Falotico came up.  I believe I probably would
15  have conveyed why we thought our bid was
16  superior to Boston's.  It's likely IP would
17  have been one of those points where we
18  believe that since we had gone through the
19  antitrust review that Boston's bid could go
20  under more scrutiny, which could delay the
21  review process.  So, there was a higher
22  degree of certainty with our bid.
23      Q.    Shortly after your conversation
24  with Mr. Biegelsen, did you see the report
25  that was published by Prudential Securities?

Page 56

1       A.    It's likely I would have read
2  it shortly after he published it.
3       Q.    Do you believe that he
4  accurately conveyed Johnson & Johnson's
5  positions as pertaining to the Wright and
6  Falotico patents in that analyst report?
7       A.    I'd have to -- to reread the --
8  the report.  I can't tell you how accurate it
9  was, but...
10      Q.    Do you recall whether you
11  thought at the time the report accurately
12  reflected Johnson & Johnson's position as
13  pertaining to the Wright and Falotico
14  patents?
15      A.    I can't recall for -- for
16  certain, and I'm not sure he conveyed Johnson
17  & Johnson's position or that was his point of
18  view.
19      MR. HANSEN:  I'll ask the court
20  reporter to mark the next Exhibit, which will
21  be Exhibit 126.
22      (Exhibit ABT-126, document on
23  Prudential Equity Group LLC's letterhead,
24  marked for identification.)
25      Q.    Do you have Exhibit 126 before

14 (Pages 53 to 56)

STANLEY PANASEWICZ, MARCH 14, 2007
CONFIDENTIAL

Page 57

1  you?
2      A.   Yes, I do.
3      Q.   Did you review this document
4  before you came to the deposition today?
5      A.   Probably not today.
6      Q.   Did you review it in
7  preparation for your deposition?
8      A.   I had read it recently, in the
9  last day or so. I think yesterday I -- I
10 scanned through it.
11     Q.   On the first page under the
12 heading Highlights, there are five bullet
13 points; is that correct?
14     A.   Correct.
15     Q.   The fourth bullet point states,
16 "J&J claims that two of its patents may be
17 infringed if a company tried to launch a
18 drug-eluting stent coated with a rapamycin
19 derivative such as ABT's zotarolimus and
20 GDT's everolimus. The potential for J&J to
21 prevent Abbott and Boston Scientific from
22 marketing the Xience-V DES could give the
23 Guidant board pause for approving a BSX-GDT
24 merger."
25         Do you see that?

Page 58

1      A.   Yes.
2      Q.   Do you believe that that
3  accurately reflects Johnson & Johnson's
4  position at the time with respect to the
5  Wright and Falotico patents?
6         MR. VEITH: I'll object to the
7  question as beyond -- beyond the scope of the
8  state of mind, understanding we had as to
9  what's relevant to this motion.
10         But be that as it may, you can
11 answer the question.
12     A.   I would say it's relatively
13 accurate. My understanding is it's actually
14 a broader patent estate than two patents.
15 You know, he mentions two patents. So, you
16 know, my understanding, it's a broader patent
17 estate than just two patents.
18     Q.   Does that accurately reflect
19 what you told Mr. Biegelsen?
20     A.   I can't recall whether we
21 talked specifically about only two patents or
22 whether part of the conversation was that,
23 you know, a broader patent estate of which
24 there's the Wright and Falotico, and I'm
25 guessing that the two patents that he's

Page 59

1  referring to would be those two.
2      Q.   Aside from the number of
3  patents, do you believe that that accurately
4  reflects your conversations with
5  Mr. Biegelsen?
6      A.   The part about patents may be
7  infringed I believe is accurate. We talked
8  about drug-eluting stents. I didn't get into
9  specifics about rapamycin or zotarolimus, I
10 believe, and everolimus. Those are more than
11 likely his -- that's his version and his
12 words.
13         And the second part is not, I
14 believe that that's a conclusion that he's
15 likely drawn himself about the potential to
16 prevent Abbott and Boston from marketing
17 Xience 5. We had talked about the potential
18 delay from the FTC in approving antitrust
19 review.
20     Q.   In the January 16th script, Q&A
21 script, in Item 13 it specifically mentions
22 everolimus, correct?
23     A.   Is there a -- one of these
24 exhibits you want me to refer to? Because
25 there are two dated January 16th. I'm

Page 60

1  assuming they're the same. Is there any one
2  in particular you want me to look at?
3      Q.   Why don't you refer to the
4  redacted one.
5      A.   Exhibit 124. Yes, everolimus
6  is mentioned.
7      Q.   Were you using this script when
8  you spoke to Mr. Biegelsen on January 20th?
9      A.   Very likely so.
10     Q.   So, why is it surprising to you
11 that -- that he would mention everolimus in
12 his analyst report?
13     A.   Well, I think it was more the
14 term "zotarolimus." I'm not familiar with
15 that compound.
16     Q.   It does mention ABT-578 in your
17 Q&A script, correct?
18     A.   Yes.
19     Q.   So, you would have mentioned
20 everolimus in your conversation with
21 Mr. Biegelsen on January 20th?
22     A.   Possibly, yes. It's very
23 likely.
24     Q.   Are you sure?
25     A.   No.

15 (Pages 57 to 60)

STANLEY PANASEWICZ, MARCH 14, 2007
CONFIDENTIAL

Page 61

1    Q.    If you turn to the third page
2 of Exhibit 126, in the first full paragraph
3 do you see that it says, "J&J believes it has
4 a strong intellectual property position with
5 regard to the use of rapamycin derivatives on
6 the stent"?
7    A.    Yes.
8    Q.    And "J&J could pursue a
9 preliminary injunction if Abbott and Boston
10 Scientific try to launch an everolimus-coated
11 or zotarolimus-coated stent"?
12    A.    I see it.
13    Q.    Does that accurately reflect
14 your conversations with Mr. Biegelsen on
15 January 20th?
16        MR. VEITH: Objection to form.
17 Are you asking him about both sentences you
18 read, or the first or the second?
19        MR. HANSEN: The entire --
20 everything that I read.
21    A.    I would say on the first
22 sentence where we believe that we got strong
23 IP in regards to the use of rapamycin
24 derivatives on the stents is probably fair
25 and accurate and reflects the position that

Page 62

1 was conveyed to me.
2        The second statement where it
3 says, "J&J could pursue a preliminary
4 injunction if Abbott and Boston try to launch
5 an everolimus-coated or zotarolimus-coated
6 stent," I believe is conjecture on the
7 analyst's point.
8    Q.    Didn't you tell Mr. Biegelsen
9 that J&J could pursue a preliminary
10 injunction if Abbott launched an
11 everolimus-coated stent?
12    A.    It's possible that that could
13 have come up in the context of a
14 conversation. I don't recall saying that
15 specifically.
16    Q.    But you may have said it?
17    A.    It's possible.
18        MR. HANSEN: All right. We
19 should take a break at this time.
20        THE VIDEOGRAPHER: Time for a
21 tape change.
22        MR. HANSEN: Yes.
23        THE VIDEOGRAPHER: Going off
24 record 3:43. This is the end of tape 1.
25        (Whereupon, a brief recess is

Page 63

1 taken.)
2        THE VIDEOGRAPHER: Back on
3 record 3:55. This is the beginning of tape
4 2.
5    Q.    Sometime during the week of
6 January 16th you spoke with Rob Faulkner from
7 JMP Securities as part of J&J's outreach
8 program?
9    A.    I may have been the one that
10 spoke to Rob. I can't recall for sure.
11    Q.    Johnson & Johnson's
12 supplemental Interrogatory responses, there's
13 a table attached as Exhibit A. I believe
14 they have been marked previously as Exhibit
15 122.
16        On page 3 of that table there's
17 a row relating to a conversation with Rob
18 Faulkner from JMP Securities. And it says in
19 the second column that Stanley Panasewicz is
20 the one that had the conversation; is that
21 correct?
22    A.    It has my name in the second
23 column, and the fourth column indicates that
24 I believe I spoke to Faulkner.
25    Q.    You're not sure?

Page 64

1    A.    I can't recall for certainty.
2    Q.    Do you believe someone from
3 J&J's investor relations group spoke with Rob
4 Faulkner?
5    A.    I'd say that that was a good
6 likelihood.
7    Q.    Why do you believe that's a
8 good likelihood?
9    A.    There was some notes that had
10 been marked regarding the call itself, so
11 that leads me to believe that someone spoke
12 to him.
13    Q.    Would you refer to Exhibit 106,
14 please?
15        Is Mr. Faulkner identified as
16 the contact for JMP Securities on this
17 suggested list of analysts?
18    A.    Yes, his name is -- is on this
19 list under -- next to JMP Securities.
20    Q.    So, was the intent of the
21 investors relations group to contact
22 Mr. Faulkner?
23    A.    Yes. He was identified as one
24 of the suggested list of analysts that we
25 contact.

