IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | **REDACTED** **PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 06-613-SLR |
| JOHNSON and JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) ) | |
| Defendants. | ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmagure@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-2202

Dated: June 14, 2007
181566.1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................3

I.      THE "CIRCUMSTANCES" CIRCA SEPTEMBER 2006.................................................3

II.     THE "CIRCUMSTANCES" CIRCA JUNE 2007 ...............................................................4

ARGUMENT .....................................................................................................................7

I.      THERE WAS NEVER AN "ACTUAL CONTROVERSY" BETWEEN THESE
        PARTIES ON THE UNASSERTED PATENTS ................................................................7

II.     ABBOTT HAS NOT ESTABLISHED IT SUFFERED INJURY-IN-FACT AS OF
        SEPTEMBER 2006, WHEN IT FILED THIS SUIT.........................................................11

III.    THE STATEMENTS MADE TO AND BY ANALYSTS, MEDIA, AND GUIDANT DO
        NOT PROVIDE A BASIS FOR EXERCISING SUBJECT MATTER JURISDICTION....14

        A.      The "Script" Related To All Aspects Of J&J's Offer For Guidant ............................14

        B.      J&J's Statements On The Patents-In-Suit Were Made In The Context of
                Discussing FTC Approval For An Acquisition Of Guidant ........................................16

        C.      J&J's Statements To Guidant Were Not Accusations Of Infringement Or Threats
                of Litigation ..............................................................................................................17

        D.      Analyst Notes Included The Author's Opinion and Speculation ...............................17

        E.      Abbott Fabricates Exchanges Between J&J and Reporters ........................................18

CONCLUSION.....................................................................................................................19

## TABLE OF AUTHORITIES

### Cases

*AngioDynamics, Inc. v. Diomed Holdings, Inc.*, No. 06-02-GMS, 2006 WL 2583107 (D. Del. Sept. 7, 2006) ................................................................................13

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731 (Fed. Cir. 1988) ..................3

*Champion International, Inc. v. Technology Development Corp.*, No. 2-92-0001, 1992 WL 315200 (S.D. Ohio June 30, 1992) ........................................................9

*Cosden Oil & Chemical Co. v. Foster Grant Co., Inc.*, 432 F. Supp. 956 (D. Del. 1977) ..............9

*GAF Building Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479 (Fed. Cir. 1996) ...................3

*Kos Pharms., Inc. v. Barr Laboratories, Inc.*, 242 F. Supp. 2d 311 (S.D.N.Y. 2003) ...................9

*Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) ................................2, 3, 12

*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007).........................................2, 3, 12

*Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152 (Fed. Cir. 2006) ................................8

*Quad Environmental Techs. Corp. v. Union Sanitary District*, 946 F.2d 870 (Fed. Cir. 1991) ................................................................................10

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992)....................................................3, 13

*SmithKline Beecham Corp. v. Zenith Goldline Pharms., Inc.*, No. 00-CV-1393, 2000 WL 963165 (E.D. Pa. June 28, 2000) ........................................................9

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330 (Fed. Cir. 2007)....3, 8, 11, 12

*Torpharm, Inc. v. Pfizer, Inc.*, No. 03-990-SLR, 2004 WL 1465756 (D. Del. June 28, 2004), *vacated as moot*, 125 Fed. Appx. 987 (Fed. Cir. 2005)................................14

*U.N.X. v. Chemtron, Inc.*, No. 95-CV-00074, 1995 U.S. Dist. LEXIS 12008 (M.D.N.C. June 13, 1995)................................................................................9

*Ventana Medical System, Inc. v. Biogenex Laboratories, Inc.*, 473 F.3d 1173 (Fed. Cir. 2006) ................................................................................10

## INTRODUCTION

*Today*, Cordis and Abbott clearly are parties to a substantial controversy. But that was not the case when Abbott Laboratories and Abbott Cardiovascular Systems, Inc. (collectively "Abbott" or "Plaintiffs") filed this lawsuit against Cordis Corporation ("Cordis") and Johnson & Johnson (collectively "J&J" or "Defendants") in September 2006. And it was not the case *until* Cordis filed separate lawsuits on patents that issued May 15, May 27, and June 12 of 2007 (the "Cordis-Asserted Patents").[1] Abbott all but admits what now is plain: this suit was initiated not because of the existence of an actual controversy on the patents-in-suit in September 2006, but because Abbott anticipated the existence of an actual controversy on *other* patents, at a later date, and decided to try to preempt Cordis' choice of forum and force Cordis to enforce its patent rights in a venue of *Abbott's* choosing.

When it filed its declaratory judgment action last September, Abbott undeniably knew that applications pending in the Patent and Trademark Office were believed (by Cordis) to contain claims that covered Abbott's XIENCE V drug-eluting stent. Abbott likewise knew that it could not initiate litigation on a patent *application* – that it would have to wait for a patent to issue before it could sue. But Abbott wanted to select the forum for that eventual fight, so it filed suit on existing patents that Cordis and Johnson & Johnson have never asserted and never threatened to assert (the "Unasserted Patents"),[2] simply because those patents were members of the same patent families as the applications that eventually resulted in the issuance of the Cordis-Asserted Patents.

---

[1] The Cordis-Asserted Patents are United States Patent Nos. 7,217,286 (the "7286 patent"), 7,223,286 (the "3286 patent"), and 7,229,473 (the " '473 patent"). These have not been asserted in this action.

[2] The patents-in-suit are United States Patent Nos. 6,585,764; 6,808,536; and 6,776,796, also described here as the "Unasserted Patents."

Abbott suggests this Court can exercise jurisdiction here because the Supreme Court's decision in *MedImmune* lowered the bar for plaintiffs seeking to maintain declaratory judgment actions in patent cases. While that proposition itself is debatable, certainly *MedImmune* did not set the bar so low that the "circumstances" present in *this* case are sufficient to establish that a justiciable controversy existed when Abbott filed suit in September 2006. "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy ... of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764, 771 (2007) (*citing Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (emphasis added). However, there was no substantial, immediate, real controversy when this suit was filed in September 2006. The "real" controversy was not yet ripe, and ultimately would depend entirely on the issuance of then-immature patent claims that Cordis believed would be infringed by the XIENCE V product. When this suit was filed, there was no basis for the Court to exercise subject matter jurisdiction. The argument that statements made in connection with the J&J-Boston Scientific Corporation takeover contest for Guidant placed Abbott under the cloud of a threat of litigation is simply a contrivance of Abbott's litigation strategy. This motion should be granted and the parties left to litigate the Cordis-Asserted Patents in the District of New Jersey, where Cordis filed lawsuits just after midnight on the dates the Cordis-Asserted Patents issued.[3]

---

[3] In the course of responding to Abbott's motions for leave to file a supplemental complaint, and its motions to enjoin Cordis from prosecuting later-filed parallel litigation in New Jersey, filed both in this case and in a separate action filed by Abbott (C.A. No. 07-259-SLR), Cordis is briefing the contested issue of whether Cordis' New Jersey cases were the first-filed cases to assert the Cordis-Asserted Patents. Before it can reach and decide those motions, the Court first needs to determine whether it has subject matter jurisdiction over this case. Obviously, the other motions are rendered moot if the Court grants this motion to dismiss. (*See* D.I. 58 at 6-7 & 14.)

# BACKGROUND

## I.     THE "CIRCUMSTANCES" CIRCA SEPTEMBER 2006

Abbott has the burden to establish that jurisdiction existed over its original claims for declaratory judgment as of the time it filed its complaint — September 29, 2006. *See Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992) (noting that plaintiff has the burden to establish jurisdiction); *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 482 (Fed. Cir. 1996) ("justiciability must be judged as of the time of filing"); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734 n. 2 (Fed. Cir. 1988) ("The presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed."). To prove the existence of a justiciable controversy, Abbott must satisfy the requirements of Article III of the U.S. Constitution. *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1337 (Fed. Cir. 2007) (citing *MedImmune*, 127 S.Ct. at 771). Therefore, Abbott must establish injury-in-fact (standing) and that the issue presented to the court is ripe (ripeness). *Id.* Abbott must establish that "the facts alleged, under *all* the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient *immediacy* and *reality* to warrant the issuance of a declaratory judgment." *See MedImmune*, 127 S. Ct. at 771 (*citing Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (emphasis added); *Teva*, 482 F.3d at 1337.

As more fully explained in Defendants' amended opening memorandum (D.I. 41), the "circumstances" surrounding Abbott's action do not support a finding of a justiciable controversy: (1) J&J did not file a claim against Abbott on any of the patents-in-suit and has never threatened to do so; (2) J&J has not accused any Abbott product of actually infringing the patents-in-suit; (3) more than eight months *before* Abbott filed suit, J&J investor relations representatives made statements to representatives at Guidant Corporation ("Guidant") and a few

financial analysts concerning J&J's drug-eluting stent patents in the context of advocating the superiority of J&J's bid in a then-ongoing corporate takeover contest for Guidant between J&J and Boston Scientific Corporation ("Boston Scientific"); (4) J&J filed papers in the United States Patent and Trademark Office ("PTO") seeking to accelerate the review of several pending patent applications (none of which was for the patents-in-suit), and in connection with those papers asserted that Abbott's drug-eluting stent XIENCE V was infringing claims being prosecuted in *those* applications – all at a time it elected not to assert the patents-in-suit.[4]

Statements like those made by J&J in the course of the bidding war for Guidant, expressing a belief in the strength of its IP position, simply are not accusations of infringement or threats of litigation giving rise to a justiciable controversy. (*See id.* at 20 & n64.) Furthermore, J&J's statements were made in the context of its advocacy that J&J's bid for Guidant was superior to Boston Scientific's bid, not as part of some "campaign" to threaten patent litigation. (*See id.* at 20.) As to the statements that were not made by J&J, the opinions and speculation of third parties as to the potential for J&J to sue Abbott or Guidant on these patents plainly cannot be attributed to J&J for the purposes of establishing an actual controversy. (*See id.* at 20-21 & n.65.) Finally, J&J's statements in support of its prosecution of pending patent applications — none of which was for the patents-in-suit — cannot be transformed into assertions by J&J concerning the patents-in-suit. (*See id.* at 21.)