16 (Pages 61 to 64)

# EXHIBIT K

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF DELAWARE

3                  -    -    -

4   ABBOTT LABORATORIES and   :

5   ADVANCED CARDIOVASCULAR   :

6   SYSTEM, INC.,             :

7                             :

8        Plaintiffs,          :  CIVIL ACTION NO.

9                             :  C-06-613-SLR

10              v.            :

11                            :

12  JOHNSON AND JOHNSON,      :

13                            :

14       Defendant.           :

15                  -    -    -

16    DEPOSITION UNDER ORAL EXAMINATION OF

17              LOUISE MEHROTRA

18        East Brunswick, New Jersey

19              March 14, 2007

20                  -    -    -

21  REPORTED BY:  DANA N. SREBRENICK, CSR RPR CLR

22                  -    -    -

23        ESQUIRE DEPOSITION SERVICES
          90 Woodbridge Center Drive
24        Woodbridge, New Jersey 07095
                (732) 283-1060
25  JOB NO. 60484       CONFIDENTIAL

LOUISE MEHROTRA, MARCH 14, 2007
CONFIDENTIAL

Page 21

1　name?
2　　A.　Luchetti.
3　　Q.　Could you spell that?
4　　A.　L-u-c-h-e-t-t-i.
5　　Q.　Stan Panasewicz?
6　　A.　Panasewicz.
7　　Q.　Stan Panasewicz was a director
8　of investor relations in January 2006?
9　　A.　Yes.
10　　Q.　And Tina Luchetti was also a
11　director --
12　　A.　No. She was a manager of
13　investor relations.
14　　Q.　Was there anyone else in the
15　investor relations department in that time
16　frame?
17　　A.　No.
18　　Q.　Who do you report to?
19　　A.　The chief financial officer.
20　　Q.　Who is that?
21　　A.　At this time it's Dominic
22　Caruso. At January 2006 it was Bob Darretta.
23　　Q.　In the December 2005/January
24　2006 time frame there was a bidding war
25　between Johnson & Johnson on the one hand and

Page 22

1　Boston Scientific on the other hand, to
2　acquire Guidant; is that correct?
3　　A.　Yes.
4　　Q.　If I during the course of the
5　deposition today refer to that time period as
6　the time period of the bidding war, will you
7　understand what I'm referring to?
8　　A.　Yes, December 2005/January
9　2006.
10　　Q.　Yes.
11　　And Abbott was also involved in
12　that bidding war?
13　　A.　I would not characterize them
14　as being, from my perspective, involved in
15　the bidding war. They were partnering with
16　Boston Scientific on Boston Scientific's bid
17　is my understanding.
18　　Q.　Were they also partnering with
19　Johnson & Johnson on their bid?
20　　A.　The -- for the Johnson &
21　Johnson bid to clear the regulatory
22　authorities, we had to license certain of our
23　compounds to Abbott to make them a viable
24　competitor in the drug-eluting stent market.
25　　So in that respect they were

Page 23

1　part of the Johnson & Johnson scenario, but
2　they were not part of the Johnson & Johnson
3　bid. I'm not a lawyer, but I don't think
4　they were part of the bid.
5　　Q.　What was the role of investor
6　relations during that bidding war?
7　　A.　During the December time period
8　it was fielding questions from the analyst
9　community. We really were not saying much to
10　the analyst community because under
11　Regulation FD we need to make sure that
12　statements we make are public. So if we had
13　a public statement it would go in a press
14　release. So we mostly were just fielding
15　questions during December.
16　　In January we were actually
17　asked to outreach to the analysts to explain
18　why the Johnson & Johnson bid was superior to
19　the Boston Scientific bid.
20　　Q.　And when you say that the
21　investor relations group was asked to
22　outreach, who asked you to outreach?
23　　A.　Okay. We had -- our investment
24　bankers were Goldman Sachs. They had been
25　working with the Executive Committee and that

Page 24

1　was a recommendation from Goldman to the
2　Executive Committee that was accepted.
3　　Q.　Did the communications group
4　also have instructions to outreach during the
5　January time frame?
6　　A.　Yes.
7　　Q.　During December, you indicated
8　that you were only fielding questions in
9　order to comply with the particular
10　regulation. What was that regulation?
11　　A.　It's called Regulation Fair
12　Disclosure. We have a number of analysts --
13　not analysts, actually hedge funds, calling
14　in to try to figure out if they can learn
15　more about this deal, so we really had no
16　comments to them.
17　　Q.　And why, in view of that
18　regulation, did you decide to outreach during
19　January 2006?
20　　A.　As long as the information is
21　in the public domain, we can speak to
22　analysts about information that is in the
23　public domain.
24　　We also, just as an additional
25　point, the last two weeks of December is a

6 (Pages 21 to 24)

LOUISE MEHROTRA, MARCH 14, 2007
CONFIDENTIAL

Page 101

1    A.    You've read it. I didn't --
2    Q.    I think we'll determine that
3 they're the same.
4    A.    Yes, we have determined they're
5 the same, yes.
6    Q.    Okay. So -- but you can refer
7 to either or both of them.
8    A.    Okay.
9    Q.    But Item 14 in the
10 Legal/Arbitrage section of Exhibits 109 and
11 111?
12    A.    Correct.
13    Q.    The question is, "What are some
14 of the factors that you believe may cause the
15 FTC/EC regulatory review process to take
16 longer than Boston Scientific is publicly
17 indicating?" Is that correct?
18    A.    Correct.
19    Q.    And that is a reference to the
20 process of receiving antitrust approval in
21 the United States and in the European Union;
22 is that correct?
23    A.    I was focused more on the FTC,
24 but, yes, it would cover both of them.
25    Q.    In this Item 14, there's no

Page 102

1 mention of intellectual property or patents;
2 is that correct?
3    A.    Not specifically, correct.
4    Q.    At some point in time you had a
5 conversation with Doug Hughes at -- in the
6 investor relations group in Guidant during
7 this period of the bidding war; is that
8 correct?
9    A.    That is correct.
10    Q.    How many times did you
11 communicate with Mr. Hughes during that
12 timeframe?
13    A.    There's one I recall vividly,
14 but it would have occurred more often because
15 we were trying to ensure that the investor
16 relations messages from both companies were
17 the same, or at least based on the same
18 foundation and facts.
19    Q.    Which conversation do you
20 recall vividly?
21    A.    The one where I -- not so
22 vividly, but the one where I called him
23 explaining that we did have the intellectual
24 property. It would have been basically
25 number 13.

Page 103

1    Q.    And was that the only topic of
2 conversation in that call?
3    A.    That's the piece that I
4 remembered. Now, we were also working on the
5 ISS presentation at that time, so I may have
6 actually discussed that with him as well.
7    Q.    What is the ISS presentation?
8    A.    I think it stands for
9 International -- it's a presentation that you
10 have to do and they solicit votes from the
11 investment community on your behalf.
12 International Shareholder Services, I believe
13 is what it's called, or Independent
14 Shareholders Services, or something like
15 that.
16        They actually vote -- they
17 recommend whether or not to vote for or
18 against transactions.
19        MR. HANSEN:  I'll ask the court
20 reporter to mark Exhibit 117.
21        (Exhibit ABT-117, Document
22 entitled Presentation Regarding the Merger of
23 Guidant Corporation with Johnson & Johnson,
24 January 2006, marked for identification.)
25    Q.    Do you have Exhibit 117 --

Page 104

1    A.    Yes, I do.
2    Q.    -- now?
3        Is this the ISS presentation
4 that you were referring to?
5    A.    Yes, it is.
6        MR. HANSEN:  I'll ask the court
7 reporter to mark Exhibit 118.
8        (Exhibit ABT-118, E-mail dated
9 January 15, 2006, with attached ISS
10 presentation, marked for identification.)
11        MR. VEITH:  Let me just for the
12 record indicate that with respect to Abbott
13 117, the e-mail forwarding information at the
14 top simply reflects Ms. Mehrotra forwarding
15 it to a legal assistant at J&J, so it wasn't
16 part of the original document.  You probably
17 gathered that from the date, but I just
18 wanted to make that clear.
19        MR. HANSEN:  I'm sorry?
20        MR. VEITH:  With respect to
21 Abbott 117, it's printed --
22        THE WITNESS:  I think it's 118.
23        MR. VEITH:  I'm sorry, 118.
24 Yes, 118, it was forwarded at J&J was printed
25 by someone named Michelle Bacorn.