## II.    THE "CIRCUMSTANCES" CIRCA JUNE 2007

Not until seven months *after* Abbott filed its original complaint, did the true controversy between the parties come into being. The controversy involves the Cordis-Asserted

---

[4] Notably, Abbott has now apparently dropped one of the circumstances it cited in its complaint as a basis for the existence of an "actual controversy." Abbott previously alleged that a justiciable controversy between the parties as to the patents-in-suit existed by virtue of non-patent litigation between the parties relating to the takeover battle for Guidant. (*See* D.I. 1 ¶¶ 48-49.) But Abbott says nothing about this other litigation in its response.

4

Patents and began with respect to each patent just after midnight on the day it issued. On the

same day each of the Cordis-Asserted Patents issued, Cordis filed suit against Abbott within

minutes past midnight. (*See* D.I. 58 Ex. 1, Raffield Decl. ¶¶ 7, 15, & 21) On May 15, 2007,

more than eight hours after Cordis filed suit in New Jersey on the 7286 patent, Abbott filed a

mirror-image case in Delaware.[5] (*See* D.I. 48 Ex. 9, Complaint.) Abbott also filed a motion in

its original Delaware case (*i.e.*, this case — C.A. No. 06-613-SLR) seeking to supplement its

complaint to add a claim on the 7286 patent or to consolidate this case with its new complaint on

the 7286 patent (then not-yet-filed).[6] On May 29, 2007, after Cordis filed its New Jersey action

on the 3286 patent, Abbott filed motions in this case and in its case on the 7286 patent, seeking

in each case to add a claim on the newly issued patent. (*See* D.I. 58 Exs. 2 & 3, 5/29/07

Delaware Notices of Electronic Filing.) On June 12, 2007, after Cordis filed its New Jersey

action on the '473 patent, Abbott again filed motions in both of its Delaware cases, seeking in

each case to add a claim on the newly issued patent. (*See* D.I. 58 Exs. 4 & 5, 6/12/07 Delaware

Notices of Electronic Filing.) A chart detailing the chronology of events relating to the Cordis-

Asserted Patents is attached as Exhibit 6 to Defendants' combined response to Abbott's motions

for leave to file a supplemental complaint and motions to enjoin (D.I. 58).

   In support of its motion to enjoin Cordis' action in New Jersey, Abbott contends

that Cordis' New Jersey complaint was not filed until 11:07 a.m. on May 15, 2007, after Abbott

filed its complaint in Delaware. (*See* D.I. 48 at 7-8.) In support of its argument, Abbott relies on

a Notice of Electronic Filing from the New Jersey court which was sent at 11:07 a.m. (*See id.*)

---

[5] The case is captioned *Abbott Laboratories et al. v. Johnson and Johnson and Cordis Corp.*, C.A. No. 07-259-SLR.

[6] Abbott filed its motion for leave to supplement or, alternatively, to consolidate on May 15 at 12:01 a.m., but it did not file the new complaint in C.A. No. 07-259 until 8:35 a.m. (*See* D.I. 48 Ex. 8, 5/15/07 Delaware Notice Of Electronic Filing.)

But Abbott's argument goes nowhere.  To remove any doubt regarding the time Cordis filed its

New Jersey complaints on the 7286 patent and the other Cordis-Asserted Patents, Cordis has

submitted the Declaration of Gale Raffield, the legal assistant at Cordis' New Jersey counsel's

office who did the filings on each of the dates the patents issued.  As explained more fully in her

declaration, on May 15, 2007, at 12:01 a.m., Ms. Raffield electronically filed Cordis' complaint

on the 7286 patent using the New Jersey court's electronic filing system.  (*See* D.I. 58 Ex. 1,

Raffield Decl. ¶ 7.)  A Notice of Electronic Filing was generated and indicates that on

May 15, 2007 at 12:01 a.m. a complaint titled "Cordis Corporation vs. Abbott Laboratories" was

filed along with other documents.  (*See id.* & Ex. A.)  Although the Notice also includes a

reference to May 14, 2007, upon review, the New Jersey court's clerk's office has confirmed that

its records reflect that Cordis' complaint was filed at 12:01 a.m. on May 15, 2007.[7]  (*See id.*,

Ex. B)  The clerk's office assigned Cordis' action case number 07-2265 and sent an email noting

its initial docket entry in the case at 11:07 a.m.  (*See id.*, Ex. C.)

Abbott's counsel has suggested it may contest the filing time for Cordis' complaint

by arguing that a complaint is not filed until the action is assigned a case number and the court

generates an email notice to that effect.  But Abbott's counsel has not cited any support for its

contention in the Federal Rules of Civil Procedure or Local Rules of the New Jersey court.

Therefore, as between the parties' complaints filed on the 7286 patent, Cordis' is first-filed by

more than eight hours.  Clearly, as Ms. Raffield's declaration proves beyond any doubt, the

---

[7]  Similarly, the Notice of Electronic Filing generated after Cordis filed its New Jersey action on the '473 patent on June 12, 2007 at 12:03 a.m. and the email noting the clerk's office's initial docket entry for that case both incorrectly refer to June 11, 2007.  (*See id.* Exs. F & G, respectively.)  However, the New Jersey court's clerk's office has confirmed that its records reflect that Cordis' complaint was filed at 12:03 a.m. on June 12, 2007.  (*See* Ex. 1, Raffield Suppl. Decl. ¶ 4 & Ex. A.)

complaint was filed at 12:01 a.m. — the fact that the clerk's office docketed the complaint after assigning a number later that day does not change that fact.

For good reason, Abbott has not argued that the issuance of the Cordis-Asserted Patents and the parties' ensuing commencement of litigation on *those* patents provides a basis for exercise of jurisdiction over its original complaint. The original complaint was filed, of course, more than seven months *before* those patents issued. But Abbott nonetheless attempts, entirely without basis, to use J&J's *actions and statements* in connection with the prosecution of anticipated but not-yet-issued Cordis-Asserted Patents to somehow support the existence of subject matter jurisdiction over that same original complaint involving different patents.

## ARGUMENT

Abbott's argument that there is an "actual controversy" between the parties with respect to the Unasserted Patents depends on a pointless, excruciating deconstruction of statements made by J&J representatives or outside third parties concerning J&J's patent rights and a sometimes flagrant mischaracterization of the record in the case. Abbott essentially urges the Court to make the novel finding that a charge of anticipated infringement made in the prosecution of a patent application creates an "actual controversy" as to *other*, already issued patents. In its haste to urge this result, Abbott fails to address certain fundamental questions that are critical to this motion. Significantly, Abbott fails to address the important policy issues implicated in its request that courts should entertain preemptive requests for declaratory relief on patents a patentee has decidedly not asserted in order to allow an infringer to seize control of that patentee's right to choose a venue for its claims on *future* controversies on *future* patents. Additionally, Abbott offers no explanation of its eight-month delay in filing a declaratory judgment action — all while it was supposedly under a cloud of a threat of an infringement suit.

## I.    THERE WAS NEVER AN "ACTUAL CONTROVERSY" BETWEEN THESE PARTIES ON THE UNASSERTED PATENTS

Abbott is asking this Court to make the novel finding that statements made during prosecution of pending patent applications create an "actual controversy" with respect to *other*, already issued patents in the same family that a patentee has not asserted or threatened to assert. Specifically, Abbott argues that a justiciable controversy on the already existing Unasserted Patents was established by virtue of J&J's statements regarding XIENCE V made in petitions to make special filed in then-pending, related patent applications. (*See* D.I. 49 at 35-6.) (To be clear, the petitions that Abbott relies on were *not* filed in applications for the patents-in-suit.) Despite suggesting that there is "well-established precedent" for such a finding (*see id.* at 35), Abbott fails to cite a single case that actually supports this extraordinary contention.

Abbott cites four cases for the proposition that an "infringement claim" on one patent gives rise to a justiciable controversy on related patents. (*See id.* at 35 & n.5.) However, none of these cases is applicable to the present case. In all of these cases, the original "infringement claim" came in the form of an actual *lawsuit* for patent infringement filed first against a declaratory judgment claimant who *then* filed counterclaims or a second lawsuit seeking declaratory relief on related patents. The courts in those cases found that the initial patent infringement *litigation* between the parties was a factor supporting a finding of an actual controversy with respect to the later-filed declaratory judgment claims or counterclaims on related patents. *See Teva*, 482 F.3d at 1340 (finding that an actual controversy exists on the other patents listed in the Orange Book after the patentee sued for patent infringement on one of the listed patents); *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1159 (Fed. Cir. 2006) (finding that an actual controversy existed because, among other things, the patentee had previously filed a patent infringement lawsuit against the declaratory judgment plaintiff on a

related patent); *Kos Pharms., Inc. v. Barr Labs., Inc.*, 242 F. Supp. 2d 311, 314 (S.D.N.Y. 2003)

(factor supporting existence of actual controversy over counterclaims for declaratory judgment

was the original patent infringement lawsuit on related patents); *SmithKline Beecham Corp. v.*

*Zenith Goldline Pharms., Inc.*, No. 00-CV-1393, 2000 WL 963165, at *2 (E.D. Pa.

June 28, 2000) (same).  Those circumstances are not present in this case.  It is undisputed that at

the time Abbott filed its complaint, Defendants had not filed any lawsuits against XIENCE V or

any other Abbott product on the patents-in-suit or related patents.