26 (Pages 101 to 104)

Page 109

1  the same document to Stan Panasewicz with a
2  note, "For your evil eye"?
3      A.   Right.
4      Q.   That appears to be at 3:36.
5  The timing there doesn't appear to be —
6      A.   It seems a bit off.
7      Q.   It doesn't make sense?
8      A.   Yes.
9      Q.   But do you recall forwarding
10  this to Mr. Panasewicz?
11      A.   Not specifically, no, but I'm
12  sure I did.  Stan was very good reviewing
13  documents.
14      Q.   You have no recollection of
15  whether or not investor relations talking
16  points were sent to anyone at Guidant in this
17  timeframe?
18      A.   Not specific recollection, no.
19      Q.   Under what circumstances -- the
20  e-mail appears to indicate that there is a
21  talking points document soon to follow,
22  correct?
23      A.   Correct.
24      Q.   Do you know under what
25  circumstances it would not have subsequently

Page 110

1  followed?
2      A.   It could possibly have been a
3  workload -- what we take is the Q&A document,
4  and then we edit out portions that are
5  confidential for Johnson & Johnson and then
6  we would share those with Guidant.
7          Stan can tell you more about
8  the process behind that because he was the
9  primary person sharing the documents.  But
10  we'd start -- it possibly didn't occur
11  because this was Friday, and I do remember
12  leaving the office at nine o'clock that
13  night.  So...
14          But I do recall speaking to
15  Doug about it.
16      Q.   If the investors relations
17  talking point document was sent, it would
18  have been derived from the Q&A document?
19      A.   If we sent it, it would have
20  been derived from the Q&A document.
21      Q.   Which Q&A document?  We have
22  one from January 12th and then another one
23  from January 16th.
24          Was there — were there
25  intermediate versions with a different date?

Page 111

1      A.   There could have been an update
2  to the same document at different times, but
3  the ones that we could find in the records
4  were the 12th and the 16th.
5      Q.   So, when do you believe you had
6  this conversation with Doug Hughes?
7      A.   I believe it was the Friday.
8      Q.   Could it have been the
9  Thursday?
10      A.   It may have been.
11      Q.   Thursday the -- January 12th?
12      A.   12th.  It was later on in the
13  day.  I do recall that.
14      Q.   If you did it on -- on January
15  12th, would you have been relying on the Q&A
16  dated January 12th, the one that's been
17  marked as Exhibit 112?
18      A.   I believe that didn't have
19  Section 13 and 14 in it.  Is that correct?
20  If it did, that wouldn't be the one I was
21  doing.  So, no, I would not have been relying
22  on this, because it doesn't have 13 and 14 in
23  it.  This was printed at 10:00 a.m. in the
24  morning.
25      Q.   So, when you spoke to Mr.

Page 112

1  Hughes on January 12th or January 13th, you
2  were not relying on Exhibit 112, is that
3  correct?
4      A.   Right, because it was not
5  complete.  It was at 10:00 a.m. in the
6  morning.
7      Q.   And do you believe there's
8  another version of that document dated
9  January 12th?
10      A.   I don't believe another version
11  is saved.  You can save and edit over
12  documents, so I think you've got the latest
13  versions on January 16th.  When they were
14  saved and edited on the 12th, I didn't -- I
15  wouldn't know.
16      Q.   You believe that you discussed
17  with Mr. Hughes the same information that you
18  were discussing with the outside analysts at
19  the time as it related to intellectual
20  property issues?
21      A.   Yes.
22      Q.   Would you have said anything
23  additional to Mr. Hughes that you weren't
24  saying to -- to other outside analysts?
25      A.   Other than --

28 (Pages 109 to 112)

Page 113

1   Q.   Regarding intellectual property
2   issues?
3   A.   No, I would not have.
4   Q.   Do you recall Mr. Hughes'
5   reaction to what you said to him about the
6   intellectual property issues?
7   A.   Not specifically.
8   Q.   And why did you decide to
9   call -- to call Guidant and raise those
10  intellectual property issues in a
11  conversation with Doug Hughes?
12  A.   The investor relations
13  departments of Guidant and J&J, because
14  Guidant said that the J&J offer was superior,
15  we needed to make sure that the two investor
16  relations departments were giving the same
17  information to the analyst community.
18  Q.   Did you ask Mr. Hughes to
19  convey certain information to the investment
20  community?
21  A.   No, I did not. That's his job
22  to decide within his judgment what to convey.
23  Q.   So you were calling to inform
24  him about what J&J was saying to the
25  investment community?

Page 114

1   A.   I was calling to inform him of
2   some additional facts he may want to use when
3   he was discussing Guidant's perspective on
4   the offer with the investment community.
5   Q.   And did you inform him that, or
6   did he understand from your conversation
7   that -- that you -- that these additional
8   facts relating to the intellectual property
9   issues were going to be conveyed by J&J to
10  the investment community?
11  MR. VEITH: Objection to the
12  form of the question and to her lack of
13  foundation to say what he thought.
14  A.   You would have to ask Doug
15  that, but I'm sure he could reach that
16  conclusion.
17  Q.   Did you tell him that you
18  intended to convey this information to the
19  investment community?
20  A.   I don't recall.
21  MR. HANSEN: Let's take a short
22  break.
23  THE VIDEOGRAPHER: Going off
24  record 12:05.
25  (Whereupon, a brief recess is

Page 115

1   taken.)
2   THE VIDEOGRAPHER: Back on
3   record 12:13.
4   MR. HANSEN: I'll ask the court
5   reporter to mark Exhibit 120, which bears
6   Bates numbers JJ 002717 through 2728.
7   (Exhibit ABT-120, Document
8   Bates numbered JJ 002717 through JJ 002728,
9   marked for identification.)
10  Q.   Previously we discussed a
11  Boston Scientific slide presentation that you
12  had forwarded to Jan Wald and several other
13  analysts.
14  Do you recall that?
15  A.   Yes, I do.
16  Q.   Is this the slide presentation
17  that you forwarded to Mr. Wald and those
18  other analysts?
19  A.   This appears to be the one,
20  specifically the second to last page, that I
21  was trying to pull their attention to.
22  Q.   Which page are you referring
23  to?
24  A.   The -- page 10 of their dec.
25  Q.   Can you read the Bates number

Page 116

1   on that page, or if not, if you want to hand
2   that to me, I'd be happy to read it.
3   A.   JJ 002727.
4   Q.   And what about that page did
5   you want to draw to their attention?
6   A.   The Guidant management was
7   using analyst estimates that did not include
8   the dilution that they would face if they
9   acquired Guidant. They were using those
10  analysts' estimates to validate the deal.
11  Q.   I think you said Guidant, that
12  management was using analysts' estimates. I
13  think you meant Boston Scientific?
14  A.   I'm sorry -- Boston
15  Scientific's management, yes. I'm sorry.
16  Q.   You -- you and Mr. Panasewicz
17  contacted a number of different outside
18  analysts sometime during the weeks of January
19  9th and January 16th; is that correct?
20  A.   That is correct.
21  Q.   And your purpose in contacting
22  them was to provide information that you
23  thought cast Johnson & Johnson's bid in a
24  superior light in comparison to Boston
25  Scientific's bid for Guidant?

29 (Pages 113 to 116)

# EXHIBIT L

**REDACTED**

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT LABORATORIES and )
ADVANCED CARDIOVASCULAR )
SYSTEMS, INC., )
)
Plaintiffs, )
)    C.A. No. 06-613-SLR
v. )
)    **CONFIDENTIAL**
JOHNSON AND JOHNSON, INC. and )
CORDIS CORPORATION, )
)
Defendants. )

**PLAINTIFFS' RESPONSE TO DEFENDANTS' FIRST SET OF
INTERROGATORIES RELATING TO SUBJECT MATTER JURISDICTION**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiffs Abbott Laboratories and

Advanced Cardiovascular Systems, Inc. (collectively "Abbott") respond to Defendants' First Set

of Interrogatories to Plaintiffs Relating to Subject Matter Jurisdiction.

**General Objections**

The following General Objections apply to all of Defendants' interrogatories. No

General Objection is waived because it is or is not specifically cited in response to a particular

interrogatory.

1.    Abbott objects to each interrogatory and Defendants' Definitions and Instructions

to the extent that they impose or infer a duty to provide discovery or to supplement beyond that

provided in the Federal Rules of Civil Procedure, the Local Rules of this Court, and the

agreement between the parties.

2.    Any responses made by Abbott to Defendants' interrogatories are made without

waiver and with preservation of: (a) all questions as to competency, relevancy, materiality,

privilege, and admissibility of the responses and the subject matter thereof as evidence for any

**CONFIDENTIAL**

purpose and in any further proceeding in this action (including the trial of this action) and in any other action or matter; (b) the right to object to the use of such responses or the subject matter thereof, on any ground, in any further proceeding in this action (including the trial of this action) and in any other action or matter;  (c) the right to object on any ground at any time to a demand or request for further response to these or any other discovery requests or proceedings involved or related to the subject matter of the information provided or the discovery to which these responses are provided; and (d) the right at any time to review, correct, supplement, or clarify any of the responses contained herein.