The other cases Abbott relies on are equally inapplicable.  Abbott cites three

additional cases purportedly for the proposition that a claim of infringement made in a statement

to the PTO while prosecuting a patent application gives rise to an actual controversy on *other*,

related patents.  (*See* D.I. 49 at 35.)  But the cases Abbott cites plainly do not stand for that

proposition.  In those cases, the courts found that a statement of infringement made during

prosecution of a patent application was a *factor* supporting a finding of an actual controversy *as*

*to that same patent.  See U.N.X. v. Chemtron, Inc.*, No. 95-CV-00074, 1995 U.S. Dist. LEXIS

12008, at *8 (M.D.N.C. June 13, 1995) (finding charges of infringement in the file history for the

patent-in-suit as relevant to jurisdictional inquiry regarding that patent); *Champion Int'l., Inc. v.*

*Technology Dev. Corp.*, No. 2-92-0001, 1992 WL 315200, at *2 (S.D. Ohio June 30, 1992)

(finding statements made in petition to make special filed in support of application for patent-in-

suit as one of the facts establishing existence of an actual controversy on that patent); *Cosden Oil*

*& Chem. Co. v. Foster Grant Co., Inc.*, 432 F. Supp. 956, 959 (D. Del. 1977) (finding statements

made in file wrapper for patent-in-suit supported finding of an actual controversy on that patent).

In contrast, in this case, the petitions to make special Abbott relies on were *not* made during

prosecution of any of the patents-in-suit.  Indeed, the latest of the patents-in-suit issued in

October 2004, and the petitions Abbott cites were filed with the PTO in August 2006 in support of *then-pending* patent applications.

Abbott attempts to avoid this fact by arguing that an infringement analysis of XIENCE V with respect to pending claims of patent applications equated to an infringement analysis on the Unasserted Patents. As support for its contention, Abbott makes unsubstantiated statements and relies on events that are irrelevant to the jurisdictional inquiry because they occurred *after* Abbott filed its original complaint. First, Abbott states that J&J's prosecuting attorney for those applications, Maurice Valla, "testified that his infringement analysis filed in support of the petitions directly applies to the claims of the [patents-in-suit]." (*See* D.I. 49 at 28-29.) However, Abbott does not cite to any such testimony by Mr. Valla. (*See id.*) Second, Abbott cites statements made by the PTO in Office Actions for the patent applications several months *after* Abbott filed this action.[8] (*See id.* at 7-8.) Third, Abbott cites to terminal disclaimers Cordis filed in response to some of these Office Actions. (*See id.* at 7 & Exs. 21-23.) Not only are these terminal disclaimers irrelevant to the jurisdictional analysis because they were filed months *after* Abbott filed this action, the act of filing a terminal disclaimer simply does not support Abbott's inference of equality between the related applications and the Unasserted Patents. *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1184 n.4 (Fed. Cir. 2006) (rejecting argument that a terminal disclaimer represents an admission equating all of the claims of the application to all of the claims of the referenced patent); *Quad Envtl. Techs. Corp.*

---

[8]  Moreover, even if these Office Actions were relevant to this analysis, Abbott omits key statements made by the PTO in these communications. In these Office Actions, the PTO issued "nonstatutory obviousness-type double patenting rejections" on the claims of the applications due to claims sought in other pending applications and/or claims in one or more of the Unasserted Patents. In doing so, the PTO made clear that the conflicting claims between the applications and the identified Unasserted Patents "are *not* identical." (*See id.* Ex. 9 at ABT008787; Ex. 10 at ABT007924; Ex. 11 at ABT008519; Ex. 12 at ABT006807 & ABT006810; Ex. 13 at ABT007208 & ABT007211; Ex. 14 at ABT008987 & ABT008990-91.) (emphasis added).

*v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991) ("the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection."); *see also* D.I. 49 Ex. 27, Valla Dep. at 68:18-24.

    Not only is there no precedent for Abbott's contention that statements made to the PTO in prosecution of a patent application give rise to an actual controversy on related patents, interests of public policy and preserving scarce judicial resources discourage such a finding. As previously explained in Defendants' amended opening memorandum, to find that statements made in the prosecution of a patent application creates a justiciable controversy over any number of the patents in the same family would open the floodgates to parties seeking advisory opinions on claims that a patentee may never intend to assert, unduly burdening the courts and subjecting a patent holder to unprovoked expensive and resource-consuming litigation. (*See* D.I. 41 at 24-26.) Further, Abbott has all but admitted that its original complaint was filed as a placeholder so that it could attempt to bring its claims on the Cordis-Asserted Patents in Delaware immediately upon issuance of each of those patents. (*See* D.I. 48 at 5.) Abbott's hurried attempts to supplement its complaint in this case with claims on the new patents laid bare the fact that its plan all along was to use its earlier-filed, illegitimate suit as a beachhead from which it could seize control of Cordis' right to choose a forum in which to litigate Cordis' newly issued patent claims. Clearly, such procedural gamesmanship does not serve the purpose and intent of the Declaratory Judgment Act and should not be condoned.

## II. ABBOTT HAS NOT ESTABLISHED IT SUFFERED INJURY-IN-FACT AS OF SEPTEMBER 2006, WHEN IT FILED THIS SUIT

    To prove jurisdiction, Abbott must prove that it had suffered actual or imminent injury-in-fact as of the time it filed its complaint. *See Teva*, 482 F.3d at 1337. Notably, Abbott

devotes only a cursory few lines at the end of its brief to discussion of injury-in-fact. (*See* D.I. 49 at 36.) Abbott claims it has been forced to "endure the coercion of choosing between abandoning the XIENCE V or living under the cloud of" J&J's purported claims of infringement. (*See id.*) But Abbott provides no details on this point.[9]

        Indeed, the circumstances present at the time Abbott filed its complaint belie the notion that Abbott had suffered any actual or imminent injury-in-fact relating to the Unasserted Patents. When Abbott filed its original complaint (September 2006), eight months had passed since J&J's purported vigorous public campaign to assert the patents-in-suit against XIENCE V (January 2006) without Cordis filing a patent infringement lawsuit against XIENCE V on the patents-in-suit or, for that matter, Abbott filing an action for declaratory relief. Abbott dismisses this undisputed fact as irrelevant, arguing that post-*MedImmune*, a plaintiff need not prove a reasonable apprehension of imminent suit. (*See* D.I. 49 at 4.) While *MedImmune* removed that prong of the Federal Circuit's test, it did not remove the requirement of actual or imminent injury-in-fact. *See Teva*, 482 F.3d at 1337. Indeed, under the Supreme Court test, a controversy must be of "*sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *MedImmune*, 127 S.Ct. at 771 (*citing Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270,

---

[9] Abbott's speculative contention that its stock price fell on January 20, 2006 due to J&J's so-called patent threats, thereby causing injury, falls woefully short of establishing the required existence of injury-in-fact. (*See id.* at 36.) Abbott speculates that the issuance of a note by analyst Larry Biegelsen, in which Biegelsen opined that the Guidant board might not approve a Boston Scientific-Abbott bid for Guidant due to patent concerns, drove down its stock price. (*See id.* Ex. 59.) But there was no evidence that the market was reacting to fears that Abbott would be sued for patent infringement – the price move likely was a reaction to the possibility that Boston Scientific (with which Abbott was aligned) would not be the prevailing suitor for Guidant. Moreover, just five days later when Guidant accepted Boston Scientific's bid, Abbott's stock rose in its biggest gain in more than three years. (*See* Ex. 2, January 26, 2006 *Chicago Sun-Times* Article at 1.) This significant run-up of Abbott's stock price immediately followed J&J's so-called vigorous public campaign to assert the patents against Abbott. So the "injury" – if any – seemed to heal quickly. That Abbott would resort to relying on a "stock price fluctuation" argument to establish that J&J's "campaign" to assert its patents caused injury simply highlights the paucity of any *real* evidence of injury.

273 (1941)) (emphasis added).  Abbott's delay in filing suit should cause the Court to doubt that

Abbott had suffered any actual or imminent injury-in-fact and conclude that the "dispute"

between the parties on the patents-in-suit was not "immediate" or "real" as of September 2006.

Abbott attempts to sidestep the implications of its delay by arguing that — based

on the previous Federal Circuit requirement of a reasonable apprehension of imminent suit — it

was required to wait to bring this action until it *subjectively* believed Defendants were on the

brink of suing (which Abbott argues was connected to the launch of XIENCE V).  (*See* D.I. 49 at

4.)  But it is well-established that the previous Federal Circuit test was objective, not subjective.

*See Shell Oil*, 970 F.2d at 888; *AngioDynamics, Inc. v. Diomed Holdings, Inc.*, No. 06-02-GMS,

2006 WL 2583107, at *4 (D. Del. Sept. 7, 2006).  In other words, there was no requirement that

Abbott wait until it had a subjective belief it was about to be sued.[10]  Abbott has not provided

any other explanation for why its delay should not counsel against a finding of an "actual

controversy."