3.    Abbott has not yet completed its investigation of the facts pertaining to this action, discovery is ongoing, and Abbott is continuing its preparation for trial.  All responses to the following interrogatories are based on information presently known to Abbott after a reasonable effort to locate information called for by these interrogatories.  Accordingly, all responses are given without prejudice to Abbott's right to supplement its responses based on any additional information that may develop or come to Abbott's attention at a later time.  In addition, Abbott's objections as set forth herein are made without prejudice to Abbott's right to assert any additional or supplemental objections at a later time.

4.    Abbott objects to each interrogatory to the extent it seeks information that is neither relevant to the subject matter of this litigation or Defendants' pending motion nor reasonably calculated to lead to the discovery of admissible evidence.

5.    Abbott objects to each interrogatory to the extent it seeks information protected by any applicable privilege, immunity, or confidentiality obligation including without limitation the attorney-client privilege or work product immunity doctrine.  Nothing contained in these responses, or contained in any subsequent responses, is intended to be, or in any way constitutes,

**CONFIDENTIAL**

a waiver of any such privilege, immunity, or confidentiality obligation. Abbott objects to the introduction into evidence or use of any privileged information that is revealed or produced inadvertently.

6.    Abbott objects to each interrogatory to the extent it seeks information related to third parties that is subject to a protective order, non-disclosure agreement, confidentiality agreement, or other obligation of confidentiality.

7.    Abbott objects to each interrogatory to the extent it seeks confidential, proprietary, and/or sensitive business information. Subject to its objections, Abbott will produce such information subject to the parties' agreement regarding a Protective Order.

8.    Abbott objects to each interrogatory to the extent it seeks information or evidence beyond the possession, custody, or control of Abbott.

9.    Abbott objects to each interrogatory to the extent it calls for a legal conclusion. Abbott's responses should not be construed as admissions of any particular legal characterization made by these interrogatories.

10.    Abbott objects to each definition of "Guidant," "Abbott," "Advanced Cardiovascular Systems," and "Plaintiffs" to the extent it is overly broad and unduly burdensome (e.g., seeking information from entities that have no relevance to this action) and to the extent it seeks information outside Abbott Laboratories' or Advanced Cardiovascular Systems, Inc.'s custody and control.

11.    Abbott's agreement to produce documents responsive to a particular interrogatory pursuant to Fed. R. Civ. P. 33(d) indicates that Abbott will produce responsive documents to the extent that such documents are in its possession, custody, or control, subject to the objections Abbott has raised to that request and the General Objections stated herein.

3

**CONFIDENTIAL**

12.   Abbott's General Objections to interrogatories as stated herein are hereby incorporated by reference into each and every response to each and every interrogatory, and shall not be repeated in every response.

## INTERROGATORY RESPONSES

### Interrogatory No. 1.

Identify and describe all statements, threats, or other actions that you contend were made or taken by J&J at any time prior to September 29, 2006 that led Abbott or Guidant to believe it was entitled to initiate a lawsuit seeking a declaration of non-infringement, including for each occurrence: (a) the date of the statement, threat, or other action; (b) the parties to the statement, threat, or other action; (c) its form (e.g., written, oral, etc.); (d) the date on which Abbott or Guidant became aware of it; (e) a description of how Abbott or Guidant became aware of it; and (f) any inferences or interpretations drawn by Abbott or Guidant from the statement, threat, or other action.

### Response:

Abbott objects to this interrogatory to the extent that it mischaracterizes Abbott's complaint. Abbott further objects to this interrogatory as argumentative. Abbott further objects to this interrogatory as overly broad and unduly burdensome, specifically to the extent that it seeks "all statements, threats, or other actions." Abbott further objects to this interrogatory to the extent it seeks information that is within the custody or possession of Defendants and/or Defendants' attorneys. Abbott further objects to this interrogatory to the extent it seeks information outside the possession, custody, or control of Abbott. Abbott further objects to this interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, work-product immunity, or other applicable privilege, immunity, or confidentiality obligation. Abbott objects to this interrogatory to the extent that it seeks information beyond the scope of the parties' agreement.

4                         **CONFIDENTIAL**

Subject to and without waiving its objections, including its General Objections, Abbott identifies the documents, pursuant to Rule 33(d), that Abbott has produced or will produce in response to Defendants' First Set Of Requests For Production To Plaintiffs Relating To Subject Matter Jurisdiction, including the documents identified by Bates number herein. Also, subject to and without waiving its objections, including its General Objections, Abbott provides the following response:

## 1.    J&J Litigation History

Defendants Johnson & Johnson, Inc. and Cordis Corporation (collectively "J&J") have a well-established history of initiating patent litigation against competitors. In the field of interventional cardiology alone, J&J has filed at least six patent infringement complaints in the District of Delaware in the last ten years:

a.  *Cordis Corp. v Advanced Cardiovascular Sys., Inc.*, Civ. No. 97-550-SLR (D. Del.) (sued shortly after US launch) (ACS Multi-Link stent)

b.  *Cordis Corp. v. Advanced Cardiovascular Sys., Inc.*, Civ. No. 97-635-SLR (D. Del.) (sued shortly after US launch) (ACS RX Rocket Coronary Dilatation Catheter)

c.  *Cordis Corp. v. Advanced Cardiovascular Sys., Inc.*, Civ. No. 98-65-SLR (D. Del.) (sued shortly after US launch) (NIR stent)

d.  *Cordis Corp. v. Boston Scientific Corp.*, Civ. No. 98-197-SLR (D. Del.) (sued in anticipation of US launch of "stockpiled" product) (NIR stent)

e.  *Cordis Corp. v. Medtronic AVE, Inc.*, Civ. No. 00-886-SLR (D. Del.) (related to Civ. No. 97-550) (S540, S660, S670 and X3 Renal stents)

f.  *Cordis Corp. v. Boston Scientific Corp.*, Civ. No. 03-027-SLR (D. Del.) (sued shortly after US launch) (Express[2] stent).

In each of these cases, J&J filed the initial complaint in conjunction with a competitor's new product launch. Also, in each of these cases, J&J moved the court to enter a preliminary injunction to immediately enjoin the competitor from making or selling its product.

5

**CONFIDENTIAL**

2.    **The XIENCE V Drug Eluting Stent**

Advanced Cardiovascular Systems, Inc. ("ACS") is a subsidiary of Abbott Laboratories. ACS manufactures the XIENCE™ V Everolimus Eluting Coronary Stent System ("XIENCE V"). The XIENCE V is a drug eluting stent ("DES") used in the treatment of coronary artery disease. The XIENCE V elutes a proprietary drug known as Everolimus. The XIENCE V is presently sold in Europe and Asia. Abbott is seeking approval from the Food and Drug Administration ("FDA") to sell the XIENCE V in the United States.

3.    **J&J's Proposed Acquisition of Guidant**

In 2004, ACS was a subsidiary of Guidant Corporation ("Guidant"). In December, 2004, Guidant entered an agreement with J&J, whereby J&J would acquire Guidant for $76 per share.

To obtain approval from the Federal Trade Commission ("FTC"), J&J agreed to license certain patents to Abbott in the event that J&J acquired Guidant. The patents that J&J agreed to license to Abbott included patents relating to drug eluting stents. The DES patents that J&J agreed to license to Abbott included U.S. Patent Nos. 6,585,764, 6,808,536 and 6,776,796 ("Wright and Falotico patents"). In addition to the Wright and Falotico patents, the patents that J&J agreed to license to Abbott included other patents relating to drug eluting stents.

4.    **Bidding War to Acquire Guidant**

In November, 2005, J&J unilaterally cut the acquisition price for Guidant to $58 per share, asserting that intervening events had adversely affected the value of Guidant. After some negotiation, J&J and Guidant agreed to an acquisition price of $63 per share.

On December 5, 2005, Boston Scientific Corporation ("Boston Scientific") announced that it intended to make a bid to acquire Guidant at $72 per share. On January 8, 2006, Boston Scientific made a definitive offer of $72 per share to acquire Guidant. Boston Scientific also

6

**CONFIDENTIAL**

agreed to divest some of Guidant's business units, including ACS, to Abbott. A bidding war between J&J and Boston Scientific ensued.

On January 11, 2006, J&J raised its offer from $63 to $68 per share. On January 12, 2006, Boston Scientific countered with $73 per share and agreed to divest all overlapping assets to "address[] any perceived antitrust concerns." On January 13, 2006, J&J responded with $71 per share. On January 17, 2006, Boston Scientific then increased its offer from $73 to $80 per share. At this juncture, Guidant's board of directors determined that Boston Scientific's $80 per share offer was superior to the terms of Guidant's merger agreement with J&J at $71 per share.

On January 25, 2006, Guidant announced that it had entered into the merger agreement offered by Boston Scientific to acquire Guidant at $80 per share, or approximately $27 billion. Boston Scientific also agreed to divest to Abbott Guidant's vascular intervention and endovascular business units, including ACS. Boston Scientific received antitrust clearance from the European Commission on April 11, 2006, and from the FTC on April 20, 2006. The merger and acquisition was completed on April 21, 2006.