Not only did Abbott delay in filing suit, but it made no extrajudicial attempts to

"clear" the purported cloud during these eight months.  Abbott never contacted J&J regarding

J&J's intentions on the patents-in-suit, nor did it ask J&J for a covenant not to sue on the patents-

---

[10]  The Court should disregard Abbott's statements on its state of mind for the separate reason that
Abbott's statements are in contravention of a March 9, 2007 discovery agreement between the parties
(attached hereto as Exhibit 3).  In this agreement, the parties expressly stipulated that each party would
not rely on "its own state of mind, intent, internal analyses or preparations …in arguing its position on the
motion to dismiss" and, therefore, that the parties would not take discovery on such matters.  (*See id.* at
1.)  Further, each party reserved the right to ask the Court to enforce this expectation and disregard any
reliance by a party on these subjective facts.  (*See id.* at 1-2.)  In reliance on this agreement, Defendants
did not seek discovery on issues of Abbott's state of mind like the one it now relies on as an explanation
for its delay in filing suit.  Therefore, Defendants request that the Court disregard this and any other such
evidence presented by Abbott due to the parties' prior discovery agreement.  The Court should also
disregard the claim that Plaintiffs did not perceive Defendants' statements and action as idle threats and

**REDACTED**

(*See* D.I. 49 at 3, 15.)

in-suit.[11] It was not until Abbott learned of the petitions to make special (and their references to

XIENCE V) that it filed suit the next month on the Unasserted Patents. But, as discussed *supra*,

Abbot has cited no authority for the proposition that statements made during prosecution of a

patent application create an actual controversy on *other*, related patents.

## III.    THE STATEMENTS MADE TO AND BY ANALYSTS, MEDIA, AND GUIDANT DO NOT PROVIDE A BASIS FOR EXERCISING SUBJECT MATTER JURISDICTION

To support its claim of an "actual controversy" on the Unasserted Patents, Abbott

manipulates facts in order to fabricate "evidence" of what it terms as J&J's "vigorous public

campaign" asserting the patents-in-suit against the XIENCE V (*see* D.I. 49 at 2). However, upon

even the slightest inspection, Abbott's claims fold like a house of cards. Abbott egregiously

distorts the facts in constructing its arguments.

### A.    The "Script" Related To All Aspects Of J&J's Offer For Guidant

Abbott would have this Court believe that J&J's attorneys created a script which

had a sole purpose and focus to publicly accuse XIENCE V of infringing the Unasserted Patents.

(*See id.* at 11-12.) What Abbott fails to acknowledge is that J&J had created scripts for use by its

Investor Relations group in communications with the analyst community at several benchmarks

throughout J&J's potential acquisition of Guidant, including in mid-January 2006 when the

bidding war between J&J and Boston Scientific heated up. (*See* Ex. 4, Defendants' First

Supplemental Interrogatory Responses at 5.) And it is common practice for J&J to prepare such

scripts in advance of significant licensing or acquisition transactions. (*Id.*) In this instance in

---

[11] Contrary to Abbott's suggestion otherwise (D.I. 49 at 3), a patentee's silence as to a covenant not to sue does not suggest an intention to sue when, like Abbott, the declaratory judgment claimant has not requested a covenant. *See Torpharm, Inc. v. Pfizer, Inc.*, No. 03-990-SLR, 2004 WL 1465756, at *10 (D. Del. June 28, 2004) (Robinson, C.J.), *vacated as moot*, 125 Fed. Appx. 987 (Fed. Cir. 2005).

mid-January 2006, J&J was discussing publicly its proposed offer for Guidant and the reasons why its bid for Guidant was superior to Boston Scientific's bid. The script discussed issues surrounding acquisition cost, stock exchange ratios, cash flow impact of the merger, and rationale for the acquisition to name just a few. (*See* Ex. 5, Guidant Questions & Answers Revised, Jan. 16, 2006 (in unredacted form).) Indeed, the redacted version of the script Abbott cites (J&J produced numerous unredacted versions to Abbott including the one attached hereto as Ex. 5) is 21 pages long, and yet Abbott has honed in on the few lines that refer to J&J's drug-eluting stent patents. Even the analysts who wrote notes that Abbott relies on as the product of J&J's purported public campaign devote the majority of their attention to aspects of the deal that have nothing to do with J&J's statements on the Unasserted Patents. Not surprisingly, the analysts' notes focus on the companies' stock earnings per share ratios and other financial valuation issues relating to the competing bids. (*See* D.I. 1 Exs. D & E, 1/20/06 Prudential Equity Group Note and 1/23/06 A.G. Edwards Note.) Abbott's characterization of the script as being constructed for the sole purpose of supporting J&J's supposed campaign to assert patents is facially inaccurate and completely lacking in credibility. J&J's efforts at the time were devoted to persuading investors that its bid for Guidant was superior to Boston Scientific's bid, not to conclude that anyone was infringing a patent.[12]

---

[12] But Abbott's distortions relating to the script do not stop here. Abbott makes repeated references to the script has having been prepared and edited by J&J's in-house attorneys. (*See e.g.*, D.I. 49 at 11.) However, in reality the script was drafted by a member of J&J's Investor Relations group, incorporating comments and suggestions from others in the company including counsel identified at the start of the section involving J&J's discussion of its Unasserted Patents. (*See* Ex. 4, Defendants' First Supplemental Interrogatory Responses at 5.) Abbott's unsupported assumptions that various edits to the script were made by J&J's attorneys (*see e.g.*, D.I. 49 at 16) are just that — assumptions and not fact.

**B.     J&J's Statements On The Patents-In-Suit Were Made In The Context Of Discussing FTC Approval For An Acquisition Of Guidant**

Abbott dismisses, in most instances, the context in which J&J's statements regarding the Unasserted Patents were made, but then turns around and relies on this context when it supports Abbott's position. Abbott cannot have it both ways. On the one hand, Abbott claims that J&J either never actually made a connection between its Unasserted Patents and antitrust review for a Guidant acquisition or that in any event, this context is irrelevant. (*See* D.I. 49 at 12-13.) Immediately following this argument, Abbott maintains that J&J drew a direct connection between its Unasserted Patents and FTC review but only in an attempt to bolster J&J's purported charge of infringement against XIENCE V. (*See id.* at 13-14.) Abbott cites absolutely no evidence supporting its convoluted argument.

**REDACTED**

With respect to an analyst note also published during the time of J&J's purported campaign which goes into detailed discussion of J&J's Unasserted Patents and the potential impact on FTC review for a Boston Scientific-Guidant merger, Abbott resorts to discrediting its author (the one analyst of three it mentions whom it did not depose). (*See* D.I. 49 at 21-22.) Abbott discredits Citigroup's Matthew Dodds as being "heavily influenced" by J&J and reporting on the antitrust issue "without any basis" in his January 13, 2006 note. (*See id.*) Yet, elsewhere in its brief, when it suits Abbott's ends, Abbott relies on statements in the same Dodds report. (*See id.* at 18.)

At the time of the bidding war, a J&J-Guidant merger had cleared antitrust review and could have closed immediately had Guidant's board accepted J&J's last offer. The Boston Scientific-Guidant deal was held up for nearly three months before it gained antitrust approval. (*See id.* at 27.) While this advantage to J&J's offer may not have been sufficient to win the bidding war, it certainly was not "nonsensical" for J&J to have raised the prospect of a speedier closing as one factor favoring its bid.[13]

### C.     J&J's Statements To Guidant Were Not Accusations Of Infringement Or Threats Of Litigation

Abbott claims that Louise Mehrotra in J&J Investor Relations "specifically identified the [patents-in-suit] as allegedly infringed by the XIENCE V" to her Guidant counterpart. (*See id.* at 15.) Abbott cites to no documents or testimony for this claim. Indeed the deposition testimony and evidence cited by Abbott elsewhere relating to Ms. Mehrotra's communication with her Guidant counterpart plainly does not support Abbott's claim. Notably, Abbott does not even attempt to argue that the communications between J&J's Corporate Communications group and Guidant constituted an accusation of infringement or threat of litigation. (*See id.* at 15-16.) All told, Abbott has not cited any statement made by J&J accusing XIENCE V of infringing the Unasserted Patents or threatening litigation on those patents.

### D.     Analyst Notes Included The Author's Opinion And Speculation

Abbott contends that statements in the analyst notes it cites by Prudential Equity Group's Larry Biegelsen and A.G. Edwards' Jan Wald were based solely on information provided to those analysts from J&J's Investor Relations group. (*See id.* at 20-21.)  **REDACTED**

---

[13]  Abbott also suggests that J&J made a point of identifying the patents-in-suit by number during its conversations with analysts. (*See id.* at 17.) Yet, the very document Abbott cites as support for this point demonstrates that the patent numbers were shared with only two analysts and possibly only in response to their specific requests for the numbers. (*See id.* Ex. 62, Defendants' Second Amended And Supplemental Interrogatory Response Ex. A at 1-2.)

**REDACTED**

E.    **Abbott Fabricates Exchanges Between J&J And Reporters**

Abbott flagrantly distorts the facts of two purported exchanges between members

of the J&J Corporate Communications group and reporters. (*See* D.I. 49 at 23.) Specifically,

Abbott claims that a J&J representative told a reporter from the New York Times that J&J had

certain intellectual property relating to drug-eluting stents and "one shouldn't assume [J&J]

shouldn't assert." (*See id.*) To the contrary, the J&J representative who authored the document

that Abbott cites as support for its contention specifically testified that the document summarized

a conversation internal to J&J that he had with a colleague, that the colleague made that

statement to him during that conversation, and that he did not have a recollection one way or the

other whether this statement was ever later communicated to a reporter — much less in that exact

fashion. (*See id.* Ex. 26, Leebaw Dep. at 30:4-47:22.)