5.    **J&J Communications with Guidant Regarding the Wright and Falotico Patents**

On January 12, 2006, as the bidding war to acquire Guidant was escalating, J&J began communicating to Guidant that, in the event Guidant were acquired by Boston Scientific and ACS were divested to Abbott, J&J would not license the Wright and Falotico patents to Abbott and an Everolimus eluting stent (the XIENCE V) would infringe the Wright and Falotico patents, based on the analysis of J&J's legal department.

J&J's communications with Guidant included at least the following:

a.    On January 12, 2006, Louise Mehrotra (J&J investor relations) contacted Doug Hughes (Guidant investor relations). (*See* ABT009914, ABT009915-16,

7

**CONFIDENTIAL**

ABT009921-22, ABT009923-24, ABT009925-26, ABT009938-39, ABT009942-43, ABT010046.) Ms. Mehrotra told Mr. Hughes that, in the event that Boston Scientific acquired Guidant, Abbott and Boston Scientific would have problems with two Wright and Falotico patents, based on the analysis of J&J's legal department. Ms. Mehrotra also told Mr. Hughes that J&J had already started to disseminate its claims regarding the Wright and Falotico patents to investors.

b.   On January 13, 2006, Susan Odenthal (J&J corporate communications) sent a document via email to James Cornelius (Guidant Chairman and CEO), Bernard Kury (Guidant General Counsel), Charles Mulaney (Guidant outside counsel) and Steven Tragash (Guidant corporate communications), asserting that J&J's intellectual property portfolio included patents directed to Everolimus when used on a stent, Abbott would not receive access to these patents in the event that Boston Scientific were to acquire Guidant, and any drug eluting stent using Everolimus (XIENCE V) may infringe these patents. (See ABT009976-79.)

6.   **Analyst Reports**

During the midst of the bidding war to acquire Guidant and continuing while Boston Scientific and Guidant were completing the transaction, Abbott and Guidant both became aware that industry analysts, citing J&J as a source, were publishing reports regarding the Wright and Falotico patents in relation to the XIENCE V. (See ABT009877-90, ABT009710-21, ABT009898, ABT009738-47, ABT009944-55, ABT009748-55, Dep. Ex. ABT 156, and Dep. Ex. ABT 157). Citing J&J as a source, these analyst reports included assertions that the XIENCE V would infringe the Wright and Falotico patents, J&J would not license the Wright and Falotico patents to Abbott, and J&J could use the Wright and Falotico patents to preclude

8                          **CONFIDENTIAL**

Abbott or Guidant from making and selling the XIENCE V. Before these analyst reports, it was

not publicly known that the Wright and Falotico patents were among the patents that J&J had

agreed to license to Abbott in the event that J&J acquired Guidant. These analyst reports

included at least the following:

    a.    Larry Biegelsen et al., *JNJ: Takes Off The Gloves In Its Fight With Boston*

        *Scientific For Guidant*, Prudential Equity Group, LLC, January 20, 2006

        (ABT009877-90).

> JNJ claims that 2 of its patents may be infringed if a company tries
> to launch a drug-eluting stent coated with a rapamycin derivative
> such as . . . GDT's everolimus. The potential for JNJ to prevent
> ABT and BSX from marketing the Xience-V DES, could give the
> GDT board pause for approving a BSX-GDT merger.
>         * * *
> If BSX acquires GDT, BSX would sell GDT's vascular
> intervention (VI) business, including shared rights to GDT's
> promising everolimus-coated stent, Xience-V, to ABT. Although
> JNJ's patents have never been litigated, JNJ believes it has a strong
> intellectual property (IP) position with regard to the use of
> rapamycin derivatives on a stent. JNJ could pursue a preliminary
> injunction if ABT and BSX try to launch an everolimus-coated . . .
> stent. . . . According to JNJ, the key patents are the Falotico
> (6,776,796) and Wright (6,585,764) patents.

    b.    Jan David Wald et al., *The Game May Be Far From Over*, A.G. Edwards & Sons,

        Inc., January 23, 2006 (ABT009710-21).

> We have had conversations with Johnson & Johnson (JNJ) and
> Boston Scientific (BSX) and others recently that lead us to believe
> that the Guidant (GDT) game is far from over.
>         * * *
> We were also reminded by JNJ that it had three patents related to '-
> limus' compounds that it thought precluded any other company
> from using such a compound on a stent. We were only given two
> patent numbers (6776796 [the Falotico '796 patent] and 6585764
> [the Wright '764 patent]) . . .

    c.    Katherine Martinelli, *More legal wrangling from J&J possible*, Merril Lynch,

9

CONFIDENTIAL

March 14, 2006 (ABT009898).

> JNJ has two patents (Wright and Falotico), which appear to relate to the elution characteristics of "olimus" compounds; JNJ's Cypher DES uses sirolimus, a member of the olimus family of drugs; other olimus drugs include Guidant's everolimus and Abbott/Medtronic's zotarolimus (ABT-578). The European launch of Guidant's Xience DES, which the company has targeted for Q2:06, could trigger possible legal activity since we understand U.S. patent law prohibits domestic manufacture of a product for sale outside the U.S. if there's been infringement of intellectual property.

d.     Bob Hopkins, *BSX: The Risks–Part 1*, Lehman Brothers, January 30, 2006

(ABT009738-47).

> There are even hypothetical litigations to contend with as JNJ has strongly suggested that they feel GDT and ABT may violate JNJ/Wyeth DES patents covering the "limus" family of drugs.

e.     Matthew J. Dodds et al., *An INTERESTing New Offer*, Citigroup, January 13,

2006 (ABT009944-55).

> The [Wright and Falotico] patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.

f.     Matthew J. Dodds et al., *Deconstructing Xience*, Citigroup, March 23, 2006

(ABT009748-55).

> Everolimus will likely face two IP challenges from JNJ as both its Falotico and Wright patents claim the use of a limus analogue on a stent.

7.     **News Reports**

During the midst of the bidding war to acquire Guidant and continuing while Boston

Scientific and Guidant were completing the transaction, Abbott and Guidant both became aware

of news reports, citing J&J as a source, regarding the Wright and Falotico patents in relation to

**CONFIDENTIAL**

the XIENCE V.    (*See* ABT009891-92, ABT009614-15, ABT009616-17, ABT009618-19, ABT009621-25, and ABT010173-74.)  These news reports included at least the following:

a.    Stephen Heuser, *Suitors take Guidant fight to The Street*, The Boston Globe, January 20, 2006, at F1 (ABT010173-74).

> [J&J] has also raised prospects that it could use patents and existing ties to Guidant to derail or complicate Boston Scientific's offer, said Matthew Dodds, an analyst for Citigroup who is skeptical about Guidant's value to both companies.

b.    Paul Merrion, *Abbott stock falls on concerns over success of Guidant bid*, Crain's Chicago Business, January 20, 2006 (ABT009891-92).

> The analyst, Prudential Equity Group, LLC's Larry Biegelsen, reported that Guidant's board could balk at Boston Scientific and Abbott's joint bid because Johnson & Johnson, a competing bidder for Guidant, claims its patents would be violated if Abbott markets its own drug-eluting stents or those made by Guidant.

c.    *Abbott, Boston shares off on J&J patent threat*, Reuters, January 21, 2006, available at Reuters News (ABT009614-15).

> One analyst, who asked not to be named, said J&J management was making rounds on Wall Street trying to fan fears about the Boston Scientific bid.  The analyst said J&J was arguing that Boston Scientific's bid was breaking its bank, that its assumptions on Guidant's cardiac rhythm management were too aggressive and that there was intellectual property infringement that would limit potential of important products.

d.    Avram Goldstein, *J&J works to discredit rival offer for Guidant*, The International Herald Tribune, January 23, 2006, at Finance 12 (ABT009616-17).

> Johnson & Johnson's campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation that may undercut Boston Scientific's plans.
> 'They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific,' said Jan David Wald, an analyst with A.G. Edwards.  Wald said he has been called

11                         **CONFIDENTIAL**

by a Johnson & Johnson employee, whom he declined to name.
Johnson & Johnson told analysts it was considering filing patent
infringement lawsuits over stent drug coatings to keep Boston
Scientific and its bidding partner, Abbott Laboratories, from
profiting from the new Guidant devices, according to Biegelsen of
Prudential.

\*\*\*

'J&J claims that two of its patents may be infringed if a company
tries to launch a drug-eluting stent coated with" Abbott's
zotarolimus and Guidant's everolimus, he wrote.

e.    Holland Johnson, *J&J offer rumors persist as Guidant has more ICD issues*,

Medical Device Daily, January 24, 2006, at 1 (ABT009618-19).