Abbott takes even more liberties with a purported communication between J&J

and a Wall Street Journal Reporter. In a bold bit of brief writing sleight-of-hand, Abbott tries to

give the appearance that it is citing an excerpt from an email Q&A between a Wall Street Journal

Reporter and J&J. (*See id.* at 23.) After the "excerpt," Abbott makes the point that the coyness

of J&J's purported answers are apparent given the context of the questions they answer. (*See id.*)

Remarkably, given Abbott's presentation and its statement emphasizing context, there is no

evidence that a word-for-word exchange like the one it represents having taken place ever

occurred between a J&J representative and the WSJ reporter. What is cited on page 23 of Abbott's brief is *not* an excerpt from an email between J&J and the reporter or a transcript of a conversation, but it is a cut and paste job from two separate documents. One document is an email from the WSJ reporter to J&J's outside counsel posing the two questions listed. (*See id.* Ex. 41 & Ex. 26, Leebaw Dep. at 59:14-60:14.) The other document is an internal J&J email listing several bullet points that J&J *could* provide to the reporter "on background." (*See id.* Ex. 42.) J&J's corporate representative specifically testified that the internal email was *not* necessarily a point-by-point response to the reporter's questions. (*See id.* Ex. 26, Leebaw Dep. at 61:16-64:23.) Indeed, the bullet points in the internal email were never communicated to the reporter in written form. (*See id.* Ex. 62, Defendants' Second Supplemental Interrogatory Responses Ex. A at 8.) A J&J representative responded to the WSJ reporter by telephone, generally conveying information like that contained in the internal email. (*See id.* & Ex. 26, Leebaw Dep. at 70:6-14.) But, contrary to Abbott's misleading suggestion, a word-for-word account of the questions posed by the reporter and J&J's answers in that conversation does not exist – despite Abbott's attempt to convey a contrary impression. (*See id.* Ex. 26, Leebaw Dep. at 72:2-73:1.)

## CONCLUSION

Abbott desperately wanted to dictate the venue in which it would have to respond to claims that its XIENCE V product infringes Cordis patents. Knowing it would face suit when the Cordis-Asserted Patents eventually issued, it unjustifiably filed a declaratory judgment suit on three patents Cordis had not — and still has not — asserted. There was no justiciable controversy between the parties in September 2006 concerning the patents-in-suit. Therefore, the Court should (1) grant Defendants' motion to dismiss for lack of subject matter jurisdiction, and (2) deny all other pending motions as moot.

ASHBY & GEDDES

/s/ *Steven J. Balick*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmagure@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-2202

Dated: June 14, 2007
181566.1

20

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT LABORATORIES and ABBOTT
CARDIOVASCULAR SYSTEMS, INC.,

      Plaintiffs,

      v.

JOHNSON and JOHNSON, INC. and CORDIS
CORPORATION,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-613-SLR

**SUPPLEMENTAL DECLARATION
OF GALE RAFFIELD**

I, Gale Raffield, under penalty of perjury, declare:

1.      I am employed as a Legal Assistant/Paralegal at Robinson & Livelli in Newark, New Jersey. I have been employed continuously with Robinson & Livelli and its predecessor firms since 1981. Robinson & Livelli is counsel for Cordis Corporation on certain cases now pending in the District of New Jersey.

2.      On June 13, 2007, I submitted a declaration in this matter (the "June 13 Declaration").

3.      Exhibits F and G to the June 13 Declaration were Notices of Electronic Filing that made reference to June 11 in the text of the notices. As I explained in the June 13 Declaration, the complaint referenced there was filed shortly after midnight on June 12, not on June 11.

4.      I contacted the clerk's office to ask that the actual filing time and date be confirmed, and the clerk sent the letter attached as Exhibit A to this Declaration confirming that the complaint was filed on June 12.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Dated this 14th day of June 2007, at Newark, New Jersey.

Gale Raffield

2

Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### OFFICE OF THE CLERK
MARTIN LUTHER KING JR. FEDERAL BLDG & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NEW JERSEY 07101

WILLIAM T. WALSH
CLERK

**CAMDEN OFFICE**
MITCHELL H. COHEN U.S. COURTHOUSE
ONE JOHN F. GERRY PLAZA
FOURTH & COOPER STREETS, ROOM 1050
CAMDEN, NEW JERSEY 08101

**TRENTON OFFICE**
CLARKSON S. FISHER U.S. COURTHOUSE
402 EAST STATE STREET, ROOM 2020
TRENTON, NJ 08608

REPLY TO: <u>TRENTON</u> 

June 13, 2007

Donald A. Robinson, Esq.
Robinson & Livelli
Two Penn Plaza East
Newark, New Jersey 07105

Re: Cordis Corporation v. Abbott Laboratories
   07-2728 (JAP)

Dear Mr. Robinson:

   At your request, the filing records of the above-entitled case were reviewed to determine exactly when your office filed the Complaint. Our records reflect that the Complaint was filed at 12:03 A.M. on June 12, 2007. The filing date of this case and the docket entry of the Complaint were modified to reflect the date of 6/12/07 on which the filing process was completed

                         Sincerely,

                         WILLIAM T. WALSH
                              Clerk

                         by:
                         KENT MARSHALL
                         Deputy-In-Charge

WTW/km

# EXHIBIT 2

Westlaw.                                                                NewsRoom

1/26/06 CHISUN 55                                                       Page 1


1/26/06 Chi. Sun-Times 55
2006 WLNR 1408536

Chicago Sun Times (IL)
Copyright 2006 ProQuest Information and Learning Company; All Rights Reserved.

January 26, 2006


Section: Financial


Shot in arm for Abbott shares: Plan to buy Guidant's vascular business boosts stock
5.3%

Francine Knowles ; News

Shares of Abbott Laboratories got a boost Wednesday from word that Boston Sci-
entific won the battle for Guidant, paving the way for Abbott to quadruple its vas-
cular products business.

North Chicago-based Abbott's stock rose 5.3 percent, the biggest gain in more
than three years, despite reporting flat fourth- quarter earnings as Wall Street fo-
cused on the Guidant deal.

Boston Scientific beat out Johnson & Johnson for defibrillator maker Guidant with
a $27 billion offer, and as previously announced, Boston Scientific agreed to sell
Guidant's vascular business to Abbott for $4.6 billion, including $500 million in
milestone payments. The purchase leaves Abbott positioned to become a big player in
the vascular device market and helps Boston Scientific address anti-trust con-
cerns.

Abbott's shares closed at $42.17, up $2.11 on the news. The stock fell 15 percent
last year amid increased generic competition and setbacks in its pipeline.

"It's all about the deal," said analyst Phil Nalbone of RBC Capital Markets.
"[Vascular] is a high-profile, high-growth business and . . . it's important in
terms of [Abbott's] mix of business."

Before the Guidant deal, Wall Street "was highly skeptical that Abbott could
maintain double-digit earnings growth in the out years," said RBC Capital Markets
analyst Phil Nalbone. "Now the operating assumption is that the vascular deal virtu-
ally guarantees Abbott the opportunity to sustain that pace of growth in the 2007-
2009 time frame."

Abbott's vascular business had 2005 sales of $253 million. Guid- ant's vascular
business generated more than $1 billion in revenues in 2004.

With the acquisition, Abbott gains a broad portfolio of intellectual property in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cluding heart stent designs, among them Guidant's next generation Xience drug-coated stent.

Abbott is also developing its own drug-coated stent, ZoMaxx, to compete in the $7.5 billion vascular device business.

The stents are metal mesh devices inserted into clogged arteries to clear them and prop them open.

Guidant said Tuesday it won recommendation for European clearance of Xience, and the product might be cleared for sale in the second quarter. Xience might gain as much as one-third of the $1.5 billion market for drug-coated stents in Europe within two years, said S.G. Cowen & Co. analyst Dhulsini de Zoysa.

"This acquisition complements our strategy in medical products to build market-leading positions in higher-margin, high-growth, innovation-driven businesses, and it complements our current Abbott vascular business," Abbott CEO Miles White told analysts.

Abbott reported fourth-quarter earnings of $976 million, or 63 cents per share, up 0.2 percent. Excluding special items, Abbott said earnings per share were 76 cents, matching the average estimate of analysts surveyed by Thomson Financial.

Abbott said last month it expected special items of 20 cents per share in the quarter because of actions related to its previously announced restructuring, gross margin improvement efforts and tax expense connected with its decision to repatriate $3.7 billion of foreign earnings via the American Jobs Creation Act. Revenues were $6 billion, up 7 percent.

Abbott's rheumatoid arthritis drug Humira generated $441 million in sales in the quarter, a 62 percent increase. The drug generated $1.4 billion in sales for the year, $100 million more than Abbott had forecast. Abbott expects 2006 sales of the drug of more than $1.9 billion.

Worldwide diagnostic sales were $989 million in the quarter up 6.6 percent. U.S sales were $322 million, up 8.1 percent.

For the year, net earnings were $3.37 billion, up 4.2 percent. Earnings per share were $2.16, up 4.9 percent. Net sales were $22.3 billion, up 13.5 percent.

Abbott forecast first-quarter earnings per share of 62 cents to 64 cents, excluding special items and stock compensation expense.

It confirmed 2006 earnings per share guidance of $2.66 to $2.72 per share.

---- INDEX REFERENCES ----

COMPANY: RBC INC; RBC DOMINION SECURITIES INC; ABBOTT LABORATORIES; GUIDANT CORP; JOHNSON AND JOHNSON

NEWS SUBJECT:  (Business Management (1BU42); Major Corporations (1MA93); Corporate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Strategy & Strategic Planning (1XO03); Business Strategy (1BU97))

INDUSTRY: (Science & Engineering (1SC33); Theoretical Analysis (1TH79); Pharmaceuticals & Biotechnology (1PH13); Business Theory (1BU14); Manufacturing (1MA74))

REGION: (Massachusetts (1MA15); USA (1US73); Americas (1AM92); New England (1NE37); North America (1NO39))

Language: EN

OTHER INDEXING: (ABBOTT; ABBOTT LABORATORIES; AMERICAN JOBS; GUIDANT; JOHNSON JOHNSON; RBC; RBC CAPITAL MARKETS) (Guid; Miles White; Phil Nalbone; S.G. Cowen; Wall Street; ZoMaxx)

PRODUCT: Pharmaceutical Preparation Mfg; Toilet Preparation Mfg; Analytical Laboratory Instrument Mfg; Surgical & Medical Instrument Mfg; In-Vitro Diagnostic Substance Mfg; Medicinal & Botanical Mfg; Surgical & Medical Instrument Mfg; Research & Development In The Physical & Engrg Sciences; Surgical & Medical Instrument Mfg

NAICS CODE: 325412; 325620; 334516; 339112; 325413; 325411; 339112; 541710; 339112

TICKER SYMBOL: ABT; BSX

EDITION: Final

Word Count: 800
1/26/06 CHISUN 55
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

pveith@sidley.com
(312) 853-4718

| | | |
|---|---|---|
| BEIJING | GENEVA | SAN FRANCISCO |
| BRUSSELS | HONG KONG | SHANGHAI |
| CHICAGO | LONDON | SINGAPORE |
| DALLAS | LOS ANGELES | TOKYO |
| FRANKFURT | NEW YORK | WASHINGTON, DC |

FOUNDED 1866

March 9, 2007

**By E-Mail and U.S. Mail**

Mr. Leland G. Hansen
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661

     Re:    Abbott Laboratories et al. v. Johnson & Johnson et al.; No. 06-613-SLR (D. Del.)