Fueling this speculation were rumors, some of which apparently
were planted by J&J personnel as part of an organized campaign to
undermine the Boston Scientific offer in the minds of analysts, that
two of its patents may be infringed if an unnamed company tries to
launch a drug-eluting stent coated with a derivative of rapamycin.

f.    Thomas M. Burton et al., *Boston Scientific Faces Pivotal Test After Victory in*

*Fight for Guidant*, The Wall Street Journal, January 26, 2006, at A1

(ABT009621-25).

Another potential wrinkle arises in the intellectual-property rights
surrounding stents --an area that's been the subject of extensive
litigation in the industry. Citigroup analyst Matthew Dodds says
J&J holds patents on methods of using "limus-type drugs on stents -
- including the everolimus on Guidant's stent, as well as a drug on
an Abbott stent.

**8.    Analysts, Reporters, Shareholders and Others Contacting ABT and GDT**

During the midst of the bidding war to acquire Guidant and continuing while Boston

Scientific and Guidant were completing the transaction, Abbott and Guidant were both contacted

by analysts, news reporters, shareholders and others regarding the Wright and Falotico patents in

relation to the XIENCE V. (*See* ABT009893, ABT009899-900, ABT009903-05, ABT009906-

08, ABT009909-11, ABT009901, ABT009917-18, ABT009919, ABT010013, ABT010014-16,

12                                    **CONFIDENTIAL**

ABT010017-19, ABT010020-23, ABT010024-27, ABT010028-31, ABT010117-18, ABT010115, ABT010116, ABT010143-44, ABT010156-57, ABT010165, ABT010166, and ABT010167-68.) These contacts included at least the following:

    a.    Abbott contacted by Avram Goldstein of Bloomberg on January 20, 2006. (*See* ABT009893.)

    b.    Guidant contacted by Bruce Nudell of Sanford C. Bernstein on January 13, 2006. (*See* ABT009899-900, ABT009903-05, ABT009906-08, ABT009909-11.)

    c.    Guidant contacted by The Shaw Group on January 13, 2006. (*See* ABT009901, ABT009917-18, ABT009919.)

    d.    Guidant contacted by Avram Goldstein of Bloomberg on January 20, 2006. (*See* ABT010013.)

    e.    Guidant contacted by Barnaby Feder of the New York Times on January 20, 2006. (*See* ABT010014-16, ABT010017-19, ABT010020-23, ABT010024-27, ABT010028-31, ABT010117-18.)

    f.    Guidant contacted by Steve Silva of Joele Frank on January 31, 2006. (*See* ABT010115, ABT010116.)

    g.    Guidant contacted by Jennifer B. Pearlman of Burgundy Asset Management on March 23, 2006. (*See* ABT010143-44, ABT010156-57.)

**9.**    **Petitions to Make Special**

J&J continues to prosecute patent applications related to the Wright and Falotico patents, including at least the following patent applications:

| Application No. | Relationship to Wright and Falotico Patents |
|---|---|
| 11/467,099 | Claims priority common to U.S. Patent No. 6,776,796 |

13

**CONFIDENTIAL**

| Application No. | Relationship to Wright and Falotico Patents |
|---|---|
| 11/467,035 | Claims priority to U.S. Patent Nos. 6,808,536 and 6,585,764 |
| 11/466,983 | Claims priority to U.S. Patent Nos. 6,808,536 and 6,585,764 |
| 10/951,385 | Claims priority to U.S. Patent Nos. 6,808,536 and 6,585,764 |
| 10/852,517 | Claims priority common to U.S. Patent No. 6,776,796 |
| 10/829,074 | Claims priority common to U.S. Patent No. 6,776,796 |

After Guidant announced that it had entered a merger agreement with Boston Scientific, J&J transferred responsibility for each of these applications to J&J's outside counsel at the Woodcock Washburn law firm in Philadelphia. For each of these patent applications, J&J subsequently filed a petition to make special (*i.e.*, to expedite the application) "because of actual infringement." (*See* ABT006995-96, ABT007335-36, ABT008004-05, ABT008676-77, ABT008936-37, and ABT009141-42.) In support of each of these petitions, J&J has submitted a declaration from its outside counsel, asserting for example:

> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases and other publicly available documents, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of [certain claims] on file in this application.

(ABT006997-7026; *see also* ABT007343-72, ABT008006-26, ABT008678-715, ABT008938-75, and ABT009143-83.) The petitions to make special and the declarations filed in support are publicly available. Before September 29, 2006, Abbott became aware of the petitions to make special and related declarations filed in conjunction with at least Application Nos. 10/951,385 and 10/829,074.

### Interrogatory No. 2.

Describe in detail all facts that led you to allege that J&J undertook a "public campaign to cast a

14                                                        **CONFIDENTIAL**

cloud" over the launch of the XIENCE V product, as stated in paragraph 19 of your Complaint.

**Response:**

Abbott objects to this interrogatory as overly broad and unduly burdensome, specifically to the extent that it seeks "all facts." Abbott further objects to this interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, work-product immunity, or other applicable privilege, immunity, or confidentiality obligation.

Subject to and without waiving their objections, including their General Objections, Abbott incorporates its objections and response to Interrogatory No. 1.

**Interrogatory No. 3.**

Identify any communication made to J&J by Abbott or Guidant prior to September 29, 2006 concerning the patents-in-suit.

**Response:**

Abbott objects to this interrogatory as overly broad and unduly burdensome, specifically to the extent that it seeks "any communication." Abbott further objects to the extent that this request is unbounded in time. Abbott further objects to this interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, work-product immunity, or other applicable privilege, immunity, or confidentiality obligation.

Subject to and without waiving their objections, including their General Objections, Abbott incorporates its objections and response to Interrogatory No. 1.

**Interrogatory No. 4.**

Identify who made the decision and/or participated in making the decision to file this lawsuit.

**Response:**

Abbott objects to this interrogatory as vague and indefinite, for example, to the extent it

15    **CONFIDENTIAL**

seeks information regarding "who...participated in making the decision." Abbott objects to this

interrogatory to the extent it seeks information that is neither relevant to this action nor reasonably

calculated to lead to the discovery of admissible evidence. Abbott further objects to this

interrogatory to the extent that it seeks information that is protected by the attorney-client

privilege, work-product immunity, or other applicable privilege, immunity, or confidentiality

obligation. Subject to and without waiving their objections, including their General Objections,

Abbott states that the parties have agreed that the information responsive to this interrogatory, to

the extent that it can be understood, is not discoverable.


As to objections,


OF COUNSEL:                              Frederick L. Cottrell, III (#2555)
Edward A. Mas, II                        cottrell@RLF.com
Leland G. Hansen                         Anne Shea Gaza (#4093)
James M. Hafertepe                       gaza@RLF.com
Sandra A. Frantzen                       RICHARDS, LAYTON & FINGER
Christopher J. Buchko                    One Rodney Square
MCANDREWS, HELD & MALLOY, LTD.           920 N. King Street
500 West Madison Street, 34th Floor      Wilmington, Delaware 19899
Chicago, Illinois 60661                  (302) 651-7700
(312) 775-8000

                                         *Attorneys For Plaintiffs Abbott Laboratories*
                                         *And Advanced Cardiovascular Systems, Inc.*

Date: April 20, 2007


16                                       **CONFIDENTIAL**

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2007, I caused to be sent by hand delivery the foregoing document to the following counsel:

> Steven J. Balick, Esquire
> Ashby & Geddes
> 500 Delaware Avenue, 8th Floor
> P.O. Box 1150
> Wilmington, DE 19899
> sbalick@ashby-geddes.com

I hereby certify that on April 20, 2007, I caused to be sent by electronic mail the foregoing document to the following counsel:

> David T. Pritikin, Esquire
> Russell E. Cass, Esquire
> Paul Veith, Esquire
> Sidley Austin LLP
> One South Dearborn
> Chicago, IL 60603
> dpritikin@sidley.com
> rcass@sidley.com
> pveith@sidley.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

# EXHIBIT N

# REDACTED

# EXHIBIT O

# REDACTED

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | Civil Action No. 06-613 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF JEFFREY LEEBAW

I, Jeffrey Leebaw, hereby declare as follows:

1.      I am employed by Johnson & Johnson Corporation ("J&J") in its Corporate Communications department.  My current position is Vice President, Corporate Media Relations.  I have held this position since March 2006.  Prior to that, I was Executive Director, Corporate Communications, which position I held for approximately ten years.  One of my responsibilities in these positions at J&J was to communicate with the news media.

2.      On or about January 20, 2006, I was contacted via e-mail by Avram Goldstein, a reporter from Bloomberg News service.  Mr. Goldstein said "I'm working on a story about your lobbying effort on Wall Street and how JNJ is reaching out to analysts and shareholders to sow doubts about Boston Scientific.  Can we discuss?"  I wrote back to Mr.

Goldstein declining to comment. I did not discuss J&J's patents with Mr. Goldstein, or provide any information to Mr. Goldstein about J&J's patents.