Dear Leland:

    This letter sets forth the parties' understanding and agreement concerning certain discovery issues that have been the subject of discussion in recent weeks. Please indicate your agreement to the following by countersigning this letter in the space provided at the end.[1]

**State of Mind**

    The parties stipulate that the Court should decide the pending motion by determining whether Plaintiffs had a reasonable apprehension of litigation based on an objective analysis of facts relating to the external statements and actions of the parties, and not based on facts relating to their subjective states of mind, intent, internal analyses or preparations, or private statements or conduct concerning the Wright & Falotico patents. The parties agree to conduct discovery accordingly, meaning that they agree for present purposes (that is, for purposes of the motion to dismiss) that they will not take discovery directed to any party's state of mind, intent, internal analyses or preparations, or private statements or conduct concerning the the patents.

    The parties are limiting discovery as indicated above based on their mutual expectation that the other will not rely on its own state of mind, intent, internal analyses or preparations, or private statements or conduct in arguing its position on the motion to dismiss, and each party reserves the right to ask the Court to enforce that expectation by disregarding

---

[1]  The only difference between the following text and the text in the emails we exchanged was (1) to add language concerning scheduling, and (2) to make minor changes to the language of the letter that do not affect the substance (such as eliminating certain pronouns, converting the the tense of some language – for example, from "The parties *will* stipulate ..." to "The parties stipulate ...").

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships



Mr. Leland G. Hansen
March 9, 2007
Page 2

any reliance by the other party on its own state of mind, intent, internal analyses or preparations, or private statements or conduct.

## History of Litigation

Plaintiffs will provide Defendants with a list of lawsuits in the field of coronary angioplasty, stents, and stent delivery systems to which JNJ/Cordis has been a party. With respect to cases listed, Plaintiffs will indicate whether they need additional information (in the form of documents or otherwise) as to (a) whether JNJ/Cordis moved for preliminary injunctive relief; and (b) when the accused products were launched, and Defendants will supply that information if it is in their possession, custody, or control.

Once Defendants receive the initial list of cases from Plaintiffs, Defendants will elect either (1) to agree not to make reference to other lawsuits in response to any arguments Plaintiffs make in response to the motion to dismiss concerning Defendants litigation history; or (2) identify and provide the requested information (including copies of complaints) for all other lawsuits in the field coronary angioplasty, stents, and stent delivery systems in which JNJ/Cordis has asserted claims in the last 10 years.

You indicated you would ask your client if it would stipulate that as of the date it filed this lawsuit it was not aware of JNJ/Cordis having been granted a preliminary injunction preventing another party from making or selling any product in the identified field.

The parties are limiting discovery as indicated above based on their mutual expectation that the other will not make reference to litigation to any cases involving JNJ/Cordis with the exception of cases listed by Plaintiffs on their initial list and/or on Defendants' supplemental list (should Defendants choose to provide the same).

## Wright & Falotico/Valla

Defendants will produce the file histories for any pending patent applications on which Defendants have filed petitions to make special referencing any Abbott product. (Defendants also agree to inquire into the burden of proving the file histories for the patents-in-suit, and to do so if it is not burdensome.) Defendants also agreed to produce Maurice Valla for a deposition of limited scope. The deposition's subject matter will be limited to matters in the file histories (including the petitions to make special) that are relevant to the issue to be decided in the motion to dismiss.

By agreeing to limits on Valla's deposition, Plaintiffs are not waiving the right to request Valla's deposition later in the event the case survives the motion to dismiss.



Mr. Leland G. Hansen
March 9, 2007
Page 3

## Antitrust

Plaintiffs agree to rely on information in the public record in addressing any arguments made in the motion to dismiss relating to antitrust issues surrounding the Guidant transaction, <u>provided</u> Defendants do not rely on non-public information in addressing those same issues in reply. (In other words, consistent with the approach on some of the issues above, the parties will limit themselves to information that was publicly known and therefore potentially relevant to the "reasonable apprehension" inquiry.)

## Confidentiality Agreement

Without waiving their right to revisit the issue in the future, Plaintiffs agree in principle with Defendants that the confidentiality agreement(s) entered between and among the parties during negotiations attendant to the Guidant transaction should foreclose discovery of communications among the parties falling under those agreements.

## Reservation of Rights

By agreeing as set forth above, the parties reserve their rights and specifically do not waive any applicable objections, privileges, etc.

## Schedule

The parties agree to adjust the current schedule for briefing the motion to dismiss to account for the fact that discovery on the motion will not be completed as quickly as originally anticipated, and will approach the Court with a request to enter a stipulation reflecting a new schedule at an appropriate time.

Very truly yours,

Paul E. Veith

Agreed:

Leland G. Hansen

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT LABORATORIES and ADVANCED
CARDIOVASCULAR SYSTEMS, INC.,

        Plaintiffs,

        vs.

JOHNSON and JOHNSON, INC. and CORDIS
CORPORATION,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-613-SLR

## DEFENDANTS' FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFFS'FIRST SET OF INTERROGATORIES RELATING TO SUBJECT MATTER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 33, Defendants Johnson & Johnson ("J&J") and Cordis Corporation ("Cordis")  (collectively "Defendants") provide the following supplemental responses to the interrogatories of Abbott Laboratories ("Abbott") and Advanced Cardiovascular Systems, Inc. ("ACS") (collectively "Plaintiffs") Nos. 1, 2, and 3 as follows:

## GENERAL OBJECTIONS

Defendants incorporate by reference all relevant General Objections set forth in Defendants' Response to Plaintiffs' First Set of Interrogatories Relating to Subject Matter Jurisdiction.  Subject to these general objections, and subject to additional objections made to the specific requests below, Defendants answer as follows:

## RESPONSES:

### INTERROGATORY NO. 1:

For each communication before September 29, 2006, between J&J and any other entity, including any communication between J&J and media, shareholders, investors, analysts, the FTC, the Patent Office, Boston Scientific, Guidant or Abbott, regarding (1) any of the Wright and Falotico patents and their connection to Guidant or Abbott, (2) XIENCE V or everolimus and their connection to any J&J intellectual property, or (3) preventing XIENCE V or any everolimus eluting or "-olimus" eluting stent from being marketed or sold, describe the following in detail:

  a. the individual(s) involved in the communication on behalf of J&J and on behalf of the other entity;

  b. the role of each such individual in connection with the communication;

  c. the date, time, place, duration and means of the communication;

  d. the nature of the communication, including whether the communication was oral or written;

  e. the substance and content of the communication;

  f. the bases for J&J's statement(s) regarding (1) any of the Wright and Falotico patents and their connection to Guidant or Abbott, (2) XIENCE V or everolimus and their connection to any J&J intellectual property, or (3) preventing XIENCE V or any everolimus eluting or "-olimus" eluting stent from being marketed or sold; and

  g. any documents and things that relate to the communication, including drafts, records and scripts.

### SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving either their general or specific objections, Defendants hereby incorporate by reference their entire response to Interrogatory No. 1 provided on February 9, 2007 in Defendants' Response to Plaintiff's First Set of Interrogatories Relating to Subject Matter Jurisdiction. Defendants also incorporate by reference the declarations of Stanley Panasewicz, Louise Mehrotra, and Jeffrey Leebaw that were submitted in support of their motion to dismiss. Additionally, Exhibit A attached hereto identifies persons with whom Johnson & Johnson representatives communicated concerning the subject matter referenced in sub-section (f) above. This list reflects Defendants' good faith attempt to list all outside parties with whom discussions concerning the referenced subject matter were undertaken. J&J has provided documents at JJ 4857 and 4858 that contain names of entities (analysts, overlap holders of stock,

and arbitrage and hedge funds) with whom some communication may have occurred in the January 2006 time frame. J&J's representatives did not have a specific recollection of communicating about the referenced subject matter with all of these entities, but cannot say with absolute certainty that no such communications took place. J&J's Investor Relations Department, and specifically Louise Mehrotra and Stanley Panasewicz, fielded many unsolicited calls from the investment community concerning the Guidant transaction. The list provided as Exhibit A contains reference to communications of which J&J personnel had some recollection or notes. J&J cannot rule out the possibility that other analysts contacted J&J and inquired about the referenced subject matter. To the extent Defendants obtain additional information responsive to this request as a result of any additional investigation, they will supplement their answer to this interrogatory.

Pursuant to an agreement-in-principle (as yet not finally memorialized) between the parties concerning certain discovery disputes, Defendants do not believe they are required at this time to supply information as to communications with the FTC (with the exception of public record materials). Public record materials have been or will be produced. Likewise, certain J&J communications with the patent office were produced on March 9, 2007, pursuant to that agreement-in-principle.