3.    Mr. Goldstein wrote an article that was published in the *International Herald Tribune* on January 23, 2006, entitled "J&J works to discredit rival offer for Guidant." This article is attached to Abbott's Complaint as Exhibit F. The article correctly states that I "declined to comment." Mr. Goldstein, however, never asked me to comment on the statements made later in the article after the reference to my name, including the statements that Boston Scientific was "tempting patent litigation" or that J&J "was considering filing patent infringement lawsuits." So far as I am aware, I was the only J&J employee contacted by Mr. Goldstein with respect to this article.

4.    I had no communications with either Lawrence Biegelsen of Prudential or Jan David Wald of A.G. Edwards about J&J's patents or any other issues surrounding the takeover battle between J&J and Boston Scientific for Guidant. Communications with financial analysts are typically handled by J&J's Investor Relations group, not the Corporate Communications group. To my knowledge, no one in J&J's Corporate Communications group spoke with Biegelsen or Wald about these issues.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2006.

Jeffrey Leebaw

2

# EXHIBIT Q

(C) Applications for reissues, particularly those involved in stayed litigation (37 CFR 1.176).

(D) Applications remanded by an appellate tribunal for further action.

(E) An application, once taken up for action by an examiner according to its effective filing date, should be treated as special by an examiner, art unit or Technology Center to which it may subsequently be transferred; exemplary situations include new cases transferred as the result of a telephone election and cases transferred as the result of a timely reply to any official action.

(F) Applications which appear to interfere with other applications previously considered and found to be allowable, or which will be placed in interference with an unexpired patent or patents.

(G) Applications ready for allowance, or ready for allowance except as to formal matters.

(H) Applications which are in condition for final rejection.

(I) Applications pending more than 5 years, including those which, by relation to a prior United States application, have an effective pendency of more than 5 years. See MPEP § 707.02.

(J) Reexamination proceedings, MPEP § 2261 >and § 2661<.

See also MPEP § 714.13, § 1207 and § 1309.

# 708.02    Petition To Make Special  [R-3]

*37 CFR 1.102.  Advancement of examination.*

(a)  Applications will not be advanced out of turn for examination or for further action except as provided by this part, or upon order of the Director to expedite the business of the Office, or upon filing of a request under paragraph (b) of this section or upon filing a petition under paragraphs (c) or (d) of this section with a showing which, in the opinion of the Director, will justify so advancing it.<

(b)  Applications wherein the inventions are deemed of peculiar importance to some branch of the public service and the head of some department of the Government requests immediate action for that reason, may be advanced for examination.

**>

(c)  A petition to make an application special may be filed without a fee if the basis for the petition is:

(1)  The applicant's age or health; or

(2)  That the invention will materially:

(i)  Enhance the quality of the environment;

(ii)  Contribute to the development or conservation of energy resources; or

(iii) Contribute to countering terrorism.<

(d)  A petition to make an application special on grounds other than those referred to in paragraph (c) of this section must be accompanied by the fee set forth in § 1.17(h).

New applications ordinarily are taken up for examination in the order of their effective United States filing dates. Certain exceptions are made by way of petitions to make special, which may be granted under the conditions set forth below.>Any statement in support of a petition to make special must be based on a good faith belief that the invention in fact qualifies for special status. See 37 CFR 1.56 and 10.18.<

## I.    MANUFACTURE

An application may be made special on the ground of prospective manufacture upon the filing of a petition accompanied by the fee under 37 CFR 1.17(h) and a statement by the applicant, assignee or an attorney/agent registered to practice before the Office alleging:

(A) The possession by the prospective manufacturer of sufficient presently available capital (stating approximately the amount) and facilities (stating briefly the nature thereof) to manufacture the invention in quantity or that sufficient capital and facilities will be made available if a patent is granted;

If the prospective manufacturer is an individual, there must be a corroborating statement from some responsible party, as for example, an officer of a bank, showing that said individual has the required available capital to manufacture;

(B) That the prospective manufacturer will not manufacture, or will not increase present manufacture, unless certain that the patent will be granted;

(C) That the prospective manufacturer obligates himself, herself or itself, to manufacture the invention, in the United States or its possessions, in quantity immediately upon the allowance of claims or issuance of a patent which will protect the investment of capital and facilities; and

(D) That the applicant or assignee has made or caused to be made a careful and thorough search of the prior art, or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

## II.  INFRINGEMENT

Subject to a requirement for a further showing as may be necessitated by the facts of a particular case, an application may be made special because of actual infringement (but not for prospective infringement) upon payment of the fee under 37 CFR 1.17(h) and the filing of a petition accompanied by a statement by the applicant, assignee, or an attorney/agent registered to practice before the Office alleging:

(A) That there is an infringing device or product actually on the market or method in use;

(B) That a rigid comparison of the alleged infringing device, product, or method with the claims of the application has been made, and that, in his or her opinion, some of the claims are unquestionably infringed; and

(C) That he or she has made or caused to be made a careful and thorough search of the prior art or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

Models or specimens of the infringing product or that of the application should not be submitted unless requested.

## III.  APPLICANT'S HEALTH

An application may be made special upon a petition by applicant accompanied by any evidence showing that the state of health of the applicant is such that he or she might not be available to assist in the prosecution of the application if it were to run its normal course, such as a doctor's certificate or other medical certificate. No fee is required for such a petition. See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## IV.  APPLICANT'S AGE

An application may be made special upon filing a petition including any evidence showing that the applicant is 65 years of age, or more, such as a birth certificate or applicant's statement. No fee is required with such a petition. See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## V.  ENVIRONMENTAL QUALITY

The U.S. Patent and Trademark Office will accord "special" status to all patent applications for inventions which materially enhance the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements, i.e., air, water, and soil.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially enhances the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements.< No fee is required for such a petition. See 37 CFR 1.102(c). >If the application disclosure is not clear on its face that the claimed invention materially enhances the quality of the environment by contributing to the restoration or maintenance of one of the basic life-sustaining natural elements, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially enhance the quality of the environment. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may enhance the quality of the environment.<

## VI.  ENERGY

The U.S. Patent and Trademark Office will, on petition, accord "special" status to all patent applications for inventions which materially contribute to (A) the discovery or development of energy resources, or (B) the more efficient utilization and conservation of energy resources. Examples of inventions in category (A) would be developments in fossil fuels (natural gas, coal, and petroleum), hydrogen fuel technologies, nuclear energy, solar energy, etc. Category (B) would include inventions relating to the reduction of energy consumption in combustion systems, industrial equipment, household appliances, etc.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to category (A) or (B) set forth above.< No fee is required for such a petition,  37 CFR 1.102(c).>If the application disclosure is not clear on its face that the claimed invention materially contributes to category (A) or (B), the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially contribute to category (A) or (B). Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to category (A) or (B).<

## VII.  INVENTIONS RELATING TO RECOMBINANT DNA

In recent years revolutionary genetic research has been conducted involving recombinant deoxyribonucleic acid ("recombinant DNA"). Recombinant DNA research appears to have extraordinary potential benefit for mankind. It has been suggested, for example, that research in this field might lead to ways of controlling or treating cancer and hereditary defects. The technology also has possible applications in agriculture and industry. It has been likened in importance to the discovery of nuclear fission and fusion. At the same time, concern has been expressed over the safety of this type of research. The National Institutes of Health (NIH) has released guidelines for the conduct of research concerning recombinant DNA. These "Guidelines for Research Involving Recombination DNA Molecules," were published in the *Federal Register* of July 7, 1976, 41 FR 27902-27943. NIH is sponsoring experimental work to identify possible hazards and safety practices and procedures.

In view of the exceptional importance of recombinant DNA and the desirability of prompt disclosure of developments in the field, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to safety of research in the field of recombinant DNA. Upon appropriate petition and payment of the fee under 37 CFR 1.17(h), the Office will make special patent applications for inventions relating to safety of research in the field of recombinant DNA. Petitions for special status should be accompanied by statements under 37 CFR 1.102 by the applicant, assignee, or statements by an attorney/agent registered to practice before the Office explaining the relationship of the invention to safety of research in the field of recombinant DNA research. The fee set forth under 37 CFR 1.17(h) must also be paid.

## VIII. SPECIAL EXAMINING PROCEDURE FOR CERTAIN NEW APPLICATIONS — ACCELERATED EXAMINATION

A new application (one which has not received any examination by the examiner) may be granted special status provided that applicant (and this term includes applicant's attorney or agent) complies with each of the following items:

(A) Submits a petition to make special accompanied by the fee set forth in 37 CFR 1.17(h);

(B) Presents all claims directed to a single invention, or if the Office determines that all the claims presented are not obviously directed to a single invention, will make an election without traverse as a prerequisite to the grant of special status.

The election may be made by applicant at the time of filing the petition for special status. Should applicant fail to include an election with the original papers or petition and the Office determines that a requirement should be made, the established telephone restriction practice will be followed.