## INTERROGATORY NO. 2:

For each communication before September 29, 2006, between J&J and any other entity, including any communication between J&J and media, shareholders, investors, analysts, the FTC, the Patent Office, Boston Scientific, Guidant or Abbott, regarding the intellectual property landscape for J&J's or Boston Scientific's bid(s) for Guidant, describe the following in detail:

      a.    the individual(s) involved in the communication on behalf of J&J and on behalf of the other entity;

      b.    the role of each such individual in connection with the communication;

      c.    the date, time, place, duration and means of the communication;

      d.    the nature of the communication, including whether the communication was oral or written;

e.    the substance and content of the communication;

f.    the bases for J&J's statement(s) regarding the intellectual property landscape for J&J's or Boston Scientific's bid(s) for Guidant; and

g.    any documents and things that relate to the communication, including drafts, records and scripts.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2

Subject to and without waiving either their general or specific objections, Defendants hereby incorporate by reference their entire response to Interrogatory No. 2 provided on February 9, 2007 in Defendants' Response to Plaintiff's First Set of Interrogatories Relating to Subject Matter Jurisdiction.  Defendants further incorporate by reference Defendants' Supplemental Response to Interrogatory No. 1 contained herein.  Defendants' investigation continues, and Defendants reserve their right to further supplement their response to this interrogatory.

## INTERROGATORY NO. 3:

For each script that was prepared by or on behalf of J&J in connection with its bid(s) for Guidant, including the script submitted as Exhibit F in connection with the Motion to Dismiss, describe the following in detail:

a.    the preparation, analysis and approval of the script, including provisions relating to the Wright and Falotico patents and their connection with Guidant or Abbott;

b.    the individual(s) substantively involved in preparing, analyzing or approving the script and the role of each such individual;

c.    any steps taken so as not to suggest or imply that any decision had been reached on suing Abbott for patent infringement; and

d.    any document and things that relate to the script, including drafts.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

Subject to and without waiving either their general or specific objections, Defendants hereby incorporate by reference their entire response to Interrogatory No. 3 provided on February 9, 2007 in Defendants' Response to Plaintiff's First Set of Interrogatories Relating to Subject Matter Jurisdiction.

It is J&J's ordinary practice to prepare a "script" or "Q&A" document (sometimes referred to as "talking points") in advance of the announcement of significant licensing or acquisition transactions involving the company. The purpose of the preparation of the "script" is to provide J&J's corporate spokespersons (typically their Corporate Communications and/or Investor Relations staff and other executive staff) with information that accurately reflects the corporation's official position on subjects of potential inquiry. J&J's Investor Relations Department typically prepares these "scripts" by first drafting potential questions (and possibly drafting preliminary answers) and then seeking the input of others at J&J in drafting answers to be incorporated in a final document.

In connection with the Guidant transaction, "scripts" were prepared on several occasions – in late 2004 when J&J's agreement to acquire Guidant was announced, in November 2005 when J&J and Guidant announced that the agreement had been renegotiated, and in January 2006 when J&J and Boston Scientific were competing bidders for Guidant. Stanley Panasewicz of J&J's Investor Relations Department drafted the version of the script that was used in January 2006 that contained a Question and Answer related to DES patents. The January 16, 2006 version of that script was produced as JJ 4790-4810, although other versions and/or copies also appear in Defendants' production (including a draft circulated on or about January 12, 2006).

In creating the January 16, 2006 version, Panasewicz incorporated comments and suggestions from a wide range of individuals from various disciplines within the company, including counsel. Most of the contributors are identified on the document itself. J&J corporate spokespersons are expected to adhere to the script in communicating with third parties on any of the subjects addressed therein. The script is not approved by any particular person, *per se*, but

J&J's Investor Relations staff determines a script is suitable for use after it has circulated and received input from others within the company.

                                        ASHBY & GEDDES

                                        Steven J. Balick (I.D. # 2114)
                                        John G. Day (I.D. # 2403)
                                        Lauren E. Maguire (I.D. # 4261)
                                        500 Delaware Avenue, 8th Floor
                                        P.O. Box 1150
                                        Wilmington, DE 19899
                                        (302) 654-1888
                                        sbalick@ashby-geddes.com
                                        jday@ashby-geddes.com
                                        lmaguire@ashby-geddes.com

                                        *Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Paul E. Veith
Russell E. Cass
Laura H. Rankin
Laura L. Kolb
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Dated: March 12, 2007
178819.1

# EXHIBIT A

**EXHIBIT A – RESPONSE TO INTERROGATORY #1**

| Third-Party | JNJ Participant(s) | Date/Means | Substance | Documents[1] |
|---|---|---|---|---|
| Biegelson, Larry (Prudential Securities) | Stanley Panasewicz | On or about January 20, 2006 (via telephone) | Panasewicz spoke to Biegelson as part of J&J's effort to reach out to financial analysts to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid. Among the reasons discussed, Panasewicz explained that Boston Scientific's offer was inferior to J&J's because Abbott would not receive rights to J&J's drug-eluting stent patents (including U.S. Patent No. 6,585,764 to Wright and No. 6,776,796 to Falotico), and that this could result in delays while regulatory authorities evaluated whether Abbott's DES business was viable without those patents. Panasewicz believes he provided these patent numbers to Biegelson, possibly in response to Biegelson asking him to do so. In his conversation with Biegelson, Panasewicz believes he confined his comments on the subject of patents in substance to that which appeared in a "script" (in "Q&A" format) (an unredacted copy is provided at JJ 4790-4810) that was prepared for internal use at J&J to provide guidance for those making public comments to | JJ 4790-4810 JJ 272-273 |

1 Johnson & Johnson may have produced multiple copies of some of the documents identified in this column, but has not cited every instance of each document in this table.

| | | | | |
|---|---|---|---|---|
| Dodds, Matthew (Citigroup) (Efrem Kamen of Citigroup may have also participated in the communications with Dodds) | Stanley Panasewicz | On or about January 12, 2006; possibly a second call during week of January 16, 2006 (via telephone) | analysts, media or the like. | JJ 4790-4810 JJ 272-273 JJ 4859-4879 |
| | | | Panasewicz believes he spoke to Dodds initially on or about January 12, either in response to a call from Dodds or as part of J&J's effort to reach out to financial analysts to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid. Panasewicz may have spoken again to Dodds again later during the week of January 16, but is not certain he did so. In the January 12 call, Panasewicz and Dodds discussed J&J's drug-eluting stent patents and Panasewicz explained that if Guidant closed a transaction with Boston Scientific instead of J&J, Abbott would not receive rights to J&J's drug-eluting stent patents (including U.S. Patent No. 6,585,764 to Wright and No. 6,776,796 to Falotico), and that this could result in delays while regulatory authorities evaluated whether Abbott's DES business was viable without those patents. Panasewicz believes he provided these patent numbers to Dodds in response to Dodds asking him to do so. Panasewicz believes any of his comments to Dodds on the subject of patents was consistent in substance with the information that was included in the "script" (in "Q&A" format) that was prepared for internal use at J&J to provide guidance for those making public | |

3

| | | | comments to analysts, media or the like. | |
|---|---|---|---|---|
| Faulkner, Rob (JMP Securities) | Stanley Panasewicz | Week of January 16, 2006 (via telephone) | Panasewicz believes he spoke to Faulkner as part of J&J's effort to reach out to financial analysts to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid. He does not recall the conversation in detail, but believes the subject of I&J's DES patents was mentioned based on notes of the call. Panasewicz believes he confined any of his comments on the subject of patents to the substance of that which appeared in a "script" (in "Q&A" format) that was prepared for internal use at J&J to provide guidance for those making public comments to analysts, media or the like. | JJ 4790-4810 JJ 272-273 |
| Feder, Barnaby (New York Times) | Jeffrey Leebaw, Susan Odenthal, Dominic Caruso | January 19, 2006 (via telephone) | Leebaw, Odenthal, and Caruso gave a "background" interview to Feder concerning J&J's belief that its bid for Guidant was superior to Boston Scientific's bid and the obstacles that Boston Scientific might face in getting its deal approved. In that context, there was some discussion of J&J's patents relating to DES, and Feder sent an email to Leebaw after the call following up on that subject. Leebaw believes he and Odenthal spoke to Feder in a follow-up call and that the discussion tracked in substance notes Leebaw had made for himself (produced as JJ 2811). | JJ 2318 JJ 2469 JJ 2811 JJ 4849-4851 |

| | | | |
|---|---|---|---|
| Goldstein, Avram (Bloomberg News Service) | Jeffrey Leebaw | January 20, 2006 (via telephone) | Leebaw received an inquiry via email from Goldstein (JJ 72) inquiring about J&J's "lobbying effort on Wall Street." Leebaw did not comment, as Goldstein reported in a subsequent article. | JJ 72 JJ 74 JJ 2460-2463 JJ 2473-2476 JJ 4815 JJ 4842-4848 |
| Hensley, Scott (Wall Street Journal) | Jeffrey Leebaw, Susan Odenthal, Nicholas Valeriani | Week of January 16, 2006 (via telephone) | Leebaw, Odenthal, and Valeriani gave a "background" interview to Hensley concerning J&J's belief that its bid for Guidant was superior to Boston Scientific's bid and the obstacles that Boston Scientific might face in getting its deal approved. Neither Leebaw nor Odenthal recall patent issues being discussed with Hensley. | |
| Hopkins, Bob (Lehman Bros.) | Louise Mehrotra, Nicholas Valeriani, Dominic Caruso* <br><br> * Stanley Panasewicz may have participated, but cannot recall for sure | Week of January 9 or 16, 2006 (via telephone) | Mehrotra believes she, Valeriani, and Caruso (and possibly Stanley Panasewicz) spoke to Hopkins as part of J&J's effort to reach out to financial analysts to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid. She does not recall the conversation in any detail, but cannot rule out the possibility that the subject of J&J's DES patents was mentioned. Mehrotra believes the J&J representatives confined any of their comments on the subject of patents in substance to that which appeared in a "script" (in "Q&A" format) that was prepared for internal use at J&J to provide | JJ 4790-4810 JJ 272-273 |