If otherwise proper, examination on the merits will proceed on claims drawn to the elected invention.

If applicant refuses to make an election without traverse, the application will not be further examined at that time. The petition will be denied on the ground that the claims are not directed to a single invention, and the application will await action in its regular turn.

Divisional applications directed to the nonelected inventions will not automatically be given special status based on papers filed with the petition in the parent application. Each such application must meet on its own all requirements for the new special status;

(C) Submits a statement(s) that a pre-examination search was made, listing the field of search by class and subclass, publication, Chemical Abstracts, foreign patents, etc. The pre-examination search must be directed to the invention as claimed in the application for which special status is requested. A search made by a foreign patent office satisfies this requirement if the claims in the corresponding foreign application are of the same or similar scope to the claims in the U.S. application for which special status is requested;

(D) Submits one copy each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record; and

(E) Submits a detailed discussion of the references, which discussion points out, with the particularity required by 37 CFR 1.111 (b) and (c), how the claimed subject matter is patentable over the references.

In those instances where the request for this special status does not meet all the prerequisites set forth above, applicant will be notified and the defects in the request will be stated. The application will remain in the status of a new application awaiting action in its regular turn. In those instances where a request is defective in one or more respects, applicant will be given *one* opportunity to perfect the request in a renewed petition to make special. If perfected, the request will then be granted. If not perfected in the first renewed petition, any additional renewed petitions to make special may or may not be considered at the discretion of the Technology Center (TC) Special Program Examiner.

Once a request has been granted, prosecution will proceed according to the procedure set forth below;

there is no provision for "withdrawal" from this special status.

The special examining procedure of VIII (accelerated examination) involves the following procedures:

(A) The new application, having been granted special status as a result of compliance with the requirements set out above will be taken up by the examiner before all other categories of applications except those clearly in condition for allowance and those with set time limits, such as examiner's answers, etc., and will be given a complete first action which will include *all* essential matters of merit as to all claims. The examiner's search will be restricted to the *subject matter encompassed by the claims*. A first action rejection will set a 3-month shortened period for reply.

(B) During the 3-month period for reply, applicant is encouraged to arrange for an interview with the examiner in order to resolve, with finality, as many issues as possible. In order to afford the examiner time for reflective consideration before the interview, applicant or his or her representative should cause to be placed in the hands of the examiner at least one working day prior to the interview, a copy (clearly denoted as such) of the amendment that he or she proposes to file in response to the examiner's action. Such a paper will not become a part of the file, but will form a basis for discussion at the interview.

(C) Subsequent to the interview, or responsive to the examiner's first action if no interview was had, applicant will file the "record" reply. The reply at this stage, to be proper, must be restricted to the rejections, objections, and requirements made. Any amendment which would require broadening the search field will be treated as an improper reply.

(D) The examiner will, within 1 month from the date of receipt of applicant's formal reply, take up the application for final disposition. This disposition will constitute either a final action which terminates with the setting of a 3-month period for reply, or a notice of allowance. The examiner's reply to any amendment submitted after final rejection should be prompt and by way of form PTOL-303, by passing the application to issue, or by an examiner's answer should applicant choose to file an appeal brief at this time. The use of these forms is not intended to open the door to further prosecution. Of course, where relatively minor issues

or deficiencies might be easily resolved, the examiner may use the telephone to inform the applicant of such.

(E) A personal interview after a final Office action will not be permitted unless requested by the examiner. However, telephonic interviews will be permitted where appropriate for the purpose of correcting any minor outstanding matters.

After allowance, these applications are given top priority for printing. See MPEP § 1309.

## IX. SPECIAL STATUS FOR PATENT APPLICATIONS RELATING TO SUPERCONDUCTIVITY

In accordance with the President's mandate directing the U.S. Patent and Trademark Office to accelerate the processing of patent applications and adjudication of disputes involving superconductivity technologies when requested by the applicant to do so, the U.S. Patent and Trademark Office will, on request, accord "special" status to all patent applications for inventions involving superconductivity materials. Examples of such inventions would include those directed to superconductive materials themselves as well as to their manufacture and application. In order that the U.S. Patent and Trademark Office may implement this procedure, we invite all applicants desiring to participate in this program to request that their applications be accorded "special" status. Such requests should be accompanied by a statement under 37 CFR 1.102 that the invention involves superconductive materials. No fee is required.

## X. INVENTIONS RELATING TO HIV/AIDS AND CANCER

In view of the importance of developing treatments and cures for HIV/AIDS and cancer and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to HIV/AIDS and cancer.

Applicants who desire that an application relating to HIV/AIDS or cancer be made special should file a petition and the fee under 37 CFR 1.17(h) requesting the U.S. Patent and Trademark Office to make the application special. The petition for special status should be accompanied by a statement explaining how the invention contributes to the diagnosis, treatment or prevention of HIV/AIDS or cancer.

## XI. INVENTIONS FOR COUNTERING TERRORISM

In view of the importance of developing technologies for countering terrorism and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications **>for inventions which materially contribute to countering terrorism<.

International terrorism as defined in 18 U.S.C. 2331 includes "activities that - (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; [and] (B) appear to be intended - (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping..." The types of technology for countering terrorism could include, but are not limited to, systems for detecting/identifying explosives, aircraft sensors/security systems, and vehicular barricades/disabling systems.

**>All applicants desiring to participate in this program should petition that their applications be accorded special status. The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to countering terrorism. No fee is required for such a petition. See 37 CFR 1.102(c). If the application disclosure is not clear on its face that the claimed invention is materially directed to countering terrorism, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the invention materiality contributes to countering terrorism. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could counter terrorism. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to countering terrorism.<

## XII. SPECIAL STATUS FOR APPLICATIONS RELATING TO BIOTECHNOLOGY FILED BY APPLICANTS WHO ARE SMALL ENTITIES

Applicants who are small entities may request that their biotechnology applications be granted "special" status. Applicant must file a petition with the petition fee under 37 CFR 1.17(h) requesting the special status and must:

(A) state that small entity status has been established or include a statement establishing small entity status;

(B) state that the subject of the patent application is a major asset of the small entity; and

(C) state that the development of the technology will be significantly impaired if examination of the patent application is delayed, including an explanation of the basis for making the statement.

### FORMAL REQUIREMENTS OF PETITION TO MAKE SPECIAL

Any petition to make special should:

(A) be in writing; and

(B) identify the application by application number and filing date.

### HANDLING OF PETITIONS TO MAKE SPECIAL

Applications which have been made special will be advanced out of turn for examination and will continue to be treated as special throughout the entire prosecution in the Office.

Each petition to make special, regardless of the ground upon which the petition is based and the nature of the decision, is made of record in the application file, together with the decision thereon. The part of the Office that rules on a petition is responsible for properly entering that petition and the resulting decision in the file record. The petition, with any attached papers and supporting affidavits, will be given a single paper number and so entered in the "Contents" of the file. The decision will be accorded a separate paper number and similarly entered. To ensure entries in the "Contents" in proper order, the technical support staff in the TC will make certain that all papers prior to a petition have been entered and/or

listed in the application file before forwarding it for consideration of the petition. Note MPEP § 1002.02 (s). For Image File Wrapper (IFW) processing, see IFW Manual.

Petitions to make special are decided by the Special Program Examiner of the TC to which the application is assigned.

## 708.03    Examiner Tenders Resignation [R-2]

Whenever an examiner tenders his or her resignation, the supervisory patent examiner should see that the remaining time as far as possible is used in winding up the old complicated cases or those with involved records and getting as many of his or her amended cases as possible ready for final disposition.

If the examiner has considerable experience in his or her particular art, it is also advantageous to the Office if he or she indicates (in pencil) in the file wrappers of application in his or her docket, the field of search or other pertinent data that he or she considers appropriate. >For Image File Wrapper (IFW) processing, see IFW Manual.<

## 709    Suspension of Action [R-3]

*37 CFR 1.103. Suspension of action by the Office.*

(a) *Suspension for cause.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph for good and sufficient cause. The Office will not suspend action if a reply by applicant to an Office action is outstanding. Any petition for suspension of action under this paragraph must specify a period of suspension not exceeding six months. Any petition for suspension of action under this paragraph must also include:

(1) A showing of good and sufficient cause for suspension of action; and

**\*>

(2) The fee set forth in § 1.17(g), unless such cause is the fault of the Office.<

(b) *Limited suspension of action in a continued prosecution application (CPA) filed under § 1.53(d).* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph in a continued prosecution application filed under § 1.53(d) for a period not exceeding three months. Any request for suspension of action under this paragraph must be filed with the request for an application filed under § 1.53(d), specify the period of suspension, and include the processing fee set forth in § 1.17(i).

(c) *Limited suspension of action after a request for continued application (RCE) under § 1.114.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph after the filing of a request for continued examina-