4

| | | | guidance for those making public comments to analysts, media or the like. | JJ 4790-4810 |
|---|---|---|---|---|
| Hughes, Douglas (Guidant) | Louise Mehrotra | Week of January 9 or 16, 2006 (via telephone) | Mehrotra believes the substance of the information later included in the "script" concerning J&J's patents on DES was communicated to Hughes of Guidant's investor relations group. Mehrotra does not recall the specifics of the communication with Hughes. | JJ 4790-4810 |
| Kamp, Jon (Dow Jones) | Jeffrey Leebaw | January 26, 2006 (email) | Kamp made an inquiry as reflected in JJ 4812. Leebaw did not comment in response. | JJ 4811-4812<br>JJ 4813-4814 |
| Levy, Tao (Deutsche Bank) | Louise Mehrotra or Stanley Panasewicz | Week of January 16, 2006 (via telephone) | Based on documents produced as JJ 272-273 and JJ 4857, either Mehrotra or Panasewicz likely spoke to Tao Levy as part of J&J's effort to reach out to financial analysts to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid. Neither Mehrotra nor Panasewicz recalls the substance of the conversation in any detail, but they cannot rule out the possibility that the subject of J&J's DES patents was mentioned. Both Mehrotra and Panasewicz believe any comments on the subject of patents they made to analysts was confined in substance to that which appeared in a "script" (in "Q&A" format) that was prepared for internal use at J&J to provide guidance for those | JJ 4790-4810<br>JJ 272-273 |

| | | | | |
|---|---|---|---|---|
| | | | making public comments to analysts, media or the like. | |
| Steenhuysen, Julie (Reuters) | Marc Monseau | January 20, 2006 (via telephone) | Steenhuysen called seeking information about J&J's "patent situation" and about J&J's going "behind the scenes" to discuss the Guidant transaction. She was following up after having read an analyst's report. Monseau recalls speaking to Steenhuysen, and although he does not recall the substance of the communication entirely he does not believe Steenhuysen pushed for any information on the subject of patents, and recalls that she focused on J&J's "behind the scenes" activities. | JJ 4821 JJ 2312-2313 JJ 4852 |
| Storch, Nate (Highbridge Capital) | Louise Mehrotra | Week of January 16, 2006 (via telephone) | Mehrotra recalls fielding a call from Storch (whom she believes worked for a hedge fund) on the subject of the Guidant transaction. She does not recall the details of that conversation, but she believes Storch had read an analyst report commenting on J&J's DES patents and inquired about the same. Mehrotra believes any comments she made in response to Storch were confined in substance to that which appeared in a "script" (in "Q&A" format) that was prepared for internal use at J&J to provide guidance for those making public comments to analysts, media or the like. | JJ 4790-4810 |
| Wald, Jan David | Louise Mehrotra | On or about | Mehrotra spoke to Wald as part of J&J's | JJ 4790-4810 |

6

| | | | | |
|---|---|---|---|---|
| (AG Edwards) | | January 17, 2006 (via telephone) | effort to reach out to financial analysis to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid.  Among other things discussed during the call, Mehrota told Wald that if the Boston Scientific bid prevailed, Abbott would not receive rights to J&J's patents on DES, and that this could result in delays while regulatory authorities evaluated whether Abbott's business was viable without these patent rights.  Mehrota believes she confined any of her comments on the subject of patents in substance to that which appeared in a "script" (in "Q&A" format) that was prepared for internal use at J&J to provide guidance for those making public comments to analysis, media or the like. | JJ 272-273 JJ 2717-2728 |
| Weakley, Ken* (UBS Warburg) * or another representative of his firm | Louise Mehrotra or Stanley Panasewicz | Week of January 16, 2006 (via telephone) | Based on documents produced as JJ 272-273 and JJ 4857, either Mehrotra or Panasewicz likely spoke to Weakley or someone else from his firm as part of J&J's effort to reach out to financial analysis to explain why J&J believed its bid for Guidant was superior to Boston Scientific's bid.  Neither Mehrotra nor Panasewicz recalls the substance of the conversation in detail, but they cannot rule out the possibility that the subject of J&J's DES patents was mentioned.  Both Mehrotra and Panasewicz believe any comments on the subject of patents they | JJ 272-273 |

CHI 3759274v.2

8

| Westphal, Sylvia (Wall Street Journal) | Mark Monseau | January 19, 2006 (via telephone) | Monseau spoke to Westphal following her inquiry. Monseau explained to Westphal that Guidant did not have rights to the J&J DES patents and would not have those rights unless it closed the transaction with J&J. Westphal told Monseau other sources had told her that intellectual property was not any kind of obstacle to a Guidant/Boston Scientific transaction. Monseau recalls that Westphal was trying to understand how Guidant was evaluating the value of each offer, and was trying to determine if Guidant was considering patent issues in that evaluation. Monseau does not believe Westphal followed up their conversation by writing any story on the subject of the communication. | JJ 2319-2320 JJ 2848-2851 JJ 2464-2466 JJ 2470-2472 JJ 4823-4839 |
|---|---|---|---|---|
| | | | made to analysts was confined in substance to that which appeared in a "script" (in "Q&A" format) that was prepared for internal use at J&J to provide guidance for those making public comments to analysts, media or the like. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of March, 2007, the attached **NOTICE OF**

**SERVICE** was served upon the below-named counsel of record at the addresses and in the

manner indicated:

Frederick L. Cottrell, III, Esquire                                    <u>HAND DELIVERY</u>
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801

Edward A. Mas, II, Esquire                                      <u>VIA FEDERAL EXPRESS</u>
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, IL  60661


/s/ *John G. Day*
_____
John G. Day

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT LABORATORIES and          )
ADVANCED CARDIOVASCULAR          )
SYSTEMS, INC.,                   )
                                 )
             Plaintiffs,         )
                                 )          C.A. No. 06-613-SLR
         v.                      )
                                 )
JOHNSON AND JOHNSON, INC. and    )
CORDIS CORPORATION,              )
                                 )
             Defendants.         )

## NOTICE OF SERVICE

The undersigned hereby certifies that on the 12th day of March, 2007, **DEFENDANTS'**

**FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF**

**INTERROGATORIES RELATING TO SUBJECT MATTER JURISDICTION** was served

upon the following counsel of record at the address and in the manner indicated:

Frederick L. Cottrell, III, Esquire                    HAND DELIVERY
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801

Edward A. Mas, II, Esquire                    VIA FEDERAL EXPRESS
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, IL  60661

ASHBY & GEDDES

/s/ *John G. Day*

_____
Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Lauren E. Maguire (I.D. # 4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Laura L. Kolb
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Dated: March 12, 2007
174107.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of March, 2007, the attached **NOTICE OF**

**SERVICE** was served upon the below-named counsel of record at the addresses and in the

manner indicated:

Frederick L. Cottrell, III, Esquire                                    HAND DELIVERY
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

Edward A. Mas, II, Esquire                                    VIA FEDERAL EXPRESS
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, IL 60661


/s/ *John G. Day*
_____
John G. Day

**Discovery Documents**

1:06-cv-00613-SLR Abbott Laboratories et al v. Johnson and Johnson Inc. et al
PATENT

**U.S. District Court**

**District of Delaware**

**Notice of Electronic Filing**

The following transaction was entered by Day, John on 3/12/2007 at 5:28 PM EDT and filed on
3/12/2007
**Case Name:** Abbott Laboratories et al v. Johnson and Johnson Inc. et al
**Case Number:** 1:06-cv-613
**Filer:** Cordis Corporation
Johnson and Johnson Inc.
**Document Number:** 35

**Docket Text:**
NOTICE OF SERVICE of First Supplemental Response to Plaintiffs' First Set of Interrogatories
Relating to Subject Matter Jurisdiction by Johnson and Johnson Inc., Cordis Corporation.(Day, John)

**1:06-cv-613 Notice has been electronically mailed to:**

Steven J. Balick    sbalick@ashby-geddes.com, dfioravanti@ashby-geddes.com, jday@ashby-geddes.com, lmaguire@ashby-geddes.com, mkipp@ashby-geddes.com, nlopez@ashby-geddes.com, rgamory@ashby-geddes.com, tlydon@ashby-geddes.com

Christopher J. Buchko    cbuchko@mhmlaw.com

Frederick L. Cottrell , III    cottrell@rlf.com, garvey@rlf.com

John G. Day    jday@ashby-geddes.com, dfioravanti@ashby-geddes.com, dharker@ashby-geddes.com, lmaguire@ashby-geddes.com, mkipp@ashby-geddes.com, nlopez@ashby-geddes.com, rgamory@ashby-geddes.com, sbalick@ashby-geddes.com, tlydon@ashby-geddes.com

Sandra A. Frantzen    sfrantzen@mhmlaw.com

Anne Shea Gaza    gaza@rlf.com, innis@rlf.com

Leland G. Hansen    lhansen@mhmlaw.com

Lauren E. Maguire    lmaguire@ashby-geddes.com

Edward A. Mas , II    emas@mhmlaw.com

**1:06-cv-613 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/12/2007] [FileNumber=356145-0]
[4db17943658e1e5b6ba56c8db89ee37a13472d1455e6ecc7192ec7d124696e3edadf
fe7a820846285c34dba63e40e4681c267c10724ca08303f075be7b29a9be]]

EXHIBIT 5

**REDACTED**